IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRY GRANT FRYE,

           Petitioner,                      No. CIV S-99-0628 LKK KJM

     vs.                                DEATH PENALTY CASE

JAMES STOKES,
Acting Warden of San Quentin
State Prison,

           Respondent.             ORDER

_____/

        Petitioner's July 19, 2004 Motion for Evidentiary Hearing came on for hearing October 11, 2005 before the undersigned.  Tim Schardl and Jennifer Corey appeared for petitioner.  Wanda Hill Rouzan appeared for respondent.  Following the hearing the parties filed supplemental briefing, as directed by the court in March 2006.  The matter was submitted upon the filing of the last supplemental brief on June 12, 2006.  Upon review of the motion and the documents in support and opposition, upon hearing the arguments of counsel, and good cause appearing therefor, the court finds and orders as follows.

/////

/////

/////

1

BACKGROUND FACTS[1]

I. Guilt Phase

    A. Prosecution's Case

        The prosecution's chief witness, Jennifer Warsing, testified under a grant of immunity.  Warsing first met petitioner in a Sacramento bar in April 1984 while she was separated from her husband of many years.  A romantic relationship between Warsing and petitioner quickly developed, and, in early May 1984, the couple moved in together in an apartment outside of Sacramento.  On several occasions during the time they lived together, petitioner assaulted Warsing.  Petitioner and Warsing returned to Sacramento in December 1984 or January 1985, and resided together at the River City Motel.  Petitioner worked at a construction job next door to the motel.

        Rick Evans worked with petitioner at the construction site and socialized with him outside of work.  Evans testified he and petitioner discussed the prospect of quitting their jobs and growing marijuana for profit instead.  Evans had access to a gold mining claim in Amador County that members of his family had worked for many years.  In April 1985, petitioner and Evans quit their jobs to pursue the marijuana venture. With approximately $500 between them, they purchased camping equipment and other supplies.  The next day, a group comprised of petitioner, Warsing, Evans and his girlfriend, and Warsing's adult son drove to the mining claim property in Amador County.  In addition to the camping gear and supplies they had purchased, petitioner and Evans brought along marijuana seeds, a 12-gauge shotgun, a .22-caliber semiautomatic rifle and ammunition.

        A quarter-mile down the hill from the group's campsite was a cabin occupied by an older couple, Robert and Lucille (Jane) Brandt, who worked a gold mining claim with their

---

[1] This overview of the facts is derived from the California Supreme Court's findings of facts, which are presumed to be correct, 28 U.S.C. § 2254(e)(1), and from this court's independent review of the state court record.

son, Bobby.  Evans testified that before setting up camp and sowing the marijuana seeds, he sought and obtained the Brandts' permission for the group to camp on the property.  The campsite had no running water or electricity, and meals were prepared over an open campfire.  Although petitioner and Warsing had a car when they moved to the campsite, they sold it to Warsing's son who left the group after a couple of days.  Evans and his girlfriend returned to Sacramento a week or two later, leaving only petitioner and Warsing at the campsite.  Before Evans departed, it was decided Evans would return to the property once or twice a week with food and supplies, and petitioner would tend the marijuana plants.

About a week after moving to the campsite, Warsing met the Brandts and became friendly with them.  Warsing would occasionally accompany Jane Brandt in the Brandts' 1982 Lincoln Towncar to run errands in town.  On these excursions, Warsing became aware that Mrs. Brandt carried an unusually large amount of cash with her to pay for goods and services.  Rick Evans testified petitioner and Warsing mentioned the Brandts' money during one of his weekly visits to the campsite.  Petitioner also showed Evans a small glass container filled with about a quarter-inch of gold he had scraped from the bucket of the front-end loader used by the Brandts in their mining operation.

On the morning of May 14, 1985, petitioner and Warsing walked from their campsite down the hill to the Brandts' cabin.  Warsing had agreed to accompany Mrs. Brandt to the dentist's office in case she did not feel well following her dental procedure.  Sometime during the late morning of May 14, an acquaintance of the Brandts, Ron Wilson, drove to the cabin. Wilson occasionally worked the Brandts' mining claim with them, receiving a percentage of the gold that was extracted.  Seeing the Lincoln gone, Wilson drove by the cabin without stopping, and proceeded up another road.  After investigating a potential mining area, Wilson hiked to the upper part of the claim, in the vicinity of petitioner's campsite.  As Wilson headed back down towards the cabin to see if anyone had returned, he met petitioner walking up the road.  Petitioner showed Wilson the marijuana-growing operation.  A short time later, Wilson drove with

1   petitioner into town where Wilson bought them lunch and a couple of beers.  After lunch, Wilson

2   and petitioner made several more stops.  Wilson bought a carton of cigarettes for petitioner, and

3   two 12-packs of beer.  Wilson also retrieved several flats of marijuana seedlings from his

4   girlfriend's residence for petitioner to tend for him, and picked up some watering equipment from

5   a friend.  During this time, petitioner and Wilson each consumed several more beers.

6            Petitioner and Wilson arrived back at the mining claim about 3:00 in the

7   afternoon, and went up the hill to the campsite.  Mrs. Brandt and Warsing arrived back at the

8   cabin some time later.  When Warsing got out of the car, Mrs. Brandt asked her to come down

9   for coffee later in the evening.  Warsing said they probably would, and set off for the campsite up

10  the hill.  When Warsing arrived at the campsite, petitioner and Wilson were talking and drinking

11  beer.  Around dusk, Wilson left the campsite and drove home.

12            Warsing testified that shortly after Wilson's departure, petitioner said he saw the

13  Devil moving around the campsite.  He also told her he thought he was being set up, and that he

14  would "just take what he could."  Petitioner then stood by the fire where Warsing was heating

15  water for coffee, and asked her if she had ever seen people dead before.  According to Warsing's

16  testimony, petitioner said he was going to go down and kill the Brandts, and told her if she did

17  not go with him, he would have to kill her too.  Hoping to run away, Warsing told petitioner she

18  needed to use the campsite's makeshift bathroom.  Petitioner accompanied her, shotgun in hand.

19  When Warsing was finished, petitioner took her by the arm and walked down the hill toward the

20  cabin, still clutching the shotgun in the other hand.

21            When petitioner and Warsing arrived at the Brandts' cabin, Mrs. Brandt greeted

22  them, asking them to come inside.  Petitioner placed the shotgun against the kitchen doorway,

23  and sat down in a chair nearby.  Warsing sat at the table where Mrs. Brandt was working on an

24  afghan and began helping her.   Petitioner complained to Mr. Brandt that he had drunk too much

25  and his head was hurting.  Mr. Brandt started laughing.  When Mrs. Brandt got up and offered

26  coffee, petitioner said he would like a cup.  Hearing petitioner joking with Mr. Brandt and asking

4

for coffee, Warsing believed things had returned to normal, and she began to relax.  Moments later, however, she heard a noise, and looked up to see petitioner pointing the shotgun at Mr. Brandt who was now standing up in front of his recliner. Petitioner shot Mr. Brandt, who then fell back in the chair.  Mrs. Brandt turned and moved towards petitioner, with Warsing behind her.  Mrs. Brandt yelled at petitioner to stop, and lunged at him.  Petitioner shot Mrs. Brandt in the chin and face, and she fell onto the sofa.  Petitioner turned and shot Mr. Brandt a second time.  Warsing testified she heard gurgly breathing from Mr. Brandt.  Petitioner told Warsing, "I am going to have to put him out of it."  Warsing heard three blows, and then no more breathing. According to Warsing's testimony, she started moving towards the door to leave, but petitioner yelled at her to get the money out of Mrs. Brandt's purse, which she did.  Petitioner then directed Warsing to go in the bedroom and look for a suitcase containing Mrs. Brandt's gambling change. Petitioner returned to where Mr. Brandt's body lay, and went through his pockets.  Petitioner took vials of gold from the kitchen counter, returned to the bedroom, and put the gold in Mrs. Brandt's suitcase.  He ripped the gold nugget necklace from Mrs. Brandt's neck.  When Warsing started walking out the door, petitioner called her back inside the kitchen, and directed her to pour water over his bloody hands to clean them.  Petitioner took the shotgun and went out the door, ordering Warsing to get into the Brandts' Lincoln.

Petitioner drove up the road leading to the campsite.  He ordered Warsing to get his suitcase.  Meanwhile, petitioner kicked down the tents and knocked things over.  The two left the campsite, with petitioner driving fast and recklessly in the direction of Placerville.  They stopped for the night in Winnemucca, Nevada, and checked into a motel using the name Dixon, petitioner's mother's maiden name.  Leaving the Brandts' Lincoln in a casino parking lot, petitioner and Warsing purchased a car for $600 cash and drove to Elko, Nevada, for the night. From there they traveled to Pocatello, Idaho, again registering in a motel under the name of Dixon.  They went from Pocatello to Wyoming.  In Rapid City, Wyoming, they traded in their car for a green pickup truck and $150 in cash.  While in Rapid City, petitioner and Warsing also sold

some gold to Jack Meyer, owner of Silver Mountain Coins.  Petitioner and Warsing continued driving until they reached Belle Fourche, South Dakota.  Petitioner had Warsing drive through town and back again, and told her this is where they would stay.  Warsing testified that en route from California to Belle Fourche, petitioner would sit in the car and cry while she drove, and said he was sorry he had killed the Brandts because "he really liked those old people."  According to Warsing, petitioner said he was sorry for what he had done to her life, too, because the authorities would never believe she had nothing to do with it because her fingerprints were all over everything.

Meanwhile, on the morning of May 16, Bobby Brandt returned to his parents' cabin in Amador County.  He noticed the Lincoln was gone and the doors to the cabin wide open. A dog apparently belonging to petitioner and Warsing was hanging around in front of the cabin. When Bobby walked inside, he saw his father lying on his back on the floor with his pants' pockets turned inside out.  He then went over to where his mother was sitting on the couch, touched her, and realized she was dead.  Bobby ran out of the cabin and down the lane to call police from a home nearby.

Inside the cabin, the responding officers found Mrs. Brandt on the couch slumped over to her left side, and Mr. Brandt lying face up on the floor near the recliner, blood down the front of him and on the furniture.  An expended 12-gauge shotgun shell was on the floor next to Mr. Brandt's head.  Two or three suitcases were also on the floor, their contents strewn about the room.  Because the Amador County Sheriff's Department did not have its own forensics lab, officers called a crime scene team from the California Department of Justice (DOJ) to process the cabin.  The next day, Bobby Brandt returned to the cabin to identify what, if anything, was missing from his parents' home.  He determined that several items had been taken, including vials of gold, $100 bills given to his mother by his father, his mother's suitcase containing silver dollars, and her necklace with the gold nuggets.  He also recognized petitioner's denim jacket hanging on the back of a kitchen chair.

Sometime around the end of May 1985, petitioner and Warsing settled in Belle Fourche, South Dakota.  Under the name Dixon, they rented an apartment and got jobs, petitioner skidding logs and Warsing waiting tables in a café.  Shortly after arriving, petitioner cut his hair, and grew a goatee.  He had Warsing buy him long-sleeved shirts to cover his tattoos.  Around 2:30 a.m. on July 6, 1985, Belle Fourche police received a call regarding a disturbance at petitioner's apartment.  After the police responded, Warsing left with one of the officers to go to the police station.  Following her departure, petitioner was arrested for assault and taken to the police station four blocks away.  Because the station had only one interview room, Officer Jepsen remained in the patrol car with petitioner while Warsing was inside giving a statement.  While sitting in the car, petitioner asked the officer, "Do you want a big one?"  When Jepsen didn't reply, petitioner said, "Have you heard of Jerry Frye?"  He told the officer he was wanted in California for a double murder.

Officers received verification of California arrest warrants for petitioner and Warsing. Petitioner, who appeared to be intoxicated and depressed, was advised of his Miranda rights, and agreed to give a videotaped statement.  Petitioner indicated he did not know if he killed the Brandts or not, but Warsing had told him he did, and that he had had alcoholic blackouts in the past.  Warsing was also arrested and taken into custody.  At the police station, she told the Belle Fourche officers what she remembered about the night the Brandts were killed. Belle Fourche police contacted officers in Amador County, advising them that petitioner and Warsing were in custody in a jail in nearby Deadwood, South Dakota.  On July 7, Amador County officers arrived in Deadwood to interview the two.  Petitioner was extradited to California.  On his return, he was permitted to talk with Warsing by telephone through a glass partition in the jail's visiting room.

Warsing continued to cooperate with police.  Accompanied by Amador County investigators, she retraced the route she and petitioner took on their cross-country flight from the Brandts' cabin, pointing out certain items that had been discarded or left behind along the way.

With Warsing's assistance, investigators recovered the murder weapon thrown out of the car window along Highway 49 in Amador County on the day of the murders.  Warsing later entered into a written immunity agreement with the Amador County District Attorney.

B.  Defense Case at the Guilt Phase

The defense sought to cast doubt on Warsing's account of the Brandts' deaths.  Dr. John Thornton, a professor of forensic science at the University of California, conducted an examination of the physical evidence aspects of the prosecution's case, making a number of visits to the Brandts' cabin following the murders.  He testified that, in his opinion, the Department of Justice inadequately processed the crime scene.  He also offered his expert opinion as to the sequence of events at the time the shootings took place in the Brandts' cabin, a scenario differing from the one presented by Warsing's testimony.

Dr. Peal, a psychiatrist who both evaluated and treated petitioner, testified he did not believe Warsing's account of the Brandt murders.  His conclusion was based on what petitioner told him of Warsing's personal history, corroborated by investigative reports.  Defense counsel also presented testimony regarding petitioner's neurological impairments and their effect on his ability to recapture or articulate memory.  Counsel originally intended to call petitioner to testify on his own behalf.  As the trial progressed, however, counsel began to question that strategy, and ultimately advised petitioner to refrain from taking the stand.  Petitioner followed the advice of counsel and did not testify.

II. Penalty Phase

The defense presented its case first during the penalty phase.  Despite his attorneys' misgivings, petitioner insisted upon speaking to the jury at this stage.  The judge permitted counsel to question petitioner without providing the prosecution an opportunity to cross-examine him.  As reviewed in more detail below, petitioner's attorney Judd Iversen led him through the allocution with questioning.  Iversen's questions to petitioner made clear that petitioner wanted to speak to the jury because he had problems with the guilt verdict, that

8

petitioner was afraid what he was going to say might make the jurors angry, and that petitioner did not want the jurors to be angry at him.  Petitioner then gave a rambling statement stating his disbelief at being found guilty and deriding the jury for taking so little time to arrive at a guilt phase verdict.

The defense presented a number of lay witnesses but no expert witnesses.  Most were family members who testified briefly that petitioner had some redeeming qualities (a protective big brother, a good artist) and that they loved him.  A couple of witnesses testified about petitioner's background growing up in Indiana, including the changes he went through at age 15 following his mother's departure from Indiana with his three younger siblings and the serious car accident he suffered shortly thereafter.  Each witness asked the jury to spare his life.  In addition, the defense presented a stipulation that jailers in Amador County and Florida (where petitioner served time on a sexual assault conviction) would testify that petitioner did not present a problem when incarcerated.  Finally, a jail chaplain from South Dakota testified that he spent three hours with petitioner in the Deadwood jail and petitioner "accepted God that night" and is now a changed man.

The prosecution put on no witnesses.  The prosecutor made a statement describing the aggravating nature of the crime.  In addition, the parties stipulated to petitioner's prior sexual assault conviction in Florida.

### PROCEDURAL HISTORY

Opening statements in the guilt phase of petitioner's trial commenced on March 2, 1988.  On May 9, 1988, the jury rendered its verdict.  Petitioner was convicted of two counts of first degree murder, first degree robbery, residential burglary, and the unlawful driving and taking of a vehicle.  The jury also found true the allegations that petitioner was armed with a firearm and personally used a firearm during the commission of the offenses.  Finally, the jury found true the special circumstance allegations: that petitioner committed multiple murders and that he committed them while engaged in robbery and burglary.

1    In July 1988, prior to the penalty phase, a competency proceeding was held before

2  a separate jury.  The jury found petitioner competent.  The trial judge made an independent

3  finding that petitioner was competent.  On August 3, 1988, the penalty phase commenced and on

4  August 8 the jury rendered the death verdict.

5    Ten years later, the California Supreme Court affirmed petitioner's conviction and

6  sentence.  People v. Frye, 18 Cal. 4th 894 (1998).  Petitioner's first state habeas petition was

7  denied October 14, 1998.  In re Frye, No. S062455.  He filed a second state habeas petition in

8  June 2000.  The California Supreme Court denied it on January 24, 2001.  In re Frye, No.

9  S087755.  Both state habeas petitions were denied summarily on the merits.

10    Petitioner initiated this habeas action in federal court by filing a request for

11  appointment of counsel on March 29, 1999.  After the denial of his second state habeas petition,

12  he filed a second amended petition here on March 31, 2003.  Respondent filed an answer on July

13  1, 2003.  On July 19, 2004, petitioner filed the present motion for evidentiary hearing.[2]

14    <u>LEGAL STANDARDS</u>

15    In 1996 Congress revised the statutory standards for considering petitions for writs of

16  habeas corpus in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Federal courts

17  must now defer to state court determinations.  After AEDPA, a writ of habeas corpus:

18    shall not be granted with respect to any claim that was adjudicated
    on the merits in State court proceedings unless the adjudication of
19    the claim–

20    (1) resulted in a decision that was contrary to, or involved
    an unreasonable application of, clearly established Federal law, as
21    determined by the Supreme Court of the United States; or

22  /////

23  _____

24    [2] The motion covers all claims for which petitioner seeks an evidentiary hearing except
    claim 37.  Claim 37 alleges that the California death penalty scheme unconstitutionally fails to
25  narrow the class of murderers eligible for the death penalty.  On March 22, 2004, petitioner's
    motion to conduct discovery on claim 37 was granted.  Discovery is proceeding on that claim.
26  Petitioner will be permitted to make a separate motion for evidentiary hearing on claim 37 when
    discovery has concluded.  See Mar. 22, 2004 Order at 8.

1            (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
2    State court proceeding.

3    28 U.S.C. § 2254(d).  An evidentiary hearing is now appropriate under the following

4    circumstances:

5            If the applicant has failed to develop the factual basis of a
     claim in State court proceedings, the court shall not hold an
6    evidentiary hearing on the claim unless the applicant shows that –

7            (A) the claim relies on –
       (i) a new rule of constitutional law, made
8    retroactive to cases on collateral review by the
     Supreme Court, that was previously unavailable; or
9      (ii) a factual predicate that could not have been
     previously discovered through the exercise of due
10   diligence; and
     (B)  the facts underlying the claim would be
11   sufficient to establish by clear and convincing
     evidence that but for constitutional error, no
12   reasonable factfinder would have found the
     applicant guilty of the underlying offense.

13

14   28 U.S.C. § 2254(e)(2).

15           Various decisions of the Court of Appeals for the Ninth Circuit establish a three-

16   step process to consider the propriety of an evidentiary hearing in federal court.  Initially, the

17   court must "determine whether a factual basis exists in the record to support the petitioner's

18   claims."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  If the facts do not exist or are

19   inadequate and a hearing might be appropriate, then

20           [the] court's first task in determining whether to grant an
     evidentiary hearing is to ascertain whether the petitioner has "failed
21   to develop the factual basis of a claim in State court."  If so, the
     court must deny a hearing unless the applicant establishes one of
22   the two narrow exceptions set forth in §2254(e)(2)(A) & (B).  If,
     on the other hand, the applicant has not "failed to develop" the
23   facts in state court, the district court may proceed to consider
     whether a hearing is appropriate, or required under Townsend.

24

25   Id.; Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005) (same).

26   /////

1        A petitioner will only be charged with a "failure to develop" the facts if "there is

2 lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

3 Williams v. Taylor, 529 U.S. 420, 432 (2000). The petitioner must have "made a reasonable

4 attempt, in light of the information available at the time, to investigate and pursue claims in state

5 court." Id. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek

6 an evidentiary hearing in the state court in the manner prescribed by state law." Id. at 437.

7 Respondent argues that petitioner failed to meet the California law requirements for obtaining an

8 evidentiary hearing and therefore has not demonstrated the diligence necessary under section

9 2254(e)(2). Not only does respondent appear to misunderstand California law, but his analysis

10 would require the court to conclude that a federal court petitioner may never produce evidence

11 here unless it was also produced in state court, a conclusion not intended by the federal habeas

12 statute.

13        Respondent points to California cases that require a habeas petitioner to make a

14 prima facie case for relief by stating "fully and with particularity the facts on which relief is

15 sought" and providing "copies of all reasonably available documentary evidence supporting the

16 claim." People v. Duvall, 9 Cal. 4th 464, 474 (1995). The parties dispute whether a petitioner

17 "must" or "should" meet the pleading requirements set out in Duvall. California law provides

18 that a petitioner is required to "allege with particularity the facts upon which he would have a

19 final judgment overturned." People v. Karis, 46 Cal. 3d 612, 656 (1988). It does not, however,

20 mandate that a petitioner provide all documentary evidence in support of his claims; only

21 available documentary evidence need be provided. E.g., In re Clark, 5 Cal. 4th 750, 781 (1993)

22 ("The court determines on the basis of the allegations of the original petition and the amended or

23 supplemental petition, if any, as well as the supporting documentary evidence and/or affidavits,

24 which should be attached if available, whether a prima facie case entitling the petitioner to relief

25 if the allegations are proven has been stated."). Absent a prima facie showing of success on the

26 merits, a California court will deny the petition outright. People v. Romero, 8 Cal. 4th 728, 737

1  (1994).  "If, however, the court finds the factual allegations, taken as true, establish a prima facie

2  case for relief, the court will issue an OSC."  Duvall, 9 Cal. 4th at 474.  "When, after considering

3  the return and the traverse, the court finds material facts in dispute, it may appoint a referee and

4  order an evidentiary hearing be held."  Id. at 478.

5           According to respondent's interpretation of California law, if the California

6  Supreme Court determines that a petitioner fails to establish a prima facie case, then it follows

7  that the petitioner has not sought "an evidentiary hearing in the state court in the manner

8  prescribed by state law" and it follows from there that the petitioner has not demonstrated

9  diligence for purposes of section 2254(e)(2).  This syllogism does not withstand scrutiny.  The

10  California Supreme Court denied summarily both of petitioner's state habeas petitions on the

11  merits.  These were merits determinations, not determinations that petitioner failed to follow

12  requirements for seeking an evidentiary hearing.  Moreover, because it did not issue an OSC in

13  either habeas proceeding, the evidentiary hearing issue was not before the state court.  See

14  Duvall, 9 Cal. 4th at 478; Horton v. Mayle, 408 F.3d 570, 582 n.6 (9th Cir. 2005) (California's

15  pleading requirements are not determinative of a petitioner's diligence in seeking evidentiary

16  development because where no OSC is issued, the petitioner "never reached the stage of the

17  proceedings at which an evidentiary hearing should be requested.").[3]  Taken to its logical

18  extreme, respondent's analysis would mean that a federal court could only hold an evidentiary

19  hearing if the state court held one.  The federal habeas statute contains no such requirement.

20

---

21           [3] Respondent also asserts that petitioner must support his state petition with "the
   evidence which he would seek to present in any evidentiary hearing."  This is an incorrect
22  interpretation of California law.  Because the California Supreme Court denied the petition
   summarily, petitioner was not able to obtain any factual support for his claims through discovery.
23  Prior to 2003, formal discovery was not available in a California habeas corpus proceeding until
   after an order to show cause had issued.  People v. Gonzales, 51 Cal. 3d 1179, 1258 (1990) (a
24  habeas petition that does not state a prima facie case for relief "must be summarily denied, and it
   creates no cause or proceeding which would confer discovery jurisdiction."), superseded in part
25  by statute, In re Steele, 32 Cal. 4th 682, 690 (2004).  Thus, a state habeas petitioner could not
   have been expected to append to his petition every item of evidence to be presented at an
26  evidentiary hearing.

1   Provisions in the habeas statute for discovery, expansion of the record, and evidentiary hearings

2   show that evidence not presented to the state court may be accepted in federal court.  Cf. Rules 6

3   and 7, Rules Governing § 2254 Cases; 28 U.S.C. § 2254(e).   "Where the state courts simply fail

4   to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on

5   otherwise exhausted claims."  Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997).

6            Petitioner requested an evidentiary hearing in both state habeas proceedings.  June

7   28, 1997 Pet. for Writ of Habeas Corpus, No. S062455 ("1997 State Pet."), at 95; Apr. 20, 2000

8   Pet. for Writ of Habeas Corpus, No. S087755 ("2000 State Pet."), at 8; Sept. 28, 2000 Inf'l Reply

9   re Pet. for Writ of Habeas Corpus, No. S087755 ("2000 State Inf'l Reply"), at 6 (Petitioner

10  specifically requested issuance of an order to show cause "to allow him to prove each of the

11  claims presented in the petition, with discovery, subpoena power and an evidentiary hearing.").[4]

12  Nothing indicates these requests were not made "in the manner prescribed by state law."

13            Further, the failure to develop standard does not require an identical presentation

14  of evidence to the state court and federal court.  Petitioner must have "made a reasonable

15  attempt, in light of the information available at the time, to investigate and pursue claims in state

16  court."  Williams, 529 U.S. at 435.  The Ninth Circuit examined the failure to develop standard

17  in Landrigan v. Schriro, 441 F.3d 638 (9th Cir. 2006), cert. granted, 127 S. Ct. 35 (Sept. 26,

18  2006).  In that case, state court petitioner "Landrigan made a general claim that his counsel had

19  failed to investigate and develop potential mitigating evidence, including his biological mother's

20  use of drugs and alcohol during gestation, his adoptive mother's alcoholism and its adverse effect

21  on Landrigan's upbringing, and information regarding his biological father and his family history

22  of violence."  441 F.3d at 642-43.  He supported his state petition with "various declarations by

23  available witnesses who attested they were never contacted by Landrigan's trial attorney, and

24  with documentary evidence regarding criminal psychobiology and congenital determinants of

25  _____

26      [4]  Both state habeas petitions were lodged with this court on April 27, 2001.

14

violence." Id. at 643.  The state court denied Landrigan's requests for appointment of a medical

expert and an evidentiary hearing.  Id.

In federal court, petitioner Landrigan presented additional evidence in the form of

declarations by mental health experts.  Id. at 641.  The Court of Appeals held Landrigan did not

"'fail to develop' the factual basis for his ineffective assistance claim in state court" because he

"tried and failed, through no fault of his own, to develop the facts supporting his ineffective

assistance claim at the state-court level."  Id. at 642, 643.[5]  The court concluded: "In such

circumstances, Landrigan is entitled to an evidentiary hearing if he can establish a 'colorable

claim' for relief."  Id. at 643 (citing Earp v. Ornoski, 431 F.3d 1158, 1173 (9th Cir. 2005), cert.

denied, 126 S. Ct. 2295 (2006)).

The second step in determining the propriety of an evidentiary hearing is

application of the AEDPA standard to determine whether "the state court's decision was an

unreasonable determination of the facts."  Earp, 431 F.3d at 1166-67.  In Townsend v. Sain, 372

U.S. 293, 313 (1963), the Supreme Court held that an evidentiary hearing is mandatory in six

circumstances:

> (1) the merits of the factual dispute were not resolved in the state
> hearing; (2) the state factual determination is not fairly supported
> by the record as a whole; (3) the fact-finding procedure employed
> by the state court was not adequate to afford a full and fair hearing;
> (4) there is a substantial allegation of newly discovered evidence;
> (5) the material facts were not adequately developed at the state-

---

[5]  Petitioner argues that the court in Landrigan applied the exhaustion standard of "fundamentally alter" to the "failure to develop" analysis.  That is not the case.  Both issues arose in Landrigan.  As stated in the text, the Court of Appeals held that the petitioner did the best he could to develop the facts in state court.  Just because he was able to develop more in federal court did not mean he "failed to develop" his claim.  Later in the opinion, the court discussed the "fundamentally alter" standard in the following context: "In evaluating prejudice, the district court improperly refused to consider additional facts proffered by Landrigan, such as expert testimony regarding Landrigan's organic brain dysfunction, because the court erroneously concluded that Landrigan had failed to exhaust this claim in state court. . . .  The additional information offered by Landrigan in support of his federal habeas claim does not 'fundamentally alter' the ineffective assistance claim presented to the state court.  It simply provides additional evidentiary support for the claim, in particular with respect to the prejudice prong of Strickland." Landrigan, 441 F.3d at 648 (citations omitted).

court hearing;[6] or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

See also Jones, 114 F.3d at 1010.[7]   According to the Court of Appeals, a state court's decision is "based on an unreasonable determination of the facts" where the petitioner establishes any one of the Townsend factors.  Earp, 431 F.3d at 1167.

The third step in determining whether an evidentiary hearing is appropriate is a showing that petitioner has a "colorable claim for relief and has never been afforded a state or federal hearing on this claim."  Id.   To show a colorable claim, a petitioner must "allege specific facts which, if true, would entitle him to relief."  Id. at 1167 n.4 (quoting Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998)).   The Court of Appeals stressed that a petitioner "only needs to allege a colorable claim for relief which is 'a low bar.'"  Id. at 1170 (emphasis in original)(citing Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001)); Landrigan, 441 F.3d at 643 (same).

---

[6]   The fifth factor was overruled in Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).  In Keeney, the Court held that a petitioner who failed to develop facts in state court must show cause and prejudice.  The Supreme Court has held that Congress codified the Keeney "failure to develop" standard in the first clause of §2254(e)(2).  Williams, 529 U.S. at 434.  Therefore, if petitioner meets the "failure to develop" standard in step one of this analysis, he has satisfied the concerns of Keeney and the court may use the fifth factor in determining whether or not to hold an evidentiary hearing.

[7]   The Court in Townsend noted that a district court has the discretion to hold a hearing even if the standards set out above are not met.  372 U.S. at 318; Hillery v. Pulley, 533 F. Supp. 1189, 1204 (E.D. Cal. 1982) ("[E]ven  where not otherwise mandated, the federal court has the discretion to hold an evidentiary hearing particularly where material issues of fact are in dispute.").  But the Court warned that this power should not be wasted on frivolous claims.  372 U.S. at 318. "Factors relevant to the District Court's discretionary determination include the existence of a factual dispute, the strength of the proffered evidence, the thoroughness of prior proceedings, and the nature of the state court determination."  Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (citations omitted).  "The attachment of the presumption of correctness to a particular finding of fact does not deprive the federal district court of the discretion to hold an evidentiary hearing."  Knaubert v. Goldsmith, 791 F.2d 722, 727 n.3 (9th Cir. 1986) (emphasis in original); Richmond v. Ricketts, 774 F.2d 957, 962 (9th Cir. 1985); Pagan, 984 F.2d at 64. The Court of Appeals for the Fifth Circuit has held that the AEDPA does not further limit this discretion once a petitioner meets the prerequisites of § 2254(e)(2).  Clark v. Johnson, 202 F.3d 760, 765 (5th Cir. 2000).  It is not clear whether, after Earp, the district court still has discretion to hold a hearing.  It is not necessary to decide the question in this case, because the undersigned finds that a hearing would not be necessary or appropriate with respect to any of the claims for which petitioner failed to meet the Townsend standards.

1                                   FAILURE TO DEVELOP

2    I.      Claims 42, 43, and 44[8]

3               Respondent alleges petitioner failed to develop claims 42, 43 and 44, which were

4    raised in his second state habeas corpus petition, because he did not seek an evidentiary hearing

5    on them.  In fact, as mentioned above, petitioner did seek an evidentiary hearing on all claims in

6    his second state petition.  In claim VII of the second state habeas petition, petitioner qualified his

7    statement of facts: "Because Petitioner has not been afforded an opportunity for full factual

8    development through discovery, adequate funding, access to this Court's subpoena power and an

9    evidentiary hearing, some of the evidence in support of the claims stated below has not yet been

10   uncovered."  2000 State Pet., at 8.  In his informal reply, petitioner specifically requested

11   issuance of an order to show cause "to allow him to prove each of the claims presented in the

12   petition, with discovery, subpoena power and an evidentiary hearing."  2000 State Inf'l Reply, at

13   6.  Petitioner adequately made clear to the California Supreme Court that he sought an

14   evidentiary hearing on each claim alleged in the second state petition.

15              Respondent also complains that petitioner "seeks to expand the evidentiary basis

16   of his third party communication/jury misconduct claim (# 43) beyond that he presented in state

17   court."  Resp't's Apr. 21, 2006 Supp. Brief on "Failed to Develop" Standard, at 6.  Respondent

18   refers to this claim as claim 43.  It is claim 42 in the Second Amended Petition.[9]  Petitioner

19   supported his state court version of claim 42 with the declarations of the two jurors involved.

20   Respondent argues he should not now be permitted to "place the issue on a different factual

21   _____

22       [8]  The parties' supplemental briefs address the "failure to develop" issue.  The discussion
     below is organized as it is in the supplemental briefs.

23          In addition to the claims discussed in this section, respondent argues petitioner failed to
     develop claim 34, which challenges trial court orders regarding petitioner's presence at the
     penalty phase.  However, petitioner has specifically stated that he does not seek an evidentiary
24   hearing on claim 34.  Apr. 7, 2005 Reply to Opp'n to Mot. for Evid. Hr'g, at 6.

25       [9]  Claim 42 has several parts.  Those at issue here, subparts A and B, allege that one juror
     had an improper conversation with her husband and a second juror consulted, and was advised
26   by, her minister.

1  footing" by seeking to introduce declarations of the third parties involved, expand on the jurors'

2  testimony, and present the testimony of a Christian legal scholar to explain Bible verses.

3            As discussed above, there is no requirement that petitioner present identical

4  evidence in state court as here.  The issue is whether petitioner was diligent in investigating his

5  claims.  When he filed his state petition, petitioner was not aware that Juror Fairfield's minister

6  provided her with written passages from the Bible.  Petitioner learned this fact from notes of

7  respondent's investigator of his interview with Fairfield, which were appended to the Answer in

8  this case.  Ex. T to July 1, 2003 Answer to Second Am. Pet.  Because petitioner did not have

9  access to discovery or an evidentiary hearing in state court, he cannot be faulted for failing to

10  flesh out his claims to the extent he now has been able to in federal court.  In his state habeas

11  filing, petitioner presented declarations to make out a prima facie case for relief.  As petitioner

12  points out, the petition is the pleading, not the proof stage, of California's habeas proceedings.

13  Petitioner did not fail to develop the factual bases of claims 42, 43 and 44 in state court.

14  II.    Claim 38

15            Claim 38 is that the length and conditions of petitioner's confinement violate the

16  Eighth and Fourteenth Amendments.  As described in Justice Mosk's concurrence to the

17  California Supreme Court's disposition of petitioner's appeal, the California court's appellate

18  jurisdiction "is limited to the four corners of the record on appeal."  People v. Frye, 18 Cal. 4th

19  894, 1032 (1998) (quoting In re Carpenter, 9 Cal. 4th 634, 646 (1995)); see also People v.

20  Sakarias, 22 Cal. 4th 596, 636 (2000) ("[T]he questions of which of two conflicting factual

21  theories is true, or which the prosecutor believed or should have believed was true, might, in a

22  habeas corpus proceeding, require reference to an evidentiary hearing. No such evidentiary

23  proceeding would be available to the court and parties in this direct appeal.").  The majority

24  opinion also reflected the court's policy that it did not consider claims "that were premised on

25  evidence and matters outside the record on appeal."  Frye, 18 Cal. 4th at 1030 n.5.  Petitioner

26  /////

1   raised claim 38 only on direct appeal.  He included in the appeal most of the extra-record

2   evidence he seeks to present here.  He did not raise the claim again on state habeas.

3          Respondent makes a sensible argument that petitioner did not raise the factual

4   bases of claim 38 in state court because he did not raise the claim, and seek an evidentiary

5   hearing, on state habeas.  Petitioner argues, however, that the only reasonable reading of the

6   California Supreme Court's opinion is that it held petitioner could not succeed regardless of any

7   evidence he presented.  Raising the claim again on state habeas would have been futile because

8   the California Supreme Court had rejected the legal bases for the claim.

9          Petitioner's futility argument has support in <u>Williams</u>.  There, the court noted that

10   Virginia law permitted an indigent petitioner to file a petition with the Virginia Supreme Court

11   within 120 days of the appointment of state habeas counsel.  <u>Williams</u>, 529 U.S. at 444 (citing

12   Va. Code Ann. § 8.01-654.1 (1999)).  State habeas counsel in that case was appointed about a

13   year before the petitioner's investigator on federal habeas uncovered certain factual information.

14   The court held that because "state postconviction relief was no longer available at the time the

15   facts came to light, it would have been futile for petitioner to return to the Virginia courts. In

16   these circumstances, though the state courts did not have an opportunity to consider the new

17   claims, petitioner cannot be said to have failed to develop them in state court by reason of having

18   neglected to pursue remedies available under Virginia law."  <u>Id.</u>

19          Under California law, a claim raised and rejected on appeal may not be raised

20   again on state habeas.  <u>See</u> <u>In re Waltreus</u>, 62 Cal. 2d 218, 225 (1965).  Because the California

21   Supreme Court denied petitioner's claim regardless of the facts, petitioner had no reason to raise

22   it again in his state habeas proceedings.  If the California Supreme Court had made it clear it was

23   denying the claim on appeal without any reference to or consideration of external matters, the

24   situation might be different; but that was not the case.  As this court pointed out in examining the

25   exhaustion issue, the California Supreme Court framed the claim as "the psychological brutality

26   that results from a prolonged wait for execution does not comport with 'evolving standards of

1  decency that mark the progress of a maturing society' from which the Eighth Amendment draws

2  its meaning.  Frye, 18 Cal. 4th at 1030 n.5 (1998); see Mar. 11, 2003 Order at 5-6.  The state

3  court appeared to accept the premise that a lengthy stay on death row has a detrimental

4  psychological effect, without examining that psychological effect.  See Mar. 11, 2003 Order at 6.

5  Thus, rather than examining the claim based only on the record, the state court seemed to

6  consider the extra-record evidence, assume its truth for purposes of resolving the claim, and

7  reject the claim anyway.  In this circumstance, petitioner cannot be said to have failed to develop

8  the factual basis of claim 38 by failing to raise it all again on state habeas.

9  III.    Claim 9

10         In his supplemental brief, petitioner states that he does not seek an evidentiary

11 hearing on claim 9 directly.  Rather, he will seek to present evidence of the suspension of trial

12 counsel Hawk to explain Hawk's conduct in the context of other claims of ineffective assistance

13 of counsel.  Accordingly, the undersigned need not determine whether petitioner has "failed to

14 develop" claim 9.

15 IV.    Claims 7, 19, 25, 2, 3, 4, 5, 7, 8, 28, 29 and 35[10]

16         Respondent argues petitioner failed to develop: (a) claims 7 and 19 because he

17 failed to show a genuine issue of material fact in state court; (b) claim 25 because petitioner

18 relied upon "incredible" facts as the basis for his state claim; and (c) claims 2, 3, 4, 5, 7, 8, 28

19 and 29 (ineffective assistance of counsel claims) because they were not supported by sufficient

20 documentary evidence and because petitioner seeks to present evidence here which was not

21 presented to the state court.  To the extent respondent argues petitioner did not make a sufficient

22 showing in state court or federal court to justify an evidentiary hearing, he again is focusing on

23

24        [10] Respondent does not argue petitioner failed to develop claim 35 (Ineffective
   Assistance of Counsel Caused by Trial Counsel's Failure to Prepare Mr. Frye for Allocution).
25 Because, as described below in the merits discussion of claim 35, the claim really involves trial
   court error, it was adequately raised in petitioner's first state habeas petition for purposes of the
26 diligence requirement.

1  the wrong question.  As discussed above, petitioner need not successfully obtain an evidentiary

2  hearing in state court to show diligence.  Further, the California pleading standard is not the same

3  as the proof standard.  Respondent's attempts to merge these standards incorrectly comprehend

4  California law.  Finally, the question of petitioner's diligence is separate from the question of

5  whether or not a hearing is necessary in federal court.

6          With his state habeas petition, petitioner presented substantial support for his

7  ineffective assistance of counsel claims.  He was diligent in giving the state court an opportunity

8  to examine the prima facie validity of his claims.  His doing so was sufficient under California

9  law and is sufficient under section 2254(e)(2).  Petitioner did not fail to develop claims 7, 19, 25,

10  2, 3, 4, 5, 7, 8, 28 and 29.

11  <u>NEED FOR AN EVIDENTIARY HEARING</u>

12          The final two steps in the evidentiary hearing analysis are: (a) does petitioner meet

13  one of the <u>Townsend</u> standards, and (b) has petitioner shown a colorable claim for relief.  Except

14  where otherwise noted, each of petitioner's claims meet the first <u>Townsend</u> standard: "the merits

15  of the factual dispute were not resolved in the state hearing." <u>Townsend</u>, 372 U.S. at 313.  The

16  merits of petitioner's claims are discussed below.

17  I.     <u>Guilt Phase Ineffective Assistance of Counsel - Claims 5, 4, 3, 7, 8, and 2</u>[11]

18          In order to establish a colorable claim of ineffective assistance of counsel,

19  petitioner must make a showing that counsel's conduct failed to meet an objective standard of

20  reasonableness. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  Petitioner must also make

21  a colorable showing that counsel's conduct prejudiced him. <u>Id.</u> at 691-92.  Prejudice is found

22  where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

23  the proceeding would have been different." <u>Id.</u> at 694.  A reasonable probability is "a probability

24

25       [11] Petitioner raised claim 6 in this section of his opening brief but, in his reply brief,

26  pointed out that he is not, in fact, seeking to present new evidence on this claim.  Accordingly, the court considers the request for an evidentiary hearing on claim 6 withdrawn.

1  sufficient to undermine confidence in the outcome." Id.; see also United States v. Murray, 751

2  F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-18 (9th Cir.

3  1984) (per curiam).

4          A.    Trial Counsel Acted Unreasonably in Securing Appointment as Petitioner's
                  Counsel - Claim 5

5

6          After petitioner was arrested, on August 1, 1985 the Amador County court

7  appointed attorney Larry Dixon to represent him.  Mr. Dixon twice sought Keenan (second)

8  counsel to assist him.  The court denied both requests.  Mr. Dixon represented petitioner at his

9  first (October 1985) preliminary hearing.[12]  In March 1986, Mr. Dixon moved to withdraw based

10  on his inexperience.  The court conditionally granted the motion subject to the appointment of

11  substitute counsel.  After three more hearings on the issue, the court withdrew its conditional

12  order.  Dixon successfully sought mandamus.

13          On September 2, 1986, the trial court appointed Judd Iversen to represent

14  petitioner.  On October 24, the court appointed Richard Hawk as second counsel.   Petitioner's

15  claims here primarily involve the conduct of Mr. Hawk.

16          According to petitioner, when Hawk first heard about the case (long before he was

17  appointed), he began visiting petitioner in jail.  Petitioner claims Hawk convinced him he would

18  be acquitted.  During the hearings to substitute counsel, Dixon submitted the names of four

19  replacement attorneys.  Hawk was one of those attorneys and petitioner himself asked the court

20  to appoint Hawk.  The judge, however, was familiar with Hawk's previous handling of the Juan

21  Corona trial; Hawk was found to have provided ineffective assistance in that trial.[13]  The trial

22

23          [12]  The trial court later dismissed the first information and found ineffective assistance of
        counsel during the first preliminary hearing.  A new complaint was filed in December 1986 and a
        new preliminary hearing held in February and March 1987.

24

25          [13]  In Corona, the Court of Appeal found a conflict of interest because Hawk agreed to
        represent Corona in exchange for exclusive literary and dramatic property rights to Corona's life,
26      including the trial.  The Court of Appeal also found Hawk provided ineffective assistance
        because he failed to investigate and present evidence of Corona's mental problems to show

1   judge refused to appoint Hawk as lead attorney.  However, he agreed to appoint Iversen, who

2   then asked that Hawk be appointed as <u>Keenan</u> counsel.  The trial court agreed to appoint Hawk

3   as second counsel.

4              Unbeknownst to petitioner, but known to Iversen, at the time Hawk was appointed

5   he was in the middle of state bar disciplinary proceedings.  Those proceedings included

6   allegations that Hawk did not deal honestly with a client.  In addition, Hawk had been suspended

7   in the past and had been found ineffective in the <u>Corona</u> case.  In fact, the California Supreme

8   Court suspended Hawk's law license during the course of petitioner's trial.  <u>Hawk v. State Bar</u>,

9   45 Cal. 3d 589, 602 (1988).  Hawk was granted a postponement of that suspension to complete

10   petitioner's trial.  <u>See</u> RT 33:9455-9456.  It appears that petitioner was not informed of the

11   suspension proceedings until February 24, 1988, the last day of juror voir dire.  The prosecutor

12   brought up the subject because she wanted the court to get a statement from petitioner that he

13   understood his attorney could be suspended during the course of the trial.  RT 19:5253-5254.

14   Petitioner was present in court during this discussion.  Iversen told the court that because Hawk

15   had not yet been suspended and because petitioner "has indicated quite strongly that that's the

16   attorney of his choice in this matter" it would be "inappropriate to voir dire Mr. Frye at this point

17   with regard to his feelings."  RT 5254.  The court then simply asked whether or not petitioner

18   wanted to proceed with Hawk.  Iversen stated: "He desires to proceed with Mr. Hawk at this time

19   and throughout the trial."  RT 19:5255.  The judge continued, "Is that correct?"  <u>Id.</u>  Petitioner

20   responded, "Yes."  <u>Id.</u>

21   ──────────────────

22   diminished capacity or insanity and because Hawk attempted to try the case through the media.
     <u>People v. Corona</u>, 80 Cal. App. 3d 684 (1978).  Despite petitioner's attempts to argue a pattern of

23   misbehavior by Hawk, the undersigned finds Hawk's conduct in the Corona case is not relevant
     to his actions in this case and should not be part of any evidence petitioner presents in support of

24   his ineffective assistance claims.  <u>See Bonin v. Calderon</u>, 59 F.3d 815, 828 (9th Cir. 1995) ("[A]
     habeas petitioner should not be allowed to transform what should be an inquiry into the

25   reasonableness of counsel's performance at his trial into a general inquisition of defense counsel's
     record and reputation.").

26

1    Claim 5 is that Hawk solicited the appointment to petitioner's case.  An

2    evidentiary hearing is not required on claim 5 because petitioner has not shown a colorable, claim

3    distinct from his other claims.  The fact that Hawk solicited the appointment may be a violation

4    of professional ethics and of the California Penal Code; however, those violations do not

5    necessarily make the solicitation a violation of the Sixth Amendment.  Prejudice to petitioner

6    does not directly flow from Hawk's solicitation.  Hawk's solicitation of and interactions with

7    petitioner relate to claim 2 (Ineffective Assistance of Counsel for Failure to Investigate and

8    Present Mental State Defense at Guilt Phase), discussed below.  The undersigned finds a hearing

9    is necessary on claim 2.  At the evidentiary hearing, petitioner will be permitted to develop

10   evidence of his relationship with Hawk to the extent it is relevant to claim 2.

11       B.  Counsel Led Petitioner to Believe he would be Acquitted - Claim 4

12       Like claim 5, claim 4 is really background information relating to other, more

13   substantive, claims of ineffective assistance of counsel.  Also like claim 5, the evidence

14   underlying claim 4 is relevant to claim 2, upon which the undersigned finds an evidentiary

15   hearing necessary.  Therefore, petitioner may present evidence that Hawk led petitioner to

16   believe he would be acquitted.

17       C.  Counsel were Unprepared and Presented an Inconsistent Defense - Claims 3, 7, & 8

18       Petitioner alleges numerous instances of unreasonable conduct at the guilt phase

19   in claim 3.  In claim 7, he focuses on counsel's failure to object to prosecutorial misconduct.  In

20   claim 8, he examines one specific instance of unreasonable trial preparation – counsel's failure to

21   edit a tape recording in which Warsing mentioned that petitioner may have killed someone else.

22       1.  Claim 3

23       There are a variety of allegations in claim 3.  Many have merit.  They are

24   intertwined with claim 2, discussed below, in which petitioner alleges that counsel unreasonably

25   failed to develop and present a mental state defense.  The allegations of ineffective assistance of

26   counsel in claim 3 are as follows:

1      a.  <u>Trial counsel approached the case with conflicting plans.</u>  Petitioner

2  argues here that Hawk focused on generally discrediting all prosecution witnesses while Iversen

3  focused on a mental state defense.  Those approaches conflicted in some ways.  For example,

4  Iversen's defense depended in part on Warsing's testimony about petitioner's behavior at the

5  camp before going to the victims' cabin.  Hawk undermined this by attempting to discredit

6  Warsing's story on his cross-examination of her.

7      b.  <u>Trial counsel unreasonably made promises to the jury he could not</u>

8  <u>keep.</u>  In his opening statement, Iversen told the jury petitioner would testify and that

9  psychologist Linda Wagner would testify to help the jury understand petitioner's problems with

10  memory and other mental problems.  Neither petitioner nor Dr. Wagner testified.

11      c.  <u>Trial counsel took conflicting positions in front of the jury on</u>
<u>numerous issues.</u>

12

13      i.  <u>Mental State Defense.</u>  In his opening statement, Iversen told the

14  jury that petitioner would not make a defense based on his mental state.  Mental state testimony

15  would be presented to help the jury understand why petitioner might have problems testifying.  In

16  his closing statement, Iversen argued that, given the evidence presented of petitioner's substantial

17  mental problems, the jury had a right to consider that petitioner did not have the mental state

18  necessary for first degree murder.

19      ii.  <u>Crime Scene Experts.</u>  Because the defense crime scene expert

20  relied on the crime scene documentation created by sheriff's deputies, Iversen praised their work.

21  Hawk, however, in addition to criticizing the crime scene work of the DOJ, also attempted to

22  discredit sheriff's Deputy Anderson who had also documented the crime scene.

23      iii.  <u>Warsing's Credibility.</u>  Hawk attempted to attack Warsing's

24  credibility by raising the issue of her son's molestation by a highway patrol officer while she was

25  in the room.  He stipulated to the introduction of the police report of the incident.  Iversen was

26  /////

1   forced to object to the stipulation because the report directly contradicted Hawk's recounting of

2   the events.

3               iv. <u>Denigrating Prosecutor.</u>  Hawk personally attacked the

4   prosecutor numerous times.  He was admonished frequently by the judge.  Iversen and McDowell

5   both felt Hawk's conduct likely prejudiced the jury against petitioner.

6              d. <u>Hawk's rude and offensive conduct prejudiced petitioner.</u>  Some of that

7   behavior is described above.  Hawk also badgered Warsing, Bobby Brandt, the victims' son who

8   found their bodies, and numerous other witnesses.

9        Petitioner should not have a problem proving unreasonable conduct in many of

10   these instances.  The issue for this court to resolve will be prejudice.  The jury obviously believed

11   Jennifer Warsing, and for good reason.  Even though her recollection of the events may not have

12   been correct in some respects, it was correct in many.  For example, there is no way she could

13   have known just how many shots killed the victims unless she had been there.  Standing alone,

14   then, Hawk and Iversen's errors described in claim 3 probably do not amount to prejudice under

15   <u>Strickland</u>.  There is no reasonable probability that absent one of these errors, the result of the

16   guilt phase would have been different.  These errors, however, cannot be examined in a vacuum.

17   They must be considered cumulatively with all other guilt phase allegations for which petitioner

18   has made a colorable showing of unreasonable conduct.  Because the undersigned finds an

19   evidentiary hearing necessary to examine defense counsel's handling of mental health evidence at

20   the guilt phase (claim 2), these additional allegations of ineffective assistance of counsel at the

21   guilt phase should be examined to the extent they are relevant to claim 2.

22       2. <u>Claim 7</u>

23        Petitioner alleges counsel was ineffective for failing to challenge various instances

24   of prosecutorial misconduct.  Because a number of the prosecutor's identified actions do not

25   amount to misconduct, petitioner has not made out a colorable claim of ineffective assistance for

26   the failure to object to them and the court need not reach the other steps in the evidentiary hearing

1  analysis.  With respect to other actions, petitioner has made a prima facie case of both

2  prosecutorial misconduct and ineffective assistance of counsel for failing to object.

3        When considering whether petitioner has made a colorable claim, this court uses

4  the familiar <u>Strickland</u> standard.  Defense counsel was obligated to object to the prosecutor's

5  statements if a reasonably competent attorney would have done so and if such an objection would

6  have contributed to a different result.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 691-94.  To determine the

7  reasonableness of counsel's failure to object, the first question is whether the prosecutor's

8  comments amounted to misconduct.

9        a.  <u>Vouching for Witness Credibility</u>

10        Petitioner claims the prosecutor improperly vouched for Jennifer Warsing by

11  stating that Warsing was "cooperative" and "provided all the information she could recall."

12  RT 5377 (prosecutor's opening statement).  Defense counsel stipulated that the prosecutor could

13  read its agreement with Warsing into the record.  Prior to Warsing's testimony, the prosecutor

14  read into the record the agreement, which  included statements that "Jennifer Warsing was an

15  unwilling participant in the crimes" who was "coerced into participation under duress and in fear

16  of her life," RT 6230-6231; that Warsing "has said the statements she has made are truthful" and

17  "she will continue to be truthful in her statements," RT 6231-6232; and that the agreement was

18  entered into "in consideration of Jennifer Warsing's promise to continue to fully cooperate . . ., to

19  testify in court and to tell the truth," RT 6232.

20        The prosecution improperly vouches for a witness's truthfulness when it either:

21  (1) places the prestige of the government behind the witness by making personal assurances of a

22  witness's veracity; or (2) indicates that information not presented to the jury supports the

23  witness's testimony.  <u>United States v. Roberts</u>, 618 F.2d 530, 533 (9th Cir. 1980).  A prosecutor's

24  use of the truthfulness requirements of a plea agreement can amount to improper vouching.

25  <u>United States v. Shaw</u>, 829 F.2d 714, 717 (9th Cir. 1987).  However, there is "no bright-line rule

26  about when vouching will result in reversal."  <u>United States v. Necoechea</u>, 986 F.2d 1273, 1278

1  (9th Cir. 1993).  Here, defense counsel stipulated to having Warsing's agreement with the

2  prosecution read in to the record.  Because it is possible the truthfulness requirements of

3  Warsing's agreement could have been considered prosecutorial vouching and thus subject to

4  exclusion, petitioner has at least made a prima facie showing of success on this claim to warrant

5  an evidentiary hearing on counsel's reasons for agreeing to having the entire agreement read into

6  the record.

7                    b.  Shifting Burden of Proof

8            Petitioner contends prosecutorial argument at various stages of trial shifted the

9  burden of proof to petitioner.  First, the prosecutor asked the jury to draw a negative inference

10  from the fact the defense did not call Dr. Wagner to the stand, even though she was mentioned in

11  defense counsel's opening statement.  RT 9248.[14]  Second, during the penalty phase the

12  prosecutor, in referring to the amount of mitigating evidence presented, stated: "Is that all he can

13  offer us?"  RT 9706-9707.  According to petitioner, both these comments would have given the

14  jury the impression that the defense was obligated to present evidence.  Contrary to petitioner's

15  position, case law shows that a "'prosecutor is entitled to comment on a defendant's failure to

16  present witnesses so long as it is not phrased to call attention to the defendant's own failure to

17  testify.'"  United States v. Garcia-Guizar, 160 F.3d 511, 522 (9th Cir. 1998) (quoting Necoechea,

18  986 F.2d at 1282); see also United States v. Mares, 940 F.2d 455, 461 (9th Cir. 1991).  Because

19  the prosecutor's comments here do not amount to misconduct, petitioner's argument that trial

20  counsel should have objected to them is baseless.  An evidentiary hearing is not warranted on this

21  aspect of claim 7.

22  /////

23  /////

24  _____

25  [14]  The prosecutor stated: "Incidentally, you were told you were going to hear from
    neuropsychologist Linda Wagner.  She did not show up at trial.  She did not testify.  Defense
26  state there was no reason for it.  But, despite that, you may reasonably infer, if that psychologist
    had some real helpful information to the defense, you would have heard from her."  RT 9248.

### c. Victim Impact Evidence

Petitioner argues the prosecutor's characterizations of the Brandts as "kind and trusting people" and, again, "kind people" in her opening statement at the guilt phase and a reference to their age in her closing argument at the penalty phase amounted to misconduct.  With respect to the first characterization of the Brandts as "kind and "trusting," it is important to put that statement in context.  The prosecutor was attempting to show that many people knew the Brandts carried large amounts of cash because the Brandts did not feel it necessary to hide that fact.  RT 5354.  With respect to the second characterization, the prosecutor referred to the Brandts' being "kind" to explain why they would admit petitioner into their cabin when he was carrying a shotgun.  RT 5362.  Finally, petitioner also characterizes the prosecutor's reference to the victims' age in closing argument at the penalty phase as "victim impact" evidence.  The prosecutor argued that the 75-year-old Brandts were no threat to 40-year-old petitioner.  RT 9709.

While neither the statements about the Brandts' kindness nor the reference to their age was necessary, the statements were certainly not the sort that were so unduly prejudicial as to render petitioner's trial fundamentally unfair.  Payne v. Tennessee, 501 U.S. 808, 825-26 (1991).  Whether or not a reasonable attorney would have objected to the statements, the failure to do so did not prejudice petitioner.  Because petitioner cannot succeed on this aspect of claim 7, it does not warrant an evidentiary hearing.

### d. Personal Opinion of Prosecutor

Petitioner objects to the prosecutor's statements that the murders "were as senseless and cold-blooded as murders come," that the case would go into another phase (thereby presuming a guilty verdict), and, during the penalty phase, that she felt the aggravating circumstances outweighed the mitigating circumstances.  Petitioner cites only Berger v. United States, 295 U.S. 78 (1935) in support of his argument.  The prosecutor in Berger stated more than a personal opinion.  The Court found misconduct because the prosecutor's statements showed personal knowledge of important aspects of a witness's testimony.  295 U.S. at 88.  Here,

1  petitioner objects only to opinions of the prosecutor.  Because petitioner does not explain how

2  these personal opinions amounted to a constitutional violation, this court cannot find that defense

3  counsel had an obligation to object to them.  Accordingly, an evidentiary hearing is unnecessary

4  on this aspect of claim 7 as well.

5                    e.  Comment on Petitioner's Silence

6           Petitioner attempts to characterize the prosecutor's statements about a lack of

7  mitigating evidence and petitioner's failure to express remorse as comments on petitioner's failure

8  to testify.  The comments were within the bounds of prosecutorial argument.  See United States v.

9  Kessi, 868 F.2d 1097, 1106 (9th Cir. 1989) ("It is permissible for the prosecutor to call attention

10  to [the defendant's] failure to present exculpatory evidence so long as he does not comment on the

11  decision not to testify.").  Counsel should not have been expected to object to them.  No

12  evidentiary hearing is necessary here.

13                   f.  Urging Mitigation as Aggravation

14          The prosecutor argued that defense evidence regarding petitioner's mental health

15  showed petitioner was capable of many things and that that evidence "cuts both ways, because it

16  also shows that he had the brains, the mental ability, to make it."  RT 9714-9715.  According to

17  petitioner, California law prohibits the use of mitigating evidence as aggravating evidence.

18  However, the California Supreme Court held that the prosecutor's comments did not violate

19  California law.  18 Cal. 4th at 1020-21.  The state court is the final arbiter of state law.  Mendez v.

20  Small, 298 F.3d 1154, 1158 (9th Cir. 2002).  Therefore, defense counsel was not obligated to

21  object to the prosecutor's statement; even if he had objected, such an objection would not have

22  succeeded.  Because petitioner cannot succeed on this aspect of claim 7, an evidentiary hearing is

23  unnecessary on it.

24                   g.  Denigration of Defense Counsel

25          Petitioner argues his counsel failed to object to the prosecutor's improper attacks

26  on defense arguments.  The challenged comments by the prosecutor were made in response to

                                                       30

1   Hawk's closing argument at the penalty phase.  Hawk commented that Ron Wilson or someone

2   else may have been involved in the murders: "Jennifer is not an accomplice because Jerry didn't

3   commit a murder.  She can only be an accomplice to murder – unless she is an accomplice to Ron

4   Wilson committing these murders or someone else that may have been involved.  But I don't have

5   any evidence of that."  RT 9193.  Later, Hawk made a more pointed accusation:

6           Ron Wilson – and if ever a guy – I have never had a witness
        take a swing at me in a courtroom, but he came as close as anybody
7       I have ever seen.  He had murder in his eye when I cross-examined
        him.  He hated me. . . .

8
        Who is this Ron Wilson?  What is he doing wandering
9       around this claim on the ridge?  Where is his driver's license?  And
        what happened between he and the Brandts?  What was it Mrs.
10      Brandt didn't like about him?  Why is he sneaking up there on the
        top?  Why does he suddenly show up on the claim, get Jerry Frye
11      drunk and give him a bunch of marijuana plants?  Why did this
        occur?

12
        And after he leaves, if we set aside the whole problem of
13      timing, the first one down the hill is Ron Wilson, who goes – if he
        drives down the hill from the campsite, he has got to go right by the
14      cabin – well, within a few feet of it, within 50 feet or so.  He knows
        about the money and he had the opportunity to kill 'em.

15

16  RT 9204.

17          In her closing argument, the prosecutor responded:

18          I would like to say that, with respect to defense counsel's
        attempt to cast suspicion in the direction of Ron Wilson or anybody
19      else in this case, there is absolutely nothing to support that.

20          With Ron Wilson, particularly, remember, he had been
        working with the Brandts for a long time in that area. . . .  There was
21      simply nothing sinister in Ron Wilson's being in that area on the
        14th, nothing whatsoever to suggest that he was involved with these
22      murders.

23          Casting suspicion in trial like that is completely
        irresponsible.  It's irresponsible of the defense to make that
24      accusation against somebody who has to live in this area, without
        anything whatsoever to back it up.

25

26  RT 9257-58.

31

1    Petitioner also objects to the prosecutor's characterization of defense arguments

2  that the murders must have happened earlier than Jennifer Warsing testified to: "For the defense

3  counsel to argue that Jennifer Warsing is lying about witnessing these murders, based on the fact

4  that they are assuming the murders happened earlier, based on that estimate, is just absolutely

5  ludicrous in this case.  It's a smoke screen."  RT 9262.

6    "A personal attack on defense counsel's integrity could constitute misconduct."

7  United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995).   However, courts have found

8  prejudicial misconduct for such attacks only infrequently.  In Santiago, the court considered

9  prosecution comments referring to defense "tactics" of "trivializing" the victim's death by

10 referring to his drug use and of trying "to sully and dirty up two of the government's witnesses."

11 Id.  The court found the district court did not abuse its discretion by permitting these statements.

12 In United States v. Millar, 79 F.3d 338, 343-44 (2d Cir. 1996), the court held the prosecutor's

13 comments that the defense was "hogwash" and a "smoke screen" and that defense counsel was

14 trying to "confuse" the jury or "lead them astray" were "mildly inappropriate, if that, and clearly

15 do not rise to the level of severity sufficient to require reversal."  The Court of Appeals for the

16 First Circuit found a "smoke screen" comment was "arguably excessive disparagement" but that

17 "it is unrealistic to suggest that such empty cliches seriously affected the jury's deliberations."

18 United States v. Procopio, 88 F.3d 21, 32 (1st Cir. 1996).

19    Here, even if counsel's "irresponsible" and "smoke screen" comments rise to the

20 level of misconduct, they were not the kind of comments that would have affected the jury's

21 decision-making.  The prosecutor is permitted to challenge defense theories and evidence.  The

22 use of colorful language to characterize an opponent's evidence is the standard stuff of closing

23 argument.  "The comment will be remembered--if at all--as a redundant statement that the theories

24 of defense are implausible. Such a statement, stripped of rhetoric, is appropriate."  United States

25 v. Sblendorio, 830 F.2d 1382, 1395 (7th Cir. 1987).  While these comments may have been

26 /////

32

1    "beneath the prosecutor," petitioner has not made a prima facie showing of prejudice under

2    Strickland.  Id. at 1396.  An evidentiary hearing is unnecessary on this aspect of claim 7.

3                  3. Claim 8

4                  Claim 8 is that counsel failed to edit Jennifer Warsing's tape-recorded statement to

5    take out her comment that petitioner told her he may have killed someone in Florida.  In

6    considering whether an evidentiary hearing is necessary on this claim, the initial question is

7    whether there is a factual basis in the record to support the claim.  Baja v. Ducharme, 187 F.3d

8    1075, 1078 (9th Cir. 1999).  There appears to be no question that petitioner could have, but did

9    not, edit the tape-recorded statement.  There also appears to be no question that the better course

10   would have been to let the jury hear an edited version of the tape.  Respondent does not argue the

11   reasonableness of counsel's conduct.  Instead, respondent argues that petitioner did not suffer any

12   prejudice because Iversen had the tape redacted for the record and the court gave a limiting

13   instruction.  All of this information is apparent from the record before this court.  The only extra-

14   record facts petitioner alleges with respect to this claim have to do with which attorney was at

15   fault for failing to edit the tape.  Because there is no question that it was unreasonable to fail to

16   edit the tape, pointing the finger at one or the other attorney is not relevant.  Petitioner has not

17   shown a factual dispute with respect to claim 8.  Because petitioner has not shown a need to

18   present additional evidence, the request for an evidentiary hearing on claim 8 is denied.

19           D.  Counsel Failed to Investigate and Present a Mental State Defense - Claim 2

20                  Petitioner argues defense counsel should have investigated more thoroughly and

21   presented evidence that petitioner lacked the mental state necessary for first degree murder.  As

22   explained in more detail below, the undersigned finds an evidentiary hearing necessary on claim 2

23   because there is considerable factual dispute about just what mental health investigation

24   petitioner's counsel did, what counsel could and should have learned, and whether a mental health

25   defense might have been successful in reducing the verdict to second degree murder.

26   /////

1          Petitioner's trial attorneys hired three mental health professionals.  Dr. Peal, a

2    psychiatrist, was hired by petitioner's original counsel, Larry Dixon.  It is not clear exactly  what

3    Dr. Peal was hired to do.  He testified at both the guilt phase and the competency proceeding that

4    he was hired to evaluate petitioner and to treat him, if necessary.  RT 7737; RTCT 447.[15]  With

5    respect to determining petitioner's competency, Dr. Peal gave conflicting testimony.  At the guilt

6    phase, he testified he also was hired to determine "whether or not there was any basis for

7    psychiatric defense, any basis for 1368 proceeding – and that's a proceeding on the determination

8    of whether the defendant can stand trial."  RT 7737.  However, at the competency proceeding, Dr.

9    Peal testified: "When I first saw him, we – there was not any thought of any 1368 or psychiatric

10   defense or anything like that."  RTCT 447.

11          After Dixon left, Dr. Peal worked primarily with Hawk.  Dr. Peal testified about

12   petitioner's problems with memory and with "thinking."  RT 7637.  He also testified that

13   petitioner had impairments in his ability to deliberate and make judgments.  RT 7860.  Dr. Peal

14   testified in detail about petitioner's automobile accident when he was fifteen.  He described the

15   resulting damage to petitioner's brain lining that in turn caused petitioner to suffer at least five

16   bouts of meningitis.  RT 7654-7659.  Eventually petitioner had surgery to repair the brain lining.

17   RT 7655.  Dr. Peal opined that petitioner suffers brain damage as a result.  RT 7651.

18          Hawk also questioned Dr. Peal quite a bit about Jennifer Warsing.  Dr. Peal

19   testified that petitioner became violent with Warsing after he discovered her twice in sexual

20   situations with dogs.  RT 7679-7680.  Dr. Peal also testified about Warsing's mental state and

21   health based on viewing a videotaped interview of Warsing from the South Dakota jail.  He

22   opined that Warsing did not appear to be a victim of domestic violence, RT 7722-7723, and that

23   he did not believe Warsing was telling the truth because she showed signs of mental illness.  RT

24   7841-7844.

25

26          [15]   "RTCT" is the Reporter's Transcript of the Competency Trial, lodged herein on April
     27, 2001.

1          The other mental health expert put on by the defense was Dr. Steven McGuire, a

2   neurologist.  Dr. McGuire's testimony primarily related to petitioner's memory issues.  Mot. for

3   Evid. Hr'g, Ex. 2 (Iversen Decl.) at ¶ 29.  He testified about petitioner's auto accident, bouts of

4   bacterial meningitis and brain problems, which would be exacerbated by alcohol and drug use.

5   RT 7278-7283, 7296.  Dr. McGuire also testified that petitioner had memory deficits, though he

6   characterized them as "relatively mild."  RT 7347.  Dr. McGuire did provide some testimony

7   relevant to petitioner's mental state at the time of the crime.  He testified that petitioner's brain

8   impairments should not cause petitioner to be violent but could cause him to be intolerant of stress

9   and possibly respond violently.  RT 7294-7295.

10          The final mental health professional hired by the defense was Dr. Linda Wagner, a

11   neuropsychologist.  Dixon also hired Wagner and she conducted her examination of petitioner in

12   May 1986, before Dixon was relieved of the case.  See Ex. 20 (Mar. 22, 1988 Neuropsychological

13   Report of Dr. Linda Wagner) to 1997 State Pet.  Wagner opined that petitioner's brain damage

14   and intoxication on the date of the crime would have prevented premeditation and deliberation.

15   Id.; Mot. for Evid. Hr'g, Ex. 3 (McDowell Decl.) at ¶ 18.  Petitioner argues Iversen and Hawk

16   never took the time to learn of Wagner's opinion until March 1988, after the prosecution

17   presented its case and too late to be part of developing a mental health defense.

18          Here, and with respect to petitioner's other allegations, respondent argues this

19   court should defer to the decision of the California Supreme Court on the issue.  Deference to the

20   court's appellate decision makes no sense in this instance.  The California Supreme Court

21   examined petitioner's claims "[o]n the basis of the appellate record."  People v. Frye, 18 Cal. 4th

22   894, 980 (1998).  In this motion for an evidentiary hearing, petitioner is attempting to bring in

23   extra-record evidence.  Therefore, the California Supreme Court's appellate opinion is not

24   relevant at this juncture.[16]

25

26          [16]  Petitioner also raised this claim in his first state habeas petition.

35

1      An evidentiary hearing is warranted on this claim.  While pursuing an innocence

2  defense may have been a "strategic" decision, it was only a reasonable one under the Sixth

3  Amendment if counsel reasonably investigated and rejected other potential defenses.  Strickland

4  v. Washington, 466 U.S. 668, 690-91 (1984) ("counsel has a duty to make reasonable

5  investigations or to make a reasonable decision that makes particular investigations

6  unnecessary").  Both Iversen and Madeline McDowell (Iversen's then associate attorney) state that

7  while they gathered some evidence toward a mental state defense, they never got to the point of

8  developing one.  Iversen Decl. at ¶¶ 29-30; McDowell Decl. at ¶¶ 13-24.  Iversen and McDowell

9  also state that Hawk's control over petitioner made it impossible to discuss pursuing a mental

10  state defense because petitioner ran everything by Hawk and Hawk rejected any such defense.

11  Iversen Decl. at ¶ 24; McDowell Decl. at ¶¶ 7-9.

12      Hawk's relationship with petitioner, his relationship with Iversen and McDowell,

13  and his behavior at trial -- the subjects of claims 5, 4, and 3, discussed above -- are relevant to

14  understanding whether counsel failed to investigate properly a mental health defense.  Evidence

15  presented here of petitioner's brain injury, subsequent bouts of meningitis and substance abuse,

16  amounts to a colorable showing of prejudice: that petitioner might have been successful in arguing

17  he did not have the mental capacity necessary for first degree murder if he had pursued this

18  defense.

19  II.  Ineffective Assistance of Counsel re Competency Proceedings - Claim 19

20      At the close of the guilt phase, Hawk questioned petitioner's competence.  RT

21  9414.  The trial judge decided there was sufficient question of petitioner's competence and

22  ordered a competency hearing before a new jury.  RT 9415, 9436-9437.  A new attorney, John

23  Philipsborn, was appointed to "represent" petitioner by arguing he was not competent.  RT 9448.

24  Philipsborn put on Iversen and Hawk.  Both testified that petitioner was unable to assist them,

25  particularly after the guilt phase verdict.  RTCT 242-432.  Dr. Peal testified that petitioner

26  suffered brain damage, and that petitioner's mental problems became more acute as the penalty

1  phase approached.  RTCT 454-455, 463-464,   Dr. Peal concluded that petitioner was not

2  competent at that time.  RTCT 465.  Dr. Peal also testified that, despite his guilt phase testimony

3  that he was hired to examine petitioner for the possibility of a challenge to his competency, he

4  was only hired to evaluate and treat petitioner.  RTCT 473-474, 447.[17]  He also testified that there

5  was no basis for a competency proceeding during the guilt phase because "we had not completed

6  an evaluation."  RTCT 474.

7          The state put on psychiatrist Patricia White, psychologist Grant Hutchinson and a

8  deputy from the jail to testify to petitioner's "normal" behavior.  The jury found petitioner

9  competent.  Petitioner's attorneys later moved the judge to make an independent finding that

10  petitioner was not competent.  The judge also found petitioner competent.  RT 9461.

11          Now, petitioner says he is not raising a claim that he was, in fact, incompetent;

12  rather he is alleging that, under Strickland, Iversen or Hawk should have questioned his

13  competency earlier and, had they done so, there is a reasonable probability he would have been

14  found incompetent during the guilt phase of trial.[18]  Because petitioner has not made a colorable

15  showing of success on this prejudice component of the Strickland test, he is not entitled to an

16  evidentiary hearing.

17          The state court's finding in July 1988 that petitioner was competent is entitled to a

18  presumption of correctness.  28 U.S.C. § 2254(e)(1).  Petitioner does not show how his

19  competence turned from bad to better between the guilt phase, which ran through March and April

20

---

21          [17]  As noted previously, at the guilt phase, Dr. Peal testified Dixon hired him to evaluate

22  petitioner and to determine "whether or not there was any basis for psychiatric defense, any basis
    for 1368 proceeding – and that's a proceeding on the determination of whether the defendant can

23  stand trial."  RT 7737.

24          [18]  Contrary to the statement in petitioner's brief, he does raise a claim of actual
    incompetence in his petition.  It is claim 21 of the Second Amended Petition entitled "Denial of

25  Petitioner's Due Process Rights, and Other Trial Rights, not to be Tried if Mentally
    Incompetent."  Interestingly, he does not seek an evidentiary hearing on this claim.  At oral

26  argument on this motion, petitioner's counsel admitted that claim 21 will be difficult to prove
    without an evidentiary hearing.

1988, and the July 1988 competency proceeding.  In fact, Dr. Peal's testimony at the competency

proceeding indicated that petitioner's competence had declined since the guilt phase.  RTCT 463-

464.  Moreover, petitioner's submission of the opinions of two experts who examined him long

after trial is entitled to little weight compared to the contemporaneous opinions of counsel at the

guilt phase, of two experts hired for the competency proceeding, and of the competency trial jury.

To re-examine petitioner's competency after a full-blown competency proceeding in state court

would violate the important policies of comity underlying the habeas statute.  Petitioner's request

for an evidentiary hearing on claim 19 is denied.

III.   Ineffective Assistance of Counsel at Penalty Phase

      A.   Overview of Penalty Phase

          Trial counsel Judd Iversen conducted the penalty phase.  In his opening statement,

Iversen briefly mentioned three mitigating factors the defense would present: (1) whether

defendant was under the influence of extreme mental or emotional disturbance; (2) whether

defendant was under the substantial domination of another person; and (3) whether defendant's

ability to conform his conduct to the law was impaired by mental disease or intoxication.  RT

9559-9560.  Petitioner then gave an allocution.  Iversen led him through it with questioning.  RT

9563.  Iversen's questions to petitioner made clear that petitioner wanted to speak to the jury

because he had problems with the guilt verdict, that petitioner was afraid what he was going to say

might make the jurors angry, and that petitioner did not want the jurors to be angry at him.

Petitioner then gave a rambling statement of his disbelief at being found guilty and derided the

jury for taking so little time to arrive at a guilt phase verdict.  RT 9563-9570.

          The defense presented a number of lay witnesses but no expert witnesses.  Most

were family members who testified briefly that petitioner had some redeeming qualities (a

protective big brother, a good artist) and that they loved him.  Each asked the jury to spare his life.

RT 9571-9592 (petitioner's mother); RT 9593-9595 (petitioner's sister); RT 9596-9607

(petitioner's best friend; testified about the auto accident's effect on petitioner's life and about

1  petitioner and his father's drinking after petitioner's mother left them); RT 9608-9620

2  (petitioner's brother; testified about petitioner's son's need for a father); RT 9625-9637

3  (petitioner's uncle); RT 9638-9641 (petitioner's sister).  In addition, the defense presented a

4  stipulation that jailers in Amador County and Florida (where petitioner served time on a sexual

5  assault conviction) would testify that petitioner did not present a problem when incarcerated.  RT

6  9622.  Finally, a jail chaplain from South Dakota testified that he spent three hours with petitioner

7  in the Deadwood jail and petitioner "accepted God that night" and is now a changed man.  RT

8  9642-9650.

9        The prosecution put on no witnesses.  The prosecutor made a statement describing

10  the aggravating nature of the crime.  RT 9697-9720.  In addition, the parties stipulated to

11  petitioner's prior sexual assault conviction in Florida.

12        In his closing, Iversen summarized the testimony.  He described: (1) petitioner's

13  difficulties after his mother and younger siblings left him and his father; (2) how petitioner, then

14  age 15,  became his father's drinking buddy; (3) petitioner's automobile accident at age 15 that

15  left him with a severe head injury and resulted in numerous bouts of meningitis; (4) petitioner's

16  subsequent mental/memory problems; (5) the difficulty petitioner must have faced from the

17  disfiguring facial injuries suffered in the auto accident; (6) petitioner's drug and alcohol problems;

18  and (7) petitioner's dependency on Jennifer Warsing.  Iversen argued that petitioner's lack of

19  remorse was due to his memory problems and that petitioner was upset during the penalty phase

20  in part because he had just been taken off anxiety medication.  RT 9730-9766.

21        Exhibit 21 to petitioner's 1997 state habeas petition summarizes the evidence he

22  alleges the defense should have presented.  Exhibit 21 is the report of psychologist Mark

23  Cunningham.  Dr. Cunningham reviews all the potentially mitigating evidence, which he groups

24  into the following "themes:" (1) neuropsychological deficits; (2) developmental derailment (from

25  the automobile accident); (3) maternal disillusionment and abandonment ( petitioner discovered

26  his mother was having an affair shortly before she abandoned him); (4) paternal corruptive

influence and constructive abandonment; (5) alcohol and drug dependence; (6) pathological responses to intoxication (drinking made him aggressive); (7) psychological disturbance at the time of the offense (primarily based on petitioner's brain damage plus intoxication).

B. Failure to Investigate and Present Mitigating Evidence - Claims 28 and 29

There are three aspects to these claims: (1) failure to investigate and present mental health evidence; (2) failure to investigate and present evidence of traumatic events in petitioner's childhood; and (3) failure to investigate and present evidence of the effects of petitioner's alcohol and drug dependencies.   Petitioner argues that each of these issues supports one conclusion – counsel failed to adequately portray petitioner's mental state at the time of the crime to show petitioner was less morally culpable than the "worst of the worst."

1. Mental Health Evidence

The defense presented mental health evidence at the guilt phase to show petitioner's memory problems.  The testimony exceeded problems with memory, as indicated by petitioner's trial attorney's weak attempt to argue diminished capacity in the guilt phase closing argument.  See discussion of claim 2, pages 33-36 above.  However, the experts' testimony did not attempt to make a direct connection between petitioner's mental problems and the crimes.

Despite the fact that the penalty phase did not begin until three months after the jury rendered the guilt verdict, because the competency proceedings intervened before a separate jury, the defense put on no new mental health evidence at the penalty phase.  In fact, the defense presented no expert testimony at the penalty phase.  During his closing argument, Iversen mentioned, briefly, the guilt phase testimony of Drs. Peal and McGuire.  RT 9730.  He told jurors that it would be "kind of silly" to have the guilt phase witnesses come back and re-testify and that if the jurors could not remember the doctors' testimony they should ask to have it read back to them.  However, Iversen did not attempt to tie the doctors' testimony to the mitigating factors of "extreme mental or emotional disturbance" and the defendant's inability to appreciate the criminality of his conduct "as the result of mental disease or defect or the effects of intoxication."

1   Rather, Iversen just argued that the jury should be able to infer the applicability of those

2   mitigating factors based on the testimony of Dr. McGuire and the testimony that showed

3   petitioner had been drinking.  RT 9742-9744.

4          It is well-established that mental health evidence is extremely important at the

5   penalty phase and that a jury needs some expert testimony to help make sense of the evidence.

6   See, e.g., Earp v. Ornoski, 431 F.3d 1158, 1179 (9th Cir. 2005) ("If proven to be true . . ., this

7   alleged history of substance abuse, emotional problems, and organic brain damage is the very sort

8   of mitigating evidence that 'might well have influenced the jury's appraisal of [Earp's] moral

9   culpability." (quoting Williams v. Taylor, 529 U.S. 362, 398 (2000)), cert. denied, 126 S. Ct. 2295

10  (2006); Smith v. Mullin, 379 F.3d 919, 942 (10th Cir. 2004) ("[T]he mitigating evidence [of

11  mental illness] omitted in Mr. Smith's trial is exactly the sort of evidence that garners the most

12  sympathy from jurors.").  The Court of Appeals for the Ninth Circuit has held consistently that

13  counsel who is "on notice that his client may be mentally impaired" must "investigate his client's

14  mental condition as a mitigating factor in a penalty phase hearing." Caro v. Woodford, 280 F.3d

15  1247, 1254 (9th Cir. 2002) (collecting cases); Caro v. Calderon, 165 F.3d 1223 (9th Cir. 1999)

16  (remanding for evidentiary hearing on ineffective assistance issue).  In Caro, the defense had four

17  experts examine Caro before trial.  None found a mental impairment sufficient to constitute legal

18  insanity or diminished capacity.  However, none knew of Caro's "extraordinary exposure to

19  pesticides."  None of the experts conducted neurological testing.  As in petitioner's case, counsel

20  hired the experts primarily for purposes of the guilt phase rather than the penalty phase.  The

21  Court of Appeals held that counsel's failure to provide the experts with information necessary to

22  evaluate Caro's neurological system was unreasonable.  Caro, 165 F.3d at 1226.  In addition, it

23  found expert evidence is necessary to explain the ramifications of mental health evidence where

24  "lay people are unable to make a reasoned judgment alone." Id. at 1227.  Counsel's conduct was

25  prejudicial because "[m]ore than any other singular factor, mental defects have been respected as

26  a reason for leniency in our criminal justice system." Caro, 280 F.3d at 1258.  "By explaining that

1  his behavior was physically compelled, not premeditated, or even due to a lack of emotional

2  control, his moral culpability would have been reduced." Id.

3          Given the clear importance of mental health testimony to the case in mitigation,

4  and given petitioner's counsel's failure to present any such evidence at the penalty phase,

5  petitioner has made a colorable claim of ineffective assistance of counsel.   An evidentiary hearing

6  is necessary to examine counsel's failure to investigate and present mental health evidence at the

7  penalty phase.

8              2.  Childhood Evidence

9          Standing alone, petitioner may not have a colorable claim based on circumstances

10  of his childhood.  Counsel did present some evidence that petitioner was abandoned by his mother

11  and that his distraught father made petitioner, then a teenager, his "drinking buddy."  While both

12  those subjects could have been fleshed out at the penalty phase, petitioner has not shown his

13  counsel failed to present substantial other evidence.  However, because it is not possible to

14  separate petitioner's childhood from his mental health, this evidence must also be examined at a

15  hearing.  Further, recent case law suggests that counsel's investigation and presentation of some

16  mitigating evidence is not enough.  In Earp, the court held that while counsel is not required "'to

17  investigate every conceivable line of mitigating evidence,'" "they are in no position to decide, as a

18  tactical matter, not to present mitigating evidence or not to investigate further just because they

19  have some information about their client's background." 431 F.3d at 1175 (quoting Wiggins v.

20  Smith, 539 U.S. 510, 533 (2003); emphasis in original).  In remanding for an evidentiary hearing,

21  the Court of Appeals framed the issue as follows: "If true, the facts alleged may well paint a

22  materially different picture of Earp's background and culpability, the very things considered

23  relevant and vital to a competent mitigation presentation." Id. at 1177.  The same might be said of

24  petitioner's childhood evidence here, particularly in combination with the evidence of his mental

25  health problems.

26  /////

1        3.  Evidence of Drug and Alcohol Use

2        Evidence of petitioner's substance abuse is clearly related to his mental health.

3  While the jury heard a fair amount about petitioner's use of drugs and alcohol, jurors did not have

4  expert testimony to help them understand the relationship of drug and alcohol use to petitioner's

5  mental problems and their contribution to his behavior on the day of the crimes.  An evidentiary

6  hearing is necessary on this aspect of claims 28 and 29, as well.

7        C.  Jailers Interfered with Petitioner's Right to Counsel - Claim 25[19]

8        The basis of claim 25 is the jail decision to take petitioner off anti-anxiety

9  medication right before the beginning of the penalty phase.  It appears that several days to a week

10  before the beginning of the penalty phase, petitioner was prescribed a short course of an anti-

11  anxiety medication by the jail physician.  He took the medication for three or four days.  On

12  August 3, 1988, the first day of penalty phase proceedings, Iversen told the judge: "The night

13  before last was the last time that he got the medication, because Dr. McLanahan knew the trial

14  was starting and thought he shouldn't have medication during trial."  Id.

15        Just prior to the beginning of the penalty phase, the defense made several motions,

16  including: (1) a motion for an independent finding that petitioner was incompetent as of July 15,

17  1988, the date the competency phase jury found petitioner competent, CT 4400; and (2) a motion

18  to continue the penalty phase based on petitioner's present incompetence, CT 4423.  In

19  declarations submitted by attorneys Philipsborn and Iversen, in testimony from an experienced

20  capital attorney who had interviewed petitioner and his counsel, and in statements to the court by

21  Philipsborn, Hawk, Iversen and McDowell, the judge was informed that petitioner's condition had

22  deteriorated in the few weeks since the competency hearing.  CT 4408-4420; RT 9518-9529,

23  9532-9535.  Mr. Philipsborn noted that petitioner had been more cooperative while on the

24

25        [19]  In his reply brief, petitioner admits some of the factual allegations made in his moving
   brief are incorrect.  In addition, he notes that he is not seeking an evidentiary hearing on claim
26  34, which involves trial court error.

1   medication.  RT 9521.  Mr. Iversen mentioned his concern about "the shift in medication."  RT

2   9542.  The judge found petitioner competent as of July 15.  RT 9461.  While the defense did not

3   specifically request a second competency proceeding, the trial judge found petitioner was

4   competent to proceed with the penalty phase and denied a request for a continuance.  RT 9537,

5   9543.

6          Petitioner actually argues that an evidentiary hearing is not necessary on this claim

7   because the facts are undisputed.  However, the factual issue, which is not resolved by the record,

8   is whether taking petitioner off the medication interfered with his relationship with his attorneys.

9   An evidentiary hearing is necessary to permit petitioner to show that his relationship with his

10  attorneys changed for the worse as the result of the discontinuation of petitioner's medication.

11         D.  Failure to Prepare Petitioner for his Allocution - Claim 35

12         The trial court originally denied petitioner's request to speak to the jury at the

13  penalty phase.  Iversen renewed the request shortly before the beginning of the penalty phase.  The

14  judge reversed himself based on new case law.  RT 9545-9546.  The judge also agreed with

15  Iversen's requests that he be allowed to lead petitioner through the allocution with questions,

16  without cross-examination afterwards.  RT 9546-9547.  Iversen asked the judge for "a brief period

17  of time to talk to Mr. Frye" so he could "make a determination what exactly he wants to do."  RT

18  9546.  The judge agreed.  RT 9547.[20]

19         Besides showing that petitioner's allocution was prejudicial, petitioner does not

20  show what more counsel could have done.  Petitioner's better issue is the trial court's refusal to

21  grant a continuance when petitioner's counsel told him petitioner had just been taken off

22

23         [20]  In his declaration, Iversen states that he requested a brief continuance to prepare
     petitioner for his allocution and that the continuance was denied.  SH Ex. 26 at 4.  As described
24   above, the record shows that the judge gave Iversen the brief continuance he asked for.
     Specifically, after resolving the issues about the allocution, the judge noted that it was "ten of
25   2:00.  What do you want?  2:15?"  Iversen responded, "That would be fine."  RT 9548.  In any
     event, to the extent petitioner seeks an evidentiary hearing, it would only be on the ineffective
26   assistance issues.  Issues of trial court error are based on the record.

1  medication and was having trouble controlling himself.  Because issues of trial court error are

2  resolved on the record, there is no basis for an evidentiary hearing on that aspect of this claim.

3  IV.  Jury Misconduct - Claim 42

4           Petitioner makes four allegations of juror misconduct: (1) Juror Fairfield sought the

5  advice of her minister on the penalty; (2) Juror Doncaster discussed the case with her husband;

6  (3) jurors discussed the possibility that life without parole did not mean petitioner would not be

7  released; and (4) jurors misunderstood the sentencing instructions.

8           There are two types of juror misconduct claims here.  First, petitioner claims jurors

9  had unauthorized communications with outside people.  Second, petitioner frames the claim of the

10 jury's discussion of the meaning of "life without parole" as consideration of extrinsic evidence.

11 On direct review, courts consider these claims under different standards.  "Where extraneous

12 material is submitted to the jury, the defendant will receive a new trial if the court finds a

13 'reasonable possibility' that the material could have affected the verdict."  United States v. Maree,

14 934 F.2d 196, 201 (9th Cir. 1991) (emphasis in original), abrogated on other grounds, United

15 States v. Adams, 432 F.3d 1092 (9th Cir. 2006).  "Where ex parte contacts are involved, the

16 defendant will receive a new trial only if the court finds 'actual prejudice' to the defendant."  Id.

17 On habeas, however, the introduction of extrinsic evidence only violates the constitution if it

18 substantially and injuriously affected the verdict.  Sassouian v. Roe, 230 F.3d 1097, 1108 (9th Cir.

19 2000).

20          Respondent raises an evidentiary issue with respect to petitioner's request to

21 submit evidence on claim 42.  Generally, jurors' statements are not admissible to impeach the

22 verdict.  Tanner v. United States, 483 U.S. 107, 115 (1987).  This rule is codified in Federal Rule

23 of Evidence 606(b), and applies to petitions for habeas corpus from state court prisoners.  See

24 Fed. R. Evid. 1101(e); see also Capps v. Sullivan, 921 F.2d 260, 262 (10th Cir.1990).  One

25 exception to the rule is juror testimony regarding "extraneous forces which influence jury

26 deliberations."  United States v. Jones, 132 F.3d 232, 245 (5th Cir. 1998) (citing Tanner, 483 U.S.

1  at 121 (juror use of alcohol and drugs not extraneous influence on jury deliberations)), aff'd, 527

2  U.S. 373 (1999); Peveto v. Sears Roebuck & Co., 807 F.2d 486, 489 (5th Cir. 1987) (jury

3  confusion regarding instructions not outside influence about which juror may competently testify).

4  Cf. Carter v. Bowersox, 265 F.3d 705, 718 (8th Cir. 2001) (no right to revisit verdict based on

5  juror's post-trial change of heart).[21]   However, juror testimony regarding extraneous influences is

6  limited.  Jurors may not testify to the effects of the extraneous influences on their decision

7  making.  Courts must make a determination about whether a reasonable juror would or would not

8  have been affected.

9         A.  Communications with Third Parties

10        Petitioner's primary claims are that Jurors Fairfield and Doncaster had improper

11  and prejudicial contacts with third parties.  Petitioner relies heavily on Caliendo v. Warden, 365

12  F.3d 691 (9th Cir.), cert. denied, 543 U.S. 927 (2004).  In Caliendo, the Court of Appeals held

13  courts must presume prejudice where jurors had conversations with a police officer witness, even

14  though those conversations did not involve the case before them.  "Any unauthorized

15  communication between a juror and a witness or interested party is presumptively prejudicial, but

16  the government may overcome the presumption by making a strong showing to the contrary." 365

17  F.3d at 696.  The court noted that an unauthorized communication that is de minimis would not

18  trigger the presumption of prejudice.  Id.  Caliendo is not applicable here.  The third parties in this

19  case, a minister and a spouse, were not "interested."

20  /////

21  /////

22  /////

23  /////

24  ─────────────

25  [21] An influence on only one juror is sufficient. "The Sixth Amendment guarantees
    criminal defendants a verdict by impartial, indifferent jurors. The bias or prejudice of even a
    single juror would violate [a defendant's] right to a fair trial." Dyer v. Calderon, 151 F.3d 970,

26  973 (9th Cir.1998).

1    The seminal case on this subject is <u>Remmer v. United States</u>, 347 U.S. 227 (1954).

2 In that case, a third party told a juror he could profit by bringing in a verdict favorable to the

3 defendant.  The Court held:

> 4    In a criminal case, any private communication, contact, or
>    tampering directly or indirectly, with a juror during a trial about the
> 5    matter pending before the jury is, for obvious reasons, deemed
>    presumptively prejudicial, if not made in pursuance of known rules
> 6    of the court and the instructions and directions of the court made
>    during the trial, with full knowledge of the parties. The presumption
> 7    is not conclusive, but the burden rests heavily upon the Government
>    to establish, after notice to and hearing of the defendant, that such
> 8    contact with the juror was harmless to the defendant.

9 347 U.S. at 229.  This is a broad statement that has been read by some courts to apply generally to

10 juror communications with third parties.  However, the Court of Appeals for the Ninth Circuit, in

11 noting the potentially broad applicability of <u>Remmer</u>, stated that it "was a jury tampering case, and

12 anything it said about other sorts of contacts with jurors is dicta."  <u>United States v. Dutkel</u>, 192

13 F.3d 893, 895 n.1 (9th Cir. 1999).  In the "run-of-the-mill ex parte contact case" the "burden rests

14 on the defendant to show prejudice."  <u>Id.</u> at 896 (citing with approval <u>United States v. Williams-</u>

15 <u>Davis</u>, 90 F.3d 490 (D.C. Cir. 1996) (exhortations from juror's husband to "nail" defendant not

16 subject to <u>Remmer</u> presumption)).

17    The record here shows Juror Fairfield sought out her minister between the guilt and

18 penalty phases "because of the . . . difficult decision remaining about whether Mr. Frye should be

19 sentenced to death."  SH Ex. 100 (Fairfield Decl.).  She asked her minister "what the Bible said

20 about the death penalty."  Ex. 12 (investigator notes of juror interviews) to Mot. for Evid. Hr'g.

21 The minister prepared a written, one and one-half page response, which included "quotations from

22 the Bible which were supplemented with writings by the minister."  <u>Id.</u>; Ex. T (Fairfield Decl.) to

23 Answer.  The response "basically said the people voted and enacted laws to determine what

24 crimes are and what the penalties should be."  Ex. T to Answer.  Fairfield told the investigator

25 that, "in her opinion, the minister would have given an individual the death penalty if the

26 individual was found guilty and the death penalty statutes applied."  Ex. 12 to Mot. for Evid. Hr'g.

1    　　　　The contact Juror Fairfield made with her minister was serious.  While she did not

2    appear to discuss the specifics of petitioner's case with the minister, she was asking for general

3    guidance on whether or not it was appropriate to impose the death penalty.  Combined with the

4    factual dispute over just what Fairfield asked and just what she was told, petitioner has shown a

5    possibility of success on the merits and an evidentiary hearing is warranted.

6    　　　　With respect to Juror Doncaster, the record shows that jurors recessed their penalty

7    phase deliberations on August 5, 1988 for the weekend.  CT 4514.  According to defense

8    investigators who interviewed jurors, several jurors told them that at that time the panel was

9    divided eleven to one in favor of death.  SH Exs. 104 & 105.  Juror Doncaster confirmed that she

10   was the holdout juror at the end of the first day of deliberations, Friday, August 5.  SH Ex. 102.

11   On Monday, August 8, 35 minutes after the jury resumed deliberations, the jury foreman sent

12   word to the court that the jury had reached a verdict.  RT 9786; CT 4517.

13   　　　　Ms. Doncaster states in her declaration that she "consulted" her husband sometime

14   before the final vote.  Id.  However, in her declaration prepared by the state, Ms. Doncaster stated

15   that she and her husband only talked about how she was doing; they never talked about what she

16   would do, what she should think, or how she would vote.  Ex. V to Answer.  Notes from the

17   state's investigator's interview with Doncaster also show that she felt "consulted" was not the

18   word she used but the one put in her declaration by the defense.  Ex. 12 to Mot. for Evid. Hr'g.

19   Relying solely on the use of the word "consulted" is not enough to turn Ms. Doncaster's

20   conversation with her husband into a claim of constitutional magnitude.  An evidentiary hearing is

21   not necessary on this aspect of claim 42.

22   /////

23   /////

24   /////

25   /////

26   /////

B. <u>Extrinsic Evidence</u>

To determine whether the introduction of extrinsic evidence into jury deliberations constitutes reversible error, courts consider the following factors:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

<u>Mancuso v. Olivarez</u>, 292 F.3d 939, 951-52 (9th Cir. 2002).

Before reaching these factors, however, the court must determine whether the evidence is, in fact, "extrinsic." Petitioner attempts to frame two of the jurors' discussions as involving the consideration of extrinsic evidence. First, petitioner claims that jurors considered whether life without parole really meant petitioner would never be released. The Court of Appeals has held that this is the sort of "intrinsic" jury discussion that courts will not examine. <u>Belmontes v. Brown</u>, 414 F.3d 1094, 1124 (9th Cir. 2005) ("Belmontes first asserts that the jurors based their decision on the view that "life without possibility of parole did not mean that Belmontes would spend the rest of his life in prison." Belmontes is not entitled to relief on this claim because it concerns intrinsic jury processes."), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 127 S. Ct. 469 (2006). Second, petitioner argues the jury misunderstood the sentencing instructions. This claim should be judged by the same standard. <u>Peveto</u>, 807 F.2d at 489. Because petitioner cannot prevail on them, an evidentiary hearing is not appropriate on petitioner's arguments that jurors considered extrinsic evidence.

V. <u>Shackling - Claim 44</u>

Claim 44 is that petitioner's due process rights were violated when jurors saw him shackled. The "Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified

by a state interest specific to a particular trial." <u>Deck v. Missouri</u>, 544 U.S. 622, 629 (2005).  In

an interview with the state's investigator, Juror Silvey said petitioner was visibly shackled during

trial.  Ex. 12 to Mot. for Evid. Hr'g.  Respondent simply argues the jurors must be wrong because

the judge ordered petitioner not be shackled, the prosecutor did not see petitioner shackled, and

the defense attorneys never objected to any shackling.  Because it is clear the trial court did not

find extraordinary circumstances justifying visible shackles, any visible shackles may have

violated petitioner's due process rights.  There is a factual dispute about whether or not jurors saw

petitioner shackled.  The only way to resolve this dispute is by taking evidence.  Cf. <u>Parrish v.

Small</u>, 315 F.3d 1131, 1135 (9th Cir. 2003).  An evidentiary hearing is necessary on claim 44.

    F.  <u>Conditions of Confinement - Claim 38</u>

        Claim 38 consists of four sub-claims:

| | |
|---|---|
| Claim 38.1 | Subjecting Mr. Frye to a Lifetime Condemned to Death Under the Conditions Maintained by the State of California Violates the Constitutional and International Legal Prohibitions on Excessively Cruel Capital Punishment |
| Claim 38.2 | The Infliction of Harsher than Necessary Carceral Punishment and Unnecessary Terror and Degradation during Unnecessarily Prolonged Judicial Review Proceedings Violates Mr. Frye's Due Process Rights |
| Claim 38.3 | The Change in Mr. Frye's Actual Sentence from Death to Indefinite Long-term Close Confinement, Coupled with Incidents of Torture, Terror and Degradation Followed by Death, Constitutes an Unforeseeable Expansion of the Penalty Imposed for Capital Crimes in Violation of Due Process |
| Claim 38.4 | The State is Inflicting Multiple Punishments upon Mr. Frye for the Same Crime |

        Petitioner states that he "seeks to present evidence regarding the conditions he

endures while his conviction and sentence is reviewed by operation of California law."  Reply at

79.  Petitioner argues there is no genuine dispute of material fact because respondent simply made

an across-the-board denial of all factual allegations in support of these claims.  Petitioner requests

leave to expand the record with the documentary evidence submitted with the evidentiary hearing

1   motion in support of claim 38.  The standard this court must apply for expansion of the record is

2   the same as the standard for determining whether an evidentiary hearing is appropriate.  Cooper-

3   Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir.), cert. denied, 126 S. Ct. 442 (2005).

4           While petitioner satisfies a Townsend requirement because "the merits of the

5   factual dispute were not resolved in the state hearing," it is not so clear claim 38 states a colorable

6   claim for relief.  The Court of Appeals for the Ninth Circuit recently held that a petitioner's claim

7   that twenty-three years on death row under horrific conditions violates the Eighth Amendment

8   cannot succeed on the merits because the California Supreme Court's denial of such a claim "was

9   not 'contrary to,' and did not involve 'an unreasonable application of, clearly established Federal

10  law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." Allen v.

11  Ornoski, 435 F.3d 946, 958 (9th Cir.), cert. denied, 126 S. Ct. 1140 (2006).[22]  As the Court

12  pointed out, the petitioner's "claim is devoid of support in federal or state law and therefore the

13  denial of habeas relief by the California Supreme Court . . . could not possibly be construed to be

14  "contrary to, or involve [ ] an unreasonable application of, clearly established Federal law, as

15  determined by the Supreme Court of the United States." Id. at 960.

16          The bases for each of the four subclaims of claim 38 are the conditions and length

17  of petitioner's confinement.  These are the same bases that supported the claim raised by Mr.

18  Allen.  Petitioner cites no clearly established federal law, as determined by the Supreme Court, for

19  his subclaims and this court finds none.  Petitioner's arguments in subclaims 38.1 and 38.2, that

20  his conditions and length of confinement violate the Eighth Amendment and due process, lack

21  support in federal law.  In fact, the Court of Appeals held otherwise in McKenzie v. Day, 57 F.3d

22  1493 (9th Cir. 1995) (prolonged incarceration on death row does not violate Eighth Amendment).

23  In subclaim 38.3, petitioner relies upon Bouie v. City of Columbia, 378 U.S. 347, 352-54 (1964).

24

25      [22]  The court's primary holding was that Mr. Allen could not raise the claim because it
26      was "second or successive."  435 F.3d at 958.  The statement in the text is the court's alternative
        ruling.

1  In Bouie, the Court held that judicial enlargement of a criminal statute, applied retroactively,

2  violates due process.  The Court held that a criminal statute must give fair warning of the conduct

3  it prohibits.  378 U.S. at 350.  The Court of Appeals has held specifically that Bouie does not

4  apply to retroactive sentence enhancements.  Holgerson v. Knowles, 309 F.3d 1200, 1203 (9th

5  Cir. 2002).  "Because the Supreme Court has not decided whether the due process fair warning

6  requirement outlined in Bouie applies to after-the-fact sentence increases, California's affirming

7  [petitioner's] judgment of conviction was not 'contrary to, or ... an unreasonable application of,

8  clearly established Federal law, as determined by the Supreme Court....' 28 U.S.C. § 2254(d)(1)."

9  Id.; see also United States v. Dupas, 419 F.3d 916, 920-21(9th Cir. 2005), cert denied, 126 S. Ct.

10  1484 (2006).  Finally, petitioner cites no direct support for his subclaim 38.4 that his years of

11  suffering on death row constitute a separate punishment for his crimes.

12           Each argument in claim 38 is novel and unsupported, in any fashion, by federal

13  law.  Accordingly, petitioner has not shown even a colorable basis for relief.  An evidentiary

14  hearing on claim 38 will be denied.

15           For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED

16  as follows:

17           1.     Petitioner's July 19, 2004 Motion for an Evidentiary Hearing is granted in

18                  part and denied in part.  The undersigned will hold an evidentiary hearing

19                  on:

20                  a.     Claims 2,[23] 3, 28, 29, 25, and 44;

21                  b.     The allegation in claim 7 that counsel was ineffective for failing to

22                         object to the prosecutor's vouching for Jennifer Warsing's

23                         credibility; and

24  /////

25  _____

26  [23]  While an evidentiary hearing is denied on claims 5 and 4, petitioner may present
     evidence of the factual allegations underlying those claims in support of claim 2.

1      c.     The allegation in claim 42 that Juror Fairfield communicated with

2             her minister.

3      Petitioner's motion is denied in all other respects.

4   2.     On December 19, 2006 at 10:00 a.m. in courtroom # 26, the undersigned

5          will hold a status conference.  Counsel need not file status reports but shall

6          be prepared to discuss procedures and a schedule for preparing for and

7          conducting an evidentiary hearing.

8   DATED:  December 1, 2006.

9

10  _____

11  U.S. MAGISTRATE JUDGE

12

13

14

15  fryeevihrg.or

16

17

18

19

20

21

22

23

24

25

26