1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JERRY GRANT FRYE,                    No.  2:99-cv-0628 LKK CKD

12              Petitioner,               DEATH PENALTY CASE

13         v.

14   WARDEN, San Quentin State Prison,    FINDINGS & RECOMMENDATIONS

15              Respondent.

16

17                              INTRODUCTION

18         Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to 28

19   U.S.C. § 2254.  In 2007, this court granted petitioner's motion for an evidentiary hearing on all or

20   parts of claims 2, 3, 4, 5, 7, 25, 28, 29, 42 and 44.  In 2008, the court heard testimony on the

21   allegations regarding Juror Fairfield in claim 42 and on claim 44.[1]  Between 2008 and 2010, the

22   parties conducted testimony depositions and prepared for additional portions of the evidentiary

23   hearing authorized by the court.  In 2011, however, the United States Supreme Court rendered

24   decisions changing the federal courts' analysis of habeas corpus petitions under section 2254.

25   This court then stayed the evidentiary hearing proceedings and ordered the parties to brief the

26

27   [1] The evidentiary hearing was conducted by the magistrate judge previously assigned to this case.
     However, the undersigned has carefully reviewed the transcripts of those proceedings in
28   preparing these findings and recommendations.

                                         1

1   application of 28 U.S.C. § 2254(d) to each claim for which petitioner was granted an evidentiary

2   hearing, and for claim 37, for which a motion for an evidentiary hearing is pending.

3       After careful consideration of the parties' briefs and of the state court record, this court

4   concludes that petitioner has satisfied the requirements of section 2254(d) for claims 28, 29, and

5   44, and for the allegations regarding Juror Fairfield in claim 42.  This court further concludes that

6   petitioner has failed to meet those requirements for claims 2, 3, 25 and 37, and for the portions of

7   claims 4, 5, and 7 for which the court had previously granted an evidentiary hearing.  Finally, this

8   court considers the evidence adduced in this federal proceeding on the allegations regarding Juror

9   Fairfield in claim 42 and on claim 44, and herein recommends denial of those claims on the

10  merits.

BACKGROUND FACTS[2]

I.  Guilt Phase

    A.  Prosecution's Case

        The prosecution's chief witness, Jennifer Warsing, testified under a grant of immunity.

Warsing first met petitioner in a Sacramento bar in April 1984 while she was separated from her

husband of many years.  A romantic relationship between Warsing and petitioner quickly

developed, and, in early May 1984, the couple moved in together in an apartment outside of

Sacramento.  On several occasions during the time they lived together, petitioner assaulted

Warsing.  Petitioner and Warsing returned to Sacramento in December 1984 or January 1985, and

resided together at the River City Motel.  Petitioner worked at a construction job next door to the

motel.

        Rick Evans worked with petitioner at the construction site and socialized with him outside

of work.  Evans testified he and petitioner discussed the prospect of quitting their jobs and

growing marijuana for profit instead.  Evans had access to a gold mining claim in Amador County

that members of his family had worked for many years.  In April 1985, petitioner and Evans quit

---

[2] This overview of the facts is derived from the California Supreme Court's findings of facts,
which are presumed to be correct, 28 U.S.C. § 2254(e)(1), and from this court's independent
review of the state court record.

their jobs to pursue the marijuana venture. With approximately $500 between them, they purchased camping equipment and other supplies. The next day, a group comprised of petitioner, Warsing, Evans and his girlfriend, and Warsing's adult son drove to the mining claim property in Amador County. In addition to the camping gear and supplies they had purchased, petitioner and Evans brought along marijuana seeds, a 12-gauge shotgun, a .22-caliber semiautomatic rifle, and ammunition.

A quarter-mile down the hill from the group's campsite was a cabin occupied by an older couple, Robert and Lucille (Jane) Brandt, who worked a gold mining claim with their son, Bobby. Evans testified that before setting up camp and sowing the marijuana seeds, he sought and obtained the Brandts' permission for the group to camp on the property. The campsite had no running water or electricity, and meals were prepared over an open campfire. Although petitioner and Warsing had a car when they moved to the campsite, they sold it to Warsing's son who left the group after a couple of days. Evans and his girlfriend returned to Sacramento a week or two later, leaving only petitioner and Warsing at the campsite. Before Evans departed, it was decided that Evans would return to the property once or twice a week with food and supplies, and petitioner would tend the marijuana plants.

About a week after moving to the campsite, Warsing met the Brandts and became friendly with them. Warsing would occasionally accompany Jane Brandt in the Brandts' 1982 Lincoln Towncar to run errands in town. On these excursions, Warsing became aware that Mrs. Brandt carried an unusually large amount of cash with her to pay for goods and services. Rick Evans testified petitioner and Warsing mentioned the Brandts' money during one of his weekly visits to the campsite. Petitioner also showed Evans a small glass container filled with about a quarter-inch of gold he had scraped from the bucket of the front-end loader used by the Brandts in their mining operation.

On the morning of May 14, 1985, petitioner and Warsing walked from their campsite down the hill to the Brandts' cabin. Warsing had agreed to accompany Mrs. Brandt to the dentist's office in case she did not feel well following her dental procedure. Sometime during the late morning of May 14, an acquaintance of the Brandts, Ron Wilson, drove to the cabin. Wilson

3

occasionally worked the Brandts' mining claim with them, receiving a percentage of the gold that was extracted.  Seeing the Lincoln gone, Wilson drove by the cabin without stopping, and proceeded up another road.  After investigating a potential mining area, Wilson hiked to the upper part of the claim, in the vicinity of petitioner's campsite.  As Wilson headed back down towards the cabin to see if anyone had returned, he met petitioner walking up the road.  Petitioner showed Wilson the marijuana-growing operation. A short time later, Wilson drove with petitioner into town where Wilson bought them lunch and a couple of beers.  After lunch, Wilson and petitioner made several more stops.  Wilson bought a carton of cigarettes for petitioner, and two 12-packs of beer.  Wilson also retrieved several flats of marijuana seedlings from his girlfriend's residence for petitioner to tend for him, and picked up some watering equipment from a friend.  During this time, petitioner and Wilson each consumed several more beers.

Petitioner and Wilson arrived back at the mining claim about 3:00 in the afternoon, and went up the hill to the campsite.  Mrs. Brandt and Warsing arrived back at the cabin some time later.  When Warsing got out of the car, Mrs. Brandt asked her to come down for coffee later in the evening.  Warsing said they probably would, and set off for the campsite up the hill.  When Warsing arrived at the campsite, petitioner and Wilson were talking and drinking beer.  Around dusk, Wilson left the campsite and drove home.

Warsing testified that shortly after Wilson's departure, petitioner said he saw the Devil moving around the campsite.  He also told her he thought he was being set up, and that he would "just take what he could."  Petitioner then stood by the fire where Warsing was heating water for coffee, and asked her if she had ever seen people dead before.  According to Warsing's testimony, petitioner was going to go down and kill the Brandts, and told her if she did not go with him, he would have to kill her too.  Hoping to run away, Warsing told petitioner she needed to use the campsite's makeshift bathroom.  Petitioner accompanied her, shotgun in hand.  When Warsing was finished, petitioner took her by the arm and walked down the hill toward the cabin, still clutching the shotgun in the other hand.

When petitioner and Warsing arrived at the Brandts' cabin, Mrs. Brandt greeted them, asking them to come inside.  Petitioner placed the shotgun against the kitchen doorway, and sat

4

down in a chair nearby.  Warsing sat at the table where Mrs. Brandt was working on an afghan

and began helping her.   Petitioner complained to Mr. Brandt that he had drunk too much and his

head was hurting.  Mr. Brandt started laughing.  When Mrs. Brandt got up and offered coffee,

petitioner said he would like a cup.  Hearing petitioner joking with Mr. Brandt and asking for

coffee, Warsing believed things had returned to normal, and she began to relax.  Moments later,

however, she heard a noise, and looked up to see petitioner pointing the shotgun at Mr. Brandt

who was now standing up in front of his recliner.  Petitioner shot Mr. Brandt, who then fell back

in the chair.  Mrs. Brandt turned and moved towards petitioner, with Warsing behind her.  She

yelled at petitioner to stop, and lunged at him.  Petitioner shot Mrs. Brandt in the chin and face,

and she fell onto the sofa.  Petitioner turned and shot Mr. Brandt a second time.  Warsing testified

she heard gurgly breathing from Mr. Brandt.  Petitioner told Warsing, "I am going to have to put

him out of it."  Warsing heard three blows, and then no more breathing.  According to Warsing's

testimony, she started moving towards the door to leave, but petitioner yelled at her to get the

money out of Mrs. Brandt's purse, which she did.  Petitioner then directed Warsing to go in the

bedroom and look for a suitcase containing Mrs. Brandt's gambling change.  Petitioner returned

to where Mr. Brandt's body lay, and went through his pockets.  Petitioner took vials of gold from

the kitchen counter, returned to the bedroom, and put the gold in Mrs. Brandt's suitcase.  He

ripped the gold nugget necklace from Mrs. Brandt's neck.  When Warsing started walking out the

door, petitioner called her back inside the kitchen, and directed her to pour water over his bloody

hands to clean them.  Petitioner took the shotgun and went out the door, ordering Warsing to get

into the Brandts' Lincoln.

Petitioner drove up the road leading to the campsite.  He ordered Warsing to get his

suitcase.  Meanwhile, petitioner kicked down the tents and knocked things over.  The two left the

campsite, with petitioner driving fast and recklessly in the direction of Placerville.  They stopped

for the night in Winnemucca, Nevada, and checked into a motel using the name Dixon,

petitioner's mother's maiden name.  Leaving the Brandts' Lincoln in a casino parking lot,

petitioner and Warsing purchased a car for $600 cash and drove to Elko, Nevada, for the night.

From there they traveled to Pocatello, Idaho, again registering in a motel under the name of

1    Dixon.  They went from Pocatello to Wyoming.  In Rapid City, Wyoming, they traded in their car

2    for a green pickup truck and $150 in cash.  While in Rapid City, petitioner and Warsing also sold

3    some gold to Jack Meyer, owner of Silver Mountain Coins.  Petitioner and Warsing continued

4    driving until they reached Belle Fourche, South Dakota.  Petitioner had Warsing drive through

5    town and back again, and told her this is where they would stay.  Warsing testified that en route

6    from California to Belle Fourche, petitioner would sit in the car and cry while she drove, and said

7    he was sorry he had killed the Brandts because "he really liked those old people."  According to

8    Warsing, petitioner said he was sorry for what he had done to her life too, because the authorities

9    would never believe she had nothing to do with it since her fingerprints were all over everything.

10          Meanwhile, on the morning of May 16, Bobby Brandt returned to his parents' cabin in

11   Amador County.  He noticed the Lincoln was gone and the doors to the cabin wide open. A dog

12   apparently belonging to petitioner and Warsing was hanging around in front of the cabin.  When

13   Bobby walked inside, he saw his father lying on his back on the floor with his pants' pockets

14   turned inside out.  He then went over to where his mother was sitting on the couch, touched her,

15   and realized she was dead.  Bobby ran out of the cabin and down the lane to call police from a

16   home nearby.

17          Inside the cabin, the responding officers found Mrs. Brandt on the couch slumped over to

18   her left side, and Mr. Brandt lying face up on the floor near the recliner, blood down the front of

19   him and on the furniture.  An expended 12-gauge shotgun shell was on the floor next to Mr.

20   Brandt's head.  Two or three suitcases were also on the floor, their contents strewn about the

21   room.  Because the Amador County Sheriff's Department did not have its own forensics lab,

22   officers called a crime scene team from the California Department of Justice to process the cabin.

23   The next day, Bobby Brandt returned to the cabin to identify what, if anything, was missing from

24   his parents' home.  He determined that several items had been taken, including vials of gold, $100

25   bills given to his mother by his father, his mother's suitcase containing silver dollars, and her

26   necklace with the gold nuggets.  He also recognized petitioner's denim jacket hanging on the

27   back of a kitchen chair.

28   /////

6

Sometime around the end of May 1985, petitioner and Warsing settled in Belle Fourche, South Dakota.  Under the name Dixon, they rented an apartment and got jobs, petitioner skidding logs and Warsing waiting tables in a café.  Shortly after arriving, petitioner cut his hair, and grew a goatee.  He had Warsing buy him long-sleeved shirts to cover his tattoos.

On July 6, 1985, at about 2:30 a.m., Belle Fourche police received a call regarding a disturbance at petitioner's apartment.  Warsing left with one of the officers to go to the police station.  Following her departure, petitioner was arrested for assault and taken to the police station four blocks away.  Because the station had only one interview room, Officer Jepsen remained in the patrol car with petitioner while Warsing was inside giving a statement.  While sitting in the car, petitioner asked the officer, "Do you want a big one?"  When Jepsen didn't reply, petitioner said, "Have you heard of Jerry Frye?"  He told the officer he was wanted in California for a double murder.

Officers received verification of California arrest warrants for petitioner and Warsing.  Petitioner, who appeared to be intoxicated and depressed, was advised of his <u>Miranda</u> rights and agreed to give a videotaped statement.  Petitioner indicated he did not know if he killed the Brandts or not, but Warsing had told him he did, and that he had had alcoholic blackouts in the past.  Warsing was also arrested and taken into custody.  At the police station, she told the Belle Fourche officers what she remembered about the night the Brandts were killed.  Belle Fourche police contacted officers in Amador County, advising them that petitioner and Warsing were in custody in a jail in nearby Deadwood, South Dakota.  On July 7, Amador County officers arrived in Deadwood to interview them.  Petitioner was extradited to California.  On his return, he was permitted to talk with Warsing by telephone through a glass partition in the jail's visiting room.

Warsing continued to cooperate with police.  Accompanied by Amador County investigators, she retraced the route she and petitioner took on their cross-country flight from the Brandts' cabin, pointing out certain items that had been discarded or left behind along the way.  With Warsing's assistance, investigators recovered the murder weapon thrown out of the car window along Highway 49 in Amador County on the day of the murders.  Warsing later entered into a written immunity agreement with the Amador County District Attorney.

7

1      B. <u>Defense Case at the Guilt Phase</u>

2      The defense sought to cast doubt on Warsing's account of the Brandts' deaths. Dr. John

3 Thornton, a professor of forensic science at the University of California, conducted an

4 examination of the physical evidence aspects of the prosecution's case, making a number of visits

5 to the Brandts' cabin following the murders. He testified that, in his opinion, the Department of

6 Justice inadequately processed the crime scene. He also offered his expert opinion as to the

7 sequence of events at the time the shootings took place in the Brandts' cabin, a scenario differing

8 from the one presented by Jennifer Warsing's testimony.

9      Dr. Peal, a psychiatrist who both evaluated and treated petitioner, testified he did not

10 believe Warsing's account of the Brandt murders. His conclusion was based on what petitioner

11 told him of Warsing's personal history, corroborated by investigative reports. Defense counsel

12 also presented testimony regarding petitioner's neurological impairments and their effect on his

13 ability to recapture or articulate memory. Counsel originally intended to call petitioner to testify

14 on his own behalf. As the trial progressed, however, counsel began to question that strategy, and

15 ultimately advised petitioner to refrain from taking the stand. Petitioner followed the advice of

16 counsel and did not testify.

17      C. <u>Verdict at the Guilt Phase</u>

18      On May 9, 1988, the jury rendered its verdict, finding petitioner guilty of two counts of

19 first degree murder, first degree robbery, residential burglary, and the unlawful driving and taking

20 of a vehicle. The jury also found true the allegations that petitioner was armed with a firearm and

21 personally used a firearm during the commission of the offenses. Finally, the jury found true the

22 special circumstance allegations: that petitioner committed multiple murders and that he

23 committed them while engaged in robbery and burglary.

24 II. <u>Competency Trial</u>

25      After the jury's verdict of guilty, the defense questioned petitioner's competence. The

26 trial judge decided there was sufficient question of petitioner's competence and ordered a

27 competency hearing before a new jury. A new attorney, John Philipsborn, was appointed to

28 "represent" petitioner by arguing he was not competent. Philipsborn put on petitioner's trial

attorneys, Judd Iversen and Richard Hawk.  Both testified that petitioner was unable to assist them, particularly after the guilt phase verdict.  Dr. Peal testified that petitioner suffered brain damage, and that petitioner's mental problems became more acute as the penalty phase approached.  Dr. Peal concluded that petitioner was not competent at that time.  Dr. Peal also testified that, despite his guilt phase testimony that he was hired to examine petitioner for the possibility of a challenge to his competency, he was only hired to evaluate and treat petitioner. He also testified that there was no basis for a competency proceeding during the guilt phase because "we had not completed an evaluation."

The state put on psychiatrist Patricia White, psychologist Grant Hutchinson and a deputy from the jail to testify to petitioner's "normal" behavior.  The jury found petitioner competent. Petitioner's attorneys later moved the judge to make an independent finding that petitioner was not competent.  After holding a brief evidentiary hearing at which attorney James Thomson, who had interviewed petitioner several times, testified, the judge also found petitioner competent.

III.  Penalty Phase

On August 3, 1988, the penalty phase commenced; the defense presented its case first. Despite his attorneys' misgivings, petitioner insisted upon speaking to the jury.  The judge permitted counsel to question petitioner without providing the prosecution an opportunity to cross-examine him.  Petitioner's attorney Judd Iversen led him through the allocution with questioning.  Iversen's questions to petitioner made clear that petitioner wanted to speak to the jury because he had problems with the guilty verdict, that petitioner was afraid what he was going to say might make the jurors angry, and that petitioner did not want the jurors to be angry at him. Petitioner then gave a rambling statement stating his disbelief at being found guilty and deriding the jury for taking so little time to arrive at a guilt phase verdict.

The defense presented a number of lay witnesses but no expert witnesses.  Most were family members who testified briefly that petitioner had some redeeming qualities (a protective big brother, a good artist) and that they loved him.  A couple of witnesses testified about petitioner's background growing up in Indiana, including the changes he went through at age 15 following his mother's departure from Indiana with his three younger siblings and the serious car

accident he suffered shortly thereafter.  Each asked the jury to spare his life.  In addition, the

defense presented a stipulation that jailers in Amador County and Florida (where petitioner served

time on a sexual assault conviction) would testify that petitioner did not present a problem when

incarcerated.  Finally, a jail chaplain from South Dakota testified that he spent three hours with

petitioner in the Deadwood jail and petitioner "accepted God that night" and is now a changed

man.

On August 8, 1988, the jury rendered its verdict: death.

The prosecution put on no witnesses.  The prosecutor made a statement describing the

aggravating nature of the crime.  In addition, the parties stipulated to petitioner's prior sexual

assault conviction in Florida.

On August 8, 1988, the jury rendered its verdict: death.

POST-TRIAL PROCEDURAL HISTORY

Ten years later, the California Supreme Court affirmed petitioner's conviction and

sentence.  People v. Frye, 18 Cal. 4th 894 (1998), cert. denied, 526 U.S. 1023 (1999).

Petitioner's first state habeas petition was denied on October 14, 1998.  In re Frye, No. S062455.

He filed a second state habeas petition in June 2000.  The California Supreme Court denied it on

January 24, 2001.  In re Frye, No. S087755.  The California Supreme Court denied both state

habeas petitions summarily on the merits.

Petitioner initiated this habeas action in federal court by filing a request for appointment

of counsel on March 29, 1999.  After the denial of his second state habeas petition, he filed a

second amended petition here on March 31, 2003.  (ECF No. 104.)  Respondent filed an answer

on July 1, 2003.  (ECF No. 112.)  On July 19, 2004, petitioner filed a motion for evidentiary

hearing.  (ECF No. 162.)  The court granted the motion in part.  (ECF Nos. 214, 227.)  In 2008,

the court heard testimony regarding petitioner's claims 42 and 44.  The parties then briefed the

merits of those claims.  (ECF Nos. 421, 437, 446.)  Over the next two years, the parties conducted

some of the testimony depositions on the remaining evidentiary hearing claims.  Also during that

time, after completion of complex discovery, petitioner filed a motion for an evidentiary hearing

on claim 37.  (ECF No. 549.)

/////

10

1    In November 2010, the court scheduled the in-court portion of the evidentiary hearing.

2    (ECF No. 546.)  Before that hearing began, however, the United States Supreme Court issued its

3    decision in Cullen v. Pinholster, 131 S. Ct. 1388 (2011).  This court vacated the scheduled

4    evidentiary hearing and ordered briefing to address:  (1) whether this court may consider evidence

5    introduced for the first time in this federal proceeding when reviewing a state court decision

6    under 28 U.S.C. § 2254(d); (2) whether the California Supreme Court's decision meets the

7    standards of 28 U.S.C. § 2254(d) for the claims on which petitioner was granted an evidentiary

8    hearing and for claim 37; and (3) whether this court previously found petitioner satisfied the

9    requirements of section 2254(d) for each claim on which the court granted an evidentiary hearing.

10    (ECF No. 584.)  In these findings and recommendations, the undersigned addresses each of those

11    questions.

12                              APPLICATION OF 28 U.S.C. § 2254(d)

13    I. Legal Standards

14    Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a

15    petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is

16    available under section 2254 only on the basis of some transgression of federal law binding on the

17    state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768

18    F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the

19    interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

20    Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

21    Where a state court resolves a federal constitutional claim on the merits, the petitioner in

22    federal court may not succeed on that claim absent a showing that the state court resolution of the

23    claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard

24    when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death

25    Penalty Act (the "AEDPA").  To meet the standard, a petitioner must establish that the state

26    court's adjudication of the claim

27                    (1) resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established Federal law, as
28                    determined by the Supreme Court of the United States; or

                                              11

1    (2) resulted in a decision that was based on an unreasonable
2    determination of the facts in light of the evidence presented in the
     State court proceeding.

3    28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1)

4    or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman,

5    551 U.S. 930, 953 (2007) (When section 2254(d) is satisfied, "[a] federal court must then resolve

6    the claim without the deference AEDPA otherwise requires.");  Frantz v. Hazey, 533 F.3d 724,

7    737 (9th Cir. 2008).

8         In 2011, the Supreme Court clarified the section 2254(d) standards.  First, the Court made

9    clear that, when making the determination that a state court decision was contrary to law or

10   unreasonable, a federal court may not consider evidence which was not before the state court.

11   Cullen v. Pinholster, 131 S. Ct. 1388, 1398-1401 (2011).  Second, the Court stressed the

12   deferential nature of the section 2254(d) standards.

13        As a condition for obtaining habeas corpus from a federal court, a
          state prisoner must show that the state court's ruling on the claim
14        being presented in federal court was so lacking in justification that
          there was an error well understood and comprehended in existing
15        law beyond any possibility for fairminded disagreement.

16   Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).  Thus, federal habeas relief is precluded if

17   "'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786

18   (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  This objective standard of

19   reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v.

20   Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012), cert. denied, 133 S. Ct. 1262 (2013).  The

21   federal court must engage in the deferential review even where the state court has not provided a

22   reasoned decision.  Richter, 131 S. Ct. at 784-785.

23        In the present case, some of petitioner's claims discussed herein were raised, and rejected,

24   in the California Supreme Court's reasoned decision on direct appeal.  However, most were

25   raised in his state habeas petitions, which were summarily denied.  A summary denial is

26   presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948,

27   957 & n. 3 (9th Cir. 2012) (The presumption that the denial is based on the merits, rather than on

28   procedural grounds, may be overcome if it is not "plausible."), cert. denied, 133 S. Ct. 1465

12

1   (2013).[3]  While the federal court cannot analyze just what the state court did when it issued a

2   summary denial, the federal court must review the state court record to determine whether there

3   was any "reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.  The

4   federal court "must determine what arguments or theories ... could have supported, the state

5   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

6   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

7   Court." Id. at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable

8   basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013)

9   (quoting Richter, 131 S. Ct. at 784), cert. denied, 2013 WL 3912909 (Nov. 4, 2013).[4]

10           When reviewing the California Supreme Court's summary denial of a petition, this court

11   must consider that

12           the California Supreme Court's summary denial of a habeas petition
             on the merits reflects that court's determination that 'the claims
13           made in th[e] petition do not state a prima facie case entitling the
             petitioner to relief.' It appears that the court generally assumes the
14           allegations in the petition to be true, but does not accept wholly
             conclusory allegations, and will also "review the record of the trial
15           ... to assess the merits of the petitioner's claims."

16   Pinholster, 131 S. Ct. at 402 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing

17   People v. Duvall, 9 Cal. 4th 464, 474 (1995)).  Accordingly, if this court finds petitioner has

18   unarguably presented a prima facie case for relief on a claim, the state court's summary rejection

19   ─────────────────

20   [3]  In a supplemental brief, petitioner argues the California Supreme Court's summary denial of his
     claims was a procedural, not a merits, ruling.  (ECF No. 631.)  However, the portion of the
21   Supreme Court case petitioner cites in his supplemental brief to support this argument is taken out
     of context.  (Id. at 2.)  In fact, the quoted language from Johnson v. Williams, 133 S. Ct. 1088,
22   1097 (2013) cited by petitioner was used by the Supreme Court to show that the presumption that
     a silent denial is on the merits may be rebutted if it can be shown a state court must have rejected
23   the claim as the result of inadvertence.  The Court in Johnson held that the state court's explicit
     consideration of the state law aspect of a claim without comment on the federal law aspect of that
24   claim did not necessarily lead to the conclusion that the state court had failed to consider the
     federal claim on the merits.  The Court relied in large part on its prior decision in Richter.
25
     [4]  Throughout his briefing, petitioner looks to respondent's arguments before the California
26   Supreme Court to determine the bases for the state court's summary denial of his habeas claims.
     However, petitioner fails to explain why this court must assume the state court's denial was based
27   on arguments raised by respondent.  Richter appears to indicate that this court must consider any
     potential support for the state court's denial of each claim.
28

                                                 13

1   of that claim would be unreasonable.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004);

2   Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

3     Under subsection (d)(1), a state court decision is "contrary to ... clearly established

4   Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result

5   different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent,

6   538 U.S. 634, 640 (2003).  A state court decision is an "unreasonable application" of clearly

7   established federal law if "the state court correctly identifies the governing legal principle ... but

8   unreasonably applies it to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694

9   (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  "Clearly established Federal

10  law" is found in the United States Supreme Court's "applicable holdings."  Carey v. Musladin,

11  549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's]

12  decisions' at the time the state court decides the matter."  Cannedy v. Adams, 706 F.3d 1148,

13  1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on

14  other grounds, 2013 WL 3744048 (9th Cir. Jul. 16, 2013).  "'[C]ircuit court precedent may be

15  persuasive in determining what law is clearly established and whether a state court applied that

16  law unreasonably.'"  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Maxwell v.

17  Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine

18  or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e]

19  [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing

20  Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)(per curiam)).  Nor may it be used to

21  "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

22  it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further, where

23  courts of appeals have diverged in their treatment of an issue, it cannot be said that there is

24  "clearly established Federal law" governing that issue.  Carey, 549 U.S. at 77.

25    There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler, 693 F.3d at 1146.

26  He may show the state court's findings of fact "were not supported by substantial evidence in the

27  state court record" or he may "challenge the fact-finding process itself on the ground it was

28  deficient in some material way."  Id. (citing Taylor, 366 F.3d at 999-1001); see also Hurles v.

1   Ryan, 706 F.3d 1021, 1038-39 (9th Cir. 2013) (If a state court makes factual findings without an

2   opportunity for the petitioner to present evidence, the fact-finding process is deficient and the

3   state court opinion is not entitled to deference.)  The standard for determining whether the state

4   court's factfinding process is insufficient requires the federal court to "be satisfied that any

5   appellate court to whom the defect [in the state court's fact-finding process] is pointed out would

6   be unreasonable in holding that the state court's fact-finding process was adequate."  Hibbler, 693

7   F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).  The state

8   court's failure to hold an evidentiary hearing does not automatically render its fact finding

9   process unreasonable.  Id. at 1147.  However, the Ninth Circuit explained in Hibbler that federal

10  standards for determining when an evidentiary hearing is mandatory are a useful guide to

11  determining the reasonableness of the state court's refusal to hold a hearing:

> A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question. See Earp, 431 F.3d at 1170 (noting that a state court is not required to hold an evidentiary hearing when it is possible to resolve the factual question "based on 'documentary testimony and evidence in the record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's factfinding procedures were reasonable; this is a fact-bound and case-specific inquiry.

> Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166-67, 1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474.  More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise

15

precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. " '[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.' " Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998)).

While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). . . . Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965-66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference). The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

693 F.3d at 1147-48.

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court may review the merits of the claim de novo. See Frantz, 533 F.3d at 737. For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Pinholster, 131 S. Ct. at 1401. As stated above, this court has previously held that petitioner met those standards for all claims addressed herein, except claim 37, which is the subject of a pending motion for an evidentiary hearing.

16

1    For the reasons set forth below, this court finds that four of petitioner's claims survive

2    section 2254(d) review.

3    II. Petitioner's Challenges to the Application of Section 2254(d)

4        A. Supremacy Clause

5    Petitioner argues that a state rule which frustrates the enforcement of federal law violates

6    the Supremacy Clause.  Petitioner relies primarily on Supreme Court statements in a 1950 case

7    that a "federal right cannot be defeated by the forms of local practice."  Brown v. Western Ry. of

8    Alabama, 338 U.S. 294, 296 (1950).  In Brown, the Court considered a Georgia law that required

9    a state court considering a demurrer to construe the complaint's allegations "most strongly against

10   the pleader."  Id. at 295.  The Supreme Court held that it would not defer to this state court

11   practice when considering whether the complainant had made a prima facie showing of the

12   violation of a federal law.  "[W]e cannot accept as final a state court's interpretation of allegations

13   in a complaint asserting it."  Id. at 296.

14   Petitioner contends that in a California habeas proceeding, California law recognizes a

15   presumption that the state court conviction is accurate.  He relies upon statements by the

16   California Supreme Court that "[f]or purposes of collateral attack, all presumptions favor the

17   truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the

18   burden of overturning them."  People v. Duvall, 9 Cal. 4th 464, 474 (1995) (quoting People v.

19   Gonzalez, 51 Cal. 3d 1179, 1260 (1990)) (emphasis in original).  According to petitioner, the

20   state court's reliance upon this presumption creates a burden on petitioner's federal claims that

21   runs afoul of the Supreme Court's concerns in Brown.

22   For several reasons, petitioner's Supremacy Clause argument is without merit.  First,

23   petitioner takes the quoted portion from Duvall out of context.  The California Supreme Court

24   described the presumption in favor of the state conviction as the reason the habeas petitioner,

25   rather than the state, bears the burden of pleading and proof.  The state court went on to describe

26   the requirements for a state habeas petition:  it must "state fully and with particularity the facts on

27   which relief is sought," and it must "include copies of reasonably available documentary evidence

28   supporting the claim."  Duvall, 9 Cal. 4th at 474.  Because the court "presume[s] the regularity of

17

1   proceedings that resulted in a final judgment," "the burden is on the petitioner to establish

2   grounds for release" and "[c]onlcusory allegations made without any explanation of the basis for

3   the allegations do not warrant relief." Id. (internal citations omitted). There is no question that

4   federal law is the same. A habeas petitioner in federal court also carries the burden of proving his

5   claims. 28 U.S.C. § 2254; Lambert v. Blodgett, 393 F.3d 943, 970 (9th Cir. 2004).

6        Second, the underpinning for petitioner's Supremacy Clause argument is that federal law

7   does not impose such a "presumption." That is, of course, incorrect. Federal courts also presume

8   a state court conviction is final and correct. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

9   (adopting a more lenient standard for harmless error review in habeas cases because use of

10  Chapman harmless error standard "undermines the States' interest in finality and infringes upon

11  their sovereignty over criminal matters"); Duckworth v. Eagan, 492 U.S. 195, 210 (1989)

12  (recognizing difference between rules applied on direct review and those applied "to a

13  presumptively final criminal judgment which is collaterally attacked in a federal habeas corpus

14  proceeding") (O'Connor, J., concurring).

15       B. Article III

16       Petitioner also argues that if AEDPA requires federal court deference to "novel state-court

17  rules for applying the Constitution," then it violates Article III of the United States Constitution

18  by encroaching upon the federal courts' role as the final arbiters of federal law. (ECF No. 612 at

19  26-27.) This argument relies upon the same interpretation of state law, discussed in the prior

20  section, that Duvall and Gonzalez somehow place a higher pleading burden upon habeas

21  petitioners than does federal law. For the reasons discussed above, that interpretation is incorrect,

22  leaving petitioner's Article III argument similarly without merit.

23       C. Suspension Clause

24       Petitioner's Suspension Clause argument rests on the same incorrect underpinning.

25  Moreover, as respondent points out, a law acts to suspend the writ of habeas corpus in violation of

26  the Constitution only where it explicitly bars habeas review. Denmore v. Kim, 538 U.S. 510, 517

27  (2003). In fact, the Ninth Circuit Court of Appeals has considered, and rejected, the argument

28  petitioner makes here. In Crater v. Galaza, 491 F.3d 1119 (9th Cir. 2007), the court considered

18

1   whether the deference due a state court under 28 U.S.C. § 2254(d)(1) constituted a suspension of

2   the writ.  The court held it did not.  First, a suspension of the writ of habeas corpus occurs only

3   when Congress "clearly and unambiguously" removes all federal habeas corpus jurisdiction.  491

4   F.3d at 1124 n. 5.  The AEDPA does not repeal federal habeas jurisdiction.  The court in Crater

5   also rejected an argument that section 2254(d)(1) "effectively suspends the writ."  Id. at 1124-25.

6   The court pointed out that altering the standards for granting habeas relief is not the same thing as

7   suspending the privilege of the writ.  Id. at 1125-26 (citing Felker v. Turpin, 518 U.S. 651

8   (1996)).  It is worth noting that petitioner never mentions Denmore, Felker, or Crater in his

9   briefing.  Instead, petitioner relies exclusively on Boumediene v. Bush, 553 U.S. 723 (2008) in

10  which the Court struck down a statute denying some aliens access to the habeas remedy.

11  Petitioner has made no comprehensible argument that the AEDPA suspends the writ of habeas

12  corpus.

13          D.  Liberty Interest

14          Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would

15  entitle him to relief," then the court will issue an order to show cause requiring a response from

16  the state.  Duvall, 9 Cal. 4th at 475.  Issuance of an order to show cause triggers rights to conduct

17  fact-finding in support of claims in the petition.  Id. at 475-77.  Petitioner creatively asserts that

18  this rule creates a liberty interest in the state habeas procedures.  That assertion cannot form the

19  basis of a due process argument.  "[A]n expectation of receiving process is not, without more, a

20  liberty interest protected by the Due Process Clause."  Olim v. Wakinekona, 461 U.S. 238, 250 n.

21  12 (1983); Elliott v. Martinez, 675 F.3d 1241, 1245-46 (10th Cir. 2012).

22          E.  Claim 39/Fairmindedness of California Supreme Court

23          Petitioner argues the court should consider here the allegations made in his claim 39 that

24  political and economic pressures cause the California Supreme Court to be arbitrary and biased in

25  its review of capital cases.  (Pet., ECF No. 103 at 282.)  He attaches a 22-page, single-spaced

26  argument challenging the "fairmindedness" of the California Supreme Court.  This argument

27  appears to go well beyond the contours of claim 39 set out in the petition.  (ECF No. 104 at 282-

28  302.)  From the outset, however, petitioner's argument suffers a basic problem – the premise from

1    which petitioner launches his fairmindedness challenge is unsupported.  Petitioner claims "[t]he

2    fairmindedness of the state court is a precondition to AEDPA deference."  (ECF No. 612-7 at 1.)

3    He cites two cases for this premise, Harrington v. Richter, 131 S. Ct. 770 (2011) and Bobby v.

4    Dixon, 132 S. Ct. 26 (2011) (per curiam).  Neither supports petitioner's suggestion that this court

5    may take evidence regarding the state court's alleged bias against death penalty cases.

6            In Richter, the Court described the standard for determining whether a state court's

7    decision was reasonable under 28 U.S.C. § 2254(d).  One iteration of that standard is cited by

8    petitioner in support of this argument – "A state court's determination that a claim lacks merit

9    precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

10   the state court's decision."  131 S. Ct. at 786.  From this statement describing federal court review

11   of a state court decision, petitioner derives the conclusion that "[t]he fairmindedness of the state

12   court is a precondition to AEDPA deference."  (ECF No. 612-7 at 1.)  Nothing about this standard

13   of federal court review gives this court license to examine possible bias by the state court based

14   on economic and political pressures.  The Court in Bobby simply cites the "fairminded jurists"

15   standard from Richter when considering the reasonableness of the Ohio Supreme Court's

16   determination that the defendant's Miranda rights had not been violated.  In neither Richter nor

17   Bobby did the Court examine the state court's process for bias.

18           Petitioner's argument appears to derive from the California Supreme Court lack of

19   explanation for its habeas decision.  However, this court is required to defer to that unexplained

20   decision just as it would an explained one.  The Supreme Court's opinion in Richter makes very

21   clear that deference is due the state court's decision regardless of whether or not the state court

22   provided reasons for its merits ruling.  131 S. Ct. at 784-85.  The Court also rejected any

23   recognition of the "theoretical possibility that members of the California Supreme Court may not

24   have agreed on the reasons for denying the petition."  Id. at 785.  The Court noted that it had

25   previously recognized the possibility that a single rationale for a state court decision may be not

26   only "undiscoverable" but "nonexistent."  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

27   (1991)).  The fact that a single rationale may be nonexistent did not mean the state court decision

28   was therefore invalid or otherwise not subject to deference under section 2254(d).  See id.  The

1  Court specifically refused to engage in speculation about the state court's decision-making

2  process.

3       Further, to the extent petitioner relies upon the statement in <u>Pinholster</u> that this court must

4  consider what the state court "knew and did," as set out in <u>Richter</u>, that inquiry requires this court

5  to consider what evidence was before the state court and look at the state court's rules for

6  considering claims.  Nothing requires this court to speculate about or investigate the state court's

7  internal processes.  In fact, <u>Richter</u> makes clear that this court must consider any possible bases

8  for the state court's merits determination.  131 S. Ct. at 786 (federal court must examine what

9  "arguments or theories ... could have supported the state court's decision").  A petitioner satisfies

10  section 2254(d) by showing there is "no reasonable basis" for the state court's decision.

11  <u>Pinholster</u>, 131 S. Ct. at 1402 (quoting <u>Richter</u>, 131 S. Ct. at 784).

12       F.   <u>Miscellaneous Other Arguments</u>

13       Petitioner also argues that the California Supreme Court regularly adjudicates ineffective

14  assistance of counsel claims contrary to the dictates of <u>Strickland v. Washington</u>, 466 U.S. 668

15  (1984).  Unlike the other arguments in this portion of his brief, this argument does not challenge

16  the applicability of section 2254(d).  Rather, it is part of petitioner's challenge to the California

17  Supreme Court's denial of his ineffective assistance of counsel claims.  The argument is

18  addressed below in the discussions of petitioner's ineffective assistance of counsel claims.

19       G.   <u>Request for Discovery & Evidentiary Hearing re Section 2254(d) Challenges</u>

20       Here and there in his arguments regarding the application of section 2254(d) generally,

21  petitioner mentions that discovery and an evidentiary hearing are necessary.  Petitioner argues

22  this fact-finding is required if "the state disputes Mr. Frye's evidence regarding the state court

23  processes."  (ECF No. 612 at 3.)  Petitioner provides very few descriptions of what that fact-

24  finding might be and almost no legal justification for it.  The few requests this court ferreted out

25  include a request for a subpoena of internal staff memoranda from the California Supreme Court

26  (ECF No. 629 at 9-10), and a barely comprehensible request to present expert testimony

27  "regarding the consequences for the legitimacy and hence the efficacy of the federal courts were

28  they to declare that process, as applied in Mr. Frye's case, was so reasonable as to be worthy of

1   deference that forestalls de novo review" (ECF No. 629 at 10).  In addition, petitioner seeks to

2   develop evidence on claim 39, a claim for which he did not seek an evidentiary hearing.

3   Petitioner's requests for discovery and an evidentiary hearing are denied because they are not

4   specific, not legally justified, and/or not reasonable.

5   III.  Did this Court Previously Find Section 2254(d)(2) Satisfied?

6          In his April 21, 2011 brief, petitioner argued that this court determined previously that he

7   had satisfied section 2254(d)(2) for the claims for which he was granted an evidentiary hearing.

8   (ECF No. 581 at 9-10.)  However, as described above, the standards of "reasonableness" have

9   changed since the court issued its evidentiary hearing order in 2006.  In 2006, the assigned

10  magistrate judge held that a state court decision runs afoul of section 2254(d)(2) where petitioner

11  pleads facts which, if true, would entitle him to relief and establishes the existence of one of the

12  remaining evidentiary hearing factors set out in Townsend v. Sain, 372 U.S. 293, 313 (1963).

13  (ECF No. 214 at 15-16.)  However, nowhere in the assigned magistrate judge's analysis is there a

14  determination that the state court's decision was unreasonable under the standards described in

15  Richter.  Further, after 2006, the mechanisms for review under section 2254(d)(2) changed as

16  well.  Contrary to Pinholster's limitation on the consideration of evidence that was not before the

17  state court, the magistrate judge considered the validity of petitioner's claims based on evidence

18  presented for the first time in federal court.  (ECF No. 214.)  Based on the substantial changes in

19  the law wrought by Richter and Pinholster, which were unavailable to the magistrate judge in

20  2006, the undersigned does not consider the prior magistrate judge's decision to constitute a

21  determination that would satisfy current standards of analysis under section 2254(d).

22  IV.  Application of 28 U.S.C. § 2254(d) to Petitioner's Evidentiary Hearing Claims and Claim 37

23         The court granted petitioner's motion for an evidentiary hearing on the following seven

24  claims:

25              1.  Claim 2, Ineffective Assistance for Failure to Investigate and Present a Mental

26                  State Defense.  (ECF No. 214 at 33-36.)

27         The court denied a hearing on claims 4 and 5, which involve the relationship of

28  petitioner's trial attorney Richard Hawk with petitioner and with his other appointed attorneys.

22

1   (Id. at 22-24.)  However, the court found the evidence supporting claims 4 and 5 relevant to claim

2   2 and therefore would be admissible during the evidentiary hearing.  (Id. at 22-24, 36, 52 & n.

3   23.)

4           2.   Claim 3, Various Instances of Ineffective Assistance at the Guilt Phase.  (ECF

5                No. 214 at 24-26.)

6       Specifically, these allegations are: (a) that petitioner's trial attorneys' approaches

7   conflicted, (b) that attorney Iversen made promises to the jury in the opening statement that he did

8   not keep, (c) that the trial attorneys' took conflicting positions in front of the jury, (d) that

9   attorney Hawk denigrated the prosecutor, and (e) that Hawk's other offensive behavior prejudiced

10  petitioner.

11          3.   The allegations in Claim 7 that trial counsel was ineffective for failing to

12               object to the prosecutor's vouching for witness Warsing's credibility.  (ECF

13               No. 214 at 26-28.)

14          4.   Claim 25, Jailers Interfered with Petitioner's Right to Counsel.  (ECF No. 214

15               at 43-44.)

16          5.   Claims 28 and 29, Ineffective Assistance at the Penalty Phase for Failure to

17               Investigate and Present Mitigating Evidence.  (ECF No. 214 at 40-43.)

18      Specifically, these claims involve the failure to present mental health evidence, childhood

19  evidence, and evidence of drug and alcohol use.

20          6.   The allegation in claim 42 that Juror Fairfield communicated with her minister.

21               (ECF No. 214 at 45-48.)

22          7.   Claim 44, Shackling.  (ECF No. 214 at 49-50.)

23      The parties were also ordered to brief the application of section 2254(d) to claim 37,

24  which is the subject of petitioner's pending motion to expand the record or for an evidentiary

25  hearing.  (ECF No. 549.)  Claim 37 alleges that California law fails to narrow the class of persons

26  eligible for the death penalty as required by the Eighth Amendment.

27  ////

28  ////

1        A.   Sixth Amendment Claims

2             1.   Legal Standards

3        "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

4   effective assistance of counsel.'"   Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005)

5   (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970)).   "This right extends to 'all

6   critical stages of the criminal process,' including capital sentencing."   Id. (citations omitted).   The

7   Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well

8   established.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show

9   that his trial counsel's performance "fell below an objective standard of reasonableness" and that

10  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

11  proceeding would have been different."   Strickland v. Washington, 466 U.S. 668, 687-88, 694

12  (1984).

13             a.   Deficient Performance

14       Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

15  failed to meet an objective standard of reasonableness.   Strickland, 466 U.S. at 687.   There is "a

16  'strong presumption' that counsel's representation was within the 'wide range' of reasonable

17  professional assistance."   Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland,

18  466 U.S. at 689.)   Petitioner must rebut this presumption by demonstrating that his counsel's

19  performance was unreasonable under prevailing professional norms and was not the product of

20  "sound trial strategy."   Strickland, 466 U.S. at 688-89.   Judicial scrutiny of counsel's performance

21  is "highly deferential," and thus the court must evaluate counsel's conduct from his perspective at

22  the time it occurred, without the benefit of hindsight.   Id. at 689.

23       The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

24  conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

25  simply reasonableness under prevailing professional norms.'"   Wiggins v. Smith, 539 U.S. 510,

26  521 (2003) (quoting Strickland, 466 U.S. at 688).   However, "general principles have emerged

27  regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective

28  standard of reasonableness' by which [a court must] assess attorney performance, particularly

1   with respect to the duty to investigate." Summerlin, 427 F.3d at 629. "[S]trategic choices made

2   after thorough investigation of law and facts relevant to plausible options are virtually

3   unchallengeable." Strickland, 466 U.S. at 690.  However,

> "strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary.  In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to counsel's
> judgment."

10   Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91); see also Thomas v. Chappell,

11   678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be

12   considered tactical if he had "sufficient information with which to make an informed decision"),

13   cert. denied, 133 S. Ct. 1239 (2013); Reynoso v. Giurbino, 462 F.3d 1099, 1112-1115 (9th Cir.

14   2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money

15   cannot be considered strategic where counsel did not investigate this avenue of impeachment);

16   Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and

17   rejection of mental health defense not reasonable strategy where counsel failed to investigate

18   possible mental defenses).

19        With respect to counsel's role in presenting penalty phase mitigating evidence, "[t]he duty

20   to investigate is critically important." Summerlin, 427 F.3d at 630.  Counsel should attempt to

21   discover "'all reasonably available mitigating evidence and evidence to rebut any aggravating

22   evidence that may be introduced by the prosecutor.'" Wiggins, 539 U.S. at 524 (quoting ABA

23   Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA

24   Guidelines") 11.4.1(c), p. 93 (1989)) (emphasis in original); see also Caro v. Calderon, 165 F.3d

25   1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed

26   for consideration at the capital sentencing phase.").  Where "'indications in the record' suggest

27   that certain mitigating evidence may be available, those leads must be pursued." Lambright v.

28   Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365 F.3d 706,

719-720 (2004)); Summerlin, 427 F.3d at 632 (counsel ineffective for failing to obtain readily available mental health evidence when he had been told by defendant's prior attorney that defendant may be mentally ill); Stankewitz, 365 F.3d at 719-722 (counsel ineffective for failing to thoroughly investigate defendant's childhood, history of drug abuse, and mental health problems notwithstanding the fact that he was on notice that such an investigation might yield mitigating evidence); Mayfield v. Woodford, 270 F.3d 915, 927-28 (9th Cir. 2001) (counsel ineffective for failing to consult appropriate medical experts or collect relevant records after "his investigator's limited efforts revealed evidence of diabetes and substance abuse," and for failing to explain to the jury the relevance of the evidence that was presented).  Of course, if counsel conducts a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence, counsel cannot be faulted for failing to locate and present it.  Babbit v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).  In addition, "a lawyer may make reasonable decisions that render particular investigations unnecessary."  Id.

Mitigating evidence counsel should consider includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences."  Wiggins, 539 U.S. at 524 (citing ABA Guidelines 11.8.6, p. 133 (1988)) (emphasis omitted).  Counsel has a "'duty to investigate and present mitigating evidence of [any] mental impairment.'"  Summerlin, 427 F.3d at 630 (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, in preparation for the penalty phase, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health."  Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002).  "The defendant's history of drug and alcohol abuse should also be investigated."  Summerlin, 427 F.3d at 630 (citing Jennings, 290 F.3d at 1016-17).  In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation to present and explain to the jury all available mitigating evidence."  Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)); see also Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing Hamilton, 583 F.3d at 1113).
/////

When determining whether the state court's application of the Strickland standard was reasonable, the federal court must be "doubly" deferential. Richter, 131 S. Ct. at 788. The "standard for judging counsel's representation is a most deferential one" and the reasonableness standards of section 2254(d) are also "highly deferential." Id. Further, because the Strickland rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." Id. at 786; Premo v. Moore, 131 S. Ct. 733, 740 (2011). As the Court described in Richter, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." 131 S. Ct. at 788.

b.   Prejudice

The second part of the Strickland test requires a petitioner to show that counsel's conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one "'sufficient to undermine confidence in the outcome.'" Summerlin, 427 F.3d at 640 (quoting Strickland, 466 U.S. at 693). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." Id.

However, "[i]n establishing prejudice under Strickland, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." Correll, 539 F.3d at 951-52 (citing Williams v. Taylor, 529 U.S. 362, 398 (2000)); see also Rompilla v. Beard, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test."). Instead, in evaluating prejudice, the court must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir.

1    1995), and evaluate whether the difference between what was presented and what could have

2    been presented is sufficient to "undermine confidence in the outcome" of the proceeding,

3    Strickland, 466 U.S. at 694.  Prejudice is established if "there is a reasonable probability that at

4    least one juror would have struck a different balance" between life and death.  Wiggins, 539 U.S.

5    at 537.

6           When examining the effect of counsel's failure to unearth and present mitigating evidence

7    at the penalty phase, the Supreme Court has stressed the relevance of evidence of a petitioner's

8    abusive childhood and mental health problems.  There is a "belief, long held by this society, that

9    defendants who commit criminal acts that are attributable to a disadvantaged background, or to

10   emotional and mental problems, may be less culpable than defendants who have no such excuse."

11   Boyde v. California, 494 U.S. 370, 382 (1990) (quotation and emphasis omitted).  The Ninth

12   Circuit recently described the Supreme Court's consideration of such evidence:

13                In Wiggins, . . . a capital habeas petitioner's defense counsel failed
              to introduce social history mitigation evidence during the penalty
14            phase, including evidence that "Wiggins experienced severe
              privation and abuse in the first six years of his life while in the
15            custody of his alcoholic, absentee mother[, and that h]e suffered
              physical torment, sexual molestation, and repeated rape during his
16            subsequent years in foster care." Wiggins, 539 U.S. at 535. The
              Court pointed out that this is the type of evidence that is "relevant
17            to assessing a defendant's moral culpability," id., and held that the
              failure to introduce this evidence at the penalty phase was
18            prejudicial: "[H]ad the jury been confronted with this considerable
              mitigating evidence, there is a reasonable probability that it would
19            have returned with a different sentence." Id. at 536.

20   Stankewitz v. Wong, 698 F.3d at 1175.

21           2.   California Supreme Court's Application of the Strickland Standard Generally

22           Petitioner argues that the California Supreme Court applied the Strickland standard

23   inappropriately in a number of ways that affected its consideration of all of his Sixth Amendment

24   claims.  To satisfy 28 U.S.C. § 2254(d)(1), petitioner must establish that the California Supreme

25   Court's "decision ... was contrary to, or involved an unreasonable application of, clearly

26   established Federal law, as determined by the Supreme Court of the United States."  Petitioner's

27   argument falls within the first part of the subsection (d)(1) standard.  He argues the California

28   /////

                                              28

1    Supreme Court applied a rule "that contradicts the governing law set forth" in Supreme Court

2    cases.  Price v. Vincent, 538 U.S. 634, 640 (2003).

3                    a.    Inappropriate Pleading Standard

4            Petitioner's first argument is that the California Supreme Court used a higher pleading

5    standard for his ineffective assistance of counsel claims than was permitted by the Supreme Court

6    in Strickland.  According to petitioner, the California Supreme Court created a pleading standard

7    in People v. Duvall, 9 Cal. 4th 464, 474 (1995) that directly contravenes a dictate of Strickland

8    that ineffective assistance of counsel claims "be adjudged without a presumption that the trial was

9    fair."  (ECF No. 612 at 107.)  Petitioner's argument fails on several grounds.  As discussed above,

10   petitioner takes the statement in Duvall out of context.  The court in Duvall simply explained why

11   a habeas petitioner, and former criminal defendant, bears the burden of pleading and proving his

12   claims.  The Court in Strickland did not change that burden.  Rather, the Court recognized that the

13   Sixth Amendment standards it enunciated should apply equally whether the ineffective assistance

14   of counsel claim is raised on appeal or in a collateral attack on the judgment.  Strickland, 466

15   U.S. at 697-98.  Petitioner has not shown the statements in Duvall regarding the burden of

16   pleading and proof fly in the face of Strickland's directive that no "special standards" be applied

17   to ineffective assistance of counsel claims raised in habeas proceedings.

18           The remaining two cases cited by petitioner to show the California Supreme Court's

19   supposed misuse of Strickland are similarly unconvincing.  In each case, while the court cites to

20   the "presumptively final judgment" language of Duvall, it goes on to apply the Strickland

21   standards without any indication that it is using them differently than it would on appeal.  See In

22   re Crew, 52 Cal. 4th 126, 149-153 (2011); In re Avena, 12 Cal. 4th 694, 710-726 (1996).[5]

23           Even if petitioner could show the California Supreme Court, in a few cases, relied upon a

24   higher pleading standard, he has failed to show the California Supreme Court relied upon this

_____

25   [5]  Petitioner also cites a number of cases from the California Courts of Appeals which he claim
26   cite, and in some cases apply, the Duvall presumptions.  (ECF No. 612 at 107 n. 37.)  The only
     question before this court is how the California Supreme Court applied the federal legal standards
27   in denying petitioner's claims.  This court does not find the lower courts' construction of those
     standards particularly applicable and petitioner does not show why this court should consider
28   them to be.

1    supposedly incorrect standard in the present case.  The California Supreme Court's opinion was

2    silent on its reasoning.  This court is required to give state court decisions the "benefit of the

3    doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002), and must "presum[e] that state courts

4    know and follow the law," <u>id.</u> (citations omitted).

5            Even if, for the sake of argument, petitioner has shown the California Supreme Court

6    applies a higher pleading standard to all habeas claims, petitioner has not shown that this pleading

7    standard runs afoul of clearly established federal law.  To be "clearly established federal law" the

8    rule must have been "'squarely established by th[e] Court.'"  <u>Richter</u>, 131 S. Ct. at 786 (quoting

9    <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009)).  Petitioner relies on one statement in

10   <u>Strickland</u>.  He cites no post-<u>Strickland</u> Supreme Court or other federal authority for the

11   proposition that an ineffective assistance of counsel claim is entitled to a less stringent standard of

12   review than other habeas claims of federal constitutional error.

13           The Court rendered its opinion in <u>Strickland</u> in 1984.  Since then, the Court has addressed

14   the difference between appellate and collateral review numerous times.  In none of the cases

15   found by the undersigned does the Court distinguish collateral review of ineffective assistance of

16   counsel claims as being subject to a different standard than other claims raised on collateral

17   review.  For example, in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), the Court addressed the

18   application of the harmless error standard of <u>Chapman v. California</u>, 386 U.S. 18 (1967) in

19   collateral review proceedings.  The Court first stated:  "The principle that collateral review is

20   different from direct review resounds throughout our habeas jurisprudence."  507 U.S. at 633

21   (citations omitted).  The Court went on to recognize the differences between habeas review and

22   direct review.  <u>Id.</u> at 634-35.  The Court noted, for example, the differing standards for the

23   retroactive application of new rules, for the right to counsel, and for raising a new claim.  <u>Id.</u>

24   (citations omitted); <u>see also</u> <u>Teague v. Lane</u>, 489 U.S. 288, 308 (1989) (opinion of O'Connor, J.)

25   (recognizing that procedural default rule applies in habeas proceedings despite "the magnitude of

26   the constitutional claim at issue"; "we have recognized that interests of comity and finality must

27   also be considered in determining the proper scope of habeas review.").  Petitioner does not

28   contend that these rules, which are unique to collateral review, do not apply to ineffective

30

1  assistance of counsel claims.  Petitioner ignores the implication that the continued use of these

2  rules, which require federal courts to consider habeas claims differently than they consider claims

3  on direct review, demonstrates the fallacy of his argument that <u>Strickland</u> somehow created a rule

4  of "clearly established federal law" excepting ineffective assistance of counsel claims from the

5  regular rules of collateral review.  Even should petitioner be correct that the Court in <u>Strickland</u>

6  intended to create some sort of exception for ineffective assistance of counsel claims, this court

7  may only determine the state court decision runs afoul of section 2254(d) if its error was not just

8  incorrect, but was unreasonable.  <u>See</u> <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (citing

9  <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)), cert. denied, 2013 WL 3912909 (Nov. 4, 2013).

10  Section 2254(d) is only satisfied if this court can say that no fairminded jurist could disagree that

11  the state court's decision was incorrect.  <u>Richter</u>, 131 S. Ct. at 786.  Petitioner's reliance on one

12  statement made by the Court almost thirty years ago does not satisfy that test.[6]

13          b.   <u>Inappropriate Prejudice Standard</u>

14       Petitioner next argues that the California Supreme Court applied an incorrect test for

15  determining prejudice by using the United States Supreme Court's decision in <u>Lockhart v.</u>

16  <u>Fretwell</u>, 506 U.S. 364 (1993), to modify the <u>Strickland</u> standard.  In <u>Fretwell</u>, the Court was

17  confronted with a unique situation.  There was no question that Mr. Fretwell's trial attorney acted

18  unreasonably in failing to object to an aggravating factor used to determine Fretwell's penalty.

19  506 U.S. at 369 n. 1.  The issue was whether that failure prejudiced the petitioner.  At the time of

20  trial, the answer to that question was "yes."  <u>Id.</u> at 367.  The Court of Appeals for the Eighth

21  Circuit had ruled the use of that aggravating factor unconstitutional.  <u>Id.</u>  However, later, after the

22  petitioner sought federal habeas relief, the Court of Appeals overruled its decision and held that

23  the use of that aggravating factor did not violate the federal constitution.  <u>Id.</u>  Therefore, if the

24  prejudice inquiry was considered as of the time the federal courts rendered their habeas decisions,

25  _____

26  [6]  Petitioner also argues that looking to <u>Brecht</u> makes no sense because it addresses federal review
of state claims not state court review of those claims.  While it is true that some of the policies

27  supporting the reasoning in <u>Brecht</u> were based on comity, it is also true that some were based on
recognizing the finality of judgments.  This focus on finality is shared by both state and federal

28  courts on collateral review.

1    the answer would have been "no," the petitioner was not prejudiced by his attorney's failure to

2    object.  Recognizing that strict application of the <u>Strickland</u> standard would result in "an error in

3    [the petitioner's] favor," the Court looked beyond <u>Strickland</u>'s outcome determinative standard

4    and considered whether the failure to object rendered the defendant's trial "unreliable or the

5    proceeding fundamentally unfair."  506 U.S. at 372.  It held that the result of Fretwell's

6    sentencing proceeding "was neither unfair nor unreliable."  <u>Id.</u> at 371.  Accordingly, the Court

7    found Fretwell suffered no prejudice.

8         In April 2000, the United States Supreme Court held that a state court erred in finding that

9    the Court's decision in <u>Fretwell</u> modified the <u>Strickland</u> standards.  <u>Williams</u>, 529 U.S. at 391-98.

10   The Court recognized there may be limited situations in which "it would be unjust to characterize

11   the likelihood of a different outcome as legitimate 'prejudice.'"  <u>Id.</u> at 391-92.  The Court

12   characterized cases such as <u>Fretwell</u> as involving an unreasonable action of a trial attorney that

13   did "not deprive the defendant of any substantive or procedural right to which the law entitles

14   him."  <u>Id.</u> at 393 n. 17.  The Court concluded that the state court decision "was contrary to, or

15   involved an unreasonable application of, clearly established Federal law."  <u>Id.</u> at 399.

16        In its state court briefing in the present case, respondent urged the California Supreme

17   Court to apply the <u>Fretwell</u> standard to its analysis of prejudice under <u>Strickland</u>:  "To establish

18   prejudice, petitioner must show not only that the outcome would have been different but that the

19   'new' outcome would be more accurate than the one achieved at trial."  (Inf. Resp. to Pet., <u>In re</u>

20   <u>Frye</u>, No. S062455, at 9.[7])  Petitioner cites several California Supreme Court cases, decided both

21   before and shortly after the California Supreme Court decided petitioner's ineffective assistance

22   of counsel claims in 1998, in which that court applied the <u>Fretwell</u> standard to ineffective

23   assistance of counsel claims.  <u>See</u> <u>People v. Earp</u>, 20 Cal. 4th 826, 870 (1999) (citing <u>Fretwell</u> for

24   prejudice standard:  challenged conduct must have "some effect ... on the reliability of the trial

25   process"); <u>In re Avena</u>, 12 Cal. 4th 694, 722 & n. 5 (1996) (describing lack of clarity about use of

26   <u>Fretwell</u> standard; court found no prejudice under either <u>Strickland</u> or <u>Fretwell</u> prejudice

27   _____

28   [7]  The state court record, including the briefs submitted in the state appeal and the state habeas
     proceedings, was lodged herein on April 27, 2001.  (<u>See</u> ECF No. 38.)

1   standards); In re Harris, 5 Cal. 4th 813, 833 (1993) ("[T]his second prong of the Strickland test is

2   not solely one of outcome determination.  Instead, the question is 'whether counsel's deficient

3   performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'")

4   (quoting Fretwell, 506 U.S. at 372); In re Clark, 5 Cal. 4th 750, 766 (1993) (To succeed on an

5   ineffective assistance of counsel claim, a petitioner must show that the attorney's "incompetence

6   ... resulted in a fundamentally unfair proceeding or an unreliable verdict.").[8]

7          Petitioner also points to cases in which the California Supreme Court simply cited

8   Fretwell.  This court does not find those cases particularly relevant evidence that the California

9   Supreme Court relied upon Fretwell in the present case.  In People v. Coddington, 23 Cal. 4th

10  529, 651-52 (2000), the court describes the two prongs of the test for ineffective assistance of

11  counsel using only the language from Strickland and citing to both Fretwell and Strickland.[9]

12  When finding a lack of prejudice, the court described it only in terms of the Strickland standard.

13  23 Cal. 4th at 653 ("it is not reasonably probable that a different verdict would have been

14  reached" absent counsel's errors).  The use of solely the Strickland standard is not surprising.

15  The California Supreme Court rendered its decision in Coddington after the United States

16  Supreme Court issued its opinion in Williams.[10]  In People v. Cain, 10 Cal. 4th 1, 42 n.17 (1995),

17  the court mentions Fretwell in a footnote.  While the court describes Fretwell as altering the

18  Strickland standard, it does so in the context of examining the defendant's unusual argument that

19  his attorney should have "refrain[ed] from frankness and honesty in his or her dealings with the

20

21  [8]  While not mentioning Fretwell, the California Supreme Court in In re Cudjo, 20 Cal. 4th 673,
    687 (1999) also added a requirement that a petitioner also show "that as a result of counsel's
22  failures the trial was unreliable or fundamentally unfair."

23  [9]  Petitioner's description of Coddington as citing both cases for the prejudice standard is not
    correct.  (ECF No. 629 at 41.)  Rather, the cases are cited after a full recitation of the Strickland
24  standards for both reasonableness and prejudice.

25  [10]  The opinion in Coddington was issued on July 3, 2000.  The United States Supreme Court
    decided Williams on April 18, 2000. Other cases cited by both parties also post-date Williams and
26  this court therefore finds they have little relevance to the question of whether or not the California
    Supreme Court in the present, pre-Williams case relied upon Fretwell.  See In re Crew, 52 Cal.
27  4th 126 (2011) (cited by respondent at ECF No. 616 at 27); In re Cox, 30 Cal. 4th 974, 1016
    (2003) (cited by petitioner at ECF No. 629 at 41).

28

1  court." 10 Cal. 4th at 42 n.17.  As respondent in the present case correctly points out, the

2  California Supreme Court in Cain looked to Fretwell for its limited, and appropriate, use in the

3  situation where strict adherence to the Strickland standard would provide the defendant a

4  windfall.

5        Respondent asserts that the California Supreme Court twice declined to adopt the Fretwell

6  standard.[11]  That is not entirely correct.  In Avena, the California Supreme Court explained that it

7  was "unclear" whether the United States Supreme Court intended Fretwell to "alter or

8  supersede[]" Strickland's prejudice standard or whether the Court in Fretwell intended only to put

9  a "gloss" on the Strickland test for the unique factual situation in Fretwell.  12 Cal. 4th at 722 &

10  n. 5.  Because it was uncertain, the California Supreme Court examined prejudice under both

11  formulations of the test separately.  Id. at 722 n. 5, 726 ("petitioner has not demonstrated [his

12  attorney's] inaction prejudiced him under either of the tests laid down in Strickland and

13  Fretwell").

14        With respect to the other case cited by respondent, In re Neely, 6 Cal. 4th 901 (1993),

15  respondent is correct that the majority opinion relied solely on the Strickland prejudice standard.

16  The court held "there is a reasonable probability that, had the tape recording been suppressed, the

17  outcome with regard to the guilt phase of the trial would have been more favorable to petitioner."

18  6 Cal. 4th at 920.  While the majority in Neely does not mention Fretwell, it is discussed in the

19  concurring opinion.  Id. at 924 (Arabian, J., concurring).  In his concurrence, Justice Arabian

20  examines whether courts should also consider whether "our confidence in the outcome is

21  undermined" by the attorney's error.  Id.  He concludes that any significant change to the

22  Strickland prejudice standard must come first from the United States Supreme Court.  Id.

23  Recognizing the Court's decision in Fretwell, Justice Arabian notes, however, that the Court had

24  not yet taken the step of altering the Strickland standard.  Id.

25  _____

26  [11]  It should be noted that respondent's attempt to apply standards from Woodford v. Visciotti, 537 U.S. 19 (2002) here is not well taken.  (ECF No. 616 at 28-29.)  In Visciotti, the state court

27  issued a reasoned opinion.  The Supreme Court took issue with the Ninth Circuit Court of Appeals' construction of that state court opinion.  In the present case, there is no state court

28  opinion to construe.

1    This court's own research reveals a number of California Supreme Court cases decided

2 after the date of Fretwell and before the United States Supreme Court found the wide use of

3 Fretwell unreasonable in Williams in which the state court looked at solely Strickland as the

4 standard for determining prejudice.  The following is only a small sample of the California

5 Supreme Court's cases with appropriate citation to Strickland:  People v. Hester, 22 Cal. 4th 290,

6 297 (2000); People v. Williams, 21 Cal. 4th 335, 349 (1999) (Brown, J., dissenting); People v.

7 Smithey, 20 Cal. 4th 936, 986-87, 1012 (1999); People v. Welch, 20 Cal. 4th 701, 743 (1999);

8 People v. Hart, 20 Cal. 4th 546, 624, 632, 634 (1999); In re Gay, 19 Cal. 4th 771, 827 (1998);

9 People v. Ochoa, 19 Cal. 4th 353, 445-46 (1998); People v. Majors, 18 Cal. 4th 385, 403 (1998);

10 People v. Musselwhite, 17 Cal. 4th 1216, 1260 (1998).  Included in this list is the California

11 Supreme Court's decision on petitioner's appeal.  In its reasoned decision, the court relied upon

12 the appropriate Strickland prejudice standard.  People v. Frye, 18 Cal. 4th 894, 952-53, 979

13 (1998).

14    When determining whether a state court's decision was contrary to or an unreasonable

15 application of federal law, this court must "presum[e] that state courts know and follow the law."

16 Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  Of course, petitioner may rebut this presumption,

17 but he has not done so.  Petitioner demonstrates that on three occasions during the relevant time

18 period, the California Supreme Court appeared to rely on an inappropriate standard for

19 determining prejudice.  In addition, petitioner shows that, in the present case, respondent urged

20 the California Supreme Court to adopt this inappropriate standard.  However, in many more cases

21 decided during that time period, the California Supreme Court cited and/or applied the correct

22 prejudice standard.  The state court decision is entitled to the benefit of any doubt.  Visciotti, 537

23 U.S. at 24.  Petitioner's showing is insufficient to convince this court that the California Supreme

24 Court likely applied an incorrect prejudice standard to petitioner's claims.

25        c.   Failure to Consider Cumulative Effect of Errors

26    Finally, petitioner argues that the California Supreme Court also failed to consider the

27 effect of counsel's errors cumulatively.  He relies primarily on just one statement in just one case

28 that indicated the California Supreme Court had, in that case, divided one of the petitioner's

1   claims into subparts and then applied timeliness standards to each subpart, rather than to the claim

2   as a whole.  In re Robbins, 18 Cal. 4th 770, 820-21 (1998) (Kennard, J., dissenting).  Petitioner

3   mentions that the California Supreme Court has engaged in this practice in other cases, and

4   provides a link to the California Supreme Court docket in In re Majors, No. S117112.  (ECF No.

5   629 at 42 n. 11.)  However, petitioner provides no explanation of how the California Supreme

6   Court order in that case differed from the petition and how that difference resulted in the

7   "dilution" of petitioner's claims.[12]  In sum, petitioner provides insufficient reason to believe the

8   California Supreme Court engages in a "practice of diluting a petitioner's prejudice evidence

9   across distinct court-created subclaims."  (ECF No. 612 at 112:10-11.)

10           3.   Ineffective Assistance of Counsel for Failure to Investigate and Present a Mental
                  Health Defense at the Guilt Phase – Claim 2
11

12          The primary focus of petitioner's Sixth Amendment claims is that his trial attorney

13   Richard Hawk convinced petitioner he would win at the guilt phase and prevented co-counsel

14   Judd Iversen and Madeline McDowell from pursuing a mental health defense at the guilt phase or

15   mental health-based mitigation at the penalty phase.  For the reasons set out below, this court

16   finds petitioner has failed to establish that the California Supreme Court's denial of his guilt

17   phase ineffective assistance of counsel claims was contrary to law or unreasonable.

18               a.   Background and Evidentiary Proffer before the State Court

19                    i.      Deficient Performance

20                         (a)  Appointment of Counsel

21          In August 1985, the trial court appointed Larry Dixon to represent petitioner.  (2 ART

22   13.[13])  According to petitioner, Dixon was a sole practitioner who had never participated in a

23
     _____

24   [12]  In his reply brief, petitioner states that he is "prepared to present evidence" from other cases
     that show the state court "routinely subdivides claims and adjudicates them as artificial
25   subclaims."  (ECF No. 629 at 42:13-16.)  Petitioner has already had the opportunity to make this
     showing in this briefing; he did not do so.
26
     [13]  The following abbreviations are used herein for references to the state court record:  "RT" -
27   Record of Transcript; "ART" – Augmented Record of Transcript; "2 ART" – Second Augmented
     Record of Transcript; "CT" – Clerk's Transcript; "ACT" – Augmented Clerk's Transcript; "1
28   ACT" – First Augmented Clerk's Transcript.  See also n. 7, supra.  This court identifies page

                                                    36

1     murder case before, and knew no colleagues with death penalty experience with whom he could

2     consult.  Dixon repeatedly told petitioner and the trial court that he was not competent to handle

3     the case.  He wanted to be relieved, but the court refused.[14]  Dixon requested the assistance of

4     second counsel, but the court would not appoint anyone.  (Decl. of L. Dixon in Supp. of Mot. to

5     Withdraw, 1 ACT 317-319.)

6           On August 5, 1985, attorney Dixon told the court he wanted to consult a psychiatrist

7     because he was concerned that Mr. Frye was not capable of assisting in his own defense.  (2 ART

8     17.)  Dixon retained psychiatrist James Peal, M.D., to treat petitioner and to determine, according

9     to Dr. Peal, "what the problems were, as I saw them, and give any suggestions that I might have."

10    (RT 7634:14-18.)  Dr. Peal felt petitioner "needed a great deal of support and help just to cope

11    with his situation and to maintain himself, because he went through some very stressful situations

12    to him ...." (RT 7635:24 – 7636:3.)  Dr. Peal found that part of petitioner's stress was due to his

13    legal problems surrounding attorney Dixon's attempts to be relieved of the case and the

14    appointment of new attorneys.  (RT 7642:2-19.)  Dr. Peal found petitioner to be depressed,

15    agitated, fearful, and suspicious during that time.  (RT 7642:20-25.)

16          On March 10, 1986, Dixon filed a motion to withdraw as petitioner's counsel.[15] (1 ACT

17    313.)  Dixon argued the motion on March 21, 1986.  (1 ACT 326.)  On May 5, 1986, the trial

18    court provisionally granted the motion subject to the "prior appointment of substitute counsel."

19    (1 ACT 371.)  On May 16, 1986, Dixon informed the court that attorney Richard Hawk had

20    conferred with petitioner and was one of four attorneys interested in taking the case.  (See ART

21    185.)  In his declaration, petitioner states that Hawk began visiting him during the time Dixon

22

23    numbers by the bate-stamped numbers in the upper right corner of each page of the transcripts.

24    [14]  Petitioner cites "Tr. Hr'g on Ex Parte App. Add'l Counsel (11/21/85)" for these allegations
      Petitioner does not identify where in the state court record the transcript or other memorialization
25    of this hearing can be found.  The court has been unable to find it through its own search.
      Accordingly, this court will not rely upon these allegations for purposes of these findings and
26    recommendations.

27    [15]  Petitioner identifies this motion as a second motion to withdraw.  However, petitioner does not
28    identify for the court the location of any prior motions.

                                                  37

1   was looking for substitute counsel.  (1 SH, Ex. 1, ¶ 6.[16])  According to attorney Dixon's notes, at

2   an ex parte hearing on May 23, 1986, the trial court expressed concern about appointing Hawk as

3   substitute counsel because of the Juan Corona trial and because the judge did not wish to "turn

4   this case into a media circus."  (1 SH, Ex. 3.)

5          In 1978, a California appellate court found Hawk provided constitutionally deficient

6   representation to Juan Corona.  People v. Corona, 80 Cal. App. 3d 684, 727 (1978).  The Corona

7   court found Hawk failed to act appropriately in response to the strengths of the prosecution's case

8   because he "failed to raise the obvious ... defenses ....  Still worse, trial counsel failed to present

9   any meaningful defense at all."  Id. at 702.  The court found Hawk was burdened by financial

10   conflicts.  Hawk had acquired literary and dramatic rights to his client's story, including an

11   account of the trial.  Id. at 703.  The court found that Hawk's financial interests would benefit

12   from a prolonged, sensational trial, and provided a disincentive to raise incompetence or insanity

13   because those issues could have shortened the trial.  Id. at 720.  Hawk had "assumed a position

14   virtually adverse to his client and, totally unsupported by strategic or tactical considerations, took

15   deliberate steps to thwart the development of viable defenses available to the accused."  Id. at 721

16   (emphasis in original).

17          Hawk's conduct during the Corona trial also resulted in his conviction on multiple counts

18   of contempt.  Hawk v. Superior Court, 42 Cal. App. 3d 108 (1974).

19          The Corona case was not the sum total of Hawk's professional, legal problems.  On March

20   13, 1986, the State Bar Court found that Hawk, when securing a deed of trust in lieu of a fee from

21   a criminal defendant, failed to disclose fully the terms of the security arrangement.  (1 SH, Ex. 5.)

22   On April 16, 1987, the State Bar Court's Review Department adopted in part the Bar Court's

23   findings and recommendations and recommended to the California Supreme Court that Hawk be

24   suspended for four years, with three and a half years' suspension stayed pending probation.  (Id.)

25   The California Supreme Court later determined that Hawk's appeal from the Review

26   _____

[16]  The court refers to petitioner's state pleadings using the following abbreviations.  "1 SH" –
27   1997 State Habeas Proceeding; "2 SH" – 2001 State Habeas Proceeding; "AOB" – Petitioner's
opening brief on appeal; "RB" – State's brief on appeal; "ARB" – Petitioner's reply brief on
28   appeal.

1   Department's recommendation was based in part on the "patently false" assertion that he was

2   denied a continuance of his bar court hearing although he had made no earlier requests.  Hawk v.

3   State Bar, 45 Cal. 3d 589, 595 (1988).  The court found that Hawk "misled his clients about the

4   time they had in which to meet the obligation secured by the deeds of trust, and he changed the

5   terms of the first agreement after [the client] had already executed it."  Id. at 602.

6         This was the third time Hawk was disciplined by the State Bar, a fact the California

7   Supreme Court said weighed "heavily against him" in the bar proceedings.  Hawk, 45 Cal. 3d at

8   601.  In 1975 Hawk was reproved for gross negligence in management of a client trust account.

9   Id. at 593.  In 1978 Hawk was suspended from the practice of law for two months because he had

10  been convicted of failing to file tax returns.  Id.

11        In May 1980, the time relevant to the 1986 Bar proceedings, Hawk shared office space in

12  San Francisco with attorney Judd Iversen. (1 SH, Ex. 5 (Sept. 1985 Decl. of J. Iversen).)  Hawk

13  assigned to Iversen the deed of trust that was at the center of the State Bar's action against Hawk.

14  (Id.)  That State Bar action was pending in October 1986, when Hawk was considered for

15  appointment to represent petitioner in the present case.  (1 SH, Ex. 5.[17])  In September 1986 when

16  Iversen was appointed to Mr. Frye's case (ART 214), and in October 1986 when Iversen moved

17  for Hawk's appointment as co-counsel (ART 220 et seq.[18]), Iversen was aware of the bar

18  proceedings.  Iversen was involved in the proceedings because he demanded payment of the note.

19  (1 SH, Ex. 5 (Letter from Judd Iversen to Mr. and Mrs. James Mederos dated Oct. 20, 1980)).  On

20  September 2, 1985, Iversen executed a declaration as part of the bar proceedings.  (Id.)  In

21  addition, Iversen was aware the court had refused to appoint Hawk.  (1 SH, Ex. 26 at 2.)

22  /////

23  ───────────────

24  [17]  The State Bar records contained in this exhibit show that a Notice to Show Cause from the Bar
    Court Investigation Department was issued to Hawk in April 1984.  As described in the text, the
25  State Bar Court's decision was rendered in March 1986; the Review Department's decision in
    April 1987; and the California Supreme Court's decision in June 1988.  In the present case,
26  attorney Dixon informed the court in May 1986 that Hawk was one of the attorneys interested in
    representing petitioner and that Hawk had visited petitioner.

27  [18]  The photocopy of the transcript of this hearing is quite poor.  The court is unable to read some
28  of the text and many of the page numbers.

1  Petitioner points out that Hawk appeared to be in bad financial condition at this time. As

2  discussed above, he faced suspension from the practice of law.[19] In addition, the trial record in

3  the present case shows Hawk had at least one very large debt. Payment records show Hawk's

4  fees in this case were garnished and assigned to an individual in Pittsburg, California. (See CT

5  2501.) Petitioner argues this is further evidence that Hawk pursued appointment to this case.

6  In addition, petitioner attempts to show Hawk tried to work his way into petitioner's good

7  graces. First, in a declaration, petitioner states that Hawk told him "that he thought that the State

8  didn't have any evidence of my guilt." (1 SH, Ex. 1, ¶ 7.) Petitioner states Hawk left money on

9  his jail commissary account and told petitioner he had to insist that Hawk be appointed to

10  represent him. (Id. ¶ 8.) Attorney Iversen declared that he believed Hawk had left money in

11  petitioner's account prior to his appointment. (1 SH, Ex. 26 at 2.)

12  Iversen recalled that Hawk repeatedly told petitioner he would get him acquitted. (1 SH,

13  Ex. 26 at 2.) "Mr. Hawk also told Jerry that he had a fishing pole in his office for Jerry and when

14  the not guilty verdict came down, they would go fishing together." (Id.) When he requested the

15  appointment of Hawk as his co-counsel, Iversen stated that Hawk spoke with petitioner "on a

16  regular basis" and had spent "in the neighborhood of 100-plus hours in this case on behalf of Mr.

17  Frye." (ART 228.) According to petitioner's state post-conviction attorney, David Lane, attorney

18  McDowell told him that she believed Hawk "convinced Jerry Frye that he would win his case ...

19  for the sole purpose of motivating Jerry to demand that Hawk be appointed on this case." (1 SH,

20  Ex. 25 at 5.[20])

---

21  [19] Petitioner also points to the California Supreme Court's statement that given Hawk's prior
22  disciplinary actions, disbarment was also a possibility. (1 SH, Ex. 5 (Cal. Sup. Ct. op. at 17).)

23  [20] Exhibit 25 before the California Supreme Court is Mr. Lane's declaration containing his
24  recollection of what attorney McDowell told him. He states in that declaration that he prepared a
   declaration for Ms. McDowell's signature, but she told him she was "not 'comfortable' signing
25  it." (1 SH, Ex. 25 at 2.) Further, in an October 29, 1996 letter to Lane, McDowell stated that she
   had "attempted to write down specifics of those years and I have found that I am not comfortable
26  with the accuracy of my memories of those times." (1 SH, Ex. 27.) Given McDowell's concern
   about the accuracy of her memory, and the absence of any sworn declaration in the state court
27  record from her, this court finds that the California Supreme Court could have reasonably chosen
   not to rely upon statements attributed to Ms. McDowell in Exhibit 25 and many of the statements
28  made in her letter to Lane, Exhibit 27, in determining whether petitioner's claims established a

1      The trial record shows that Hawk initially contacted attorney Dixon when, while working

2 in nearby Stockton, he heard there was a need for new counsel in this case. (ART 189.) By the

3 time his name was first mentioned in court, on May 16, 1986, Hawk had already "conferred with

4 the defendant." (ART 185.) In response to the judge's concerns about Hawk, Dixon tried to

5 assure the court Hawk would not "play games" or "make a circus" of the case. (ART 191.)

6 Dixon repeatedly mentions the "rapport" Hawk developed with petitioner. (ART 191-93.)

7      Iversen summed up Hawk's relationship with petitioner in the following way:

> Richard Hawk made a susceptible, psychologically malleable and brain-damaged Jerry Frye feel that Hawk was the only person who could save his life. Hawk had completely convinced Jerry that Hawk was going to walk him out the door after a jury trial. Jerry expressed his certainty that Hawk could deliver on his promises to walk him. Jerry trusted Hawk.

12 (1 SH, Ex. 26 at 3.[21])

13      (b)  <u>Investigations into Petitioner's Mental Health</u>

14      Attorney Iversen states that the direct consequence of Hawk's actions was that "Jerry

15 refused to consider pleas involving insanity defenses or defenses involving a lack of or reduced

16 culpability based upon his mental condition and/or alcohol and drug intoxication." (1 SH, Ex. 26

17 at 3.) According to state habeas counsel Lane, attorney McDowell agreed. (1 SH, Ex. 25 at 4.)

18 However, counsel did investigate petitioner's mental health problems. Prior to the guilt phase,

19 petitioner was examined by psychiatrist Dr. Peal, psychologist Dr. Wagner, neuropsychologist

20 Dr. McGuire, and, it appears, psychiatrist Dr. Anderson.

21 /////

---

prima facie case. That is not to say that a petitioner must have sworn evidentiary support to establish a prima facie ground for relief. Rather, in this case, the grounds for discounting these exhibits are based on McDowell's refusal to sign a declaration and concern about her memory. Herein, this court considers some statements attributed to McDowell in Exhibit 25 or mentioned in her letter, Exhibit 27, but the undersigned does not find any of those statements would have made a difference, one way or the other, in this court's final recommendations.

[21] Petitioner suggests that before he was appointed, Hawk knew about petitioner's brain damage through his relationship with Dr. Peal. Petitioner has no support for that suggestion and this court does not consider it. However, the court does note that attorney Iversen referred to petitioner's "mental deficiencies" as "apparent." (1 SH, Ex. 26 at 2.)

1

(i)     Dr. Peal

2          As already noted, the first inquiries into petitioner's mental condition were made by

3   attorney Dixon.  Dixon retained psychiatrist Dr. Peal, who started seeing petitioner in August

4   1985.  (RT 7634:14 - 7635:7.[22])  Dr. Peal saw petitioner over the next several years.  (RT

5   7635:10-11.)  He estimated at trial that he had visited petitioner 21 times for a total of 50-60

6   hours.  (RT 7635:16-17.)  Dr. Peal testified that Dixon retained him for two reasons.  First, to help

7   Dixon determine "what was wrong with petitioner" and what "needed to be done ... to take care

8   of whatever is wrong with him."  (RT 7737:13-16.)  Second, to determine "whether or not there

9   was any basis for a psychiatric defense, any basis for 1368 [competency] proceeding."  (RT

10  7737:17-21.)

11         Dr. Peal testified that he reviewed petitioner's records from Fayette Hospital in

12  Connersville, Indiana; Indiana University hospital records; Florida Department of Corrections

13  records; records from Shands Hospital in Florida; and medical records from the Amador County

14  Jail.  (RT 7639:13-19.)  In addition, Dr. Peal had a history from petitioner's mother.  (RT 7754:4-

15  5.)  Petitioner provided the California Supreme Court with copies of some of these medical

16  records.[23]  The Fayette Memorial Hospital Records, contained in exhibits 6, 8, 9, and 10 to

17  petitioner's first state habeas petition, show several admissions for petitioner.[24]  First, he was

18  admitted in April 1962, when he was 6 years old, after he was hit by a car.  The hospital records

19  state that he had abrasions and was admitted for observation.  He had several X-rays that revealed

20  no evidence of fractures.  Petitioner's next admission to that hospital was after an auto accident in

21  May 1971, when he was 15 years old.  Petitioner had a fractured knee cap and fractured "nasal

22  and frontal bones."  According to Dr. Peal, in addition to multiple fractures of bones in his face,

23

24  [22]  Because petitioner did not provide the California Supreme Court with a report by Dr. Peal, the
     court looks to Dr. Peal's testimony for information about what investigations were conducted into
25   petitioner's mental health and what Dr. Peal's opinions were.

26  [23]  Petitioner indicates that the medical records were obtained by Dixon through requests by him
     or his investigators or through pre-trial discovery.  (ECF No. 612 at 61:13-16.)
27

28  [24]  Many of the records in exhibits 6, 8, 9, and 10 appear to be duplicates.

1  the accident also caused a fracture at the base of petitioner's skull.  (RT 7654:17-19.)  The

2  hospital records appear to show that petitioner had surgery for his head injuries.  In January 1972,

3  when he was 16 years old, petitioner was diagnosed with meningitis and was sent to the Indiana

4  University Medical Center.  The final record from Fayette Memorial is dated December 1975.

5  Petitioner was then 20 years old.  While many of the copies provided to the court are not legible,

6  it is apparent that petitioner was admitted at that time and diagnosed with meningitis.  The

7  hospital's summary states that petitioner had three prior episodes of meningitis.

8       The records from the University of Florida's Shands Hospital were provided to the

9  California Supreme Court in Exhibit 11 to the first state habeas petition.  Those records show that

10  in 1978, when he was 22 years old, petitioner was admitted for "persistent and progressive" "CSF

11  rhinorrhea."  CSF rhinorrhea is identified in the records as the leakage of cerebral spinal fluid

12  through the nostrils.  The hospital's records state that petitioner had developed this problem after

13  the surgical repair of his facial fractures following his 1971 auto accident.  The records also state

14  that petitioner had had five episodes of meningitis following the 1971 surgery.  The hospital

15  performed surgery in June 1978 and repaired the "fistula site" by closing the holes in petitioner's

16  dura, the sac that encloses the brain.  The notes also state that petitioner's neurological exam

17  following the surgery was unchanged from his initial exam, "that is the only significant defect

18  which was found was bilateral amosmia."  This condition is referred to as "bilateral anosmia" in a

19  note to the file from the neurologist.  According to The Merck Manual, "anosmia" is "complete

20  loss of smell."  The Merck Manual of Diagnosis & Therapy 466 (19th ed. 2011).

21       Exhibit 12 to the first state petition contains notes from Indiana University Hospital.

22  Although many of the records in this exhibit are, at best, barely legible, it appears that they

23  involve petitioner's approximately two-week stay at the hospital in 1972 for meningitis.  It does

24  not appear that petitioner provided the state court with the remaining medical records relied upon

25  by Dr. Peal.

26       Dr. Peal also reviewed the police reports and interviews from Belle Fourche and

27  Deadwood, South Dakota.  (RT 7640:12-18.)  The interviews were available to Dr. Peal as

28  transcripts, a video of petitioner's interview by officers in Belle Fourche, videos of two

1     interviews of Jennifer Warsing, and an audio tape of petitioner's interview at the Deadwood Jail.

2     (RT 7640:12 – 7641:14.)

3          Dr. Peal testified that when he first met with petitioner in 1985, he suspected petitioner

4     had a neurological disorder or some kind of brain injury.  (RT 7750:12-15.)   Dr. Peal also

5     testified he recommended that Dixon and later Hawk have petitioner receive a neurological

6     examination.  (RT 7753:8-19.)  However, he also testified that he did not believe testing was

7     indicated due to the obviousness of petitioner's brain damage.  (RT 7775:25 – 7776:6; 7665:5-6.)

8     Dr. Peal testified that both petitioner and his mother reported that petitioner suffered "altered

9     states of consciousness, irritability, and memory problems."  (RT 7761:20-25.)  He also

10    determined petitioner suffered from blackouts and had brain impairments in the areas of

11    cognition, emotional control, behavior, and personality change.  (RT 7675:1-25; 7676:12-13.)

12    Dr. Peal felt that these changes were the result of petitioner's traumatic brain damage to his

13    frontal lobe.  (See RT 7774:22 – 7775:20.)  He testified that petitioner's mother described him as

14    a "happy-go-lucky person" before the auto accident and a "somewhat moody" person afterwards.

15    (RT 7677:4-7.)  However, Dr. Peal acknowledged that in the ten years since petitioner had had

16    the surgery to repair the holes in his dura, he had not been hospitalized for any other problems,

17    including any other mental health problems.  (RT 7762:11-24.)  Dr. Peal rejected the suggestions

18    that petitioner has anti-social personality disorder and that he was faking his memory problems.

19    (RT 7792:5-22.)  Dr. Peal also confirmed that petitioner was not insane, "pathological," or

20    psychotic.  (RT 7669:13-15.)

21         Dr. Peal testified that petitioner experienced significant stress and was depressed while

22    awaiting trial for a number of reasons.  (RT 7641:19 – 7642:3; 7649:23 – 7650:3.)  First,

23    petitioner was "agitated, fearful, and suspicious" due to the problems with attorney Dixon's

24    attempts to have second counsel appointed or be relieved of the case.  (RT 7642:4-25.)  Second,

25    petitioner felt he was being celled with people who were trying to get a confession from him.

26    (RT 7643:1-13.)  Third, petitioner felt some of his cellmates were mentally ill and at least one

27    was extremely so.  (RT 7643:16 – 7644:1.)  Fourth, petitioner was isolated from his family in

28    Indiana and felt he had no one to help him.  (RT 7644:5-8.)   Petitioner felt it was very difficult to

1    maintain control of his behavior while in jail, but he tried hard to do so.  (RT 7644:12-24.)  He

2    also had concerns about his health and about a recurrence of meningitis.  (RT 7645:6 – 7646:4.)

3          On redirect, Dr. Peal was asked whether the brain damage petitioner suffered "could

4    impair his ability to form intent?"  (RT 7858:25 – 7859:1.)  Dr. Peal responded:

5                 The impairment from the brain damage is in the area of
             cognition, which is knowing, which is thinking, which is being able
6             to plan and carry out the plans.

7                 The second part that's affected is his emotional control, and
             considering his brain, the impairments from his brain damage, they
8             affect these two areas, and these two areas are the areas that would
             be critical in his ability to form intent.  So he would be impaired in
9             the ability to form intent.

10   (RT 7859:2-9.)  Dr. Peal also opined about petitioner's ability to deliberate:

11                I think the same impairments in function that govern the
             previous impairment would be present in his impairment to
12            deliberate.  To deliberate, he has to be able to think and to plan, to
             perceive correctly the environment that he's in, and then to plan and
13            carry out whatever it is that he wants to carry out.

14                And he also has to have the ability to control whatever
             emotions that this situation arouses, to the point that the emotional
15            – the lack of emotional control doesn't impair his ability to think
             and plan.  And I think that he would be impaired in this area, also.
16

17   (RT 7860:1-11.)  Dr. Peal added that the same reasons impaired petitioner's ability to make

18   judgments because making judgments requires the ability "to size up the situation and then act

19   accordingly and appropriately."  (RT 7860:15-17.)  Dr. Peal also testified that petitioner's

20   accident, and its consequences which included injuries to friends in the car, along with repeated

21   severe headaches that had to be relieved by spinal taps and the repeated incidences of meningitis,

22   caused petitioner to suffer depression.  (RT 7867:3-4, 19-20.)  Dr. Peal testified that petitioner

23   sought help at mental health clinics, but left when clinic workers did not believe he had suffered,

24   and survived, five episodes of meningitis.  (RT 7867:23 – 7868:6.)

25         Also indicative of the pre-trial work undertaken by Dr. Peal is a letter he prepared

26   regarding petitioner's competence.  In a June 17, 1988 letter to the trial judge, Dr. Peal opined

27   that petitioner was incompetent to proceed with the penalty phase because he could not "accept

28   the reality that the guilt phase of the trial is over."  (1 SH, Ex. 13 at 2.)  Part of that determination

1   rested on petitioner's "marked memory problems," "very disturbed and depressed" state, lack of

2   "emotional control," and impaired judgment.  (Id.)  Dr. Peal concluded that petitioner was not

3   competent

> because of impairments in judgment and memory precipitated by a
> severe automobile accident and head injury in 1971, the residuals
> and sequelae of 5 episodes of meningitis . . ., the residuals of brain
> surgery . . ., and his utilization of alcohol in the presence of a head
> injury.   These factors have all resulted in impulsive acts, poor
> judgment and poor emotional control and memory impairment.

(Id. at 5-6.)

### (ii)    Dr. Wagner

Sometime in early spring 1986, at Dr. Peal's request, Dixon retained psychologist Linda

Wagner, Ph.D.  (See 1 SH, Ex. 20 at 1.)  Dr. Wagner prepared a draft report almost two years

after she evaluated petitioner in May 1986.  (Id.)  According to her report, Dr. Wagner was hired

to evaluate petitioner's "present neuropsychological status subsequent to a long history of brain

trauma." (Id.)  It is not clear from the record before the state court just what communications, if

any, Dr. Wagner had with either attorney Dixon or with petitioner's subsequent counsel Hawk,

Iversen, and McDowell.  Petitioner states that Hawk and Iversen did not meet with Dr. Wagner

until March 29, 1988, just two days before the defense started its guilt phase case.  (ECF No. 612

at 9-10.)  Yet, petitioner cites only the report of forensic psychologist Dr. Mark Cunningham,

who was hired by state post-conviction counsel David Lane, for this statement.  (1 SH, Ex. 21 at

2.)  Dr. Cunningham prepared an evaluation of the mitigation case that was presented at the

penalty phase, as well as an analysis of the mitigation case that could have been, but was not,

presented at the penalty phase.  (Id.)  It appears that investigators working for Mr. Lane or Dr.

Cunningham spoke with Dr. Wagner.  (Id. at 5.)  Dr. Wagner described for them "providing a

report of her neuropsychological evaluation dated 3-22-88 to defense counsel" and a "two hour

conference with defense attorneys Hawke [sic] and Iverson [sic] on 3-29-88."  (Id.)

These statements do not necessarily support petitioner's characterization of that March 29,

1988 meeting as the first one between Dr. Wagner and petitioner's trial counsel.  There is a record

of at least one communication between Dr. Wagner and the defense before or during the guilt

phase:  Dr. Peal testified that he discussed Dr. Wagner's findings with her.  (RT 7751:13.)  In addition, Dr. Wagner states that, in addition to the Shands Hospital and Indiana University Hospital medical records, she also relied upon an interview she conducted with petitioner's mother on December 16, 1987, well after the new attorneys were appointed and six days after the start of jury selection.  (Id. at 6; CT 3385.)

Dr. Wagner found petitioner "demonstrated a deficit in memory functions," had a personality characterized as "anti-social," and had symptoms that "could be suggestive of a neurological disorder as well as symptoms which may be functional in origin."  (1 SH, Ex. 20 at 11-12.)  She also found petitioner in "chronic stress/distress" and suffering from "depression, anxiety, and nervousness."  (Id.)  With respect to executive functions, petitioner demonstrated "some deficits in sustained attention/concentration, mental tracking and mental control."  (Id. at 11.)

(iii)    Dr. McGuire

Sometime in October 1987 defense counsel had petitioner examined by neurologist Dr. Stephen McGuire.  (RT 7276:14-18.)  Dr. McGuire's contemporaneous notes indicate Mr. Frye was "referred by his attorney for evaluation of possible encephalopathy secondary to previous head trauma and meningitis."  (1 SH, Ex. 16 at 2.)  In his testimony, Dr. McGuire defined encephalopathy as "altered function of the brain."  (RT 7324:1-2.)  Dr. McGuire testified that he was asked to evaluate petitioner's "neurological function" as of the time of the evaluation.  (RT 7346:24-25; 7350:5-8)   In addition, he testified that he was asked to look at petitioner's neurological function specifically with respect to memory.  (RT 7352:9-15.)

Dr. McGuire examined petitioner and ordered an MRI and EEG.  (1 SH, Ex. 16; RT 7276:14-20, 7277:6-7.)  Sometime after the results of the EEG were reported, Dr. McGuire met for "approximately one hour ... with the attorneys representing Mr. Frye."  (1 SH, Ex. 15.)  A copy of Dr. McGuire's undated "clinical note" memorializing this meeting was submitted to the

/////

/////

/////

California Supreme Court as Exhibit 15.  It bears the handwritten note "Recvd 12/30/87" in the upper right corner.[25]  (Id.)

In his clinical note of the meeting with counsel, Dr. McGuire memorialized two substantive topics that were discussed.  (1 SH, Ex. 15.)  The first, and more detailed, issue concerned "potential explanations for Mr. Frye's loss of memory."  (Id.)  Dr. McGuire identified four such explanations. "One is a partial, complex seizure disorder, including potentially complex status epilepticus."  However, given the lack of evidence of seizure activity in Mr. Frye before or after "that event," Dr. McGuire characterized the likelihood that petitioner suffers a seizure disorder as "extremely remote."  (Id.; RT 7317:1-4.)  Dr. McGuire's second possible explanation was a "drug or alcohol induced amnestic episode."  (1 SH, Ex. 15.)  Someone reported to Dr. McGuire that Mr. Frye "had consumed some 12-16 beers and smoked at least two joints of marijuana during the time in question.  This, especially with his pre-existing encephalopathy, could account for his amnestic period."  (Id.)  The third possibility Dr. McGuire considered was "a functional or emotionally traumatic induced episode ... similar to a fugue type state.  A fourth possibility is that Mr. Frye is deliberately electing not to remember."  (Id.)  Dr. McGuire concluded that it was "impossible at this time to distinguish between these events."  (Id.)

The second topic discussed in Dr. McGuire's note was petitioner's general diagnosis and its effects.  The diagnosis was "chronic encephalopathy" with "EEG showing frontal lobe injury." (1 SH, Ex. 15.)  From this diagnosis "one could postulate certain frontal lobe symptoms such as apathy, personality changes, intolerance of stress, and memory loss.  However, in general, this would not lead to directed violence.  Excessive violence would be more in concert with a

---

[25]  In an attempt to show petitioner's counsel's lack of preparation, petitioner points out that the date written on this note, presumably the date the note was received by trial counsel, was twenty days after the start of jury selection.  (ECF No. 612 at 63:20-21.)  However, the date the note was received by counsel shows only that the meeting with Dr. McGuire occurred sometime before then.  The EEG was administered on October 26, 1987.  (1 SH, Ex. 16.)  Exhibit 16 also contains what appears to be a report on the EEG.  However, the court's copy is so poor that a date cannot be made out.  Based on the evidence the court has before it, there is certainly a possibility counsel met with Dr. McGuire before trial began.  Further, while jury selection began on December 10, 1987, defense counsel did not give an opening statement until almost three months later, on March 2, 1988.  (CT 3385; RT 5380.)

1  personality disorder."  (Id.)  As petitioner points out, these responses indicate trial counsel did not

2  ask McGuire whether Mr. Frye's brain damage would impair his ability to form a plan to kill

3  someone.

4          Dr. McGuire's testimony further clarifies his pre-trial findings.  First, Dr. McGuire

5  reported that the results of petitioner's EEG were abnormal.  (RT 7290:21-25.)  They indicated

6  that the left frontal and left temporal region of petitioner's brain "were not functioning

7  appropriately."  (RT 7291:1-4.)  Dr. McGuire explained that those areas of the brain "are highly

8  involved in cognitive function," which includes the "ability to process memory," a person's

9  "sense of initiative or self-drive," the "ability to maintain normal social behavior," and

10 "intolerance of stresses."  (RT 7292:17 – 7293:4; 7294:16-20.)  Petitioner's diagnosis was "static

11 encephalopathy."  (RT 7294:2-3.)  Dr. McGuire also testified that this type of brain injury would

12 not make a person more likely to commit a planned violent act.  (RT 7295:1-8.)  On cross-

13 examination, he clarified that he was not suggesting that petitioner was incapable of planning a

14 violent act.  (RT 7335:18-23.)  Brief episodes of amnesia are possible with this sort of brain

15 injury.  (RT 7296:9-12.)  Those episodes would be exacerbated by the use of drugs and/or

16 alcohol.  (RT 7296:15 – 7297:6.)  Most of Dr. McGuire's testimony was about these blackout

17 periods and the brain-damaged person's reliance upon others to fill in the blanks in his or her

18 memory.  (RT 7299-7301.)  However, on cross-examination, Dr. McGuire qualified his testimony

19 somewhat.  He said petitioner's chronic encephalopathy was "mild" and that his testing showed

20 petitioner had "relatively mild" memory deficits.  (RT 7347:2, 13-15.)

21         On re-direct, Dr. McGuire agreed that petitioner's brain dysfunction may cause problems

22 processing information, with judgment, and with the ability to reflect.  (RT 7350:13 – 7351:6.)

23 He would also be more vulnerable to stress.  (RT 7351:15-23.)  Dr. McGuire opined that

24 petitioner may have difficulty testifying because testifying in court is a "fairly stressful activity."

25 (RT 7353:5-7.)  A person with petitioner's brain dysfunction may have memory loss or block

26 memories when confronted with that sort of stress.  (RT 7353:7-23.)

27 /////

28 /////

1                (iv)     Dr. Anderson

2      Attorney McDowell recalled that petitioner was also evaluated by psychiatrist Dr. Doug

3 Anderson.  (1 SH, Ex. 27 at 2.[26])  McDowell stated that, based on her time records, the first

4 contact she made with Dr. Anderson occurred on December 14, 1987, when she telephoned "him

5 to set up an appointment to see Frye."  (Id.)  According to McDowell, after Dr. Anderson

6 interviewed Mr. Frye, he "recommended putting on a mental defense."  (Id.)

7               ii.     Prejudice

8               (a)  Mental Health Evidence

9      Much of the evidence developed by trial counsel is discussed above.  To summarize,

10 petitioner reported to Dr. McGuire his history of head trauma, "persistent problems with

11 photophobia and phonophobia leading to decreased tolerance of stress and increased irritability"

12 that inferred with his work, and numerous blackouts which were "[g]enerally ... associated with

13 alcohol ingestion."  (1 SH, Ex. 16 at 2.)  Dr. McGuire noted that petitioner was "very clear[]" that

14 "the black-out occurs before any violent episodes have occurred."  (Id.)  On the basis of the initial

15 examination and history, Dr. McGuire tentatively diagnosed

16
17
18
19

> episodes of transient alteration of consciousness. This appears to be secondary to substance abuse, however with his history of meningitis as well as head trauma, a seizure disorder must be excluded.  In addition, structural abnormalities secondary to his injuries must be evaluated.  Thus I have requested a MRI scan and EEG. In addition, I will be reviewing his previous extensive medical records.

20 (Id. at 4.)

21      The MRI revealed abnormalities in Mr. Frye's frontal sinuses and ventricles. (1 SH, Ex.

22 16 at 6.[27])

23

24 _____

[26] As stated above in note 20, this court finds the California Supreme Court could have discounted
25 much of Exhibits 25 and 27, which contain statements attributed to or made in an unsworn format
by attorney McDowell.  However, because McDowell states in her letter that her memory about
26 Dr. Anderson is confirmed by an examination of her time sheets, the court finds the statements
made in this paragraph more reliable.

27
[27] As noted above, pages 6 and 7 of Exhibit 16 appear to contain the MRI and perhaps some EEG
28 results.  However, the copies provided to the court are illegible.

1    On October 26, 1987, A.J. Gabor, M.D., performed and analyzed the EEG. He reported

2           an abnormal EEG characterized by the presence of focal, left
             anterior temporal epileptiform discharges and by the presence of
3           bilateral focal frontopolar epileptiform discharges. These findings
             would be consistent with the presence of focal left anterior temporal
4           abnormality which is epileptogenic and in addition would suggest a
             possibility of bilateral frontopolar abnormalities which are
5           epileptogenic.

6    (1 SH, Ex. 16 at 8.)

7        In addition to the mental health evidence petitioner's trial attorneys did develop before

8    trial, petitioner presented to the California Supreme Court, and presents here, significant

9    additional evidence of his mental health problems.

10       The record before the California Supreme Court included Exhibit 21, the curriculum

11   vitae and report of Mark D. Cunningham, Ph.D., a forensic psychologist.  (1 SH, Ex. 21.)  Dr.

12   Cunningham was asked to determine "what mitigation and related sentencing testimony

13   could have been presented at [Mr. Frye's] sentencing phase trial in August 1988."  (1 SH, Ex. 21

14   at 2.)  While Dr. Cunningham's report is titled "Capital Sentencing Mitigation Evaluation,"

15   petitioner's state habeas counsel cited to the report in his argument that trial counsel was

16   ineffective for failing to present a mental defense at the guilt phase.  (1 SH Pet. at 34-35.)

17       Dr. Cunningham had substantially more information than was provided to, or obtained by,

18   the doctors engaged prior to trial.  Dr. Cunningham interviewed petitioner and his mother, Hazel

19   Frye, and reviewed available evidence of petitioner's history including educational, medical,

20   corrections and other records.  (1 SH, Ex. 21 at 1-2.)  Dr. Cunningham also reviewed petitioner's

21   interrogation by police, the testimony of mental health experts from the trial, including the

22   competency trial, and the testimony of Jennifer Warsing and Ron Wilson.  (Id.)  His review of

23   mental health records included the draft report of neuropsychologist Linda Wagner, Ph.D., as well

24   as the psychologist and psychiatrist who testified at the competency trial.  (Id. at 1, 5.)  Dr.

25   Cunningham relied upon interviews of people from petitioner's past which were conducted by a

26   mitigation specialist who was apparently retained by post-conviction counsel.  (Id. at 1.)

27       Dr. Cunningham reviewed petitioner's educational records and records from his past

28   incarceration. (1 SH, Ex. 21 at 1.)  According to Dr. Cunningham, the educational records were

51

important to a mental health diagnosis because they showed that petitioner was more vulnerable than the average person to suffering adverse psychiatric effects from his traumatic brain injury. (Id. at 13-14.)  The records suggest Mr. Frye "was learning disabled," which is an additional risk factor.  (Id.)

Dr. Cunningham identifies additional risk factors that explain petitioner's difficult childhood and adolescence.  "Jerry's first head injury of note occurred at age 7 when he was hit by an automobile and knocked unconscious."  (Id. at 14.)  "It is also notable that there is a history of psychiatric disturbance in Jerry's extended family which may have predisposed him to psychiatric disorder as well."  (Id.)  Petitioner's "paternal grandmother reportedly suffered a 'nervous breakdown' and died in a mental institution."  (Id.)

The psychological literature cited by Dr. Cunningham identifies other circumstances present in petitioner's life as risk factors for developing psychiatric problems after a traumatic brain injury.  Dr. Cunningham notes that petitioner suffered his injury when "Jerry's parents were experiencing marital separation."  (Id.)  Specifically, petitioner's mother had an affair and left the family home and his father "was depressed and drinking alcoholically."  (Id. at 14, 15.)  In addition, petitioner's childhood friend Frank Sturgell reported that after petitioner's mother left, petitioner's problems with the law began.  (Id. at 15.)  Dr. Cunningham also notes petitioner's childhood head injuries and petitioner's extensive use of alcohol prior to and at the time of the accident.  (Id. at 7.)

Dr. Cunningham looks to petitioner's disfigurement in the accident as contributing to his later mental health problems.  The facial fractures petitioner suffered in the car accident "markedly changed his facial features."  (Id. at 3-4.)  He describes how the disfigurement would have adversely affected petitioner's adolescent development.  (Id. at 13.)

Dr. Cunningham explains Dr. Wagner's testing results.  He states that Dr. Wagner "identified multiple pieces of data that formed a consistent pattern indicative of brain dysfunction."  (Id. at 5.)  Her testing showed deficits in petitioner's executive functions, such as sustained attention, concentration, mental tracking, and mental control.  (Id.)  According to Dr.

/////

Cunningham, "[d]eficits in executive functions are commonly associated with frontal lobe damage." (Id. at 6.)

Dr. Cunningham also considered the effects of petitioner's intoxication and disordered thinking at the time of the shootings. (Id. at 36-39.) Relying on Jennifer Warsing's account of what transpired that day, Dr. Cunningham concludes,

> the offense was impulsive, disorganized, and largely made up on the fly, entirely consistent with intoxication, frontal lobe brain damage, and Jerry's history of eruptive unprovoked violence when intoxicated.

(Id. at 39.)

Dr. Cunningham identifies other evidence that was available to trial counsel, but not presented, including "multiple visual exhibits to assist [jurors'] understanding" and "relevant psychological research which could have substantiated the mitigation and offense nexus." (Id. at 6.)

Through Dr. Cunningham, petitioner provided the state court with an overview of the "extensive psychological and medical literature available in August 1988 which could have been obtained by defense counsel had this effort been made." (Id. at 6.) Dr. Cunningham begins by describing the physical nature of the brain in order to "make ... understandable the mechanical forces and stresses of brain damage." (Id. at 6-9.) Dr. Cunningham focuses on frontal lobe functions relevant to culpability including the "formulation of intentions and programs of behavior," "maturity, decision making, planning, attention, delay of gratification." (Id. at 10.) He notes the literature available at the time of trial found the area of the brain damaged in petitioner's case "is responsible for long range planning, decision making, evaluation, impulse control, and maturity. Damage to the pre-frontal area will impact on these higher order psychological functions." (Id. at 11.) Dr. Cunningham then relies upon published studies to explain and graphically illustrate how petitioner experienced two traumatic brain injuries. (Id.) He describes how the impacts on petitioner's skull caused bruising in his brain. (Id.) He focused specifically on the literature examining the forces at play in a rapid deceleration motor vehicle accident such as Mr. Frye's. (Id. at 12.) Dr. Cunningham explains,

> Begali described that the continuation of brain movement and rotation within the skull following initial impact puts strain on delicate nerve fibers and blood vessels and results in shearing. As brain surfaces are pushed against the inner surface of the skull with sudden deceleration, the brain sustains bruising.

(Id. (internal citations omitted).)  Dr. Cunningham relied upon published studies to explain that the areas most often injured in this way in motor vehicle accidents are the frontal and temporal lobes.  (Id.)  As discussed above, both Dr. McGuire, relying on the EEG, and Dr. Wagner, relying on neuropsychological testing, found dysfunction in petitioner's frontal and temporal lobes.

Again relying on published research, Dr. Cunningham explains that the available literature found the types of injury petitioner suffered "are identified as accounting for specific, localized behavior alterations."  (Id. at 11.)  Specifically, he explains that "[l]esions to the undersides of the frontal and temporal lobes may have negative consequences on behavior, affect, emotions, memory, and attention."  (Id. at 12 (internal citation omitted).)  Appendix A to Dr. Cunningham's report contains a long list of articles documenting personality changes as the result of traumatic brain injury.  Dr. Cunningham notes that many of the listed changes are similar to those people observed in petitioner after his accident and meningitis.  (Id. at 15-23.)  Dr. Cunningham also describes case studies of young men who, after traumatic injury to their frontal lobes, faced problems similar to those suffered by petitioner.  (Id. at 16-17.)

Dr. Cunningham discusses studies that showed frontal lobe damage

> may disrupt the ability of the person to correctly perceive and interpret feelings in himself and others.  The patient may suffer an inability to cognitively 'deal with' arousal producing stimuli.  There is often poor tolerance for frustration, greater dependence on others, insensitivity to others, and a generally more demanding attitude.

(Id. at 17.)  Dr. Cunningham notes that medical literature predating the trial by decades had identified "emotional lability" in patients who had suffered brain trauma.  (Id. at 23.)  As Dr. Cunningham explains at length, the events in petitioner's life following his brain injuries and meningitis fit within the categories of outcomes described in the literature:  (1)  "Anxiety and catastrophic reaction"; (2)  "Denial of illness or anosognosia";  (3) "Paranoia and psychomotor agitation";  (4)  "Depression, social withdrawal, amotivational states."  (Id. at 17-19.)  Dr. Cunningham observed that paranoid thinking is present and explainable in people with frontal and

1  left temporal lobe damage, and was observed in petitioner shortly before the Brandts were killed.

2  (Id. at 18-19.)  The evidence of paranoia was reported by psychiatrist Patricia White, M.D., and

3  psychologist Grant Hutchinson, Ph.D.  (Id. at 19.)  The former was the trial court's expert, the

4  latter worked for the prosecution.

5       Lastly, Dr. Cunningham refers to several studies supporting the conclusion that brain

6  damage such as petitioner's is "permanent and irreversible regardless of rehabilitative therapy."

7  (Id. at 12.)  Dr. Cunningham explains that psychiatric disturbance is significantly more common

8  in cases of damage to both hemispheres and the frontal lobe, such as petitioner's.  (Id.)

9       Dr. Cunningham found several aspects of petitioner's background consistent with higher

10  risk of adverse psychological effects from traumatic brain injury.  First, he notes petitioner

11  suffered facial disfigurement and "was subsequently more self conscious" and experienced a

12  fundamental change in his relationship with peers.  (Id. at 13.)  Dr. Cunningham describes the

13  many ways in which injury can affect an adolescent brain:

14  
15  
16  
17  
18  
> Poor impulse control, aggression, disinhibition, and other emotional behavioral complications associated with traumatic brain injury may make old friendships difficult to sustain.  Adolescent developmental strivings toward individuation and independence may be compromised or reversed. . . . [A]dditional challenges to family adjust [sic.] may be associated with the self centered behavior, apathy, impulsivity, irritability, and loss of initiative of the traumatically brain injured adolescent.

19  (Id. at 14-15 (internal references omitted).)

20       Dr. Cunningham describes how petitioner's history fits within the observed histories of

21  other patients with similar brain injuries:

22  
23  
24  
25  
26  
27  
> Review of Jerry's history reflects significant deficits in goal directed behavior and plan follow through. Jerry dropped out of high school following his brain injury.  His geographic, employment, and relationship pattern has been unstable. His participation in the instant offense would have reflected a failure to follow through on the much more promising and lower risk marijuana growing joint ventures which he had had in progress at the time of the instant offense. Even his spontaneously identifying himself to the police when arrested for domestic violence in July 1985 reflected an inability to follow through on a plan that was underway to create a new identity and thereby avoid arrest.

28  (Id. at 19.)

1   The medical literature identified by Dr. Cunningham shows that some sufferers of

2   traumatic brain injury "may attempt to dull their pain with alcohol and drugs."  (Id. at 15 (internal

3   references omitted).)  Dr. Cunningham notes that "Jerry's alcohol and substance abuse had begun

4   prior to the traumatic brain injury, but markedly increased in quantity and pervasiveness

5   following the injury."  (Id.)

6   Dr. Cunningham observes that the medical literature reports that "patients suffering

7   frontal lobe injury as often displaying normal scores on standard intelligence tests but

8   displaying personality changes of reduced initiative, reduced planning ability and foresight,

9   unreliability, rudeness or tactlessness, and irascibility resulting in their having difficulty holding

10  employment."  (Id. at 20.)  Dr. Wagner identified some of the same deficits in petitioner on the

11  basis of neuropsychological testing.  She reported, "some deficits in sustained

12  attention/concentration, mental tracking, and mental control," and found "his ability to sequence

13  and shift cognitive sets was impaired." (1 SH, Ex. 20 at 11.)  Dr. Cunningham notes the same

14  difficulty found in "frontal patients:"  "chang[ing] from one solution of a problem or one form of

15  response to a different one."  (1 SH, Ex. 21 at 20.)

16  Dr. Cunningham also explains that studies of frontal lobe patients exhibited increased

17  libido and disregard for their partners.  (Id. at 21-22.)

(b) Social History Mitigation

19  In his briefing, petitioner next sets out the social history mitigation developed during state

20  habeas.  While this information is primarily relevant to the prejudice analysis of petitioner's

21  claims of ineffective assistance of counsel at the penalty phase, discussed below, it is included

22  here because some of it would have been helpful to counsel regarding the guilt phase to provide

23  to mental health experts and to better understand petitioner.  Again, petitioner relies primarily on

24  the report prepared by Dr. Cunningham.

25  Dr. Cunningham starts his story of petitioner's life by relating petitioner's discovery of his

26  mother's affair with the father of one of petitioner's friends.

27
        Jerry's father, Preston Frye, had hired a carpenter, Bob Burch, to
        help repair the house. Bob Burch was the father of one of Jerry's
28      male friends. Additionally Bob and Jerry's mother, Hazel, often

56

went to church together.  One day, when Jerry assumed that both parents would be gone from the house, he stayed or returned home from school to go rabbit hunting, only to hear two cars drive up to the house. Jerry hid in the attic, and watched through holes in the dining room ceiling as his mother and Bob began "making out." His mother saw Jerry's school books on the couch, and instantly panicked and began searching for Jerry. After they found him, Bob took him to school and tried to bribe Jerry not to say anything. Jerry described that his mother subsequently related to him in a more detached and irritated fashion.

(1 SH, Ex. 21 at 30-31.)  Petitioner said of this event, "I lost all my faith in anything that day." (Id. at 31.)

Several months later, petitioner's younger brother and a friend found a case of beer petitioner had hidden in the woods.  (Id.)  After they drank the beer and became sick, petitioner's mother, Bob Burch, and petitioner's father became angry and attempted to beat petitioner.  (Id.) Petitioner attempted to fight back.  (Id.)  The next day, when he came home from school, petitioner discovered that his mother had taken a check he had earned picking tobacco and "left with Jerry's younger three siblings for California where she remained for approximately six months."  (Id.)  Petitioner felt guilty over his role in the separation and described his father's heart as "broken" by it.  (Id.)

Petitioner was left alone with his father who was already "an episodic binge drinker" and who had encouraged petitioner to get drunk for the first time when petitioner was only about nine years old.  (Id. at 32.)  After petitioner's mother left, petitioner's father started drinking more regularly.  (Id.)  "Our house on the weekends looked like a bar," petitioner said.  (Id.)  Adults and teens congregated there on weekends and "drank heavily."  (Id.)  Petitioner and his father also smoked marijuana together during this time.  (Id.)  These activities continued for about six months until petitioner's accident.  (Id.)  The accident occurred when petitioner was driving two friends home after a party at his house.  (Id.)  Petitioner was drunk.  (Id.)  His friend Frank Sturgell was seriously injured and spent a month in the hospital.  (Id. at 32-33.)  The other friend, Eddie Burch, lost his two front teeth.  (Id.)  Petitioner described feeling a lot of guilt about the injuries his friends suffered.  (Id. at 33.)

/////

1    After the accident, petitioner's mother and siblings returned home.  (Id.)  They found a

2    "'dump truck full' of beer cans behind the house."  (Id.)  However, petitioner's sister reported that

3    his father stopped binge drinking after their return.  (Id.)

4    Dr. Cunningham concludes petitioner experienced "developmental derailment" and

5    identified this as a mitigating circumstance that could have been presented at trial.  (Id. at 29-30.)

6    He describes the forces that "interacted to result in derailing Jerry from a normal, well socialized

7    sequence of development."  (Id. at 29.)  First were the effects of the car accident on his cognitive

8    functioning, his personality, and his socialization, including the knee injury that excluded him

9    from sports, the facial deformation that alienated him from peers, and the recurrent bouts with

10   meningitis.  (Id. at 29.)  Second, petitioner's alcohol consumption increased after the accident and

11   particularly after he dropped out of school.  (Id.)  Dr. Cunningham looks next at "a loss of a

12   protective sense of invulnerability and immortality."  (Id.)  He notes that the "disruption of this

13   sense of personal control, personal longterm optimism, and confidence in one's personal physical

14   security" often occurs in people who suffer serious injury or illness.  He adds that "[a]dolescence

15   is a particularly difficult time to have this sense of personal security disrupted" because it also is

16   the time when children must become more independent.  (Id. at 29-30.)  The final factors in

17   petitioner's developmental derailment discussed by Dr. Cunningham were petitioner's mother's

18   extramarital affair and subsequent abandonment of him and his father's "corruptive influence and

19   constructive abandonment."  (Id. at 30.)  Dr. Cunningham notes that at age 16, Jerry married a 21-

20   year-old woman, and that his history thereafter, including his relationship with Jennifer Warsing,

21   followed this pattern of relationships with older women and included domestic violence.  (Id.)

22   Dr. Cunningham also discusses at some length petitioner's alcohol and drug dependence.

23   (Id. at 33-39.)  He finds a number of factors influenced the development of petitioner's

24   dependence.  They included:  "[g]enetic vulnerability, family/community/peer influences,

25   child/adolescent onset, self medication in response to traumatic experience, reciprocal life impact

26   as alcohol and drug abuse further undermined opportunities and access to experiences which

27   would build confidence and more adaptive lifestyle, apathy of coping capacity, disinhibition of

28   aggressive impulses, and influencibility."  (Id. at 33.)  Dr. Cunningham describes petitioner's

1    early exposure to and use of alcohol.  (Id.)  In addition, petitioner's sister reported that petitioner

2    experienced "multiple alcohol related blackouts during periods of intoxication even before [his]

3    automobile accident."  In fact, petitioner was drinking every weekend by the time he was 12 or

4    13.  (Id. at 33-34.)  The blackouts "increased in frequency following the accident."  (Id.)

5    Petitioner's sister described "episodes lasting 15 to 20 minutes when [petitioner] would be

6    conscious but unresponsive to external stimuli including being spoken directly to as if profoundly

7    internally preoccupied."  (Id. at 15.)  Dr. Cunningham also describes petitioner's abuse of

8    marijuana and methamphetamines.  (Id. at 34.)

9        As to genetic vulnerability, Dr. Cunningham notes that petitioner's father and two

10    maternal uncles were described as alcohol abusers, two other maternal uncles had multiple

11    convictions for drunk driving, and petitioner's sister reported that she also had drug dependency

12    problems.  (Id. at 35.)  In addition, many of the adults, as well as the peers, in petitioner's life

13    modeled alcohol abuse and encouraged his early consumption.  (Id. at 36.)  Dr. Cunningham

14    shows that petitioner's alcohol abuse increased markedly after extremely stressful events, such as

15    the discovery of his mother's affair and his accident, demonstrating that he used alcohol as a

16    coping mechanism.  (Id.)  Dr. Cunningham also discusses that "brain damage with its associated

17    judgment deficits and reduced coping capacity was a risk factor for alcohol and substance

18    dependence."  (Id.)

19        Many people reported that petitioner became "profoundly more aggressive" when he was

20    drinking.  (Id. at 36.)  Dr. Cunningham notes that Jennifer Warsing testified that petitioner beat

21    her when he was intoxicated.  (Id.)

22                    b.  Discussion

23        In his opening brief, petitioner spends a great deal of time arguing that Iversen and Hawk

24    acted unreasonably in failing to investigate and present a mental health defense for the guilt

25    phase.  Petitioner makes a significant case that counsel acted unreasonably.  However, the

26    reasonableness of counsel's conduct is only half of the Strickland test.  Cf. Hurles v. Ryan, 706

27    F.3d 1021, 1035 (9th Cir. 2013) (court need not address both components of ineffective assistance

28    of counsel claim if the petitioner makes an insufficient showing as to one) (citing Strickland, 466

1    U.S. at 697).  Petitioner must also show a "reasonable probability" that counsel's errors affected

2    the outcome of the guilt phase.  Strickland, 466 U.S. at 694.  Moreover, he must make this

3    showing within the context of the deferential standard of review under 28 U.S.C. § 2254(d).  As

4    discussed above, this court may only find section 2254(d) satisfied if "no fair-minded jurist"

5    could have denied this claim.  Richter, 131 S. Ct. at 736.  Petitioner has failed to show that no

6    reasonable jurist could have found that he failed to make a prima facie showing of prejudice as a

7    result of counsel's failures at the guilt phase.

8           To establish a prima facie case of prejudice under Strickland, petitioner must show a

9    reasonable probability that, had counsel presented a mental state defense, the result of the guilt

10   phase would have been different.  The jury found petitioner guilty of first degree murder of both

11   Brandts and guilty of first degree felony murder through verdicts of guilt on the robbery and

12   burglary charges.  (RT 9372-9377.)  Petitioner only suffered prejudice if the mental state defense

13   would have been successful to show that "because of his mental illness or voluntary intoxication,

14   [petitioner] did not in fact form the intent unlawfully to kill" or form the intent to commit robbery

15   or burglary.  See People v. Saille, 54 Cal. 3d 1103, 1117 (1991) (emphasis in original), cited in

16   Sully v. Ayers, 725 F.3d 10576, 1070 (9th Cir. 2013).

17          Petitioner has made no attempt to place the evidence he has collected regarding

18   petitioner's mental state within the legal context of the guilt phase determination.  Petitioner has

19   certainly shown he has mental health problems that were not fully explored at trial.  That does not

20   also mean he has shown a reasonable probability that the jury's consideration of those mental

21   health problems would have changed its guilt phase determination.  Moreover, he has not shown

22   that no fair-minded jurist could have determined he had not established a prima facie case of

23   prejudice.

24          There was significant evidence at trial that petitioner formed the intent for murder,

25   burglary, and robbery.  Ron Wilson testified that petitioner told him twice on the day of the

26   crimes that the Brandts should be "knocked in the head for their money."  (RT 5818:14-17;

27   6001:5-11.)  Petitioner also indicated to Wilson that he was broke.  (RT 5596:6-7.)  Wilson saw

28   the shotgun at petitioner's campsite that night.  (RT 6003:7-12; 6110:22-26.)  After Wilson left

1   petitioner's campsite, petitioner told Jennifer Warsing that he was going to "take what he could"

2   and that he "was going to do something bad, really bad." (RT 6271:25 – 6272:2.)  Warsing

3   testified that petitioner then told her he was going to kill the Brandts and that if she did not come

4   with him he would have to kill her too.  (RT 6272:15-21.)  Petitioner took the shotgun, grabbed

5   Warsing by the arm, and walked to the Brandts' cabin.  (RT 6273:11-22.)  Before he shot Mr.

6   Brandt, Warsing heard petitioner say, "Old man, you want to live?"  (RT 6279:4-5.)  After

7   petitioner shot both of the Brandts, he directed Warsing to help him take money and gold from

8   their house.  (RT 6290-6295.)  During their flight in the Brandts' car, petitioner disposed of the

9   murder weapon and hid the keys to the Brandts' car.  He and Warsing purchased a new car and

10  new clothes.  (RT 6300-6315.)

11          To succeed on his mental health defense at trial, the defense attorneys would have had to

12  discredit Wilson and Warsing's testimony.  That would have been particularly difficult because

13  petitioner needed both witnesses' testimony to show his mental state at the time of the crimes.

14  Petitioner relies on Wilson's statements about the amount petitioner drank the day and evening of

15  the crimes and many of Warsing's statements, including her description of petitioner's statement

16  that he saw the devil at their camp.  Petitioner does not show how trial counsel could have

17  induced the jury to selectively believe only parts of both Wilson's and Warsing's testimony.

18          This court recognizes that, previously, it found petitioner made a colorable showing of

19  prejudice.  As other courts have recognized, the question under section 2254(d) is not whether

20  this court finds the petitioner has established a prima facie case.  Rather, the question is whether

21  no reasonable jurist could have found otherwise.  With respect to petitioner's argument that

22  counsel was ineffective for failing to investigate and present a mental health defense, he has

23  failed to satisfy that section 2254(d) standard.

24  /////

25  /////

26  /////

27  /////

28  /////

61

1
2

      4.   Other Instances of Ineffective Assistance of Counsel at the Guilt Phase – Claims 3 and 7

3

      a.   Opening Promises that Petitioner and Dr. Wagner would Testify[28]

4

Petitioner points out that attorney Iversen promised the jury that petitioner would testify

5

and tell his story.  Iversen also told jurors they would hear testimony from both neurologist Dr.

6

McGuire and psychologist Dr. Wagner about petitioner's memory problems.  Neither petitioner

7

nor Dr. Wagner testified at the guilt phase.

8

      i.   Background and Evidentiary Proffer

9

In his opening statement, attorney Iversen told the jury four times that petitioner would

10

testify.  At the beginning of his opening statement, he said that "when" petitioner took the witness

11

stand, he would tell the jury how sad he was about what happened to the Brandts.  (RT 5381:9-

12

12.)  After an extensive discussion of how the physical evidence contradicted Jennifer Warsing's

13

version of the events, Iversen said, "Jerry Frye wants to take the witness stand.  He wants to

14

testify.  He wants to tell you how he feels and what he remembers happening."  (RT 5406:1-3.)

15

Iversen then addressed the prosecutor's statements about petitioner's various stories to

16

police officers.  The prosecutor had described petitioner's first, videotaped statement to the Belle

17

Fourche police that he did not know whether he had killed the Brandts, but that Warsing had told

18

him he did.  (RT 5378:6-8.)  In a later statement, petitioner told police he had heard shots coming

19

from the Brandts' cabin, he and Warsing had run down the hill, found the Brandts' bodies, and

20

fled in their car.  (RT 5378:9-18.)  Finally, the prosecutor recounted that during his trip from

21

North Dakota to California, petitioner told an officer that he had killed the Brandts.  (RT 5379:3-

22

7.)

23

Iversen explained that the jury would hear about petitioner's physical and mental

24

problems that resulted from an automobile accident.  (RT 5409:19-24.)  He stated that two mental

25

26
[28]  Petitioner combines this issue with the various other allegations of ineffective assistance of counsel at the guilt phase.  However, because the court finds these allegations more serious, and

27
because there is a substantial body of law regarding this issue, the court considers it separately. In addition, the court considers it below as part of petitioner's overall argument that the defense

28
was unorganized and lacked a consistent strategy.

1   health experts would testify about the problems with petitioner's brain from the auto accident and

2   the repeated bouts of meningitis. (RT 5409-5412.)  He identified neurologist Dr. Stephen

3   McGuire and psychologist "Dr. Linda Walker." (RT 5411:16 – 5412:5.)  He told the jury the

4   experts' testimony was important for two reasons.  First, to help the jurors understand petitioner's

5   difficulties testifying:  "Jerry is going to testify. And when he testifies, the information that these

6   doctors will tell you is that he has difficulty processing words." (RT 5412:11-15.)  He told jurors

7   the second reason the testimony was important was that "any damage to the neurons in the brain

8   makes you particularly susceptible or vulnerable to the effects of alcohol and/or drugs." (RT

9   5413:12-15.)  He added that petitioner "has had a history of some blank spots or some blackouts.

10  There is some basis, just on the abnormal EEG, to consider that it might be a seizure pattern.

11  Certainly, it would be exacerbated or worsened if you drank." (RT 5413:25 – 5414:4.)

12  However, Iversen went on to "make it clear" that "we are not saying he is crazy," or "that he has

13  diminished capacity." (RT 5414:18-21.)  Rather, Iversen focused the expert testimony on

14  "memory loss." (RT 5415:5-17.)

15      Shortly after the discussion of the experts' intended testimony, Iversen again said "He is

16  going to testify.  He is going to not only, obviously, tell his story, but be subject to cross-

17  examination with regard to that videotape.  So you will hear from him what was going on and

18  why he said what he said that night." (RT 5418:6-10.)  This time Iversen was adding to his

19  promise that Mr. Frye would explain how, when he was speaking to South Dakota police in the

20  middle of the night while drunk, he was trying to piece together his memories. (RT 5417:23 –

21  5418:5.)

22      It is not clear whether at the time of his opening statement, which was delivered on March

23  2, 1988, Iversen had ever spoken to Dr. Wagner.  As discussed above, Dr. Wagner was hired

24  while attorney Dixon was representing petitioner.  She examined petitioner in May 1986, several

25  months before Iversen's appointment in September 1986.[29] (1 SH, Ex. 20 at 1.)  According to the

26  ─────────────────────

[29] Dr. Wagner found that petitioner had "demonstrated a deficit in memory functions." (1 SH,
27  Ex. 20 at 10.)  She described instances "when listening to a conversation where he misses
information and becomes confused because there is to [sic] much information for him to process
28  at once." (Id.)  She also opined that petitioner had a "significantly impaired" ability "to learn and

mitigation evaluation performed by psychologist Mark Cunningham at the behest of state habeas

counsel, Dr. Wagner described preparing her report of the "neuropsychological evaluation" on

March 22, 1988 and meeting with counsel Hawk and Iversen on March 29, 1988, two days before

the beginning of the defense case.  (1 SH, Ex. 21 at 5.)  However, at the time of his opening

statement in early March, Iversen was aware that Dr. Wagner "ran some tests" and that her

findings corroborated the findings of Dr. McGuire regarding "this problem that [petitioner] has."

(RT 5412:1-5.)

On April 21, 1988, Iversen requested an in camera hearing to discuss why he was not

going to call petitioner as a witness.  (RT 8369-8370.)  Iversen described many hours of

preparation he and Hawk had spent with petitioner, some of which also included Dr. Peal and

some of which included a sociologist experienced in capital cases who worked with the National

Jury Project.  (RT 8371.)  Iversen then explained that petitioner experienced what he referred to

as "the popcorn phenomenon."  (RT 8372:1-3.)  He described petitioner's difficulty processing

questions and his later, sudden provision of important information.  (RT 8372:4-11; 8372-8375.)

Iversen told the judge that due to petitioner's

> physical and mental problems . . ., he really can't assist me in terms
> of preparing to testify, because he, one, can't bring things up from
> his memory to tell me about them, and secondly, we can't rely, if
> you ask the same question two days in a row, that you will get all
> the information.
>
> . . .
>
> [D]espite the many hours of preparation, I think that, because of
> this impairment that he has, it's virtually impossible for me to feel
> that he is prepared to testify or that he can properly testify.
>
> And I have researched the 1368 [competency] issue in terms of a
> client that is unable to assist you.  It doesn't seem to fit into that
> area.

(RT 8375:19 – 8376:2, 8-15.)

/////

retain new information."  (Id.)  Dr. Wagner also identified problems with petitioner's executive
functions.  She found "deficits in sustained attention/concentration, mental tracking, and mental
control … [and] his ability to sequence and shift cognitive sets was impaired."  (Id. at 11.)

Iversen also told the judge that Dr. Peal was concerned that the stress of testifying could cause petitioner to have a stroke.  (RT 8375:13-15.)   However, Iversen informed the judge, petitioner wanted to testify.  (RT 8376:20-24.)  Iversen stated that his opinion that petitioner should not testify was not based on the usual tactical considerations in determining whether or not a defendant should testify.  (RT 8377:7-15.)  He told the judge he was unsure about how to proceed.  (RT 8377:16-24.)  The judge made clear that if petitioner wished to testify, he could do so.  (RT 8379:7-16.)

Also during this ex parte conference with the judge, Iversen told him that Dr. Wagner would not testify.  (RT 8381:13-16.)  He told the judge the prosecutor had been seen observing a trial in which there was cross-examination of a psychologist regarding the validity of psychological testimony.  (RT 8381:18-25.)  He was aware the prosecutor had retained "prominent psychologist" Dr. Grant Hutchinson, who had given "very effective testimony" about the reliability of a number of tests.  (RT 8382:1-4, 20-24.)  Iversen said he had spent "the better part of two days" with Dr. Wagner and was concerned that with her "very, very little forensic experience" and her lack of knowledge about some of the testing, she would not do well under cross-examination.  (RT 8382:5-10.)  Iversen told the court he had another psychologist "with a great deal of forensic experience, Dr. Aaron Bohr" prepared to testify if necessary.  (RT 8382:16-19.)

In his closing argument, Iversen explained why he had not put on the testimony of petitioner and Dr. Wagner.  He first told the jury he felt "badly" about not doing so because he wanted the jury to trust him.  (RT 9076:23 – 9077:4.)  He then explained that Dr. Wagner's testimony was not necessary because "Dr. Peal testified extensively and testified that he had discussed the results of Dr. Wagner's test with her and that they were consistent with his opinion."  (RT 9077:5-8.)   He added that had the prosecutor attempted to contradict either Dr. Peal's or Dr. McGuire's testimony, he could have put Dr. Wagner on.  (RT 9077:14-16.)  With respect to the failure to put petitioner on the stand, Iversen reminded the jury of Dr. McGuire's testimony about petitioner's brain injury, told them that testifying is stressful, and concluded that

/////

1  a person with an injured brain may have memory problems in a stressful situation.  (RT 9078:1-

2  10.)

3      The prosecutor responded to the failure to put Dr. Wagner on the stand.  First, she

4  discussed Dr. Peal's testimony at some length, including pointing out the facts that Dr. Peal

5  administered no tests for brain damage, was not qualified to do so, and was not familiar with, nor

6  did he inspect, the raw test data obtained by Dr. Wagner.  (RT 9245-9251.)  The prosecutor

7  added:

8        you were told you were going to hear from neuropsychologist
       Linda Wagner.  She did not show up at trial.  She did not testify.
9        Defense stated there was no reason for it.  But, despite that, you
       may reasonably infer, if that psychologist had some real helpful
10       information to the defense, you would have heard from her.

11  (RT 9248:16-21.)

12                    ii.   Legal Standards

13      Federal law is clear: counsel's failure to follow through on testimony promised in an

14  opening statement has a high probability of prejudicing the jury.  This is particularly true when

15  the testimony promised is the defendant's.

16      It does not appear that the Ninth Circuit has applied Strickland to a case in which defense

17  counsel promised certain testimony and then failed to deliver on that promise at trial.  See

18  Nguyen v. Cate, 2012 WL 850609, *8 (N.D. Cal. March 13, 2012).  The First Circuit addressed

19  defense counsel's unfulfilled promise that his client would testify in Ouber v. Guarino, 293 F.3d

20  19 (1st Cir. 2002).  The court in Ouber found defense counsel's actions unreasonable because,

21  after making the jury feel that the petitioner's testimony was the "centerpiece of the defense,"

22  counsel advised the petitioner not to testify.  293 F.3d at 27.  The court noted that such conduct

23  could not be accepted "as part and parcel of a reasoned strategy."  Id.  Further, recognizing that

24  "unexpected developments sometimes may warrant changes in previously announced trial

25  strategies," the court noted that Ouber's case had no such surprises.  Id. at 29-30.  The First

26  Circuit court found that the record did not support the state court's finding that the attorney's

27  conduct was a reasonable, strategic choice and concluded that the state court's finding was an

28  unreasonable application of Strickland.  Id. at 32.

                              66

In an earlier, pre-AEDPA case, when examining a broken promise of psychiatric testimony, the First Circuit also stressed that "little is more damaging than to fail to produce important evidence that had been promised in an opening."  Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988).  The court found that damage particularly bad in Anderson because the opening was only the day before the defense case, the jurors had been asked on voir dire about their acceptance of psychiatric testimony, the promise was "dramatic," and the promised testimony "strikingly significant."  Id.  The court in Anderson rejected an argument that the expert's testimony would not have been completely favorable to the defendant.  Id.  "[I]f it was ... wise [not to call the experts to testify] because of the damaging collateral evidence, it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise."  Id. at 18.  The First Circuit held that defendant Anderson's Sixth Amendment rights were violated by the unfulfilled promise.  Id. at 19; see also Harris v. Reed, 894 F.2d 871, 878-79 (7th Cir. 1990) (failure to put on testimony of promised eye witness ruled unreasonable and prejudicial).

District courts in this circuit have also considered the issue.  In United States v. Crawford, 680 F. Supp. 2d 1177 (E.D. Cal. 2009), a federal prisoner moved under 28 U.S.C. § 2255 to have his judgment of conviction and sentence vacated, arguing that his trial lawyer was unconstitutionally ineffective for, among other things, promising in his opening statement that the jury would hear testimony that his client was framed and then failing to produce that evidence at trial.  The court held counsel's failure to produce the promised witness may constitute ineffective assistance of counsel depending upon "the nature of the promise(s) made during his opening statement."  680 F. Supp. 2d at 1194-95, 1197.  To make the determination, the court considered the following factors:  (1) whether the promise was "dramatic"; (2) whether the evidence omitted would have been significant; (3) whether the promise was general or specific; (4) whether the testimony was elicited through other means; and (5) whether the time lapse between the promise in opening statement and submission of the case to the jury was relatively short or long.  Id. at 1195-1202.  The court determined that although counsel gave a "specific, and lengthy description" of the witness's testimony, it was not unreasonable to fail to put that witness on the stand.  The witness was "highly impeachable, disreputable, and incredible."  Id. at 1202.  By

1    describing the witness's testimony for the jury, but not putting him on the stand, the defense

2    attorney got the witness's statements before the jury without the risks involved in having him

3    testify.  Id.  The court held this decision allowed the defendant to, in effect, "'have his cake and

4    eat it too.'"  Id.

5         More recently, in Williams v. Woodford, Chief Judge Kozinski found that defense counsel

6    provided constitutionally deficient assistance when he promised jurors in opening statement they

7    would hear from two alibi witnesses as well as the defendant and thereafter failed to put any of

8    the witnesses on the stand at trial.  859 F. Supp. 2d 1154 (E.D. Cal. 2012).  The court compared

9    the conduct of counsel in that case to the deficient performances rendered in Anderson and

10   Ouber, among others, and found that "the failures in many of those cases were less serious than

11   the broken promises here; none was more serious."  Williams, 859 F. Supp. 2d at 1171.  The court

12   further found that defense counsel's broken promises in that case were "prejudicial not only

13   because of their harm but because of just how close a case this was."  Id. at 1172.  The court in

14   Williams acknowledged that each of the promised witnesses would have brought his or her own

15   weaknesses to the defense and that on that basis alone "[i]t would be a close call whether mere

16   failure to put these witnesses on the stand prejudiced [the defendant]."  Id. at 1173.  But "[w]hat

17   fatally undermined [the] defense were counsel's unfulfilled promises that these witnesses would

18   testify ….  Every indication is that this one came down to the wire.  Effective assistance of

19   counsel, rather than unfulfilled promises, might well have changed the outcome."  Id.; see also

20   Madrigal v. Yates, 662 F. Supp. 2d 1162 (C.D. Cal. 2009) (where prosecution's case was "weak,"

21   failure to present promised testimony was unreasonable).

22        Finally, last year in Nguyen, the court considered defense counsel's statement to the jury

23   that the defendant would testify and tell the jury "these things that I'm telling you."  2012 WL

24   856609, *7.  The defendant did not testify.  Counsel perceived the prosecution case as weak and

25   knew his client's testimony posed considerable risks.  Id. at *9.  The court accepted the state court

26   determination that counsel's conduct was not unreasonable.  Id.

27   /////

28   /////

iii.   Opinion of the State Court

Petitioner raised this claim on appeal and the California Supreme Court rejected it as follows:

> On this record, we cannot conclude counsel rendered deficient representation by advising defendant against taking the witness stand notwithstanding having told the jury in opening statement that defendant would testify. In light of defendant's initial desire and willingness to testify, counsel's statement was an appropriate exercise of his decisionmaking responsibilities at trial. (Cf. People v. Hines (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388] [counsel not ineffective for informing jury during opening statement defendant would testify, given defendant's indication to counsel of willingness to do so].) As the trial progressed and counsel observed defendant's increasing inability to remember, counsel's advice against testifying also fell within the realm of tactical considerations. Given defendant's decision to heed his attorneys' advice and forego his right to testify, and in the absence of anything in the record evidencing the lack of a reasonable basis for counsel's advice not to take the witness stand, we view the challenged acts as appropriate tactical decisions, subject to great deference on appellate review. (Fields, supra, 51 Cal.3d at pp. 1069-1.)

18 Cal. 4th at 983-84.  In his reply brief, petitioner argues generally that the California Supreme Court appellate opinion should not be considered the final decision on his ineffective assistance of counsel claims.  However, this court is unable to find any reference to this argument in petitioner's state habeas petitions.  Therefore, it appears this aspect of petitioner's ineffective assistance of counsel claim was only raised on appeal.  The California Supreme Court's appellate decision is that court's final decision on the merits of this claim and therefore the one subject to review under section 2254(d).

iv.   Discussion

The California Supreme Court held Iversen's decision was not unreasonable.  The state court's decision is supported by the record.  The record shows that petitioner insisted upon testifying.  Iversen obviously was aware of petitioner's problems with memory and understanding questions.  Iversen told the jury about those problems in the opening statement.  Thus, Iversen was confronted by an insistent client, who he knew would have trouble testifying.

/////

1    Iversen was careful in his opening statement.  He did not describe petitioner's expected

2 testimony with any sort of specificity.  Rather, Iversen told jurors only that petitioner would tell

3 them how sad he was about what happened to the Brandts and "how he feels." (RT 5381:9-12;

4 540-6:1-3.)  Iversen's references to petitioner's testimony about the crime were vague.

5 According to Iversen, petitioner would tell jurors "what he remembers happening." (RT 5406:1-

6 3.)  Later Iversen stated that petitioner was going to "tell his story" and also be subject to cross-

7 examination regarding the video-taped statements he made to police in South Dakota.  (RT

8 5418:6-10.)  However, again Iversen was vague; with respect to the videotape, he told jurors only

9 that petitioner would tell them "what was going on and why he said what he said that night." (Id.)

10 The only specificity Iversen provided the jury was that petitioner would explain he was drunk at

11 the time of the videotape and that "he was trying to piece together his memories." (RT 5417:23 –

12 5418:5.)

13    Iversen made no attempt to tell the jury petitioner's "story."  Rather, Iversen spent his

14 time in the opening statement focusing on the problems with the physical evidence and showing

15 that Jennifer Warsing's testimony did not jibe with the physical evidence they did have.  (RT

16 5385-5409.)  The lack of specificity meant that the defense in the present case avoided the

17 situation in <u>Anderson</u> of failing to put on specific, promised, "powerful" evidence to support the

18 primary defense.  858 F.2d at 19.

19    It is also important that Iversen's promise was made in his opening statement on March 2,

20 before the beginning of the prosecution's case.  The defense case did not begin until April 21,

21 over a month and a half later.  This is not a situation like that in <u>Anderson</u> where defense counsel

22 made a promise in an opening statement given immediately before the beginning of the defense

23 case and then defense counsel rested the following day without calling the promised witness.  858

24 F.2d at 17.

25    Finally, Iversen had a reasonable explanation for his decision not to put on petitioner's

26 testimony.  He told the judge Dr. Peal was concerned that testifying could cause petitioner

27 extreme stress, possibly to the point of having a stroke.  And, Iversen provided the jury with a

28 reasonable explanation for petitioner's failure to testify.  He told the jury of Dr. McGuire's

70

1    testimony about petitioner's brain injury, that testifying is stressful, and that a person with an

2    injured brain may have memory problems in a stressful situation.  (RT 9078:1-10.)  In sum, while

3    Iversen's conduct was far from perfect and may indicate a lack of preparation, this court finds the

4    California Supreme Court's determination that Iversen acted reasonably is neither contrary to, nor

5    an unreasonable application of, Strickland and case law regarding counsel's failure to introduce

6    promised testimony.

7            Iversen's failure to put on the testimony of Dr. Wagner is somewhat different.  First, while

8    petitioner raised that issue on appeal, it does not appear that the California Supreme Court

9    addressed it directly.  (AOB at 66.)  This court presumes, however, that because the issue was

10   fairly raised, the state court rejected it on the merits.  See Johnson v. Williams, 133 S. Ct. 1088,

11   1094 (2013) (rebuttable presumption that claim raised in state court, but not explicitly addressed

12   by court in reasoned opinion, was rejected on the merits).  Getting to the merits of petitioner's

13   claim, it should first be noted that, unlike his description of petitioner's expected testimony,

14   Iversen did describe, albeit briefly, how Dr. Wagner would testify.  Iversen told the jury that Dr.

15   Wagner, along with Dr. McGuire, would explain why petitioner may have problems

16   understanding questions and remembering things.  (RT 5412:11-15; 5413:12-15.)   Nonetheless,

17   during the in camera proceeding, Iversen explained legitimate grounds for concern about cross-

18   examination of Wagner.  Further, and as Iversen told the jury, he put on the testimony of two

19   other experts.  Had the defense pursued a mental health defense, then the need for Wagner's

20   testimony would have been greater.  However, given the guilt-phase focus on attacking Jennifer

21   Warsing's credibility, this court finds the California Supreme Court would not have been

22   unreasonable in concluding that making or breaking the promise that Wagner would testify was

23   not contrary to Strickland or otherwise unreasonable.

24                      b.  Additional Allegations of Ineffective Assistance of Counsel

25                           i.  Counsel's Conflicting Agendas

26           Petitioner makes much of counsel's conflict.  Because attorney Hawk is deceased, the

27   court has only the declaration of attorney Iversen, state habeas counsel's declaration about what

28   attorney McDowell told him, and McDowell's letter to Lane to support the argument they were

                                                   71

1   unable to work well with Hawk.  Petitioner's primary argument here is the one discussed above,

2   that Hawk developed a relationship with petitioner which foreclosed reasonable discussion of any

3   guilt phase defense strategies besides outright acquittal.  In addition, petitioner argues that Hawk

4   had no clear strategy.  Attorney Iversen described the situation like this:

5           Prior to, and during both the guilt and penalty phases of the trial, I
            sat down with Mr. Hawk to discuss strategy with him. Hawk had
6           his own agenda in this case.   He was often ill-prepared and
            abrasive. . . .  Hawk angered and frustrated the efforts of everyone
7           involved in the process of representing Jerry Frye by failing to keep
            appointments with  the investigator, failing  to  perform  tasks
8           assigned to him, and failing  to follow  previously-agreed upon
            strategies.
9

10  (1 SH, Ex. 26 at 3-4.)  Iversen said, "His lack of preparation, cooperation and failure to advise co-

11  counsel of his intentions made planning a coherent strategy with Mr. Hawk futile."  (Id. at 4.)

12  According to state habeas counsel Lane, attorney McDowell said,

13          This case was absolutely frustrating because we could never agree
            on things as a team. Richard Hawk prevented the defense team
14          from working cohesively together and thereby undermined the
            assistance Jerry received. There was no clear leadership and
15          communication within the team was severely strained. . . .
            [Hawk's] agenda in this case . . . was completely unknown to me.
16

17  (1 SH, Ex. 25 at 5, 6.)  In her letter to Lane, McDowell confirmed that there were "numerous

18  times that Hawk simply did not show up for appointments with [an investigator]."  (1 SH, Ex. 27

19  at 2.)

20                          ii.   Attorneys took conflicting positions in front of the jury

21          Petitioner also points to various conflicts he claims would have confused or prejudiced

22  jurors.  While the court understands that petitioner is attempting to show that the defense was in

23  chaos and had no consistent strategy at the guilt phase, most of the conflicts pointed out are

24  simply not significant.  First, petitioner argues Hawk and Iversen had different goals, which

25  resulted in taking conflicting positions before the jury with respect to prosecution witness Jennifer

26  Warsing.  Petitioner points out that Iversen asked the jury to listen to Warsing's videotaped

27  statements to the police because "she talks about blackouts and she talks about telling Jerry Frye

28  things he did, and she said he has this disbelief like he didn't know he said that or done it."  (RT

                                                72

1    5415:6-9.)  On the other hand, according to petitioner, Hawk attempted to discredit everything

2    Warsing said.  Given the fact that Warsing was, by far, the prosecution's most important witness,

3    any attorney would have attempted to discredit her before the jury.  Iversen's one, isolated

4    statement to the contrary, can hardly be said to have created a conflict in the eyes of the jury.

5        Petitioner also points out that, in his opening statement, Iversen took inconsistent

6    positions when he informed the jury about petitioner's mental problems, but followed that by

7    telling jurors, "We are not saying that he has a diminished capacity."  (RT 5414:19-20.)

8    Petitioner fails to mention that Iversen raised petitioner's mental health issues to give jurors some

9    understanding of petitioner's demeanor and memory issues during his videotaped statements to

10   police and his expected testimony.

11       Petitioner next argues that Hawk and Iversen approached the law enforcement witnesses

12   differently.  The defense case closed with testimony from criminalist John Thornton regarding the

13   crime scene.  According to petitioner, Thornton's testimony relied upon a crime scene diagram

14   prepared by Amador County Detective Mark Anderson.[30] While Iversen attempted to show

15   Anderson's work was solid, Hawk attempted to impeach Anderson by insinuating he was having

16   a relationship with Warsing.  (Compare RT 5579-90, 5599-5606, 6964-48, 6981-86 with RT

17   7121-25.)  While this one example may demonstrate the lack of  consistency between Iversen and

18   Hawk with respect to the defense approach to the credibility of Detective Anderson, petitioner

19   does not demonstrate just how Hawk's attempt to label Anderson as Warsing's "boyfriend,"

20   would have prejudiced the jury's consideration of Thornton's testimony.

21       Petitioner also shows that, while the guilt phase defense was that Jennifer Warsing was

22   lying, both Iversen and Hawk made some attempts to question experts about, and even argue, that

23   petitioner was not capable of committing a deliberate and premeditated murder.  Iversen

24   questioned Dr. McGuire on this point.  Dr. McGuire testified that a person with the sort of brain

25   injury suffered by petitioner might "be intolerant of stress, and thus would have non-directed

26   violence in response to his environment."  (RT 7295:12-14.)  This problem would be exacerbated

27

28   [30] Petitioner does not provide citations to the transcript to verify this statement.

73

1  by the use of alcohol and/or drugs.  (RT 7296:15-17.)  Hawk briefly questioned Dr. Peal along the

2  same lines.  Dr. Peal testified that petitioner's brain damage would impair his ability to deliberate.

3  (RT 7860:1-11.)  Then, in his closing argument, Iversen stated, contrary to the statement made in

4  his opening that the defense was "not saying that he has a diminished capacity," that "[t]here is

5  evidence that supports a finding that Jerry Frye didn't have the appropriate mental state."  (RT

6  9083:16-17.)  What petitioner omits from his argument, however, is that Iversen also attempted to

7  tell the jury that he was not being inconsistent.  He first asserted that "our defense is [that] Jerry

8  Frye did not commit the act."  (RT 9083:10-12.)  He went on to state that if the jury was satisfied

9  beyond a reasonable doubt that petitioner did commit the act, then it should consider evidence

10  that he did not have the appropriate mental state.  (RT 9083:12-15.)  Iversen explained that he

11  brought up the issue because evidence was presented on it and the judge would give jurors an

12  instruction on it.  (RT 9083:16 – 9084:15.)  Iversen implied that the evidence came in because the

13  prosecutor "brought out evidence with regard to intoxication and asked some questions with

14  regard to certain of the experts."  (RT 9084:1-3.)  He told jurors they could consider testimony

15  from Drs. McGuire and Peal to find a doubt about whether petitioner harbored the specific intent

16  to commit the crimes.  (RT 9084:4-11.)  Iversen then further explained that jurors would need to

17  consider petitioner's brain damage and he reviewed the testimony of Dr. McGuire that

18  petitioner's brain injury would affect not only memory, but judgment.  (RT 9086:14 – 9093:7.)

19  He added that Jennifer's Warsing's videotaped statement supported the lack of specific intent.

20  She described petitioner's drunken state and his memory lapses.  (RT 9094:18 – 9095:17.)

21      Petitioner also uses examples of conflicts occurring after the guilt phase to show the

22  inconsistencies in the defense.  He makes much of Hawk's motion to stay the penalty phase

23  proceedings because he believed petitioner was incompetent.  Apparently, the motion took

24  Iversen and McDowell by surprise.  (1 SH, Ex. 26 at 4; Ex. 25 at 6.)  Petitioner also points to

25  penalty phase errors, which are discussed in greater detail below.

26      Petitioner has a somewhat better argument that the defense failed to object to the reading

27  of Warsing's immunity agreement and its provision to the jury.  This argument is contained in

28  petitioner's claim 7.  He argues that aspects of the immunity agreement bolstered Warsing's

74

1   credibility in conflict with counsel's strategy of attacking that credibility.  According to

2   petitioner, the following parts of that agreement were objectionable:  (a) the identity of petitioner

3   as the killer; (b) the statement that "information available to the District Attorney" prior to the

4   preliminary hearing "indicated" Warsing was an "unwilling participant" in the crimes; (c) the

5   agreement's statement that the "District Attorney believes Jennifer Warsing was an unwilling

6   participant."  (ECF No. 612-8 (text of immunity agreement).)

7       There was no apparent reason for counsel to permit the reading of Warsing's immunity

8   agreement.  Even if it was unreasonable for counsel to allow it, however, it would have been

9   reasonable for the California Supreme Court to conclude that it did not prejudice petitioner.

10  Jurors knew that the prosecutors' position was that Warsing was telling the truth and that the state

11  believed petitioner killed the Brandts.  The fact that the agreement made clear the prosecutor had

12  made that determination from "information" received before the preliminary hearing would not

13  have caused the jury necessarily to believe that that information was not also introduced at trial.

14  The jury had no reason to think the prosecutors' belief was based on anything but the evidence

15  presented at trial.  To the extent the prosecutors' statements were inappropriate, there is no

16  reasonable probability they affected the jury's guilt phase verdict.

17      This is also true when looked at as part of counsel's entire presentation at the guilt phase.

18  Most of petitioner's complaints about counsel's conduct involve their failure to investigate and

19  present a case that petitioner was unable to form the intent necessary for a first degree murder

20  conviction.  And those complaints rely, in important part, on the jury accepting as true many

21  aspects of Warsing's testimony, such as her descriptions about petitioner's behavior right before

22  the crimes.  Only a few arguments relate to the impeachment of Warsing.  Even if counsel should

23  have moved to exclude the objectionable portions of the immunity agreement, if Hawk had not

24  attempted in inappropriate ways to challenge Warsing's credibility, and if Iversen had not asked

25  the jury to believe Warsing's statements that petitioner had blackouts and that he sometimes had

26  no memory of things he had done, the California Supreme Court still could have reasonably

27  found that petitioner failed to make a prima facie showing that the absence of those errors would

28  have made a difference in the result.

### iii.   Hawk's offensive behavior

Petitioner points to numerous instances in the record of Hawk interrupting prosecutor Graves, deriding her, speaking directly to her rather than to the court, and answering her questions directed to witnesses.  (ECF No. 612 at 107-109.[31])  Petitioner also points out that the trial judge admonished Hawk for this behavior a number of times.  Some of Hawk's attempts to discredit Warsing were also offensive, particularly because he stressed issues which were not directly related to her credibility.  Petitioner points to Hawk's questioning of Warsing regarding why she "stuck around" after being beaten by petitioner, his graphic description of the sexual molestation of her son by a Highway Patrol Officer, and his focus on Warsing's sexual proclivities, including bestiality.  (E.g., RT 6555-6556; 7843-7844.)

### c.   Prejudice

While petitioner argues the unreasonableness of counsel's conduct, he devotes little effort to showing how that behavior might have affected the guilt phase.  Prosecutors had a strong guilt phase case supported by eye witness testimony.  While the defense managed to show some of Warsing's memories were inexact, much of her testimony was corroborated by the physical evidence.  For example, Warsing's testimony about the number of shots used to kill the victims was corroborated by testimony about the victims' injuries.  Her testimony about petitioner's disposal of the murder weapon was corroborated by the testimony of officers that they located that weapon based on Ms. Warsing's description.  In addition, as the California Supreme Court pointed out,

> Numerous items of physical evidence introduced at trial also corroborated Warsing's testimony. For example, a denim jacket belonging to defendant was hanging on the back of one of the chairs in the Brandts' cabin when the victims' bodies were

---

[31]  Some of the supposed instances of offensive conduct cited by petitioner are misleading.  For example, petitioner says that Hawk "capped off his effort to offend everyone" by referring to the jurors' hometown as a "little Podunk area."  (ECF No. 612 at 109:7-8.)  Petitioner takes this statement out of context.  Hawk was not rendering his personal opinion of the region.  Rather, he was trying to disparage the "big city" Department of Justice investigators by stating that "[t]hose guys don't care.  They didn't care one way or the other.  They are up here in a podunk rural area and they wanted to go back to Sacramento City.  They didn't spend any more time in the woods than they had to."  Frye, 18 Cal. 4th at 74.

1
2
3
4

> discovered.  The  Brandts'  automobile  was  recovered  in
> Winnemucca.  One of the vials of gold taken from the Brandts'
> cabin and sold to the proprietor of Silver Mountain Coins was
> introduced into evidence and Rolland Lungden identified defendant
> as the person he saw come into the shop on two occasions in May
> or June of 1985 offering to sell some gold contained in such a
> bottle.

5  18 Cal. 4th at 966.

6      Besides petitioner's statement to police that he and Warsing came upon the Brandts'

7  bodies and then fled, petitioner has not presented here any alternative explanation for what

8  happened to the Brandts.  Thus, petitioner's essential guilt phase ineffective assistance of counsel

9  argument appears to hinge on the claim that counsel should have chosen a mental health defense.

10  As discussed above, however, petitioner does not show how that defense would have convinced a

11  jury that petitioner did not intend to murder, rob, or burglarize the Brandts.  More importantly,

12  petitioner does not show how the state court's denial of these guilt phase ineffective assistance of

13  counsel claims was contrary to law or unreasonable.

14          5.  Ineffective Assistance of Counsel for Failure to Investigate and Present Mitigating
             Evidence at the Penalty Phase – Claims 28 and 29
15

16      The penalty phase defense presented at trial focused on petitioner's good qualities despite

17  some hardships in his upbringing, including his father's drinking and the effects petitioner's

18  mother noticed of the auto accident on his personality.  In addition, the defense presented

19  evidence to show petitioner had been a well-behaved prisoner.  Petitioner argues counsel was

20  ineffective for failing to investigate and present three categories of evidence:  (1) mental

21  health evidence; (2) evidence of traumatic events in petitioner's childhood; and (3) evidence of

22  the effects of petitioner's alcohol and drug dependencies.  Petitioner argues that each of these

23  issues supports one conclusion – counsel failed to adequately portray petitioner's mental state at

24  the time of the crime to show petitioner was less morally culpable than the "worst of the worst."

25  /////

26  /////

27  /////

28

1

        a.  Background and Evidentiary Proffer

2

           i.     Deficient Performance

3        Petitioner presented little evidence to the California Supreme Court about what penalty

4  phase investigations took place.  In his declaration, Iversen stated that he was in charge of

5  "launching" the investigation.  (1 SH, Ex. 26 at 1.)  However, Iversen says nothing else about

6  preparation for the penalty phase investigations or the defense strategy.  In her letter to state

7  habeas counsel Lane, McDowell stated that no one on the defense team knew that petitioner's

8  mother had abandoned him shortly before the automobile accident until right before the penalty

9  phase began.  (1 SH, Ex. 27 at 3.)  She also indicated that Hawk and investigator Bricker took a

10  trip to Indiana to investigate, but "hated each other," which, she felt, resulted in a less than

11  adequate mitigation investigation.  (Id.; 1 SH, Ex. 25 at 9.)  Primarily, the state court and this

12  court must look to the penalty phase evidence presented to determine defense preparation for it.

13        Before the penalty phase began, petitioner asked the court to permit him to be absent from

14  the penalty proceedings.  (RT 9539-9540.)  Petitioner told the judge he could not stand being

15  there because he was so angry and he didn't want to "jeopardize anything that I might have with

16  the jury."  (RT 9540-9541.)  The court denied the request.  (RT 9542:2.)  Iversen asked for a

17  continuance to allow the defense time to deal with petitioner's anxiety, for which he had been

18  receiving medication for a short time.  (RT 9542-9543.)  This request was also denied.  (RT

19  9543:19.)

20        Another issue addressed prior to the start of the penalty phase was petitioner's request to

21  speak to the jurors in the form of an allocution, or unsworn testimony, rather than under oath and

22  subject to cross-examination.  (RT 9544:19-24.)  The judge had previously denied the request,

23  but, on reconsideration, granted it.  (RT 9545:5-10, 9546:10-15.)  Iversen asked for, and was

24  permitted, "a bit of time to prepare."  (RT 9546:23 – 9547:2.)  In his declaration, Iversen states

25  that the court denied the continuance and "[w]e did not prepare Jerry how to proper[ly] address

26  the jury."  (1 SH, Ex. 26 at 4.[32])  However, when the court asked Iversen how much time he

27

28  [32] According to David Lane, attorney McDowell similarly recalled that the court denied the motion "for a brief continuance" and "we were unable to prepare Jerry to properly address the

78

1 | needed and suggested 25 minutes, Iversen replied, "That would be fine."  (RT 9548:15-19.)

2 |      The prosecution presented in aggravation only the fact of petitioner's prior conviction for

3 | sexual battery in Florida.  (RT 9619:16-17.)  When Iversen attempted to introduce testimony to

4 | mitigate this prior offense, the court ruled the evidence inadmissible.  (RT 9631:20, 9633:20-24.)

5 | The California Supreme Court recognized this ruling was error, but found it harmless.  18 Cal. 4th

6 | at 1016-17.

7 |      Attorney Iversen conducted the penalty phase.  In his opening statement, Iversen briefly

8 | mentioned three mitigating factors the defense would present: (1) whether defendant was under

9 | the influence of extreme mental or emotional disturbance; (2) whether defendant was under the

10 | substantial domination of another person; and (3) whether defendant's ability to conform his

11 | conduct to the law was impaired by mental disease or intoxication.  (RT 9559-9560.)

12 |      After Iversen's opening statement, petitioner gave his allocution. Iversen led him through

13 | it with questioning.  (RT 9562, et seq.)  Iversen's questions to petitioner made clear that petitioner

14 | wanted to speak to the jury because he had problems with the guilt phase verdict, that petitioner

15 | was afraid what he was going to say might make the jurors angry, and that petitioner did not want

16 | the jurors to be angry at him.  Petitioner then gave a rambling statement of his disbelief at being

17 | found guilty and derided the jury for taking so little time to arrive at a guilt phase verdict.  (RT

18 | 9563-9570.)

19 |      Thereafter, the defense presented a number of lay witnesses but no expert witnesses.

20 | Most were family members who testified briefly that petitioner had some redeeming qualities (a

21 | protective big brother, a good artist) and that they loved him.  Each asked the jury to spare his

22 | life.  (RT 9571-9592 (petitioner's mother); RT 9593-9595 (petitioner's sister); RT 9596-9607

23 | (petitioner's best friend; testified about the auto accident's effect on petitioner's life and about

24 | petitioner and his father's drinking after petitioner's mother left them); RT 9608-9620

25 | (petitioner's brother; testified about petitioner's son's need for a father); RT 9625-9637

26 | (petitioner's uncle); RT 9638-9641 (petitioner's sister).)  In addition, the defense presented a

27 |

28 | jury."  (1 SH, Ex. 25 at 9.)

1    stipulation that jailers in Amador County and Florida (where petitioner served time on the sexual

2    assault conviction) would testify that petitioner did not present a problem when incarcerated. (RT

3    9622:18 – 9624:3.)  Finally, a jail chaplain from South Dakota testified that he spent three hours

4    with petitioner in the Deadwood jail and petitioner "accepted God that night" and is now a

5    changed man.  (RT 9642-9650.)

6         The prosecution put on no witnesses.  The prosecutor made a closing statement in which

7    she primarily described the aggravating nature of the crime.  (RT 9697-9720.)  In his closing,

8    Iversen summarized the testimony.  He described: (1) petitioner's difficulties after his mother and

9    younger siblings left him and his father; (2) how petitioner, then age 15, became his father's

10   drinking buddy; (3) petitioner's automobile accident at age 15 that left him with a severe head

11   injury and resulted in numerous bouts of meningitis; (4) petitioner's subsequent mental/memory

12   problems; (5) the difficulty petitioner must have faced from the disfiguring facial injuries suffered

13   in the auto accident; (6) petitioner's drug and alcohol problems; (7) petitioner's state of

14   intoxication at the time of the crimes; and (7) petitioner's dependency on Jennifer Warsing.

15   Iversen argued that petitioner's lack of remorse was due to his memory problems and that

16   petitioner was upset during the penalty phase in part because he had just been taken off anti-

17   anxiety medication.  (RT 9721-9766.)

18        With respect to petitioner's mental health, Iversen asked the jury to recall the testimony of

19   Drs. Peal and McGuire from the guilt phase.  (RT 9730.)  He briefly described Dr. Peal's

20   testimony about petitioner's personality being "passive-dependent" and that Dr. Peal did not think

21   someone with this personality could have committed the murders.  (RT 9741:10-18.)  He

22   discussed Dr. McGuire's diagnosis of "static encephalopathy" as a result of petitioner's head

23   injuries.  (RT 9743:13-23.)  He added that Dr. McGuire testified that alcohol would exacerbate

24   the effects of the injury.  (Id.)  In response to the prosecutor's focus on McGuire's

25   characterization of the brain injury as "mild," Iversen re-read Dr. McGuire's testimony which

26   referred to the injury as mild because it dealt only with one part of petitioner's brain.  (RT

27   9744:1-8.)  Iversen also stressed that both Peal and McGuire had testified that people with

28   petitioner's injuries tended to have memory deficits and to become dependent upon someone to

80

1    fill in the blanks.  (RT 9753:1-6.)  He also used that testimony to explain that petitioner was not

2    remorseful because he had relied upon Jennifer Warsing to fill in the blanks, but did not

3    remember committing the crime and could not believe he had done so.  (RT 9758.)

4    　　　　Petitioner argues that trial counsel were aware that petitioner had assisted law

5    enforcement officers in Indiana and that those officers were willing to testify on his behalf.

6    Petitioner presented to the state court declarations from Indiana law enforcement personnel who

7    stated that, had they been contacted, they would have come to California and testified that

8    petitioner was one of their best undercover operatives, making 100 to 150 cases for the police.  (1

9    SH, Exs. 23, 24.)

10   　　　　　　　　　　ii.　　Prejudice

11   　　　　The sort of evidence petitioner argues the defense could have found, and presented, is set

12   forth primarily in the report of Dr. Cunningham, which is discussed in detail above.

13   　　　　　　　　　b.　Discussion

14   　　　　While the legal standards are set out above, it is worth repeating them here because those

15   relevant to counsel's conduct at the penalty phase differ somewhat from counsel's role in

16   preparing for the guilt phase.  With respect to counsel's role in presenting penalty phase

17   mitigating evidence, "[t]he duty to investigate is critically important."  <u>Summerlin v. Schriro</u>, 427

18   F.3d 623, 630 (9th Cir. 2005).  Counsel should attempt to discover "'<u>all reasonably available</u>

19   mitigating evidence and all evidence to rebut any aggravating evidence that may be introduced by

20   the prosecutor.'"  <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines

21   11.4.1(c), p. 93 (1989)) (emphasis in original).  Where "indications in the record suggest that

22   certain mitigating evidence may be available, those leads must be pursued."  <u>Lambright v.</u>

23   <u>Schriro</u>, 490 F.3d 1103, 1117 (9th Cir. 2007).

24   　　　　The mitigating evidence counsel should consider includes "medical history, educational

25   history, employment and training history, family and social history, prior adult and juvenile

26   correctional experience, and religious and cultural influences."  <u>Wiggins</u>, 539 U.S. at 524 (citing

27   1 ABA Standards for Criminal Justice 4-4.1, commentary, p.4-55 (2d ed. 1982)).  Counsel has a

28   "'duty to investigate and present mitigating evidence of mental impairment' ... [,] [which]

1   includes examination of mental health records." Summerlin, 427 F.3d at 630 (quoting Bean v.

2   Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, "counsel has an affirmative duty to

3   provide mental health experts with information needed to develop an accurate profile of the

4   defendant's mental health."  Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002).  This is a

5   distinctly different duty than counsel's obligations with respect to mental health experts at the

6   guilt phase.  Courts have held counsel had no duty to provide a guilt phase mental health expert

7   with background materials absent a specific request from the expert.  Compare Hendricks v.

8   Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995) (Requiring counsel to "second-guess their

9   experts ... would effectively eliminate the legitimate role experts play in guiding and narrowing

10  an attorney's investigation.") with Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999)

11  (attorney may render ineffective assistance at penalty phase for failing to investigate and

12  adequately prepare expert witness).

13      "The defendant's history of drug and alcohol abuse should also be investigated."

14  Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford, 290 F.3d 1006, 1016-17 (9th Cir.

15  2002)).  In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation to

16  present and explain to the jury all available mitigating evidence."  Hamilton v. Ayers, 583 F.3d

17  1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)); Mayfield

18  v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001) (Counsel must "present and explain to the jury

19  the significance of all the available mitigating evidence.") (citing Williams v. Taylor, 529 U.S.

20  362 (2000)).

21      It is clear from Iversen's penalty phase argument that a primary theme in mitigation was

22  petitioner's mental state.  Petitioner makes a substantial showing that counsel did not support that

23  theme with available evidence.  First, counsel failed to provide clear testimony regarding

24  petitioner's mental problems.  Instead, counsel relied upon the testimony of Drs. Peal and

25  McGuire which the jury had heard months previously and which counsel had argued at the guilt

26  phase was presented only for the purpose of explaining petitioner's memory gaps.  Both doctors'

27  testimony was inadequate to support the mental health argument Iversen attempted to make in his

28  closing argument and fell far short of the mental health argument counsel could have, and should

1  have, made.  Neither doctor examined, as a whole, petitioner's background, long-term substance

2  abuse, and substance abuse on the day of the murders, along with the effects of his head injury to

3  opine about petitioner's mental difficulties on the day of the murders.

4      Second, counsel failed to present evidence to put petitioner's mental problems in some

5  context.  Courts are clear: an important purpose of a penalty phase defense is helping a jury

6  understand how the defendant came to be sitting before them.  See Porter v. McCollum, 558 U.S.

7  30, 41 (2009) (Mitigation should "humanize [the defendant] or allow [the jury] to accurately

8  gauge his moral culpability.")  The story Dr. Cunningham lays out is a multi-layered one.

9  Petitioner began abusing alcohol at a very young age with family encouragement; he was

10  abandoned by his mother; his father fell deep into his alcoholism and brought his son along with

11  him; petitioner's accident had numerous repercussions:  not only did he suffer a brain injury, but,

12  at a young age, he had to deal with the emotional traumas of injuring his friends and his facial

13  disfigurement; petitioner's multiple episodes of meningitis also took an emotional toll; finally,

14  and most importantly, petitioner has irreparable brain damage which affects his judgment,

15  memory, impulse control, aggression, and ability to cope with stress.  Dr. Cunningham supports

16  his analysis of the brain damage with scientific research, the reports of others about petitioner's

17  behavior, such as his blackouts, his substance abuse, and his paranoia, and with the results of

18  testing of petitioner himself.  Dr. Cunningham presents evidence of "the kind of troubled history

19  [the Supreme Court has] declared relevant to assessing a defendant's moral culpability."

20  Wiggins, 539 U.S. at 535.  The Court considers evidence of a defendant's "background and

21  character" highly relevant "because of the belief, long held by this society, that defendants who

22  commit criminal acts that are attributed to a disadvantaged background ... may be less culpable

23  than defendants who have no such excuse."  Penry v. Lynaugh, 492 U.S. 302, 319 (1989),

24  abrogated on other grounds in Atkins v. Virginia, 536 U.S. 304 (2002).

25      It is also worth noting that petitioner's allocution likely prejudiced him at the penalty

26  phase.  It is reasonable to suppose that Iversen's failure to control Hawk's relationship with

27  petitioner was one of the causes of petitioner's distress – he could not believe the jury found him

28  guilty.  It is also reasonable to assume that had petitioner been given a more realistic perspective

1   on the strength of the prosecutor's guilt phase case, his reaction to the verdict would have been

2   less extreme.

3        While the court agrees with much of petitioner's perspective on counsel's conduct at the

4   penalty phase, not every error charged is supported by the record.  For example, as respondent

5   points out, there is evidence that counsel knew about petitioner's cooperation with law

6   enforcement and made a reasoned decision not to present it.  Before the penalty phase began,

7   Iversen told the court that the defense and the prosecutor had agreed that petitioner's cooperation

8   with law enforcement would not be introduced at trial.  Iversen told the court "that's something

9   that is confidential and could have problems over [sic] the defendant, who at this point is looking

10  at the prospect, at the very best, of spending most of the rest of his life in prison."  (RT 9386:24 –

11  9387:14.)  This makes clear that the defense made a decision, based on a fear that petitioner

12  would suffer serious repercussions in prison should other inmates know he had been an

13  informant, to keep the evidence of petitioner's cooperation with law enforcement out of the trial.

14  As respondent further points out, the evidence was also "two-edged."  Petitioner's actions were

15  not purely altruistic.  Both officers recollect that petitioner aided them to "work off" a burglary

16  charge.  (1 SH, Exs. 23 and 24.)  Thus, even assuming, for the sake of argument, that counsel

17  erred in failing to introduce that evidence at the penalty phase, the court would have to consider

18  both the good and bad impacts that evidence would have had on the jury.

19       In response to respondent's argument, petitioner charges that counsel's decision cannot be

20  considered in isolation.  This court agrees.  However, petitioner has provided no reason to think

21  that the decision counsel made to keep petitioner's informant activities out of trial was an

22  unreasonable one.  Moreover, when looking at the total prejudice from counsel's actions, the

23  court looks only to those actions that amounted to error, either alone or in combination with other

24  actions.  Looking at counsel's decision to keep petitioner's informant activity under wraps was

25  not, when considered alone or as part of counsel's whole strategy, unreasonable.

26       That said, counsel's failure to present mitigating evidence of petitioner's mental health

27  problems, social history, and substance abuse, and counsel's failure to put on an expert to put that

28  evidence in some sort of understandable context for the jury cannot be "rationalized on any

1    tactical ground." Stankewitz v. Wong, 698 F.3d 1163, 1172-73 (9th Cir. 2012).  Moreover, this

2    court finds it is reasonably likely it affected the verdict.  The prosecutor relied primarily on the

3    crimes at issue.  As the California Supreme Court pointed out, the defense should have been

4    permitted to put on testimony explaining the one prior offense for sexual assault.  Had they been

5    permitted to do so, and had petitioner's other violent behavior been considered in the context of

6    his brain injury and substance abuse, the jury may very well have considered petitioner in a

7    different light.

8            Of course, this court's analysis does not end there.  This court must consider whether any

9    fairminded jurist could have found petitioner failed to establish a prima facie case of ineffective

10   assistance of counsel at the penalty phase.  Respondent argues that Dr. Cunningham's findings

11   are "largely cumulative."  (ECF No. 616 at 37.)  This court disagrees.  The testimony of Drs. Peal

12   and McGuire did not give the jury the sense of how petitioner's brain damage and substance

13   abuse contributed to his behavior on the day of the crimes.  Dr. Cunningham's report does.  The

14   doctors' testimony also failed to consider and explain petitioner's childhood and the

15   psychological effects of his emotional and physical traumas.  Dr. Cunningham's report

16   accomplishes these goals as well.  The fact that counsel may have made a weak, brief closing

17   argument at the guilt phase that the doctors' testimony supported a mental state defense is a far

18   cry from the sort of multi-faceted mitigation case laid out by Dr. Cunningham.  Moreover, the

19   penalty phase determination is a very different one from the guilt phase determination.  Jurors

20   have a great deal of leeway in considering the mitigating and aggravating evidence presented and

21   in deciding how that evidence fits into the weighing process.  The mitigating evidence need only

22   convince one juror that a defendant's moral culpability requires a sentence of life, rather than

23   death.

24           The question here is not whether petitioner has proved a reasonable probability that the

25   result of the penalty phase would have been different.  Rather, the question is whether petitioner

26   has made a prima facie showing entitling him to further factfinding on this claim.  This court

27   finds he has done so.

28   /////

1    The Supreme Court has recognized that "a superficially reasonable mitigation theory

2    during the penalty phase" does not mean a defendant did not suffer prejudice from his counsel's

3    failure to present a substantial and more compelling mitigation case.  See Sears v. Upton, 130 S.

4    Ct. 3259, 3266 (2010) (internal citations omitted).  The record before the California Supreme

5    Court does not show that counsel had a strategic reason to limit the mental health and social

6    history evidence at the penalty phase.  To the contrary, counsel attempted to argue those points on

7    the basis of testimony presented at the guilt phase on a different issue and on the basis of very

8    brief and limited social history testimony.  The record before the California Supreme Court also

9    shows that the prosecution relied almost exclusively on the crimes charged, which the defense

10   could have put in some context with expert testimony.  After considering the evidence presented

11   in both phases of trial and the evidence proffered to the California Supreme Court in petitioner's

12   state habeas proceedings, this court recommends a finding that the California Supreme Court's

13   rejection of petitioner's claims of ineffective assistance of counsel at the penalty phase was either

14   an unreasonable application of Strickland or an unreasonable determination of the facts.

15           6.   Jailers' Interference with Right to Counsel – Claim 25

16   The basis of claim 25 is the decision made by jail personnel to take petitioner off anti-

17   anxiety medication just before the beginning of the penalty phase.  In the petition, petitioner

18   argues that, as a result, he was rendered incompetent in violation of the Due Process Clause and

19   became unable to assist his attorneys in violation of his Sixth Amendment right to counsel.

20                a.   Background and Evidentiary Proffer

21   Just prior to the beginning of the penalty phase, the defense made several motions,

22   including: (1) a motion for an independent finding that petitioner was incompetent as of July 15,

23   1988, the date the competency phase jury found petitioner competent (CT 4400); and (2) a motion

24   to continue the penalty phase based on petitioner's present incompetence (CT 4423).  The judge

25   made an independent finding that petitioner was competent as of the close of the competency

26   proceeding on July 15.  (RT 9461.)  With respect to petitioner's motion for a continuance, on

27   August 3, 1988, the judge considered declarations submitted by attorneys Philipsborn and

28   Iversen, testimony from an experienced capital attorney who had interviewed petitioner and his

1    counsel, and statements to the court by Philipsborn, Hawk, Iversen and McDowell.  All informed

2    the judge that petitioner's condition had deteriorated in the few weeks since the competency

3    hearing.  (CT 4408-4420; RT 9518-9529, 9532-9535.)

4         Defense counsel had also contacted Dr. White, who had been appointed by the court to

5    evaluate petitioner for the competency proceeding.  (1 SH, Ex. 18 at 1.)  Counsel asked Dr. White

6    to re-evaluate petitioner due to a concern about petitioner's ability to cooperate with his attorneys.

7    (Id.)  Dr. White interviewed petitioner on July 24, 1988.  (Id.)  In her report, which was provided

8    to the trial judge and to the California Supreme Court, Dr. White expressed concern about

9    petitioner's extreme, escalating anxiety and level of "emotional disturbance."  (Id. at 2-3.)  She

10   felt that petitioner had "deteriorated further in his mental functioning than when I originally

11   evaluated him on June 9, 1988.  He seems less able to understand the nature of the proceedings

12   pending against him and less able to assist counsel in a rational manner in the conduct of his

13   defense."  (Id. at 3.)  On July 27, 1988, she spoke with Dr. McLanahan, the jail physician.  (Id. at

14   3.)  "As a result of our conversation, Dr. McLanahan decided to place Mr. Frye on Ativan 2

15   mgms at bedtime for the next 3-4 days and follow him closely as to his response to the

16   medication."  (Id.)  Mr. Philipsborn noted that petitioner had been "medicated for a while after

17   Dr. White prepared her report" and indicated petitioner had been more cooperative while on the

18   medication.  (RT 9521.)

19        The judge found that petitioner was competent and denied the motion for a continuance.

20   (RT 9535-9537.)  The judge explained:

21            I can certainly understand Mr. Frye being under pressure,
         tense, having difficulty sleeping, things of that nature.  I think
22       anyone that finds himself in this situation and after the jury's
         verdict of guilt is certainly not up to par, in fact, is depressed,
23       anxious and very anxious as to what is going to happen in the
         future.
24
             The question is whether or not he is competent at this point
25       to be examined carefully.

26       . . .

27            And I think that, when the verdict came in of guilt, I think
         that he is rightly, in his mind, angry, upset and concerned.  And
28       that's why he can't shift gears.  It is because he feels that he made a

mistake [by not testifying]; that it really was something that he should have done and that he regrets it as a very serious mistake.

I know counsel is sincere in giving their advice, analyzing this situation.  But I think Mr. Frye can shift gears any time he wishes to, if he wishes to go on with the case.

He is attempting to delay the case, in my judgment, trying to delay the case so that the jury will be eliminated in this case and there will be a different jury to hear it.  I think that he may wish to testify, as you have indicated, to blame the jury, blame anyone else, including the Court.  But I think he can change if he wants.

I think it's his lack of cooperation; not inability, but his desire to not go forward because he is mad and he is very angry.  And I can understand that.

But I have concluded that does not amount to incompetency.  I find that he is competent.   Dr. White made the most recent examination.  And I have read her report carefully and, although he is under pressure, there is no question about it that he, in my mind, is competent.

So I find there is not substantial evidence of incompetency and, therefore, the motion is denied.  The defendant is competent to proceed to trial.

(RT 9535:14 – 9537:16.)

After the noon recess on August 3, Iversen informed the court that petitioner wished to be absent during the penalty phase.  Iversen explained petitioner's state of distress and told the judge: "The night before last was the last time that he got the medication, because Dr. McLanahan knew the trial was starting and thought he shouldn't have medication during trial." (RT 9539:20-23.)  After the judge denied petitioner's request to be absent, Iversen asked the judge for a continuance to allow petitioner to deal with his "medical condition."

I am concerned about the shift in medication.

I am at the horns of a dilemma.  I agree it's very important, except in an extreme situation, to have the defendant present.

On the other hand, I do believe Mr. Frye is going to have some outbursts this afternoon.  I believe that is going to prejudice him in front of this jury.  We are in this very, very difficult spot.

. . .

Judge, we had a motion to continue, which was filed with the Court.  It was based on two grounds that dovetailed each other.

One was 1368; and the other one was the facts underlying the expression of doubt of the 1368.

The Court has ruled Mr. Frye is competent.

I am Mr. Frye's lawyer. I am unprepared to proceed. I am not prepared to proceed because Mr. Frye has a medical condition. It is detailed in the report of Dr. White, which the Court has been presented with, which deals with his anxiety and emotional distress at this time based upon that condition, based upon her recommendation of medicating him for a period of time. And that recommendation was made last week; and he was medicated for a short period of time.

I believe that his medical condition which has caused me to be unprepared is grounds for a continuance. And I would ask the court at this point to grant us a continuance to allow Jerry's medical condition . . . to be treated so that, hopefully, he will arrive at a place where he can assist us in preparing.

(RT 9542:5 – 9543:12.)

In a declaration presented to the California Supreme Court, petitioner says he was given some sort of "tranquilizer" around the time he was first incarcerated. (1 SH, Ex. 31, ¶ 5.) He felt it helped him "remain somewhat calm" and "focus on my case." (Id. ¶¶ 5-6.) According to petitioner, that medication was withdrawn the night prior to the beginning of the penalty phase. (Id. ¶ 7.) Petitioner described himself as a "nervous wreck" as a result and could not concentrate on the penalty phase proceedings. (Id. ¶¶ 8-9.) As described below, petitioner has since withdrawn his assertion that he was medicated throughout trial.[33]

While the defense did not specifically request a second competency proceeding, the trial judge found petitioner was competent to proceed with the penalty phase and denied a request for a continuance. (RT 9537, 9543.)

---

[33] Petitioner also relies upon state habeas counsel Lane's statement that McDowell told him petitioner was taking "some sort of medication which kept him calm throughout the guilt phase of the trial...." (1 SH, Ex. 25 at 8.) As described above in note 20, McDowell refused to sign the declaration prepared by Lane because she did not feel "comfortable" signing it. It would have been reasonable for the California Supreme Court to refuse to rely on this statement in support of claim 25 and this court will not do so either. It is worth pointing out that it does not appear McDowell made this statement in the declaration submitted in federal court. While this fact is not relevant to this court's consideration of claim 25 at this juncture, the court questions the reliance that petitioner places upon Mr. Lane's memory of an unsworn statement that has not been included in McDowell's sworn statement.

89

1          b.   Discussion

2          While respondent again refers to the California Supreme Court's opinion on appeal, this

3    issue was raised in petitioner's state habeas proceeding, which was denied summarily.  Therefore,

4    this court must determine whether there was any "reasonable basis for the state court to deny

5    relief."  Richter, 131 S. Ct. at 784.

6          The parties' briefs on this claim lack clarity on a number of issues.  First, this court finds

7    there is no factual issue about the extent of petitioner's medication.  Even if there is an issue, it is

8    not material to petitioner's claims.  As respondent points out, petitioner conceded that some of the

9    facts he has relied upon are, in petitioner's words, "incorrect."  This problem was first raised in

10   respondent's opposition to petitioner's motion for an evidentiary hearing.  Respondent argued that

11   the record refuted petitioner's claim that his jailers discontinued medication he had been taking

12   throughout trial.  (ECF No. 187 at 32.)  Respondent then laid out all the record evidence showing

13   that petitioner was medicated for the first time, at Dr. White's insistence, shortly before the

14   beginning of the penalty phase and was only prescribed that medication for three or four days.  In

15   his reply, petitioner admitted that he had been in error:  "The State has correctly identified errors

16   in the factual allegations supporting Claims 25, 34, and 35.  We acknowledge that the pleadings

17   have not correctly described the sequence of events in some respects, and we apologize to the

18   Court and the Attorney General for these errors which we regret."  (ECF No. 194 at 57:17-19.)

19   Petitioner then went on to explain that his claim was based on the 3-4 day course of medication

20   prescribed to petitioner shortly before the penalty phase and the fact that it was discontinued

21   immediately before the penalty phase.  (Id. at 57-58.)

22         In his current briefing, petitioner attempts to backtrack.  He again mentions petitioner's

23   state court declaration stating that he took some sort of tranquilizer throughout his trial, arguing

24   creatively that his prior statement was simply for purposes of the motion for an evidentiary

25   hearing; petitioner fails to mention that he clearly stated previously that this factual recitation was

26   in error.  (ECF No. 629 at 73-75 & n.22.)  It is worth pointing out that whether petitioner was

27   medicated briefly or for a more extended period of time is not material to this claim.  Petitioner's

28   claim is based on the argument that he was more able to assist counsel while taking the

90

1  medication and that its discontinuation right before the penalty phase rendered him incompetent

2  and unable to assist counsel.

3      The second area of confusion in the briefing is that it is unclear to the court just what

4  petitioner is arguing as the legal basis for his claim.  In his state court petition, petitioner argued

5  that the discontinuation of his medication "reduced his ability to assist in his own defense."  (1

6  SH Pet. at 91.)  He relied on Riggins v. Nevada, 504 U.S. 127, 133-38 (1992), in which the

7  Supreme Court held that compelled medication of a defendant with anti-psychotic drugs, absent a

8  showing of necessity "to accomplish an essential state policy," violated his due process right to a

9  "full and fair trial."  Defendant Riggins began taking the anti-psychotic drug shortly after his

10  arrest.  504 U.S. at 129.  Prior to trial, a competency hearing was held.  Riggins was examined by

11  three psychiatrists while he was taking the drug.  Id. at 129-30.  Two of the three found Riggins

12  competent and the judge agreed.  Id. at 130.  Thereafter, the defense moved for an order

13  suspending the administration of the drugs until the end of Riggins' trial, in part because Riggins

14  intended to put on an insanity defense.  Id.  The trial judge denied the motion.  Id. at 131.  The

15  Supreme Court held that a criminal defendant has a due process right not to be forcibly medicated

16  absent a showing by the state that medication was necessary for the defendant's safety or for the

17  safety of others, that the trial could not be accomplished by any less intrusive means, or some

18  other reason serving an essential state policy.  Id. 135, 138.  The Court did not frame its holding

19  in terms of the defendant's competence.  Rather, it considered that "forcible injection of

20  medication into a nonconsenting persons' body ... represents a substantial interference with that

21  person's liberty" under the Fourteenth Amendment.  Id. at 133-34.

22      In the federal petition, petitioner relies again on Riggins.  Largely, he focuses on

23  comments made by Justice Kennedy in his concurrence about the potential prejudice that may

24  result from the forced administration of medication.  (ECF No. 612 at 130.)  However, he also

25  argues that discontinuation of the medication rendered him incompetent.[34]

26  /////

27  _____

[34] In the petition, petitioner also argues this claim under the Sixth Amendment.  However, he cites
28  no Sixth Amendment authority which would support his arguments here.

1    Petitioner has failed to show the California Supreme Court's denial was contrary to law or

2    unreasonable.  First, petitioner has not shown clearly established Federal law, as decided by the

3    Supreme Court, that a criminal defendant has a constitutional right to be medicated.  Petitioner

4    has not shown that the Riggins analysis, and the Court's focus on a defendant's liberty, applies to

5    the situation here.  Accordingly, with respect to the argument under Riggins, petitioner has not

6    satisfied section 2254(d).

7    With respect to petitioner's argument that discontinuation of the medication rendered him

8    incompetent, that argument requires a prima facie showing that petitioner was, in fact,

9    incompetent on the first day of the penalty phase.  Under clearly established Federal law, a

10   criminal defendant is only competent to stand trial if he "'has sufficient present ability to consult

11   with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as

12   factual understanding of the proceedings against him.'" Cooper v. Oklahoma, 517 U.S. 348, 354

13   (1996) (quoting Dusky v. United States, 362 U.S. 402 (1960)).  Based on the evidence before the

14   California Supreme Court, it would not have been unreasonable for that court to have found that

15   petitioner did not make that showing.  The trial judge presided over the competency proceeding,

16   made an independent finding that petitioner was competent on July 15, 1988, heard from

17   numerous witnesses on August 3, 1988 that petitioner could no longer cooperate with counsel,

18   observed petitioner during this time, and concluded that petitioner was competent on August 3.

19   The California Supreme Court held that the trial judge's final finding of competency on August 3

20   was not error.  18 Cal. 4th at 1005.

21   In his state habeas proceeding, petitioner presented the following extra-record evidence

22   that could be deemed supportive of this claim:  (1) the reports of Drs. McGuire, Wagner and

23   Cunningham discussed above, (2) petitioner's declaration that he took a tranquilizer throughout

24   trial, that is was suddenly stopped before the penalty phase, and that he "could not concentrate

25   upon the proceedings," was "unable to focus [his] attention on the penalty phase," and "felt

26   disoriented" (1 SH, Ex. 31); and (3) reports from a District Attorney investigator that jail

27   personnel told him during June 1988 that petitioner was initially very distressed by the guilty

28   verdict but that by mid-June, he had appeared to be acting normally (1 SH, Ex. 35).  Even if the

92

1  California Supreme Court examined all of this evidence in the light most favorable to petitioner,

2  the court could still reasonably have determined that petitioner had not made a sufficient showing

3  that he was in fact incompetent at the penalty phase.  The doctors' reports did not directly address

4  petitioner's competence on August 3, 1988.  Petitioner's declaration showed he was upset and

5  lacked focus, but that is a far cry from a showing that he lacked an ability to reasonably assist

6  counsel.  Finally, the most reasonable conclusion from the District Attorney's investigator's notes

7  was that, as of mid-June, petitioner had improved.  This court finds the California Supreme

8  Court's rejection of this claim was neither contrary to law nor unreasonable.

9         7.   <u>California Capital Sentencing Scheme Fails to Narrow – Claim 37</u>

10       Petitioner was tried and sentenced in 1988 for crimes committed in 1985.  In California, a

11  defendant was eligible for the death penalty or for a sentence of life in prison without the

12  possibility of parole, if a jury convicted him of first degree murder and found at least one special

13  circumstance.[35]  Cal. Penal Code §§ 190.1, 190.2, 190.4.  If a prosecutor decided to seek the death

14  penalty, a second trial was held to determine whether a death-eligible defendant should be

15  sentenced to death or life without the possibility of parole.  <u>Id.</u> § 190.4(a).  At the time of

16  petitioner's trial, California had 26 special circumstances.  <u>Id.</u> § 190.2.[36]  Petitioner argues that

17  the special circumstances are so numerous and so broad that at least one can be found in almost

18  any first degree murder case.  Therefore, his argument continues, California's special

19  circumstances fail to narrow the class of murderers eligible for the death penalty as required by

20  the Eighth Amendment.  The California Supreme Court rejected this claim summarily on state

21  /////

22  /////

23
---

24  [35] Petitioner's jury found five special circumstances: that petitioner committed multiple murders
and that he committed each murder while engaged in the commission of a robbery and of a

25  burglary.  (RT 9372-9377.)

26  [36] In 1985, Cal. Penal Code § 190.2(a) listed 19 special circumstances, one of which (felony-
murder) had 9 enumerated sub-parts.  The "heinous, atrocious, or cruel" special circumstance,

27  subsection (a)(14), was struck down by the California Supreme Court in <u>People v. Superior Court
(Engert)</u>, 31 Cal. 3d 797 (1982), and was not included in the discussion of the special

28  circumstances by petitioner or his expert. (<u>See</u> Decl. of Steven F. Shatz (1 SH, Ex. 29) at 3 n.2.)

1    habeas.[37]  For the reasons set out below, this court finds petitioner has failed to show the

2    California Supreme Court was unreasonable.  Claim 37 should be denied.

3                              a.  Legal Standards

4         The Eighth Amendment's narrowing requirement is the product of a series of Supreme

5    Court cases starting with Furman v. Georgia, 408 U.S. 238 (1972).  Furman was a per curiam

6    opinion in which the Court held the Georgia and Texas capital sentencing statutes violated the

7    Eighth and Fourteenth Amendments.  However, there was little clear agreement on the underlying

8    reasons for that decision.  Five justices wrote concurring opinions.  The opinions of Justices

9    Stewart and White are considered some basis for a "majority" holding.  See 408 U.S. at 401

10   (Burger, J., dissenting) (While it is "not entirely clear" what the holding is, the Stewart and White

11   opinions are the "two pivotal concurring opinions.")  They focused on the fact that the states'

12   capital sentencing statutes made every murderer eligible for the death penalty, but provided no

13   guidance to help juries decide when to impose it.  As a result, "the death penalty is exacted with

14   great infrequency even for the most atrocious crimes and ... there is no meaningful basis for

15   distinguishing the few cases in which it is imposed from the many cases in which it is not."  408

16   U.S. at 313 (White, J., concurring).  Justice Stewart similarly focused on the apparent

17   arbitrariness of imposition of the death penalty:

18              These death sentences are cruel and unusual in the same way that
             being struck by lightning is cruel and unusual. For, of all the people
19           convicted of rapes and murders in 1967 and 1968, many just as
             reprehensible as these, the petitioners are among a capriciously
20           selected random handful upon whom the sentence of death has in
             fact been imposed.  My concurring Brothers have demonstrated
21           that, if any basis can be discerned for the selection of these few to
             be sentenced to die, it is the constitutionally impermissible basis of
22           race.  But racial discrimination has not been proved, and I put it to
             one side. I simply conclude that the Eighth and Fourteenth
23           Amendments cannot tolerate the infliction of a sentence of death
             under legal systems that permit this unique penalty to be so
24           wantonly and so freakishly imposed.

25   _____

26   [37] Petitioner raised this claim in both his state appeal and his first state habeas petition.  The
     arguments were essentially the same.  However, in his state habeas petitioner made a significantly
27   different factual showing.  Accordingly, this court finds the California Supreme Court's rejection
     of petitioner's habeas claim to be the most recent decision of that court on this issue and is the
28   claim that should be analyzed herein.

408 U.S. at 309-10 (footnotes and citations omitted).

In Gregg v. Georgia, 428 U.S. 153, 188 (1976), the Court further explained that in Furman it held that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).  In his concurring opinion Justice White described how a death penalty statute should work:

> As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries even given discretion not to impose the death penalty will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device.

Id. at 222-23.  The Court in Gregg upheld Georgia's revised death penalty statute which, at a separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to be true before it imposed a death sentence.  Id. at 198-05.

In Zant v. Stephens, 462 U.S. 862, 877 (1983), the Court examined Georgia's aggravating circumstances and held that each must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  Each aggravating circumstance must "provide a principled basis for distinguishing" the petitioner's case "from the many other murder cases in which the death penalty was not imposed under the statute."  Id. at 878 n.16.  The Court applied the narrowing principles of Zant to sentencing statutes in Lowenfield v. Phelps,

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  Under the capital sentencing laws of most States, the jury

1

> is required during the sentencing phase to find at least one
> aggravating circumstance before it may impose death. By doing so,
> the jury narrows the class of persons eligible for the death penalty
> according to an objective legislative definition.

484 U.S. 231, 244 (1988) (internal citations omitted).

To summarize, the goal of the Eighth Amendment narrowing requirement is limiting the possibility of arbitrary and capricious imposition of the death penalty. States may accomplish this by enacting objective legislative standards to limit the pool of those eligible for the death penalty in a way that reasonably justifies imposition of a more severe sentence on them. The sentencer may then exercise discretion to determine who will be selected to receive that sentence.[38] If the death eligible pool is so large that it includes persons with vastly different levels of culpability, then the discretionary decisionmaking at the selection stage is not sufficiently limited. Without sufficient, objective limits, the system risks arbitrary and capricious application of the death penalty upon those who are not necessarily the most deserving of the greatest punishment.

### b. Evidentiary Proffer

In federal court, petitioner relies little on evidentiary support. Rather, he focuses on legal arguments that respondent raised in state court and shows why, if the California Supreme Court relied upon those arguments, its denial was contrary to law or unreasonable.[39] However, in state court, petitioner's primary support for his argument about the expansiveness of the special circumstances was the declaration of law professor Steven Shatz. (1 SH, Ex. 29.) Professor Shatz describes a study he conducted to determine whether California's special circumstances in

---

[38] The final selection process necessarily involves greater discretion because it requires "particularized consideration of relevant aspects of the character and record of each convicted defendant" and consideration of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Woodson v. North Carolina, 428 U.S. 280, 303 (1976); Lockett v. Ohio, 438 U.S. 586, 604 (1978).

[39] For example, petitioner makes an extended argument regarding respondent's reliance in state court upon Pulley v. Harris, 465 U.S. 37, 53 (1984). (ECF No. 612 at 144-146.) Petitioner concludes this argument by stating: "The California Supreme Court's misinterpretation and misapplication of Harris renders its decision in Mr. Frye's case 'objectively unreasonable.'" (Id. at 146:14-15.) Given the California Supreme Court's silent rejection of his claim, and the fact the court did not mention Harris in its rejection of the claim on appeal, this court finds no reason to assume the California Supreme Court relied upon Harris when it rejected petitioner's claim.

96

1    fact narrow the class of death-eligible murderers.  Professor Shatz examined published opinions

2    from the California Supreme Court and California Courts of Appeal and unpublished opinions

3    from the California Court of Appeal for the First Appellate District in first and second degree

4    murder cases from 1988-1992.  (Id. at 4-6.)  Based on his review of the courts' opinions,

5    Professor Shatz determined that special circumstances were present in most cases.  He concluded

6    that only 12% of those who were potentially death-eligible according to the statute were actually

7    being sentenced to death.  (Id. at 16.)  Comparing that number to the 15-20% figure mentioned in

8    Furman, petitioner concluded in his state habeas petition that "the risk of arbitrariness in

9    California's death penalty scheme is even greater than the risk found unconstitutional in Furman,

10   and the scheme is likewise unconstitutional."  (1 SH Pet. at 91.)

11              c.       Discussion

12        Petitioner argues that because a very low percentage of those who are eligible for the

13   death penalty are sentenced to death, California's death penalty scheme fails to "genuinely

14   narrow the class of persons eligible for the death penalty."  Primarily, he focuses on the number

15   and breadth of California's special circumstances, which create the class of those eligible for the

16   death penalty.  The California Supreme Court has explained that the special circumstances were

17   enacted to perform the "constitutionally required 'narrowing' function."  People v. Bacigalupo, 6

18   Cal. 4th 457, 467-68 (1993).

19        Petitioner's argument is largely focused on the assumption that this court must divine the

20   actual basis for the California Supreme Court's summary denial of his claim.  (ECF No. 612 at

21   144-149.)  However, the Supreme Court does not require that sort of guesswork.  The Court

22   described a federal court's job when considering a summary denial under section 2254(d) as

23   reviewing the state court record to "determine what arguments or theories ... could have supported

24   [] the state court's decision; and then [asking] whether it is possible fairminded jurists could

25   disagree that those arguments or theories are inconsistent with the holding in a prior decision of

26   [the Supreme] Court."  Richter, 131 S. Ct. at 786.  It described the petitioner's burden as

27   demonstrating that "there was no reasonable basis for the state court to deny relief."  Id. at 784.

28   /////

1   Accordingly, this court looks to petitioner's claim and considers whether there is any reasonable

2   basis for its rejection.

3        This task is difficult because petitioner sets out little real argument in support of his claim.

4   Petitioner does appear to be distancing himself from his reliance in state court on the 15-20%

5   ratio discussed in Furman.  He states that "the test for constitutionally adequate narrowing is not a

6   rigid, numerical one."  (ECF No. 612 at 143:23-24.)  In fact, Justice Burger cited the 15-20%

7   ratio to counter the petitioners' "unwarranted hyperbole" that the rate of imposition of the death

8   penalty was "freakishly rare."  408 U.S. at 386 n.11.  This court will not consider the 15-20%

9   figure as some sort of benchmark below which the rate of imposition of the death penalty could

10  be said to be so infrequent that it violates the Eighth Amendment narrowing requirement.  That

11  determination is supported by a decision of the First Circuit Court of Appeals.  In United States v.

12  Sampson, 486 F.3d 13, 23 (1st Cir. 2007), that court considered a narrowing challenge to the

13  Federal Death Penalty Act.  Defendant Sampson argued that the federal death penalty is so

14  infrequently sought, and even less frequently carried out, that its imposition is arbitrary under

15  Furman.  In rejecting this argument, the Court of Appeals clarified the nature of the Supreme

16  Court's arbitrariness concern:

17              In the thirty-four years since Furman was decided, the Court has
               made clear that its decision was not based on the frequency with
18              which the death penalty was sought or imposed.  Rather, the
               primary emphasis of the Court's death penalty jurisprudence has
19              been the requirement that the discretion exercised by juries be
               guided so as to limit the potential for arbitrariness.
20

21  486 F.3d at 23.

22       To the extent petitioner is making an argument based on a 15-20% ratio, he has not shown

23  the California Supreme Court's rejection of his claim was contrary to clearly established federal

24  law.

25       As this court recognized previously, the Court of Appeals for the Ninth Circuit has

26  rejected a claim that California's statutory scheme, on its face, fails to narrow.  See Karis v.

27  Calderon, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002); (Jul. 27, 2004 Order in the present case

28  (ECF No. 169)); see also Berryman v. Ayers, 2007 WL 1991049, ** 183-185 (E.D. Cal. Jul. 10,

1    2007).  Petitioner has not shown clearly established Federal law, as decided by the Supreme

2    Court, compels a different result based either on the face of the statute or on the evidence

3    proffered.  See Hawkins v. Wong, 2013 WL 3422701, *3 (E.D. Cal. Jul. 8, 2013) (no clearly

4    established federal law that only those death penalty schemes in which a large percentage of

5    death-eligible inmates receive the death penalty adequately narrow the death-eligible class);

6    Carter v. Chappell, 2013 WL 1120657, ** 198-201 (S.D. Cal. Mar. 18, 2013).  Because petitioner

7    has not satisfied the requirements of 28 U.S.C. § 2254(d) for claim 37, it should be denied.  In

8    addition, petitioner's pending motion for an evidentiary hearing or an expansion of the record on

9    claim 37 should be denied.

10                   8.    Juror Misconduct – Claim 42

11           In claim 42, petitioner alleges several instances of juror misconduct.  The court granted an

12   evidentiary hearing on his allegation that Juror Fairfield had inappropriate communications and

13   considered extrinsic evidence prior to the penalty phase.  In 2008, the court heard evidence on

14   this claim and the parties briefed its merits.  (ECF Nos. 421, 437, 446.)  The question now is

15   whether petitioner can satisfy section 2254(d) for claim 42 so that this court may consider that

16   new evidence.  Because, as set out below, this court finds petitioner has satisfied section 2254(d),

17   the court considers the new evidence and recommends denial on the merits of petitioner's claim.

18           Petitioner raised this claim in his second state habeas petition.  (2 SH Pet. at 6-14.)  That

19   petition was denied summarily by the California Supreme Court.

20                   a.    Background and Evidentiary Proffer[40]

21           Petitioner presented the state court with the April 18, 2000 declaration of Juror Fairfield

22   regarding a communication she had with her minister:

23   _____

24   [40]  At the beginning of his discussion of the background of this claim, petitioner describes defense
     investigators' discovery that when the jury recessed from its penalty phase deliberations on
     Friday August 5, 1988, it was divided 11 to 1 in favor of the death penalty.  Jurors told the
25   investigators that one juror told the holdout to consult her minister or husband about what to do.
     When the jurors reconvened on Monday morning, they arrived at a verdict almost immediately.
26   (ECF No. 612 at 150:15-21.)  What petitioner leaves out of this discussion is the fact that Juror
     Doncaster stated in her declaration submitted to the state court that she was the holdout juror.  (2
27   SH Pet., Ex. 102.)  Thus, petitioner's discussion of the fact of a holdout juror has little if any
     relevance to his claim regarding Juror Fairfield.

28

> Between the guilt and penalty phases, I talked with a clergyman because of the difficult decision I had just made in finding Mr. Frye guilty and another difficult decision remaining about whether Mr. Frye should be sentenced to death. The clergyman reconfirmed my own beliefs about the propriety of what I was doing.

(2 SH, Ex. 100, ¶ 3.)  In the next paragraph of her declaration, Juror Fairfield states that she voted to impose the death penalty "because I felt the law as explained to the jury meant that we were required under the circumstances to sentence him to death."  (Id. ¶ 4.)

Respondent also provided the state court with a declaration from Juror Fairfield.  (2 SH, Ex. C to Inf. Resp.)  In this July 6, 2000 declaration, and contrary to her prior statement, Juror Fairfield expressed a lack of certainty about the timing of the discussion with her minister – "I did speak to my minister around the time of the trial, but I do not remember whether I did so before or after my vote for the death penalty."  (Id. ¶ 3.)  She then explained the content of that discussion:

> I did not discuss the details of Mr. Frye's trial with my minister. I asked him what the Bible had to say about the death penalty.
>
> My minister gave me a 1 ½ pages written response that basically said the people voted and enacted laws to determine what crimes are and what the penalties should be.

(Id. ¶¶ 5,6.)

b.   Legal Standards

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir.1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court.").  A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced.  Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.), amended, 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc).  The introduction of prejudicial extraneous influences into the jury room constitutes

100

1    misconduct which may result in the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363,

2    364–65 (1966).

3         However, not every incident of juror misconduct requires a new trial.  United States v.

4    Klee, 494 F.2d 394, 396 (9th Cir.1974).  Rather, "[t]he test is whether or not the misconduct has

5    prejudiced the defendant to the extent that he has not received a fair trial."  Id.  On collateral

6    review, trial errors, such as extraneous information that was considered by the jury, "are generally

7    subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious'

8    effect or influence in determining the jury's verdict."  Jeffries v. Wood, 114 F.3d 1484, 1491 (9th

9    Cir. 1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)), overruled on other grounds

10   by Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012); see also Brown v. Ornoski, 503 F.3d 1006,

11   1018 (9th Cir. 2007); Fields v. Brown, 503 F.3d 755, 781 & n. 19 (9th Cir. 2007) (noting that

12   Brecht provides the standard of review for harmless error in cases involving unconstitutional juror

13   misconduct); Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.1993) (a habeas petitioner must

14   show that the alleged error "'had substantial and injurious effect or influence in determining the

15   jury's verdict.'")

16        As he did in his motion for an evidentiary hearing, petitioner casts his argument in terms

17   of a third party's improper contact with a juror.  Based on this argument, petitioner asserts that

18   respondent bears the burden of proving the contact was harmless.  (ECF No. 612 at 152-161.)

19   However, as the court explained previously, case law establishes that prejudice should be

20   presumed from a third party contact only where the third party is "interested,"[41]  Caliendo v.

21   Warden, 365 F.3d 691, 696 (9th Cir. 2004), or where the third party sought to influence the

22   verdict through "jury tampering," United States v. Dutkel, 192 F.3d 893, 895 n. 1 (9th Cir. 1999)

23   (explaining limitations on application of Remmer v. United States, 347 U.S. 227 (1954)).  (See

24   Dec. 12, 2006 Findings & Recommendations re Mot. for Evi. Hrg. (ECF No. 214) at 47.)

25   _____

26   [41]  Petitioner argues the court should not assume Fairfield's minister was disinterested.  (ECF No.
     421 at 17:18.)  The fact that the minister was aware that Fairfield was on a jury and aware of the

27   subject matter of the trial does not mean he was an "interested" party as defined in Caliendo.
     Examples of interested parties given by the Court of Appeals include witnesses, potential

28   witnesses, relatives of the defendant, and the prosecutor.  365 F.3d at 696.

1    Neither situation applies here.  Accordingly, in this "run-of-the-mill ex parte contact case" the

2    "burden rests on the defendant to show prejudice."  Id. at 896 (citing with approval United States

3    v. Williams-Davis, 90 F.3d 490 (D.C. Cir. 1996) (exhortations from juror's husband to "nail"

4    defendant not subject to Remmer presumption)); see also United States v. Bradshaw, 281 F.3d

5    278, 288-89 (1st Cir. 2002).  If petitioner's claim is considered under the case law regarding juror

6    consideration of extrinsic evidence, the analysis is the same.  As discussed above, petitioner must

7    show the juror's consideration of the extrinsic evidence had a substantial and injurious effect on

8    the jury's verdict.  See, e.g., Oliver v. Quarterman, 541 F.3d 329, 341 & n. 13 (5th Cir. 2008)

9    (court notes that, with the exception of the Eleventh Circuit, courts used Brecht standard for

10   jury's inappropriate consideration of the Bible); Fields, 503 F.3d at 781 & n. 19.

11          When reviewing a claim of jury misconduct, Federal Rule of Evidence 606(b) limits

12   consideration of juror testimony.  As discussed in Sassounian v. Roe, 230 F.3d 1097 (9th Cir.

13   2000), juror testimony may be considered to demonstrate that extraneous evidence or information

14   was introduced during the jury's deliberation, but not, for instance to show the subjective impact

15   of that extraneous information:

16                  A long line of precedent distinguishes between juror testimony
                    about the consideration of extrinsic evidence, which may be
17                  considered by a reviewing court, and juror testimony about the
                    subjective effect of evidence on the particular juror, which may
18                  not.... Therefore, although we may consider testimony concerning
                    whether the improper evidence was considered, we may not
19                  consider the jurors' testimony about the subjective impact of the
                    improperly admitted evidence.
20

21   230 F.3d at 1108–09; see also Jeffries, 5 F.3d at 1190.

22          Evidence concerning the mental processes by which a juror arrived at his/her verdict is

23   inadmissible to test the validity of that verdict.  See Tanner v. United States, 483 U.S. 107, 117,

24   127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury

25   deliberations from intrusive inquiry.").  This rule is intended to protect the jury's deliberative

26   process by preventing challenges to a verdict based on arguments, statements, discussions, mental

27   and emotional reactions, votes, or methods used in reaching a verdict.  Fed. R. Evid. 606

28   /////

1    Advisory Committee's Notes; In re U.S. Financial Securities Litigation, 609 F.2d 411, 430 n. 68

2    (9th Cir. 1979).

3                          c.    Application of Section 2254(d)

4          The California Supreme Court's summary denial of petitioner's claim meant that the court

5    "assume[d] the allegations in the petition to be true" and determined petitioner failed to state a

6    prima facie case of juror misconduct.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1402 n.12

7    (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing People v. Duvall, 9 Cal. 4th 464, 474

8    (1995)).  Petitioner's factual proffer shows that Juror Fairfield contacted her minister prior to the

9    end of the penalty phase because she was concerned about her role as a juror.  The minister

10   "reconfirmed" her beliefs about the "propriety" of what she was doing.  Juror Fairfield also stated

11   that she asked the minister "what the Bible had to say about the death penalty."  He gave her a

12   written response that "basically said the people voted and enacted laws to determine what crimes

13   are and what the penalties should be."

14         There is no question that Juror Fairfield went to see her minister because of concerns

15   about petitioner's trial and her role in it.  Her declarations do not, however, provide much clarity

16   about just what she and her minister may have discussed and just what his written response to her

17   involved.  From the evidence proffered, there is no way to know whether the content of that

18   conversation and written material could have affected a reasonable juror's consideration of

19   evidence during the penalty phase, her weighing of the aggravating and mitigating factors, or her

20   understanding of her role in the process.  While the court may not consider the actual effect the

21   conversation and written material had on Juror Fairfield's deliberations, federal law is clear that

22   the objective impact of the information Juror Fairfield learned must be considered.  A court can

23   only do that if it knows what information she learned.  As petitioner points out, it is also

24   important to consider that Juror Fairfield sought out information from her minister, someone

25   whose opinion and guidance she presumably respected.  Due to the nature of this relationship, it

26   is reasonable to conclude the possibility of prejudice may be greater – Juror Fairfield sought help

27   because of the difficult decision she had to make.

28   /////

                                            103

1    The California Supreme Court simply did not have the factual information necessary to

2    resolve this claim.  Petitioner presented that court with sufficient information to show likely juror

3    misconduct because Juror Fairfield sought advice about her "difficult decision" in this case and to

4    show a reasonable likelihood of prejudice from the fact Juror Fairfield felt that she needed advice

5    and from the fact that she discussed the death penalty with her minister.  Under the case law set

6    out above, and as described in this court's Findings and Recommendations granting petitioner's

7    request for an evidentiary hearing on this claim, this court finds petitioner has made out a prima

8    facie case for relief.  This court can think of no reasonable basis for the California Supreme Court

9    to have denied petitioner the opportunity to present evidence to prove this claim.  To have done

10   so, the California Supreme Court would have had to make factual findings adverse to petitioner

11   that were not apparent from the record before that court.  See Hurles v. Ryan, 706 F.3d 1021,

12   1038-39 (9th Cir. 2013) (If a state court makes factual findings without an opportunity for the

13   petitioner to present evidence, the fact-finding process is deficient and the state court opinion is

14   not entitled to deference.)

15   Respondent argues petitioner has "identified no established precedent establishing a per se

16   rule of prejudice resulting from a juror's bringing Biblical principles to bear on the decision of

17   whether a criminal defendant's life should be spared."  (ECF No. 616 at 50:5-6.)  Respondent's

18   argument assumes Juror Fairfield's communications with her minister involved only Biblical

19   principles, which is not necessarily clear from her state court declarations.  Further, this court

20   need not determine the information Juror Fairfield had was "per se" prejudicial in order to find

21   petitioner has made out a prima facie case for relief.

22   Respondent next questions whether the information is "extrinsic."  Again, without

23   knowing just what those communications involved, it is not possible to say whether what Juror

24   Fairfield was told was the type of general knowledge that might not be considered prejudicial,

25   Fields v. Brown, 503 F.3d 755, 780 (9th Cir. 2007) (en banc), or whether it was information that a

26   reasonable juror would have found impactful upon his or her penalty phase decisionmaking.[42]

27   _____

28   [42]  Respondent argues that "the record does not show that Mrs. Fairfield's passages persuaded her
      to do anything during penalty deliberations other than to be mindful of the laws enacted to define

1    Respondent also focuses on the fact that there is no allegation Juror Fairfield shared the

2    information with anyone else on the jury.  That is not the test.  Petitioner was entitled to have

3    each juror make the penalty determination based only on the evidence presented.  The death

4    penalty verdict required a unanimous jury.  Even misconduct on the part of one juror could affect

5    that verdict.  See Fields v. Woodford, 309 F.3d at 1103; Dyer, 151 F.3d at 973.

6         This court finds petitioner has met the requirements of 28 U.S.C. § 2254(d) for the

7    allegations of Juror Fairfield's misconduct in claim 42.  Accordingly, this court will consider the

8    evidence presented at the 2008 evidentiary hearing in resolving this aspect of claim 42.

9                              d.   Merits of Juror Fairfield Allegations in Claim 42

10        During the August 2008 evidentiary hearing on this claim, petitioner presented the

11   testimony of three people.  First, petitioner's expert on religion and the death penalty, Professor

12   Richard Garnett, testified during the August 19, 2008 portion of the evidentiary hearing.  (ECF

13   No. 351 at 14-67.)  Second, Juror Fairfield testified by deposition on August 20, 2008.  The

14   transcript of that deposition is attached to petitioner's opening brief on the merits of claim 42.

15   (ECF No. 421-1.)  Finally, Department of Justice Special Agent John Radu testified at the August

16   21, 2008 portion of the hearing.  (ECF No. 352.)  The evidence was presented in an attempt to

17   show what Juror Fairfield learned from her minister.  The evidence can be organized into four

18   categories:  (1) what Juror Fairfield told or asked her minister; (2) when she talked with him; (3)

19   what the minister orally told Juror Fairfield; and (4) what was contained in the note the minister

20   prepared and gave to Juror Fairfield.

21                              i.   What Juror Fairfield asked her Minister

22        Juror Fairfield testified that she asked her minister "one time about the case," but that "we

23   did not discuss it."  (ECF No. 421-1 at 16:25 – 17:1.)  Rather, she "asked him what the Bible has

24   to say about the death penalty."  (Id. at 17:9-12.)  This testimony mirrors what she stated in her

25   July 2000 declaration.  (2 SH Inf. Resp., Ex. C at 1.)  In her April 2000 declaration, Juror

26

27   crimes and determine penalties."  (ECF No. 616 at 50:22-24.)  This court may not consider how
     the passages subjectively affected Juror Fairfield.  As explained in the text, the question is an
28   objective one.

                                         105

Fairfield described her reasons for talking with her minister as being due to the "difficult decision I had just made in finding Mr. Frye guilty and another difficult decision remaining about whether Mr. Frye should be sentenced to death." (2 SH Pet., Ex. 100.) She testified that she did not ask the minister what he personally thought about the death penalty. (ECF No. 421-1 at 33:2-4.) Nor did she ask him what the Southern Baptist organization had to say about the death penalty. (Id. at 34:2-5.)

Agent Radu testified that Juror Fairfield told him in their June 2000 interview that she talked with her minister because "she was concerned about what the Bible said about sentencing someone to death. And she wanted her minister's response about that." (8/21/08 EH RT (ECF No. 352) at 136:17-22.[43])

ii.   When Juror Fairfield Spoke to her Minister

In her April 2000 declaration, Juror Fairfield stated that the conversation with her minister occurred between the guilt and penalty phases. (2 SH Pet., Ex. 100.) However, in her July 2000 declaration, she stated that she did not remember whether she spoke with him before or after her vote for the death penalty. (2 SH Inf. Resp., Ex. C at 1.) During her evidentiary hearing deposition, Juror Fairfield testified that the penalty phase "had to be after" the time she received the written response from her minister. (ECF No. 421-1 at 30:14-17; 37:12-18.)

Agent Radu testified that Juror Fairfield told him she had spoken to her minister "during the trial." (8/21/08 EH RT (ECF No. 352) at 136:17-18.)

iii.   What the Minister told Juror Fairfield

Juror Fairfield testified that after she asked him about references to the death penalty in the Bible, her minister told her "he would look it up, look up in the Bible and see what he could find and then give it to me." (ECF No. 421-1 at 17:17-24.)

/////

/////

---

[43] The evidentiary hearing on claims 42 and 44 was held on August 19 and 21, 2008. The transcripts of that hearing have been filed herein at ECF Nos. 351 and 352. Those transcripts are referred to herein as "8/19/08 EH RT" and "8/21/08 EH RT."

iv.   What the Minister's Note Contained

Juror Fairfield testified that the minister's note was typewritten and about a page and half long.  (Id. at 19:13-20.)  She recalled that the note contained Bible verses, but could not recall which ones.  (Id. at 20:21-24.)  She remembered that some of the verses "came from the Old Testament, maybe a lot of them.  I don't really recall."  (Id. at 21:20-22.)  She did not remember whether any verses came from the New Testament.  (Id. at 21:23-25.)

Juror Fairfield testified that she did not recall whether the Biblical verses mentioned the death penalty specifically.[44]  (Id. at 28:14-16.)  Petitioner's statement that "[a]t a minimum, ... Juror Fairfield received a selection of Bible verses that demanded a death sentence for murderers" is absolutely unsupported.  (ECF No. 421 at 22:5-7.)

Juror Fairfield testified that she did not recall having an impression of the verses as a whole.  She recalled only that she "felt like [she was] still going to have to make up [her] own mind."[45]  (Id. at 22:11-14; 32:20-25.)  After being shown her July 2000 declaration, Juror Fairfield stated that she must have made accurate statements in that declaration because she signed it.  (Id. at 23:2-5.)  In her July 2000 declaration, Juror Fairfield had stated that the minister's note "basically said the people voted and enacted laws to determine what crimes are and what the penalties should be."  (2 SH Inf. Resp., Ex. C at 1.)  It is worth noting here that petitioner argues Federal Rule of Evidence 606(b) precludes this court's consideration of Juror Fairfield's statements about the "subjective effects of extraneous information."  (ECF No. 446 at 5:17-18.)  It is true that this court may not consider Juror Fairfield's statements about the effect of

---

[44] Petitioner asserts that Fairfield testified that the minister "placed the death penalty in a Biblical context for her."  (ECF No. 421 at 6:1-2.)  She did not.  Rather, when asked that question, Fairfield responded:  "It would have to be in a biblical context if it came from the Bible.  I guess I don't understand what you're saying again."  (ECF No. 421-1 at 28:17-21.)

[45]  Petitioner states that Juror Fairfield testified that her recollection was that "the minister did not confirm her own beliefs."  (ECF No. 421 at 4:17-18.)  Petitioner cites page 11 of the transcript of Fairfield's testimony in support of this statement.  Juror Fairfield did not make this statement.  Rather, when asked about the statement in her April 2000 declaration that the "clergyman reconfirmed my own beliefs about the propriety of what I was doing," Juror Fairfield testified:  "This is not quite the way I remember it, that the clergyman reconfirmed my own beliefs about the --."  (ECF No. 421-1 at 11:12-21.)  Petitioner's counsel then interrupted Fairfield and she did not complete the statement.

1   the minister's note on her deliberations at the penalty phase.  See Jeffries, 5 F.3d at 1191 (use

2   objective test to determine impact of extraneous evidence on jury).  But, the limitation of Rule

3   606(b) involves the determination of prejudice.  This court considers Juror Fairfield's statements

4   regarding the note from her minister only to determine what that note may have contained.  The

5   court does not consider her statements as direct evidence that the note did, or did not, affect her

6   consideration of the penalty phase evidence or her deliberations.

7         When she was interviewed by Agent Radu, Juror Fairfield told him the minister's note

8   included handwriting.  (8/21/08 EH, Ex. 40 at 2.[46])  However, Juror Fairfield testified that she did

9   not recall handwriting on the note.[47]  (ECF No. 421-1 at 26:16-20.)  Neither of Juror Fairfield's

10  declarations submitted to the state court mentioned any handwriting.  (2 SH Pet., Ex. 100; Inf.

11  Resp., Ex. C.)  She also testified that the minister "didn't give me his personal opinion."  (ECF

12  No. 431-1 at 29:7-9.)  Nor did he give her a policy statement from the Southern Baptist national

13  organization.  (Id. at 34:7-10.)

14        Agent Radu testified that Juror Fairfield told him the written response from her minister

15  consisted of quotations from the Bible and some handwritten notations from the minister "further

16  describing" the Biblical passages.  (8/21/08 EH RT (ECF No. 352) at 137:3-14.)  He further

17  testified that Fairfield described the content of the document as stating that "the Bible had

18  described laws people had passed and the punishments that should be handed down for people

19  who broke those laws."  (Id. at 137:17-19.)  Radu also testified that Fairfield told him the minister

20  said "that if he was in a situation where someone had broke [sic] the law and they were – needed

21  to be given the death penalty, that he would do so."  (Id. at 137:23 – 138:2.)  On cross-

22  examination, Radu clarified that Fairfield told him it was her opinion, not something the minister

23  said, that he would have voted for the death penalty.  (Id. at 139:25 – 140:3.)  In his investigative

24  notes, Radu described Juror Fairfield's statement as follows:  "Fairfield said, in her opinion, the

_____

25  [46] Portions of Agent Radu's investigative report were admitted into evidence during the
    evidentiary hearing.  (See 8/21/08 EH RT at 142-145.)

26

27  [47] Juror Fairfield testified that she had no reason to think Agent Radu's notes did not accurately
    reflect her conversation with him.  (ECF No. 421-1 at 29:10 – 30:2.)  However, she repeated that
28  she simply did not recall "that much about it."  (Id.)

1     minister would have given an individual the death penalty if the individual was found guilty and

2     the death penalty statutes applied."[48]  (8/21/08 EH, Ex. 40 at 2.)

3          Professor Garnett's testimony about what the minister's note likely contained is based on

4     his interpretation of Juror Fairfield's statements that she "consulted with her minister and asked

5     what the Bible said about the death penalty" and that she "received from her minister some

6     written materials which included scripture verses and some commentary so on" which the juror

7     summarized "as being in the vein of the people vote and enact laws and decide what crimes and

8     punishments should be." (8/19/08 EH RT (ECF No. 351) at 23:22 – 24:8.)  Professor Garnett

9     then testified to what he thought were the minister's "likely" responses.  (Id. at 29:22-23.)  The

10    first passage Professor Garnett found "is ubiquitously cited in support of the proposition that

11    human authority is legitimate, that it's ordained by God, and that religious believers, like all

12    citizens, should submit to these authorities." (Id. at 30:10-17.)  The passage then goes on to refer

13    to "civil rulers as being God's ministers and bearing the sword." (Id. at 30:18-20.)  Therefore,

14    according to Professor Garnett, it is frequently used in death penalty debates.  (Id. at 30:20-21.)

15         Professor Garnett went on to identify numerous passages from the Bible that he testified

16    are frequently used in response to questions like that posed by Juror Fairfield and would support

17    her description of what the minister told her.  (Id. at 24-47; EH Ex. 36.)

18                              v.   Discussion

19         The evidence showed that Juror Fairfield spoke to her minister between the guilt and

20    penalty phases of trial.  She was concerned about the decision she would be asked to make at the

21    penalty phase and asked him what the Bible has to say about the death penalty.  In response, her

22    minister gave her a limited number of Bible verses, possibly with some written commentary, that

23    basically told Fairfield that following the state's law was approved in the Bible.  While Professor

24    _____

25    [48] Petitioner tries very hard to interpret Radu's testimony to mean that Fairfield told him her
      minister said he would have voted for the death penalty.  However, as petitioner repeatedly

26    stresses regarding Juror Fairfield's testimony and memory, what Radu recorded in 2000 shortly
      after he interviewed Fairfield is much more likely to be a reliable reflection of what she told him

27    than his memory eight years later during his testimony in this court.  Further, neither Juror
      Fairfield nor Radu testified that the minister "favored the death penalty for those convicted of

28    murder."  (ECF No. 446 at 6:8.)

1    Garnett's testimony is interesting, he did not convince the court that it was anything more than

2    possible that the passages he identified were those supplied by Juror Fairfield's minister.  No

3    evidence was presented to give the court any sense that this minister in particular might choose

4    the passages suggested by Professor Garnett.

5           Juror Fairfield's testimony about the import of the minister's writing is the best evidence

6    of what that writing contained.  Because the most logical interpretation of Juror Fairfield's

7    statement is that the writing directed her to follow the law, and it can hardly be said that this

8    message was objectively prejudicial to petitioner, this court finds Juror Fairfield's contact with

9    her minister and consideration of extraneous evidence did not have a substantial and injurious

10   effect or influence in determining the jury's verdict.  Cf. Fields, 503 F.3d at 781 & n. 19 (use

11   Brecht harmless error standard on federal habeas review of juror misconduct claim).  Claim 42

12   should be denied.

13           9.   Shackling – Claim 44

14           The final claim for which petitioner was granted an evidentiary hearing alleges that jurors

15   saw petitioner shackled.  In 2008, the court heard evidence on this claim and the parties briefed its

16   merits.  (ECF Nos. 421, 437, 446.)  Like claim 42, this court finds petitioner has satisfied section

17   2254(d) for claim 44.  Therefore, as the court did in the prior section, the merits of claim 44 are

18   also addressed below.

19           Petitioner raised this claim in his second state habeas petition.  (2 SH Pet. at 16-18.)  That

20   petition was denied summarily by the California Supreme Court.

21           a.   Background and Evidentiary Proffer

22           Prior to the commencement of trial, the judge ruled that petitioner not be shackled "any

23   time he's in the courtroom."  (RT 454:3-4; CT 2375.)  The judge also discussed with sheriff's

24   officers and petitioner's trial counsel limiting petitioner's restraints when he was being

25   transported to court to minimize the chance jurors might see petitioner restrained. (RT 454-457.)

26   Petitioner presented the declarations of two jurors who state they saw petitioner shackled.  Juror

27   Silvey's declaration includes a handwritten paragraph with, what appears to be, her initials.  This

28   paragraph states:

                                                    110

> I recall seeing Mr. Frye in shackles: feet, wrists & waist. I recall the defense asking the court to remove them so the jury would not form an opinion. The shackles gave him the flavor of danger.

(2 SH, Ex. 101, ¶ 9.)

Juror Canale stated:

> During the trial, I saw Mr. Frye in shackles – hands and feet – but I do not remember how many times this occurred or whether this occurred inside the courtroom or in the hallway.

(2 SH, Ex. 3 to Inf. Reply, ¶ 3.)

Respondent's investigator also interviewed Juror Silvey. Respondent provided the state court with a second declaration from Juror Silvey stating:

> I saw Mr. Frye shackled in the courtroom during jury selection. I believe the entire jury saw him. Mr. Hawk, one of Frye's trial attorneys, asked the court to remove the shackles. Hawk seemed to make a production of his request. He said it was unfair to have Mr. Frye remain in shackles because it make [sic] him appear more dangerous than he really is. The judge granted the request and told the jury not to have preconceived ideas about Mr. Frye's guilt or innocence.

> At the beginning of jury selection, I saw Mr. Frye sitting shackled on a bench near the entrance to the courtroom. Mr. Frye should not have been there. I believe the viewing was staged to make Mr. Frye appear more human to the jury.

(2 SH, Inf. Resp., Ex. E, ¶¶ 7,8.)

b. Legal Standards

The "Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005). To establish a claim of unconstitutional shackling, a petitioner must show that he was physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests. Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002). Where a defendant was seen shackled in the courtroom for a significant period of time, courts have found the shackling "inherently prejudicial," and, once it is established that it occurred without adequate justification, the burden shifts to the state to prove the error was

1  harmless beyond a reasonable doubt under <u>Chapman v. California</u>, 386 U.S. 18 (1967).[49]  <u>Deck</u>,

2  544 U.S. at 635; <u>Estelle v. Williams</u>, 425 U.S. 501, 504-06 (1976); <u>Holbrook v. Flynn</u>, 475 U.S.

3  560, 568-69 (1986).  However, if the defendant was seen shackled outside the courtroom or was

4  seen shackled in the courtroom only briefly, prejudice has not been presumed and the petitioner

5  must prove he was actually prejudiced.  <u>Ghent</u>, 279 F.3d at 1133; <u>Rhoden v. Rowland</u>, 172 F.3d

6  633, 636 (9th Cir. 1999); <u>United States v. Olano</u>, 62 F.3d 1180, 1190 (9th Cir. 1995) (jurors brief

7  exposure to defendant in shackles as he entered courtroom requires a showing of actual

8  prejudice); <u>United States v. Halliburton</u>, 870 F.2d 557, 561-62 (9th Cir. 1989) (jurors' brief view

9  of defendant handcuffed outside courtroom requires showing of actual prejudice); <u>Wilson v.

10  McCarthy</u>, 770 F.2d 1482, 1486 (9th Cir. 1985) (defendant required to make an "affirmative

11  showing of prejudice" from jurors brief exposure to shackles as defendant was leaving the

12  witness stand); <u>United States v. Figueroa-Espinoza</u>, 454 F.2d 590, 591 (9th Cir. 1972) (fact some

13  jurors may have seen defendants in handcuffs when they reentered the courtroom after a recess

14  "was not so inherently prejudicial as to require a mistrial").  Prejudice is not inherent in shackling

15  outside the courtroom because "'[i]t is a normal and regular as well as a highly desirable and

16  necessary practice to handcuff prisoners when they are being taken from one place to another, and

17  the jury is aware of this.'"  <u>Halliburton</u>, 870 F.2d at 561 (quoting <u>United States v. Leach</u>, 429

18  F.2d 956, 962 (8th Cir. 1970)).

19       The Court of Appeals has held that considerations in determining the prejudicial effect of

20  a shackling error include "the appearance and visibility of the restraining device, the nature of the

21

22  [49]  Respondent objects to use of the <u>Chapman</u> standard.  He argues simply that because this is a
   habeas proceeding, this court must consider whether the state court could reasonably have

23  concluded that petitioner failed to show the shackling had a substantial and injurious effect on the
   verdict, the <u>Brecht</u> harmless error standard.  (ECF No. 616 at 51.)  This court must look to the

24  clearly established Federal law regarding shackling.  That law, set out above, requires use of the
   <u>Chapman</u> harmless error standard for shackling during trial.  The <u>Brecht</u> harmless error standard

25  is used by federal, not state, courts to consider the effect of a constitutional error.  The Supreme
   Court adopted this harmless error standard in large part due to concerns of comity and the state's

26  interest in finality of its convictions.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 634-35 (1993).
   Respondent cites no authority for his assertion that this court should consider <u>Brecht</u> the harmless

27  error standard the California Supreme Court was required to use under "clearly established

28  Federal law."

1    crime with which the defendant was charged and the strength of the state's evidence against the

2    defendant." Larson, 515 F.3d at 1064 (citing Dyas v. Poole, 317 F.3d 934, 937 (9th Cir. 2003)).

3    In addition, the Court of Appeals has considered that more elaborate physical restraints would

4    likely heighten the appearance of the defendant's dangerousness. Id. (citing Spain v. Rushen, 883

5    F.2d 712, 722 (9th Cir. 1989)). "Similarly, if the defendant is charged with a violent crime, then

6    the risk of prejudice increases, because shackling 'essentially brand[s] [him] as having a violent

7    nature.'" Id. (quoting Rhoden, 172 F.3d at 637).

8            This court recognizes that all of these considerations have been set out by the Courts of

9    Appeals. As such, they do not necessarily reflect "clearly established Federal law as decided by

10   the Supreme Court." The Court of Appeals recognized this AEDPA limitation on the use of Dyas

11   and other circuit case law. Walker v. Martel, 709 F.3d 925, 941 (9th Cir. 2013), cert. denied,

12   2013 WL 3912909 (Nov. 4, 2013). However, the considerations mentioned by the Court of

13   Appeals in Larson and Dyas are just that, considerations. They are logical facts to consider when

14   determining whether or not a defendant suffered prejudice from being inappropriately shackled at

15   trial. This court looks to those listed considerations, among others, when examining the

16   reasonableness of a California Supreme Court determination that any constitutional shackling

17   error was harmless.

18                              c.   Application of Section 2254(d)

19           This court finds there is little question that petitioner stated a prima facie shackling claim.

20   He presented the declarations of two witnesses who saw petitioner shackled during trial. To the

21   extent respondent argues that the record shows otherwise, that is a factual and credibility issue

22   that involves consideration of the merits of petitioner's claim. If the state court made those sort

23   of factual determinations adverse to petitioner without holding a hearing, then the state court

24   made an "unreasonable determination of the facts" under section 2254(d)(2). See Hurles v. Ryan,

25   706 F.3d 1021, 1038-39 (9th Cir. 2013). In addition, both parties agree the trial court did not

26   order the shackling and, in fact, seemed determined to keep any necessary restraints to a

27   minimum and out of the jury's presence. The only issue, then, upon which the California

28   Supreme Court could reasonably have denied petitioner's claim is harmless error.

1    This court finds that the state court could not reasonably have determined petitioner's

2    shackling was not harmless.  Without developing the facts underlying petitioner's claim, there is

3    no way to know how many jurors saw petitioner shackled, where they saw him, how long they

4    saw him, or just what sort of shackles he was wearing at the time.  The harmless error analysis

5    necessarily rests upon numerous factual determinations.  The California Supreme Court lacked

6    the evidence it would have needed to determine whether or not the error was harmless.

7    Accordingly, this court finds the state court determination amounted to either an unreasonable

8    application of the law or an unreasonable determination of the facts.  The evidence presented

9    during the 2008 evidentiary hearing may therefore be considered when examining the merits of

10    petitioner's claim.

11                              d.    Merits of Claim 44

12    The evidence produced at the evidentiary hearing from Jurors Silvey and Canale was

13    largely the same as their declarations.  Juror Silvey testified that she saw petitioner's hands

14    shackled to his waist.  (8/19/08 EH RT (ECF No. 351) at 79:18-19.)  She recalled that she saw

15    petitioner sitting on a bench outside the courtroom almost every morning of trial before the jury

16    started deliberating at the guilt phase.  (Id. at 83:14-15; 84:5-8, 12-14.)  She recalled seeing him

17    shackled outside the courtroom more than once, but was unsure how many times.  (Id. at 84:12 –

18    85:2.[50])  She also saw him shackled once inside the courtroom.  (Id. at 96:16-19.)  Juror Silvey

19    recalled attorney Hawk asking the court to remove the shackles.  (Id. at 83:19 – 84:2.)  The other

20    jurors were also present when that happened.  (Id.)  However, as respondent points out, and

21    petitioner does not contest, there is no indication in the record of the transcript that Hawk made

22    this statement.  Juror Silvey did not remember seeing petitioner shackled inside the courtroom

23    again.  (Id. at 99:4-7.)  Juror Silvey felt the shackles gave petitioner "just a touch of danger."  (Id.

24    at 85:7-8.)  She also recalled other jurors mentioning the shackles at some point prior to

25    deliberations.  (Id. at 101:13 – 102:9.)

26    _____

27    [50]  In his reply brief, petitioner states that jurors "were forced to walk by [petitioner] almost every
day as he sat shackled before them."  (ECF No. 446 at 20:11-12.)  That statement is not supported
by the evidence.  Juror Silvey's testimony was only that she saw petitioner sitting outside the
28    courtroom more than once.

1    Juror Canale also testified.  She recalled seeing petitioner shackled at the wrists and feet

2  outside the courthouse in a parking area.  (Id. at 69:16 – 70:19.)  She also recalled petitioner was

3  wearing an orange jumpsuit at the time.  (Id. at 70:8-10.)  She did not recall if she saw him

4  shackled more than once.  (Id. at 71:6-10.)  Juror Canale did not recall seeing petitioner shackled

5  in the hallway or inside the courtroom.  (Id. at 70:25 – 71:5.)

6    Trial prosecutor Jo Graves testified for respondent.  She did not recall ever seeing

7  petitioner shackled in the presence of the jury.  (8/21/08 EH RT (ECF No. 352) at 167-68, 172:8-

8  17.)  Prosecutor Graves testified that she was in the courtroom at all times the jury was present.

9  (Id. at 172:2-7.)

10    For the sake of this analysis, this court finds that jurors saw petitioner shackled once

11  inside the courtroom at the beginning of trial and at least once in the hallway outside the

12  courtroom.  In addition, the court finds that at least one juror saw petitioner shackled and in a

13  prison jumpsuit outside the courthouse.  When he was seen inside the courthouse, petitioner's

14  hands were shackled and connected to a belly chain.[51]  When he was seen outside the courthouse,

15  petitioner's feet were shackled as well.  Thus, petitioner has established unconstitutional

16  shackling.  The question is whether that shackling was harmless because it did not have a

17  "substantial and injurious effect or influence" on the jury's verdicts.  See Brecht, 507 U.S. at 638.

18    Shackling has been found to be prejudicial error where the defendant was shackled at the

19  feet during her entire trial, was charged with a violent crime, and the evidence against her was not

20  overwhelming, Dyas, 317 F.3d at 937; where the defendant was painfully shackled for an entire

21  seventeen-month trial, Spain, 883 F.2d 712; where the defendant was shackled during the entire

22  course of his trial, the case involved a violent crime, and the evidence was disputed, Rhoden, 172

23  F.3d 633; where the defendant was shackled during the entire penalty phase after not being

24  shackled at the guilt phase, Elledge v. Dugger, 823 F.2d 1439, 1451-52 (11th Cir.), withdrawn in

---

25  [51]  Petitioner states that Juror Silvey saw petitioner's feet shackled as well.  (ECF No. 421 at 23.)

26  He cites the evidentiary hearing transcript for that statement.  However, at the evidentiary
    hearing, Juror Silvey did not recall seeing petitioner's feet shackled.  (8/19/08 EH RT at 79:20-

27  22.)  In her declaration submitted to the state court, Juror Silvey had said she had also seen
    petitioner's feet shackled.  (2 SH, Ex. 101, ¶ 9.)  Whether the shackling included petitioner's feet

28  or not, the court's analysis of this claim is the same.

1    part on other grounds, 833 F.2d 250 (11th Cir. 1987).  Unconstitutional shackling was found

2    harmless, on the other hand, where there was overwhelming evidence of guilt.  Wilson v. United

3    States, 344 F.2d 166 (D.C. Cir. 1964).

4            With respect to the guilt phase, the in-court shackling occurred very early in the trial.  It is

5    unlikely jurors would have considered this one in-court occurrence to indicate petitioner's

6    dangerousness when he was not shackled for the remainder of the proceeding.  This case is not

7    unlike the situation in Larson v. Palmateer, 515 F.3d 1057 (9th Cir. 2008).  There, the trial judge

8    ordered the pro se defendant to wear a leg brace for two of the six days of his trial.  515 F.3d at

9    1064.  The Court of Appeals was "troubled" by the trial court's failure to make a finding of

10   necessity for the brace on the record.  Id.  However, the court felt that the fact the defendant was

11   allowed to move around the courtroom unencumbered for four of the six days of his trial

12   "mitigated the prejudicial impact of the trial court's decision to use the leg brace."  Id.  The Court

13   held the limited shackling was harmless under Brecht.  Id. at 1064-65.  Petitioner's in-court

14   shackling in the present case was far less intrusive than that found harmless in Larson.

15          The shackling occurring outside the courtroom could not have come as any surprise to the

16   jury.  Petitioner was charged with two capital murders.  Objectively, shackling during transport of

17   someone on trial for such violent and egregious crimes would have seemed reasonable and

18   ordinary.  The court recognizes that both Juror Silvey and Canale recalled the shackling, which

19   indicates it had some impact upon them.  See Rhoden, 172 F.3d at 637 (court considers fact juror

20   remembered the shackles six years after trial and recalled other jurors commenting on them).

21   However, as discussed above, the guilt phase evidence against petitioner was substantial.  This

22   court finds that any effect of shackling on the guilt phase verdict would have been insubstantial.

23          The same is true for the penalty phase.[52] The court recognizes that the considerations at

24   the penalty phase are different. The penalty phase determination is more amorphous and guided

25   by less precise factors than is the guilt phase determination.  Jurors may consider the defendant's

26   character and mercy.  That said, as discussed above regarding petitioner's claim of ineffective

27   _____

28   [52]  Petitioner also argues the shackling would have affected petitioner's mental health and ability
     to participate in his trial.  However, he presents no evidence to support those conclusions.

116

1     assistance of counsel at the penalty phase, the penalty phase defense had serious flaws.  While the

2     nature of the penalty phase itself made it perhaps a closer case than the guilt phase decision, the

3     mitigating evidence was insubstantial.  Moreover, the only in-court shackling shown occurred

4     many months before the jurors deliberated at the penalty phase.  Any out-of-court shackling

5     would not have affected the verdict substantially.  This court finds shackling would have had

6     little, if any, effect on juror's consideration of the penalty phase evidence.  Any error was

7     harmless with respect to the penalty phase as well.  Claim 44 should be denied.

8     V.   Conclusion

9           Based on the foregoing findings, and good cause appearing, IT IS HEREBY

10    RECOMMENDED that:

11          1.   Petitioner's claims 2, 3, 25, and 37 be denied because the California Supreme Court's

12                rejection of those claims was not contrary to law or unreasonable as defined in 28

13                U.S.C. § 2254(d).

14          2.   The allegations in petitioner's claims 4, 5, and 7 that were the subject of the

15                evidentiary hearing ordered previously be denied because the California Supreme

16                Court's rejection of those claims was not contrary to law or unreasonable as defined in

17                28 U.S.C. § 2254(d).

18          3.   The evidentiary hearing proceedings on petitioner's claims 28 and 29 resume because

19                the California Supreme Court's denial of those claims was contrary to law or

20                unreasonable as defined by 28 U.S.C. § 2254(d).

21          4.   The allegations in petitioner's claim 42 that Juror Fairfield committed misconduct by

22                communicating with her minister be denied on the merits.

23          5.   Petitioner's claim 44 be denied on the merits.

24          6.   Petitioner's November 5, 2010 Motion to Expand the Record and for an Evidentiary

25                Hearing on Claim 37 (ECF No. 549) be denied.

26          These findings and recommendations are submitted to the United States District Judge

27    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days after

28    being served with these findings and recommendations, any party may file written objections with

1   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

2   Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

3   objections within the specified time may waive the right to appeal the District Court's order.

4   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5   Dated:  December 3, 2013

6   _____
    CAROLYN K. DELANEY

7   UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12   Frye 2254d.fr

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28