1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   JERRY GRANT FRYE,                          No.  2:99-cv-0628 KJM CKD

11                  Petitioner,                 DEATH PENALTY CASE

12           v.

13   WARDEN, San Quentin State Prison,          AMENDED FINDINGS &
                                                RECOMMENDATIONS
14                  Respondent.

15

16                                 INTRODUCTION

17          Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to 28

18   U.S.C. § 2254.  In 2007, this court granted petitioner's motion for an evidentiary hearing on all or

19   parts of claims 2, 3, 4, 5, 7, 25, 28, 29, 42 and 44.  In 2008, the court heard testimony on the

20   allegations regarding Juror Fairfield in claim 42 and on claim 44.[1]  Between 2008 and 2010, the

21   parties conducted testimony depositions and prepared for additional portions of the evidentiary

22   hearing authorized by the court.  In 2011, however, the United States Supreme Court rendered

23   decisions changing the federal courts' analysis of habeas corpus petitions under section 2254.

24   This court then stayed the evidentiary hearing proceedings and ordered the parties to brief the

25   ////

26

27   ───────────────────────
     [1] The evidentiary hearing was conducted by the magistrate judge previously assigned to this case.
     However, the undersigned has carefully reviewed the transcripts of those proceedings in
28   preparing these amended findings and recommendations.

                                           1

1   application of 28 U.S.C. § 2254(d) to each claim for which petitioner was granted an evidentiary

2   hearing, and for claim 37, for which a motion for an evidentiary hearing is pending.

3          After careful consideration of the parties' briefs, the state court record, both parties'

4   objections to the December 4, 2013 Findings and Recommendations, and the parties' responses to

5   the objections, this court again concludes that petitioner has satisfied the requirements of section

6   2254(d) for claims 28, 29, and 44, and for the allegations regarding Juror Fairfield in claim 42.[2]

7   This court further concludes that petitioner has failed to meet those requirements for claims 2, 3,

8   25 and 37, and for the portions of claims 4, 5, and 7 for which the court had previously granted an

9   evidentiary hearing.  Finally, this court considers the evidence adduced in this federal proceeding

10  on the allegations regarding Juror Fairfield in claim 42 and on claim 44, and herein recommends

11  denial of those claims on the merits.

12                              BACKGROUND FACTS[3]

13  I.  Guilt Phase

14          A.  Prosecution's Case

15          The prosecution's chief witness, Jennifer Warsing, testified under a grant of immunity.

16  Warsing first met petitioner in a Sacramento bar in April 1984 while she was separated from her

17  husband of many years.  A romantic relationship between Warsing and petitioner quickly

18  developed, and, in early May 1984, the couple moved in together in an apartment outside of

19  Sacramento.  On several occasions during the time they lived together, petitioner assaulted

20  Warsing.  Petitioner and Warsing returned to Sacramento in December 1984 or January 1985, and

21
22  [2] The parties are advised that these amended findings and recommendations reflect substantive
    changes to the original findings and recommendations in the following sections:  (1) I.  Legal
23  Standards – changes to n. 5 at p. 13; (2) II.A. Supremacy Clause – changes at pp. 17-21; (3) II.B.
    Article III – changes at pp. 21-22; (4) IV.A. Sixth Amendment Claims – addition of n. 8 at p. 27;
    (5) IV.A.2.a.  Inappropriate Pleading Standard – changes at pp. 32-37; (6) IV.A.3.a.i.(a)
24  Appointment of Counsel – changes to n. 19 at p. 42; (7) IV.A.3.b. Discussion – changes at pp. 65-
    66; (8) IV.A.8.b. Legal Standards – changes at pp. 107-112; (9) IV.A.8.d.(v) Discussion –
25  changes at pp. 119-120.  The parties will be permitted to file supplemental objections to only the
    amendments made herein.
26

27  [3] This overview of the facts is derived from the California Supreme Court's findings of facts,
    which are presumed to be correct, 28 U.S.C. § 2254(e)(1), and from this court's independent
28  review of the state court record.

1   resided together at the River City Motel.  Petitioner worked at a construction job next door to the

2   motel.

3       Rick Evans worked with petitioner at the construction site and socialized with him outside

4   of work.  Evans testified he and petitioner discussed the prospect of quitting their jobs and

5   growing marijuana for profit instead.  Evans had access to a gold mining claim in Amador County

6   that members of his family had worked for many years.  In April 1985, petitioner and Evans quit

7   their jobs to pursue the marijuana venture.  With approximately $500 between them, they

8   purchased camping equipment and other supplies.  The next day, a group comprised of petitioner,

9   Warsing, Evans and his girlfriend, and Warsing's adult son drove to the mining claim property in

10  Amador County.  In addition to the camping gear and supplies they had purchased, petitioner and

11  Evans brought along marijuana seeds, a 12-gauge shotgun, a .22-caliber semiautomatic rifle, and

12  ammunition.

13      A quarter-mile down the hill from the group's campsite was a cabin occupied by an older

14  couple, Robert and Lucille (Jane) Brandt, who worked a gold mining claim with their son, Bobby.

15  Evans testified that before setting up camp and sowing the marijuana seeds, he sought and

16  obtained the Brandts' permission for the group to camp on the property.  The campsite had no

17  running water or electricity, and meals were prepared over an open campfire.  Although petitioner

18  and Warsing had a car when they moved to the campsite, they sold it to Warsing's son who left

19  the group after a couple of days.  Evans and his girlfriend returned to Sacramento a week or two

20  later, leaving only petitioner and Warsing at the campsite.  Before Evans departed, it was decided

21  that Evans would return to the property once or twice a week with food and supplies, and

22  petitioner would tend the marijuana plants.

23      About a week after moving to the campsite, Warsing met the Brandts and became friendly

24  with them.  Warsing would occasionally accompany Jane Brandt in the Brandts' 1982 Lincoln

25  Towncar to run errands in town.  On these excursions, Warsing became aware that Mrs. Brandt

26  carried an unusually large amount of cash with her to pay for goods and services.  Rick Evans

27  testified petitioner and Warsing mentioned the Brandts' money during one of his weekly visits to

28  the campsite.  Petitioner also showed Evans a small glass container filled with about a quarter-

3

1   inch of gold he had scraped from the bucket of the front-end loader used by the Brandts in their

2   mining operation.

3        On the morning of May 14, 1985, petitioner and Warsing walked from their campsite

4   down the hill to the Brandts' cabin.  Warsing had agreed to accompany Mrs. Brandt to the

5   dentist's office in case she did not feel well following her dental procedure.  Sometime during the

6   late morning of May 14, an acquaintance of the Brandts, Ron Wilson, drove to the cabin.  Wilson

7   occasionally worked the Brandts' mining claim with them, receiving a percentage of the gold that

8   was extracted.  Seeing the Lincoln gone, Wilson drove by the cabin without stopping, and

9   proceeded up another road.  After investigating a potential mining area, Wilson hiked to the upper

10  part of the claim, in the vicinity of petitioner's campsite.  As Wilson headed back down towards

11  the cabin to see if anyone had returned, he met petitioner walking up the road.  Petitioner showed

12  Wilson the marijuana-growing operation. A short time later, Wilson drove with petitioner into

13  town where Wilson bought them lunch and a couple of beers.  After lunch, Wilson and petitioner

14  made several more stops.  Wilson bought a carton of cigarettes for petitioner, and two 12-packs of

15  beer.  Wilson also retrieved several flats of marijuana seedlings from his girlfriend's residence for

16  petitioner to tend for him, and picked up some watering equipment from a friend.  During this

17  time, petitioner and Wilson each consumed several more beers.

18       Petitioner and Wilson arrived back at the mining claim about 3:00 in the afternoon, and

19  went up the hill to the campsite.  Mrs. Brandt and Warsing arrived back at the cabin some time

20  later.  When Warsing got out of the car, Mrs. Brandt asked her to come down for coffee later in

21  the evening.  Warsing said they probably would, and set off for the campsite up the hill.  When

22  Warsing arrived at the campsite, petitioner and Wilson were talking and drinking beer.  Around

23  dusk, Wilson left the campsite and drove home.

24       Warsing testified that shortly after Wilson's departure, petitioner said he saw the Devil

25  moving around the campsite.  He also told her he thought he was being set up, and that he would

26  "just take what he could."  Petitioner then stood by the fire where Warsing was heating water for

27  coffee, and asked her if she had ever seen people dead before.  According to Warsing's testimony,

28  petitioner was going to go down and kill the Brandts, and told her if she did not go with him, he

4

1   would have to kill her too.  Hoping to run away, Warsing told petitioner she needed to use the

2   campsite's makeshift bathroom.  Petitioner accompanied her, shotgun in hand.  When Warsing

3   was finished, petitioner took her by the arm and walked down the hill toward the cabin, still

4   clutching the shotgun in the other hand.

5           When petitioner and Warsing arrived at the Brandts' cabin, Mrs. Brandt greeted them,

6   asking them to come inside.  Petitioner placed the shotgun against the kitchen doorway, and sat

7   down in a chair nearby.  Warsing sat at the table where Mrs. Brandt was working on an afghan

8   and began helping her.   Petitioner complained to Mr. Brandt that he had drunk too much and his

9   head was hurting.  Mr. Brandt started laughing.  When Mrs. Brandt got up and offered coffee,

10  petitioner said he would like a cup.  Hearing petitioner joking with Mr. Brandt and asking for

11  coffee, Warsing believed things had returned to normal, and she began to relax.  Moments later,

12  however, she heard a noise, and looked up to see petitioner pointing the shotgun at Mr. Brandt

13  who was now standing up in front of his recliner.  Petitioner shot Mr. Brandt, who then fell back

14  in the chair.  Mrs. Brandt turned and moved towards petitioner, with Warsing behind her.  She

15  yelled at petitioner to stop, and lunged at him.  Petitioner shot Mrs. Brandt in the chin and face,

16  and she fell onto the sofa.  Petitioner turned and shot Mr. Brandt a second time.  Warsing testified

17  she heard gurgly breathing from Mr. Brandt.  Petitioner told Warsing, "I am going to have to put

18  him out of it."  Warsing heard three blows, and then no more breathing.  According to Warsing's

19  testimony, she started moving towards the door to leave, but petitioner yelled at her to get the

20  money out of Mrs. Brandt's purse, which she did.  Petitioner then directed Warsing to go in the

21  bedroom and look for a suitcase containing Mrs. Brandt's gambling change.  Petitioner returned

22  to where Mr. Brandt's body lay, and went through his pockets.  Petitioner took vials of gold from

23  the kitchen counter, returned to the bedroom, and put the gold in Mrs. Brandt's suitcase.  He

24  ripped the gold nugget necklace from Mrs. Brandt's neck.  When Warsing started walking out the

25  door, petitioner called her back inside the kitchen, and directed her to pour water over his bloody

26  hands to clean them.  Petitioner took the shotgun and went out the door, ordering Warsing to get

27  into the Brandts' Lincoln.

28  ////

5

1    Petitioner drove up the road leading to the campsite.  He ordered Warsing to get his

2    suitcase.  Meanwhile, petitioner kicked down the tents and knocked things over.  The two left the

3    campsite, with petitioner driving fast and recklessly in the direction of Placerville.  They stopped

4    for the night in Winnemucca, Nevada, and checked into a motel using the name Dixon,

5    petitioner's mother's maiden name.  Leaving the Brandts' Lincoln in a casino parking lot,

6    petitioner and Warsing purchased a car for $600 cash and drove to Elko, Nevada, for the night.

7    From there they traveled to Pocatello, Idaho, again registering in a motel under the name of

8    Dixon.  They went from Pocatello to Wyoming.  In Rapid City, Wyoming, they traded in their car

9    for a green pickup truck and $150 in cash.  While in Rapid City, petitioner and Warsing also sold

10   some gold to Jack Meyer, owner of Silver Mountain Coins.  Petitioner and Warsing continued

11   driving until they reached Belle Fourche, South Dakota.  Petitioner had Warsing drive through

12   town and back again, and told her this is where they would stay.  Warsing testified that en route

13   from California to Belle Fourche, petitioner would sit in the car and cry while she drove, and said

14   he was sorry he had killed the Brandts because "he really liked those old people."  According to

15   Warsing, petitioner said he was sorry for what he had done to her life too, because the authorities

16   would never believe she had nothing to do with it since her fingerprints were all over everything.

17       Meanwhile, on the morning of May 16, Bobby Brandt returned to his parents' cabin in

18   Amador County.  He noticed the Lincoln was gone and the doors to the cabin wide open. A dog

19   apparently belonging to petitioner and Warsing was hanging around in front of the cabin.  When

20   Bobby walked inside, he saw his father lying on his back on the floor with his pants' pockets

21   turned inside out.  He then went over to where his mother was sitting on the couch, touched her,

22   and realized she was dead.  Bobby ran out of the cabin and down the lane to call police from a

23   home nearby.

24       Inside the cabin, the responding officers found Mrs. Brandt on the couch slumped over to

25   her left side, and Mr. Brandt lying face up on the floor near the recliner, blood down the front of

26   him and on the furniture.  An expended 12-gauge shotgun shell was on the floor next to Mr.

27   Brandt's head.  Two or three suitcases were also on the floor, their contents strewn about the

28   room.  Because the Amador County Sheriff's Department did not have its own forensics lab,

6

1    officers called a crime scene team from the California Department of Justice to process the cabin.

2    The next day, Bobby Brandt returned to the cabin to identify what, if anything, was missing from

3    his parents' home.  He determined that several items had been taken, including vials of gold, $100

4    bills given to his mother by his father, his mother's suitcase containing silver dollars, and her

5    necklace with the gold nuggets.  He also recognized petitioner's denim jacket hanging on the

6    back of a kitchen chair.

7            Sometime around the end of May 1985, petitioner and Warsing settled in Belle Fourche,

8    South Dakota.  Under the name Dixon, they rented an apartment and got jobs, petitioner skidding

9    logs and Warsing waiting tables in a café.  Shortly after arriving, petitioner cut his hair, and grew

10   a goatee.  He had Warsing buy him long-sleeved shirts to cover his tattoos.

11           On July 6, 1985, at about 2:30 a.m., Belle Fourche police received a call regarding a

12   disturbance at petitioner's apartment.  Warsing left with one of the officers to go to the police

13   station.  Following her departure, petitioner was arrested for assault and taken to the police station

14   four blocks away.  Because the station had only one interview room, Officer Jepsen remained in

15   the patrol car with petitioner while Warsing was inside giving a statement.  While sitting in the

16   car, petitioner asked the officer, "Do you want a big one?"  When Jepsen didn't reply, petitioner

17   said, "Have you heard of Jerry Frye?"  He told the officer he was wanted in California for a

18   double murder.

19           Officers received verification of California arrest warrants for petitioner and Warsing.

20   Petitioner, who appeared to be intoxicated and depressed, was advised of his <u>Miranda</u> rights and

21   agreed to give a videotaped statement.  Petitioner indicated he did not know if he killed the

22   Brandts or not, but Warsing had told him he did, and that he had had alcoholic blackouts in the

23   past.  Warsing was also arrested and taken into custody.  At the police station, she told the Belle

24   Fourche officers what she remembered about the night the Brandts were killed.  Belle Fourche

25   police contacted officers in Amador County, advising them that petitioner and Warsing were in

26   custody in a jail in nearby Deadwood, South Dakota.  On July 7, Amador County officers arrived

27   in Deadwood to interview them.  Petitioner was extradited to California.  On his return, he was

28   permitted to talk with Warsing by telephone through a glass partition in the jail's visiting room.

1      Warsing continued to cooperate with police.  Accompanied by Amador County

2  investigators, she retraced the route she and petitioner took on their cross-country flight from the

3  Brandts' cabin, pointing out certain items that had been discarded or left behind along the way.

4  With Warsing's assistance, investigators recovered the murder weapon thrown out of the car

5  window along Highway 49 in Amador County on the day of the murders.  Warsing later entered

6  into a written immunity agreement with the Amador County District Attorney.

7      B.  Defense Case at the Guilt Phase

8      The defense sought to cast doubt on Warsing's account of the Brandts' deaths.  Dr. John

9  Thornton, a professor of forensic science at the University of California, conducted an

10  examination of the physical evidence aspects of the prosecution's case, making a number of visits

11  to the Brandts' cabin following the murders.  He testified that, in his opinion, the Department of

12  Justice inadequately processed the crime scene.  He also offered his expert opinion as to the

13  sequence of events at the time the shootings took place in the Brandts' cabin, a scenario differing

14  from the one presented by Jennifer Warsing's testimony.

15      Dr. Peal, a psychiatrist who both evaluated and treated petitioner, testified he did not

16  believe Warsing's account of the Brandt murders.  His conclusion was based on what petitioner

17  told him of Warsing's personal history, corroborated by investigative reports.  Defense counsel

18  also presented testimony regarding petitioner's neurological impairments and their effect on his

19  ability to recapture or articulate memory.  Counsel originally intended to call petitioner to testify

20  on his own behalf.  As the trial progressed, however, counsel began to question that strategy, and

21  ultimately advised petitioner to refrain from taking the stand.  Petitioner followed the advice of

22  counsel and did not testify.

23      C.  Verdict at the Guilt Phase

24      On May 9, 1988, the jury rendered its verdict, finding petitioner guilty of two counts of

25  first degree murder, first degree robbery, residential burglary, and the unlawful driving and taking

26  of a vehicle.  The jury also found true the allegations that petitioner was armed with a firearm and

27  personally used a firearm during the commission of the offenses.  Finally, the jury found true the

28  ////

8

1   special circumstance allegations: that petitioner committed multiple murders and that he

2   committed them while engaged in robbery and burglary.

3   II.  Competency Trial

4          After the jury's verdict of guilty, the defense questioned petitioner's competence.  The

5   trial judge decided there was sufficient question of petitioner's competence and ordered a

6   competency hearing before a new jury.  A new attorney, John Philipsborn, was appointed to

7   "represent" petitioner by arguing he was not competent.  Philipsborn put on petitioner's trial

8   attorneys, Judd Iversen and Richard Hawk.  Both testified that petitioner was unable to assist

9   them, particularly after the guilt phase verdict.  Dr. Peal testified that petitioner suffered brain

10  damage, and that petitioner's mental problems became more acute as the penalty phase

11  approached.  Dr. Peal concluded that petitioner was not competent at that time.  Dr. Peal also

12  testified that, despite his guilt phase testimony that he was hired to examine petitioner for the

13  possibility of a challenge to his competency, he was only hired to evaluate and treat petitioner.

14  He also testified that there was no basis for a competency proceeding during the guilt phase

15  because "we had not completed an evaluation."

16         The state put on psychiatrist Patricia White, psychologist Grant Hutchinson and a deputy

17  from the jail to testify to petitioner's "normal" behavior.  The jury found petitioner competent.

18  Petitioner's attorneys later moved the judge to make an independent finding that petitioner was

19  not competent.  After holding a brief evidentiary hearing at which attorney James Thomson, who

20  had interviewed petitioner several times, testified, the judge also found petitioner competent.

21  III.  Penalty Phase

22         On August 3, 1988, the penalty phase commenced; the defense presented its case first.

23  Despite his attorneys' misgivings, petitioner insisted upon speaking to the jury.  The judge

24  permitted counsel to question petitioner without providing the prosecution an opportunity to

25  cross-examine him.  Petitioner's attorney Judd Iversen led him through the allocution with

26  questioning.  Iversen's questions to petitioner made clear that petitioner wanted to speak to the

27  jury because he had problems with the guilty verdict, that petitioner was afraid what he was going

28  to say might make the jurors angry, and that petitioner did not want the jurors to be angry at him.

1    Petitioner then gave a rambling statement stating his disbelief at being found guilty and deriding

2    the jury for taking so little time to arrive at a guilt phase verdict.

3          The defense presented a number of lay witnesses but no expert witnesses.  Most were

4    family members who testified briefly that petitioner had some redeeming qualities (a protective

5    big brother, a good artist) and that they loved him.  A couple of witnesses testified about

6    petitioner's background growing up in Indiana, including the changes he went through at age 15

7    following his mother's departure from Indiana with his three younger siblings and the serious car

8    accident he suffered shortly thereafter.  Each asked the jury to spare his life.  In addition, the

9    defense presented a stipulation that jailers in Amador County and Florida (where petitioner served

10   time on a sexual assault conviction) would testify that petitioner did not present a problem when

11   incarcerated.  Finally, a jail chaplain from South Dakota testified that he spent three hours with

12   petitioner in the Deadwood jail and petitioner "accepted God that night" and is now a changed

13   man.

14         The prosecution put on no witnesses.  The prosecutor made a statement describing the

15   aggravating nature of the crime.  In addition, the parties stipulated to petitioner's prior sexual

16   assault conviction in Florida.

17         On August 8, 1988, the jury rendered its verdict: death.

18                     POST-TRIAL PROCEDURAL HISTORY

19         Ten years later, the California Supreme Court affirmed petitioner's conviction and

20   sentence.  People v. Frye, 18 Cal. 4th 894 (1998), cert. denied, 526 U.S. 1023 (1999).

21   Petitioner's first state habeas petition was denied on October 14, 1998.  In re Frye, No. S062455.

22   He filed a second state habeas petition in June 2000.  The California Supreme Court denied it on

23   January 24, 2001.  In re Frye, No. S087755.  The California Supreme Court denied both state

24   habeas petitions summarily on the merits.

25         Petitioner initiated this habeas action in federal court by filing a request for appointment

26   of counsel on March 29, 1999.  After the denial of his second state habeas petition, he filed a

27   second amended petition here on March 31, 2003.  (ECF No. 104.)  Respondent filed an answer

28   on July 1, 2003.  (ECF No. 112.)  On July 19, 2004, petitioner filed a motion for evidentiary

hearing.  (ECF No. 162.)  The court granted the motion in part.  (ECF Nos. 214, 227.)  In 2008, the court heard testimony regarding petitioner's claims 42 and 44.  The parties then briefed the merits of those claims.  (ECF Nos. 421, 437, 446.)  Over the next two years, the parties conducted some of the testimony depositions on the remaining evidentiary hearing claims.  Also during that time, after completion of complex discovery, petitioner filed a motion for an evidentiary hearing on claim 37.  (ECF No. 549.)

In November 2010, the court scheduled the in-court portion of the evidentiary hearing.  (ECF No. 546.)  Before that hearing began, however, the United States Supreme Court issued its decision in Cullen v. Pinholster, 131 S. Ct. 1388 (2011).  This court vacated the scheduled evidentiary hearing and ordered briefing to address:  (1) whether this court may consider evidence introduced for the first time in this federal proceeding when reviewing a state court decision under 28 U.S.C. § 2254(d); (2) whether the California Supreme Court's decision meets the standards of 28 U.S.C. § 2254(d) for the claims on which petitioner was granted an evidentiary hearing and for claim 37; and (3) whether this court previously found petitioner satisfied the requirements of section 2254(d) for each claim on which the court granted an evidentiary hearing.  (ECF No. 584.)  In these findings and recommendations, the undersigned addresses each of those questions.

APPLICATION OF 28 U.S.C. § 2254(d)

I. <u>Legal Standards</u>

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is available under section 2254 only on the basis of some transgression of federal law binding on the state courts.  <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1994); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the

claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard

when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death

Penalty Act (the "AEDPA").  To meet the standard, a petitioner must establish that the state

court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1)

or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman,

551 U.S. 930, 953 (2007) (When section 2254(d) is satisfied, "[a] federal court must then resolve

the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724,

737 (9th Cir. 2008).

        In 2011, the Supreme Court clarified the section 2254(d) standards.  First, the Court made

clear that, when making the determination that a state court decision was contrary to law or

unreasonable, a federal court may not consider evidence which was not before the state court.

Cullen v. Pinholster, 131 S. Ct. 1388, 1398-1401 (2011).  Second, the Court stressed the

deferential nature of the section 2254(d) standards.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).  Thus, federal habeas relief is precluded if

"'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786

(quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  This objective standard of

reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v.

Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012), cert. denied, 133 S. Ct. 1262 (2013).  The

federal court must engage in the deferential review even where the state court has not provided a

reasoned decision.  Richter, 131 S. Ct. at 784-785.

1    In the present case, some of petitioner's claims discussed herein were raised, and rejected,

2    in the California Supreme Court's reasoned decision on direct appeal.  However, most were

3    raised in his state habeas petitions, which were summarily denied.  A summary denial is

4    presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948,

5    957 & n. 3 (9th Cir. 2012) (The presumption that the denial is based on the merits, rather than on

6    procedural grounds, may be overcome if it is not "plausible."), cert. denied, 133 S. Ct. 1465

7    (2013).[4]  While the federal court cannot analyze just what the state court did when it issued a

8    summary denial, the federal court must review the state court record to determine whether there

9    was any "reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.  The

10   federal court "must determine what arguments or theories ... could have supported, the state

11   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

12   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

13   Court."  Id. at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable

14   basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir.) (quoting

15   Richter, 131 S. Ct. at 784), cert. denied, 134 S. Ct. 514 ( 2013).[5]

16   _____

17   [4]  In a supplemental brief, petitioner argues the California Supreme Court's summary denial of his
     claims was a procedural, not a merits, ruling.  (ECF No. 631.)  However, the portion of the
18   Supreme Court case petitioner cites in his supplemental brief to support this argument is taken out
     of context.  (Id. at 2.)  In fact, the quoted language from Johnson v. Williams, 133 S. Ct. 1088,
19   1097 (2013) cited by petitioner was used by the Supreme Court to show that the presumption that
     a silent denial is on the merits may be rebutted if it can be shown a state court must have rejected
20   the claim as the result of inadvertence.  The Court in Johnson held that the state court's explicit
     consideration of the state law aspect of a claim without comment on the federal law aspect of that
21   claim did not necessarily lead to the conclusion that the state court had failed to consider the
     federal claim on the merits.  The Court relied in large part on its prior decision in Richter.
22

23   [5]  Throughout his briefing, petitioner looks to respondent's arguments before the California
     Supreme Court to determine the bases for the state court's summary denial of his habeas claims.
24   However, petitioner fails to establish that  this court must assume the state court's denial was
     based on arguments raised by respondent.  Both the language of  Richter and the Supreme Court's
25   section 2254(d) analysis in that case lead this court to conclude that it must consider any potential
     support for the state court's denial of each claim.  The Court in Richter stated that petitioner has
26   the burden of showing there was "no reasonable basis" for the state court to deny relief.  131 S.
     Ct. at 784.  In its analysis of the petitioner's ineffective assistance of counsel claims, the Court
27   considered all "arguable" support for the state court's denial.  Id. at 788-792.  Not once does the
     Court mention that it must determine what the state court in fact relied upon and not once does it
28

1    When reviewing the California Supreme Court's summary denial of a petition, this court

2    must consider that

> the California Supreme Court's summary denial of a habeas petition
> on the merits reflects that court's determination that 'the claims
> made in th[e] petition do not state a prima facie case entitling the
> petitioner to relief.' It appears that the court generally assumes the
> allegations in the petition to be true, but does not accept wholly
> conclusory allegations, and will also "review the record of the trial
> ... to assess the merits of the petitioner's claims."

7    Pinholster, 131 S. Ct. at 402 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing

8    People v. Duvall, 9 Cal. 4th 464, 474 (1995)).  Accordingly, if this court finds petitioner has

9    unarguably presented a prima facie case for relief on a claim, the state court's summary rejection

10   of that claim would be unreasonable.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004);

11   Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

12   Under subsection (d)(1), a state court decision is "contrary to ... clearly established

13   Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result

14   different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent,

15   538 U.S. 634, 640 (2003).  A state court decision is an "unreasonable application" of clearly

16   established federal law if "the state court correctly identifies the governing legal principle ... but

17   unreasonably applies it to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694

18   (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  "Clearly established Federal

19   law" is found in the United States Supreme Court's "applicable holdings."  Carey v. Musladin,

20   549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's]

21   decisions' at the time the state court decides the matter."  Cannedy v. Adams, 706 F.3d 1148,

22   1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on

23   other grounds, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001 (2014).  "'[C]ircuit

24   court precedent may be persuasive in determining what law is clearly established and whether a

25   refer to the arguments made by the state in state court to frame its determination of the possible
     bases for denial of the claims.  That said, this court does take into consideration what it in fact
26   knows the California Supreme Court did.  This court knows the California Supreme Court denied
     the petition for petitioner's failure to state a prima facie basis for any of his claims.  This court
27   also knows that the California Supreme Court did so by determining that petitioner's non-
     conclusory allegations would not, if proved, establish a right to relief.
28

1   state court applied that law unreasonably.'" Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

2   (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

3   not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

4   specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S.

5   Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)(per curiam)).

6   Nor may it be used to "determine whether a particular rule of law is so widely accepted among

7   the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."

8   Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said

9   that there is "clearly established Federal law" governing that issue.  Carey, 549 U.S. at 77.

10       There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler, 693 F.3d at 1146.

11  He may show the state court's findings of fact "were not supported by substantial evidence in the

12  state court record" or he may "challenge the fact-finding process itself on the ground it was

13  deficient in some material way."  Id. (citing Taylor, 366 F.3d at 999-1001); see also Hurles v.

14  Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an

15  opportunity for the petitioner to present evidence, the fact-finding process is deficient and the

16  state court opinion is not entitled to deference.)  The standard for determining whether the state

17  court's factfinding process is insufficient requires the federal court to "be satisfied that any

18  appellate court to whom the defect [in the state court's fact-finding process] is pointed out would

19  be unreasonable in holding that the state court's fact-finding process was adequate."  Hibbler, 693

20  F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).  The state

21  court's failure to hold an evidentiary hearing does not automatically render its fact finding

22  process unreasonable.  Id. at 1147.  However, the Ninth Circuit explained in Hibbler that federal

23  standards for determining when an evidentiary hearing is mandatory are a useful guide to

24  determining the reasonableness of the state court's refusal to hold a hearing:

25          A state court's decision not to hold an evidentiary hearing does not
            render its fact-finding process unreasonable so long as the state
26          court could have reasonably concluded that the evidence already
            adduced was sufficient to resolve the factual question. See Earp,
27          431 F.3d at 1170 (noting that a state court is not required to hold an
            evidentiary hearing when it is possible to resolve the factual
28          question "based on 'documentary testimony and evidence in the

15

record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's factfinding procedures were reasonable; this is a fact-bound and case-specific inquiry.

Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166-67, 1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474. More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. " '[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.' " Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998)).

While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). . . . Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the

16

applicant's factual allegations or otherwise precludes habeas relief."
Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see
also Lambert, 393 F.3d at 965-66 (holding that an evidentiary
hearing is not a prerequisite to an adjudication on the merits
triggering AEDPA deference). The ultimate question, however, is
whether an appellate court would be unreasonable in holding that
an evidentiary hearing was not necessary in light of the state court
record. Taylor, 366 F.3d at 1000.

693 F.3d at 1147-48.

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court may

review the merits of the claim de novo.  See Frantz, 533 F.3d at 737.  For the claims upon which

petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2)

by showing that he has not "failed to develop the factual basis of [the] claim in State court

proceedings" and by meeting the federal case law standards for the presentation of evidence in a

federal habeas proceeding.  See Pinholster, 131 S. Ct. at 1401.  As stated above, this court has

previously held that petitioner met those standards for all claims addressed herein, except claim

37, which is the subject of a pending motion for an evidentiary hearing.

For the reasons set forth below, this court finds that four of petitioner's claims survive

section 2254(d) review.

II.  Petitioner's Challenges to the Application of Section 2254(d)

A.  Supremacy Clause

Petitioner argues that a California rule requires a petitioner to make a higher showing in

his pleadings than required by federal law, which frustrates the enforcement of federal law and

violates the Supremacy Clause.  Petitioner relies primarily on Supreme Court statements in a

1950 case that a "federal right cannot be defeated by the forms of local practice."  Brown v.

Western Ry. of Alabama, 338 U.S. 294, 296 (1949).  In Brown, the Court examined a Georgia

law that required a state court considering a demurrer to construe the complaint's allegations

"most strongly against the pleader."  Id. at 295.  The Supreme Court held that it would not defer

to this state court practice when considering whether the complainant had made a prima facie

showing of the violation of a federal law.  "[W]e cannot accept as final a state court's

interpretation of allegations in a complaint asserting it."  Id. at 296.  Petitioner also relies on more

17

1   recent cases in which the Supreme Court ruled that state procedures which are inconsistent with

2   the goals of the federal law basis for the claim are preempted by federal law.  See Felder v.

3   Casey, 487 U.S. 131, 138 (1988) (state notice-of-claim provision conflicts with objectives of

4   section 1983; court recognizes risk that enforcement of the provision would produce different

5   outcomes in section 1983 claims depending on whether they were asserted in state or federal

6   court).

7       Petitioner contends that in a California habeas proceeding, California law recognizes a

8   presumption that the state court conviction is accurate.  He relies upon statements by the

9   California Supreme Court that "[f]or purposes of collateral attack, all presumptions favor the

10  truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the

11  burden of overturning them."  People v. Duvall, 9 Cal. 4th 464, 474 (1995) (quoting People v.

12  Gonzalez, 51 Cal. 3d 1179, 1260 (1990)) (emphasis in original).  According to petitioner, the

13  state court's reliance upon this presumption creates a burden on petitioner's federal claims that

14  runs afoul of the Supreme Court's concerns in Brown.

15      For several reasons, petitioner's Supremacy Clause argument is without merit.  First,

16  petitioner's argument ignores well-established precepts about the nature of collateral review.  His

17  argument that state law burdens his federal claims ignores the fact that, had he raised those claims

18  in a federal collateral proceeding, they would have been subject to a similar bias in favor of

19  preserving the finality of the judgment.[6]  In United States v. Frady, 456 U.S. 152 (1982), the

20  Court considered whether the "plain error" standard applicable on direct appeal to excuse a

21  procedural default should be applied to a claim for relief under 28 U.S.C. § 2255.  In recognizing

22  "the existence of a final judgment perfected by appeal," the Court held that once a defendant's

23  direct review proceedings have concluded, "we are entitled to presume he stands fairly and finally

24  convicted."  456 U.S. at 164.  The Court in Frady "reaffirm[ed] the well-settled principle that to

25  obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on

26

27  _____

    [6] Just as in state court, a petitioner challenging a federal court criminal conviction with a claim
    that requires the development of facts outside the trial record must bring that claim in a habeas
28  petition.  See United States v. Houtchens, 926 F.2d 824, 828 (9th Cir. 1991).

                                          18

1   direct appeal." 456 U.S. at 166.  See also Barefoot v. Estelle, 463 U.S. 880, 887-888 (1983)

2   ("When the process of direct review—which, if a federal question is involved, includes the right

3   to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and

4   legality attaches to the conviction and sentence."); United States v. Johnson, 988 F.2d 941, 945

5   (9th Cir. 1993).

6        The Supreme Court further recognized "the distinction between direct and collateral

7   review," in Brecht v. Abrahamson, 507 U.S. 619 (1993).  In Brecht, the Court discussed the

8   "extraordinary remedy" of habeas corpus and concluded that the beyond-a-reasonable-doubt

9   harmless error standard used on direct review should not be used when determining the impact of

10  a constitutional error raised in a habeas proceeding.  507 U.S. at 633-639.  While Brecht involved

11  claims raised under 28 U.S.C. § 2254, the Brecht harmless error standard has been applied to

12  claims raised under section 2255 as well.  See United States v. Montalvo, 331 F.3d 1052, 1058

13  (9th Cir. 2003); Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003).  The Court's

14  motivations in Brecht involve "'considerations underlying our habeas jurisprudence' that apply

15  equally to collateral attacks on both federal and state convictions – considerations such as the

16  different purposes of direct and collateral review and the importance of finality in criminal

17  convictions."  Montalvo, 331 F.3d at 1058 (quoting Brecht, 507 U.S. at 633).

18       Because federal law similarly looks to habeas corpus as a challenge to a presumptively

19  final and correct judgment, it cannot be said that the California Supreme Court's possible

20  application of a presumption, as stated in Duvall, amounted to a state-created impingement on a

21  federal right.[7]

22       Petitioner's claims are further unsupported by the authority he cites.  In Brown, the Court

23  held it would not defer to state court rules in construing the pleadings.  This court is not being

24  asked to construe petitioner's claims under any state law standard.  Rather, this court looks to

25  federal, not state law, to determine whether petitioner has established a prima facie case for relief.

26  _____

27  [7] Of course, petitioner's argument assumes the California Supreme Court applied such a
    presumption.  Because the court's decision is summary, it is not possible to know to what extent it
28  did so, if at all.

1    If he has, this court looks again to only federal law to determine whether there were any

2    reasonable bases for the California Supreme Court's denial of petitioner's claims.  The concerns

3    raised in <u>Brown</u> are inapplicable here.

4           B.   <u>Article III</u>

5           Petitioner also argues that if the AEDPA requires deference to "novel state court rules for

6    applying the Constitution," then it violates Article III of the United States Constitution by

7    encroaching upon the federal courts' role as the final arbiters of federal law.  (ECF No. 612 at 26-

8    27.)  This argument relies upon the same false distinction between state and federal review

9    discussed above, and thus also fails for the reasons discussed above.

10          C.   <u>Suspension Clause</u>

11          Petitioner's Suspension Clause argument rests on the same incorrect underpinning.

12   Moreover, as respondent points out, a law acts to suspend the writ of habeas corpus in violation of

13   the Constitution only where it explicitly bars habeas review.  <u>Denmore v. Kim</u>, 538 U.S. 510, 517

14   (2003).  In fact, the Ninth Circuit Court of Appeals has considered, and rejected, the argument

15   petitioner makes here.  In <u>Crater v. Galaza</u>, 491 F.3d 1119 (9th Cir. 2007), the court considered

16   whether the deference due a state court under 28 U.S.C. § 2254(d)(1) constituted a suspension of

17   the writ.  The court held it did not.  First, a suspension of the writ of habeas corpus occurs only

18   when Congress "clearly and unambiguously" removes all federal habeas corpus jurisdiction.  491

19   F.3d at 1124 n. 5.  The AEDPA does not repeal federal habeas jurisdiction.  The court in <u>Crater</u>

20   also rejected an argument that section 2254(d)(1) "effectively suspends the writ."  <u>Id.</u> at 1124-25.

21   The court pointed out that altering the standards for granting habeas relief is not the same thing as

22   suspending the privilege of the writ.  <u>Id.</u> at 1125-26 (citing <u>Felker v. Turpin</u>, 518 U.S. 651

23   (1996)).  It is worth noting that petitioner never mentions <u>Denmore</u>, <u>Felker</u>, or <u>Crater</u> in his

24   briefing.  Instead, petitioner relies exclusively on <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008) in

25   which the Court struck down a statute denying some aliens access to the habeas remedy.

26   Petitioner has made no comprehensible argument that the AEDPA suspends the writ of habeas

27   corpus.

28   ////

1

     D. Liberty Interest

2

         Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would

3

entitle him to relief," then the court will issue an order to show cause requiring a response from

4

the state. Duvall, 9 Cal. 4th at 475.  Issuance of an order to show cause triggers rights to conduct

5

fact-finding in support of claims in the petition.  Id. at 475-77.  Petitioner creatively asserts that

6

this rule creates a liberty interest in the state habeas procedures.  That assertion cannot form the

7

basis of a due process argument.  "[A]n expectation of receiving process is not, without more, a

8

liberty interest protected by the Due Process Clause."  Olim v. Wakinekona, 461 U.S. 238, 250 n.

9

12 (1983); Elliott v. Martinez, 675 F.3d 1241, 1245-46 (10th Cir. 2012).

10

     E. Claim 39/Fairmindedness of California Supreme Court

11

         Petitioner argues the court should consider here the allegations made in his claim 39 that

12

political and economic pressures cause the California Supreme Court to be arbitrary and biased in

13

its review of capital cases.  (Pet., ECF No. 103 at 282.)  He attaches a 22-page, single-spaced

14

argument challenging the "fairmindedness" of the California Supreme Court.  This argument

15

appears to go well beyond the contours of claim 39 set out in the petition.  (ECF No. 104 at 282-

16

302.)  From the outset, however, petitioner's argument suffers a basic problem – the premise from

17

which petitioner launches his fairmindedness challenge is unsupported.  Petitioner claims "[t]he

18

fairmindedness of the state court is a precondition to AEDPA deference."  (ECF No. 612-7 at 1.)

19

He cites two cases for this premise, Harrington v. Richter, 131 S. Ct. 770 (2011) and Bobby v.

20

Dixon, 132 S. Ct. 26 (2011) (per curiam).  Neither supports petitioner's suggestion that this court

21

may take evidence regarding the state court's alleged bias against death penalty cases.

22

         In Richter, the Court described the standard for determining whether a state court's

23

decision was reasonable under 28 U.S.C. § 2254(d).  One iteration of that standard is cited by

24

petitioner in support of this argument – "A state court's determination that a claim lacks merit

25

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

26

the state court's decision." 131 S. Ct. at 786.  From this statement describing federal court review

27

of a state court decision, petitioner derives the conclusion that "[t]he fairmindedness of the state

28

court is a precondition to AEDPA deference."  (ECF No. 612-7 at 1.)  Nothing about this standard

1   of federal court review gives this court license to examine possible bias by the state court based

2   on economic and political pressures.  The Court in <u>Bobby</u> simply cites the "fairminded jurists"

3   standard from <u>Richter</u> when considering the reasonableness of the Ohio Supreme Court's

4   determination that the defendant's <u>Miranda</u> rights had not been violated.  In neither <u>Richter</u> nor

5   <u>Bobby</u> did the Court examine the state court's process for bias.

6        Petitioner's argument appears to derive from the California Supreme Court lack of

7   explanation for its habeas decision.  However, this court is required to defer to that unexplained

8   decision just as it would an explained one.  The Supreme Court's opinion in <u>Richter</u> makes very

9   clear that deference is due the state court's decision regardless of whether or not the state court

10   provided reasons for its merits ruling.  131 S. Ct. at 784-85.  The Court also rejected any

11   recognition of the "theoretical possibility that members of the California Supreme Court may not

12   have agreed on the reasons for denying the petition." <u>Id.</u> at 785.  The Court noted that it had

13   previously recognized the possibility that a single rationale for a state court decision may be not

14   only "undiscoverable" but "nonexistent." <u>Id.</u> (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803

15   (1991)).  The fact that a single rationale may be nonexistent did not mean the state court decision

16   was therefore invalid or otherwise not subject to deference under section 2254(d).  <u>See id.</u>  The

17   Court specifically refused to engage in speculation about the state court's decision-making

18   process.

19        Further, to the extent petitioner relies upon the statement in <u>Pinholster</u> that this court must

20   consider what the state court "knew and did," as set out in <u>Richter</u>, that inquiry requires this court

21   to consider what evidence was before the state court and look at the state court's rules for

22   considering claims.  Nothing requires this court to speculate about or investigate the state court's

23   internal processes.  In fact, <u>Richter</u> makes clear that this court must consider any possible bases

24   for the state court's merits determination.  131 S. Ct. at 786 (federal court must examine what

25   "arguments or theories ... could have supported the state court's decision").  A petitioner satisfies

26   section 2254(d) by showing there is "no reasonable basis" for the state court's decision.

27   <u>Pinholster</u>, 131 S. Ct. at 1402 (quoting <u>Richter</u>, 131 S. Ct. at 784).

28   ////

1        F.  Miscellaneous Other Arguments

2            Petitioner also argues that the California Supreme Court regularly adjudicates ineffective

3    assistance of counsel claims contrary to the dictates of Strickland v. Washington, 466 U.S. 668

4    (1984).  Unlike the other arguments in this portion of his brief, this argument does not challenge

5    the applicability of section 2254(d).  Rather, it is part of petitioner's challenge to the California

6    Supreme Court's denial of his ineffective assistance of counsel claims.  The argument is

7    addressed below in the discussions of petitioner's ineffective assistance of counsel claims.

8        G.  Request for Discovery & Evidentiary Hearing re Section 2254(d) Challenges

9            Here and there in his arguments regarding the application of section 2254(d) generally,

10   petitioner mentions that discovery and an evidentiary hearing are necessary.  Petitioner argues

11   this fact-finding is required if "the state disputes Mr. Frye's evidence regarding the state court

12   processes."  (ECF No. 612 at 3.)  Petitioner provides very few descriptions of what that fact-

13   finding might be and almost no legal justification for it.  The few requests this court ferreted out

14   include a request for a subpoena of internal staff memoranda from the California Supreme Court

15   (ECF No. 629 at 9-10), and a barely comprehensible request to present expert testimony

16   "regarding the consequences for the legitimacy and hence the efficacy of the federal courts were

17   they to declare that process, as applied in Mr. Frye's case, was so reasonable as to be worthy of

18   deference that forestalls de novo review" (ECF No. 629 at 10).  In addition, petitioner seeks to

19   develop evidence on claim 39, a claim for which he did not seek an evidentiary hearing.

20   Petitioner's requests for discovery and an evidentiary hearing are denied because they are not

21   specific, not legally justified, and/or not reasonable.

22   III.  Did this Court Previously Find Section 2254(d)(2) Satisfied?

23           In his April 21, 2011 brief, petitioner argued that this court determined previously that he

24   had satisfied section 2254(d)(2) for the claims for which he was granted an evidentiary hearing.

25   (ECF No. 581 at 9-10.)  However, as described above, the standards of "reasonableness" have

26   changed since the court issued its evidentiary hearing order in 2006.  In 2006, the assigned

27   magistrate judge held that a state court decision runs afoul of section 2254(d)(2) where petitioner

28   pleads facts which, if true, would entitle him to relief and establishes the existence of one of the

23

1   remaining evidentiary hearing factors set out in <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963).

2   (ECF No. 214 at 15-16.)  However, nowhere in the assigned magistrate judge's analysis is there a

3   determination that the state court's decision was unreasonable under the standards described in

4   <u>Richter</u>.  Further, after 2006, the mechanisms for review under section 2254(d)(2) changed as

5   well.  Contrary to <u>Pinholster</u>'s limitation on the consideration of evidence that was not before the

6   state court, the magistrate judge considered the validity of petitioner's claims based on evidence

7   presented for the first time in federal court.  (ECF No. 214.)  Based on the substantial changes in

8   the law wrought by <u>Richter</u> and <u>Pinholster</u>, which were unavailable to the magistrate judge in

9   2006, the undersigned does not consider the prior magistrate judge's decision to constitute a

10  determination that would satisfy current standards of analysis under section 2254(d).

11  IV.  <u>Application of 28 U.S.C. § 2254(d) to Petitioner's Evidentiary Hearing Claims and Claim 37</u>

12         The court granted petitioner's motion for an evidentiary hearing on the following seven

13  claims:

14              1.  Claim 2, Ineffective Assistance for Failure to Investigate and Present a Mental

15                  State Defense.  (ECF No. 214 at 33-36.)

16         The court denied a hearing on claims 4 and 5, which involve the relationship of

17  petitioner's trial attorney Richard Hawk with petitioner and with his other appointed attorneys.

18  (<u>Id.</u> at 22-24.)  However, the court found the evidence supporting claims 4 and 5 relevant to claim

19  2 and therefore would be admissible during the evidentiary hearing.  (<u>Id.</u> at 22-24, 36, 52 & n.

20  23.)

21              2.  Claim 3, Various Instances of Ineffective Assistance at the Guilt Phase.  (ECF

22                  No. 214 at 24-26.)

23         Specifically, these allegations are: (a) that petitioner's trial attorneys' approaches

24  conflicted, (b) that attorney Iversen made promises to the jury in the opening statement that he did

25  not keep, (c) that the trial attorneys' took conflicting positions in front of the jury, (d) that

26  attorney Hawk denigrated the prosecutor, and (e) that Hawk's other offensive behavior prejudiced

27  petitioner.

28  ////

3.   The allegations in Claim 7 that trial counsel was ineffective for failing to object to the prosecutor's vouching for witness Warsing's credibility. (ECF No. 214 at 26-28.)

4.   Claim 25, Jailers Interfered with Petitioner's Right to Counsel. (ECF No. 214 at 43-44.)

5.   Claims 28 and 29, Ineffective Assistance at the Penalty Phase for Failure to Investigate and Present Mitigating Evidence. (ECF No. 214 at 40-43.)

Specifically, these claims involve the failure to present mental health evidence, childhood evidence, and evidence of drug and alcohol use.

6.   The allegation in claim 42 that Juror Fairfield communicated with her minister. (ECF No. 214 at 45-48.)

7.   Claim 44, Shackling. (ECF No. 214 at 49-50.)

The parties were also ordered to brief the application of section 2254(d) to claim 37, which is the subject of petitioner's pending motion to expand the record or for an evidentiary hearing. (ECF No. 549.) Claim 37 alleges that California law fails to narrow the class of persons eligible for the death penalty as required by the Eighth Amendment.

A.   Sixth Amendment Claims[8]

1.   Legal Standards

"The Sixth Amendment right to counsel in a criminal trial includes 'the right to the effective assistance of counsel.'"  Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005)

---

[8] Petitioner argues this court must look to his ineffective assistance of counsel claims as one claim, as they were plead in state court, rather than as the individual claims asserted in the federal petition. This argument is somewhat curious because petitioner chose to plead his claims individually in the federal petition. In any event, to the extent petitioner has argued deficient performance herein and has referenced counsel's conduct which is the subject of other claims, this court has considered counsel's conduct in that context. To the extent petitioner argues prejudice, he will have the opportunity to argue the cumulative effect of prejudice when he briefs the remaining claims. It is worth noting that to consider prejudice, this court necessarily must consider how each unreasonable act of counsel affected the verdict, and then evaluate the cumulative effect of all errors. As the Supreme Court has noted with respect to the analysis of cumulative prejudice for prosecutorial misconduct claims, "there is no other way" to conduct that inquiry.  Kyles v. Whitley, 514 U.S. 419, 436 n. 10 (1995).

1   (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970)).  "This right extends to 'all

2   critical stages of the criminal process,' including capital sentencing."  Id. (citations omitted).  The

3   Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well

4   established.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show

5   that his trial counsel's performance "fell below an objective standard of reasonableness" and that

6   "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

7   proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694

8   (1984).

9                  a.   Deficient Performance

10         Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

11   failed to meet an objective standard of reasonableness.  Strickland, 466 U.S. at 687.  There is "a

12   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

13   professional assistance."  Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland,

14   466 U.S. at 689.)  Petitioner must rebut this presumption by demonstrating that his counsel's

15   performance was unreasonable under prevailing professional norms and was not the product of

16   "sound trial strategy."  Strickland, 466 U.S. at 688-89.  Judicial scrutiny of counsel's performance

17   is "highly deferential," and thus the court must evaluate counsel's conduct from his perspective at

18   the time it occurred, without the benefit of hindsight.  Id. at 689.

19         The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

20   conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

21   simply reasonableness under prevailing professional norms.'"  Wiggins v. Smith, 539 U.S. 510,

22   521 (2003) (quoting Strickland, 466 U.S. at 688).  However, "general principles have emerged

23   regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective

24   standard of reasonableness' by which [a court must] assess attorney performance, particularly

25   with respect to the duty to investigate."  Summerlin, 427 F.3d at 629.  "[S]trategic choices made

26   after thorough investigation of law and facts relevant to plausible options are virtually

27   unchallengeable."  Strickland, 466 U.S. at 690.  However,

28   ////

26

> "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment."

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91); see also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"), cert. denied, 133 S. Ct. 1239 (2013); Reynoso v. Giurbino, 462 F.3d 1099, 1112-1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

With respect to counsel's role in presenting penalty phase mitigating evidence, "[t]he duty to investigate is critically important." Summerlin, 427 F.3d at 630. Counsel should attempt to discover "'all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Wiggins, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(c), p. 93 (1989)) (emphasis in original); see also Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."). Where "'indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365 F.3d 706, 719-720 (2004)); Summerlin, 427 F.3d at 632 (counsel ineffective for failing to obtain readily available mental health evidence when he had been told by defendant's prior attorney that defendant may be mentally ill); Stankewitz, 365 F.3d at 719-722 (counsel ineffective for failing to thoroughly investigate defendant's childhood, history of drug abuse, and mental health

1   problems notwithstanding the fact that he was on notice that such an investigation might yield

2   mitigating evidence); Mayfield v. Woodford, 270 F.3d 915, 927-28 (9th Cir. 2001) (counsel

3   ineffective for failing to consult appropriate medical experts or collect relevant records after "his

4   investigator's limited efforts revealed evidence of diabetes and substance abuse," and for failing

5   to explain to the jury the relevance of the evidence that was presented).  Of course, if counsel

6   conducts a reasonable investigation, and nothing put counsel on notice of the existence of certain

7   evidence, counsel cannot be faulted for failing to locate and present it.  Babbit v. Calderon, 151

8   F.3d 1170, 1174 (9th Cir. 1998).  In addition, "a lawyer may make reasonable decisions that

9   render particular investigations unnecessary."  Id.

10          Mitigating evidence counsel should consider includes "medical history, educational

11  history, employment and training history, family and social history, prior adult and juvenile

12  correctional experience, and religious and cultural influences."  Wiggins, 539 U.S. at 524 (citing

13  ABA Guidelines 11.8.6, p. 133 (1988)) (emphasis omitted).  Counsel has a "'duty to investigate

14  and present mitigating evidence of [any] mental impairment.'"  Summerlin, 427 F.3d at 630

15  (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, in preparation for

16  the penalty phase, "counsel has an affirmative duty to provide mental health experts with

17  information needed to develop an accurate profile of the defendant's mental health."  Caro v.

18  Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002).  "The defendant's history of drug and alcohol

19  abuse should also be investigated."  Summerlin, 427 F.3d at 630 (citing Jennings, 290 F.3d at

20  1016-17).  In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation

21  to present and explain to the jury all available mitigating evidence."  Hamilton v. Ayers, 583 F.3d

22  1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)); see also

23  Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing Hamilton, 583 F.3d at 1113).

24          When determining whether the state court's application of the Strickland standard was

25  reasonable, the federal court must be "doubly" deferential.  Richter, 131 S. Ct. at 788.  The

26  "standard for judging counsel's representation is a most deferential one" and the reasonableness

27  standards of section 2254(d) are also "highly deferential."  Id.  Further, because the Strickland

28  rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case

28

1   determinations" and the "range of reasonable applications is substantial." Id. at 786; Premo v.

2   Moore, 131 S. Ct. 733, 740 (2011).  As the Court described in Richter, "[w]hen § 2254(d) applies,

3   the question is not whether counsel's actions were reasonable.  The question is whether there is

4   any reasonable argument that counsel satisfied Strickland's deferential standard." 131 S. Ct. at

5   788.

6               b.   Prejudice

7        The second part of the Strickland test requires a petitioner to show that counsel's conduct

8   prejudiced him. Strickland, 466  U.S. at 691-92.  Prejudice is found where "there is a reasonable

9   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

10   been different." Id. at 694.  A reasonable probability is one "'sufficient to undermine confidence

11   in the outcome.'" Summerlin, 427 F.3d at 640 (quoting Strickland, 466 U.S. at 693). "This does

12   not require a showing that counsel's actions 'more likely than not altered the outcome,' but the

13   difference between Strickland's prejudice standard and a more-probable-than-not standard is

14   slight and matters 'only in the rarest case.'" Richter, 131 S. Ct. at 792 (quoting Strickland, 466

15   U.S. at 693).  "The likelihood of a different result must be substantial, not just conceivable." Id.

16        However, "[i]n establishing prejudice under Strickland, it is not necessary for the habeas

17   petitioner to demonstrate that the newly presented mitigation evidence would necessarily

18   overcome the aggravating circumstances." Correll, 539 F.3d at 951-52 (citing Williams v.

19   Taylor, 529 U.S. 362, 398 (2000)); see also Rompilla v. Beard, 545 U.S. 374, 393 (2005)

20   ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still have

21   decided on the death penalty, that is not the test.").  Instead, in evaluating prejudice, the court

22   must "compare the evidence that actually was presented to the jury with the evidence that might

23   have been presented had counsel acted differently," Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir.

24   1995), and evaluate whether the difference between what was presented and what could have

25   been presented is sufficient to "undermine confidence in the outcome" of the proceeding,

26   Strickland, 466 U.S. at 694.  Prejudice is established if "there is a reasonable probability that at

27   least one juror would have struck a different balance" between life and death. Wiggins, 539 U.S.

28   at 537.

1    When examining the effect of counsel's failure to unearth and present mitigating evidence

2    at the penalty phase, the Supreme Court has stressed the relevance of evidence of a petitioner's

3    abusive childhood and mental health problems.  There is a "belief, long held by this society, that

4    defendants who commit criminal acts that are attributable to a disadvantaged background, or to

5    emotional and mental problems, may be less culpable than defendants who have no such excuse."

6    Boyde v. California, 494 U.S. 370, 382 (1990) (quotation and emphasis omitted).  The Ninth

7    Circuit recently described the Supreme Court's consideration of such evidence:

8
> In Wiggins, . . . a capital habeas petitioner's defense counsel failed
> to introduce social history mitigation evidence during the penalty
9
> phase, including evidence that "Wiggins experienced severe
> privation and abuse in the first six years of his life while in the
10
> custody of his alcoholic, absentee mother[, and that h]e suffered
> physical torment, sexual molestation, and repeated rape during his
11
> subsequent years in foster care." Wiggins, 539 U.S. at 535. The
> Court pointed out that this is the type of evidence that is "relevant
12
> to assessing a defendant's moral culpability," id., and held that the
> failure to introduce this evidence at the penalty phase was
13
> prejudicial: "[H]ad the jury been confronted with this considerable
> mitigating evidence, there is a reasonable probability that it would
14
> have returned with a different sentence." Id. at 536.

15   Stankewitz v. Wong, 698 F.3d at 1175.

16           2.   California Supreme Court's Application of the Strickland Standard Generally

17   Petitioner argues that the California Supreme Court applied the Strickland standard

18   inappropriately in a number of ways that affected its consideration of all of his Sixth Amendment

19   claims.  To satisfy 28 U.S.C. § 2254(d)(1), petitioner must establish that the California Supreme

20   Court's "decision ... was contrary to, or involved an unreasonable application of, clearly

21   established Federal law, as determined by the Supreme Court of the United States."  Petitioner's

22   argument falls within the first part of the subsection (d)(1) standard.  He argues the California

23   Supreme Court applied a rule "that contradicts the governing law set forth" in Supreme Court

24   cases.  Price v. Vincent, 538 U.S. 634, 640 (2003).

25           a.   Inappropriate Pleading Standard

26   Petitioner's first argument is that the California Supreme Court used a higher pleading

27   standard for his ineffective assistance of counsel claims than was permitted by the Supreme Court

28   in Strickland.  According to petitioner, the California Supreme Court recited a pleading standard

30

1    in People v. Duvall, 9 Cal. 4th 464, 474 (1995) that directly contravenes a dictate of Strickland

2    that ineffective assistance of counsel claims "be adjudged without a presumption that the trial was

3    fair." (ECF No. 516 at 85:21-22.)  In Strickland, the Court held that a Sixth Amendment

4    challenge to counsel's effectiveness is an "attack on the fundamental fairness of the proceeding

5    whose result is being challenged."  466 U.S. at 697.  Therefore, "[t]he principles governing

6    ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal

7    or in motions for a new trial."  Id.  The Court specifically mentioned the presumption of finality

8    of criminal judgments that is recognized in habeas in stating that "no special standards ought to

9    apply to ineffectiveness claims made in habeas proceedings."  Id. at 697-98.

10        Petitioner's argument that Strickland created a "clearly established rule" that collateral

11   ineffective assistance of counsel claims should be treated just like direct review ineffective

12   assistance of counsel claims is hard to reconcile with the fact that limitations which are unique to

13   collateral review may be applied to ineffective assistance of counsel claims brought in federal

14   collateral proceedings.  For example, the bar on applying new rules set out in Teague v. Lane, 489

15   U.S. 288 (1989), can be applied to ineffective assistance of counsel claims brought in federal

16   collateral proceedings.  See Chaidez v. United States, 133 S. Ct. 1103, 1107-08 (2013).[9]

17        Even assuming the California Supreme Court's presumption of correctness described in

18   Duvall runs afoul of the United States Supreme Court's statement in Strickland, and even

19   assuming, for the sake of argument, that the California Supreme Court must have applied that

20   presumption to petitioner's ineffective assistance of counsel claims, this court may only find

21   section 2254(d)(1) satisfied if the California Supreme Court's decision was "contrary to, or

22

23   [9] It should be noted that the Supreme Court held that most claims of ineffective assistance of
     counsel do not seek "new rules" and thus would not be barred by Teague because the Strickland
24   standard is a general one that "'provides sufficient guidance for resolving virtually all' claims of
     ineffective assistance."  Chaidez, 133 S. Ct. at 1107-08 (quoting Williams v. Taylor, 529 U.S.
25   362, 391 (2000)).  Significantly, however, the Supreme Court did not except Strickland claims
     from the Teague rule of collateral review because they deserved special consideration, as
26   petitioner argues.  Rather, the Court accepted that there may be some ineffective assistance of
     counsel claims that would fall outside the general scope of Strickland.  In other words, the Court
27   in Chaidez did not make the distinction between direct and collateral review of ineffective
     assistance of counsel claims that petitioner argues Strickland requires.
28

1    involved an unreasonable application of, clearly established Federal law, as determined by the

2    Supreme Court of the United States."  It is difficult to find the "rule" petitioner cites from

3    Strickland to be "clearly established" when he cites no post-Strickland Supreme Court or other

4    authority citing or applying that "rule."  To be "clearly established federal law" the rule must

5    have been "'squarely established by th[e] Court.'"  Richter, 131 S. Ct. at 786 (quoting Knowles v.

6    Mirzayance, 556 U.S. 111, 122 (2009)).  Petitioner's entire analysis hinges on just one statement

7    in an almost 30-year-old decision.  Further, while the California Supreme Court may have been

8    incorrect in its interpretation of the law, its decision only runs afoul of section 2254(d)(1) if it also

9    "was so lacking in justification that there was an error well understood and comprehended in

10   existing law beyond any possibility for fairminded disagreement."  Richter, 131 S. Ct. at 786-87.

11   See also Williams v. Taylor, 529 U.S. 362, 410 (2000) ("an unreasonable application of federal

12   law is different from an incorrect application of federal law") (emphasis in original).  Even

13   making all the assumptions regarding the existence of the rule in the state court and its application

14   in this case, this court cannot find the California Supreme Court's decision to be so lacking.

15               b.  Inappropriate Prejudice Standard

16          Petitioner next argues that the California Supreme Court applied an incorrect test for

17   determining prejudice by using the United States Supreme Court's decision in Lockhart v.

18   Fretwell, 506 U.S. 364 (1993), to modify the Strickland standard.  In Fretwell, the Court was

19   confronted with a unique situation.  There was no question that Mr. Fretwell's trial attorney acted

20   unreasonably in failing to object to an aggravating factor used to determine Fretwell's penalty.

21   506 U.S. at 369 n. 1.  The issue was whether that failure prejudiced the petitioner.  At the time of

22   trial, the answer to that question was "yes."  Id. at 367.  The Court of Appeals for the Eighth

23   Circuit had ruled the use of that aggravating factor unconstitutional.  Id.  However, later, after the

24   petitioner sought federal habeas relief, the Court of Appeals overruled its decision and held that

25   the use of that aggravating factor did not violate the federal constitution.  Id.  Therefore, if the

26   prejudice inquiry was considered as of the time the federal courts rendered their habeas decisions,

27   the answer would have been "no," the petitioner was not prejudiced by his attorney's failure to

28   object.  Recognizing that strict application of the Strickland standard would result in "an error in

1  [the petitioner's] favor," the Court looked beyond <u>Strickland</u>'s outcome determinative standard

2  and considered whether the failure to object rendered the defendant's trial "unreliable or the

3  proceeding fundamentally unfair."  506 U.S. at 372.  It held that the result of Fretwell's

4  sentencing proceeding "was neither unfair nor unreliable."  <u>Id.</u> at 371.  Accordingly, the Court

5  found Fretwell suffered no prejudice.

6       In April 2000, the United States Supreme Court held that a state court erred in finding that

7  the Court's decision in <u>Fretwell</u> modified the <u>Strickland</u> standards.  <u>Williams</u>, 529 U.S. at 391-98.

8  The Court recognized there may be limited situations in which "it would be unjust to characterize

9  the likelihood of a different outcome as legitimate 'prejudice.'"  <u>Id.</u> at 391-92.  The Court

10  characterized cases such as <u>Fretwell</u> as involving an unreasonable action of a trial attorney that

11  did "not deprive the defendant of any substantive or procedural right to which the law entitles

12  him."  <u>Id.</u> at 393 n. 17.  The Court concluded that the state court decision "was contrary to, or

13  involved an unreasonable application of, clearly established Federal law."  <u>Id.</u> at 399.

14       In its state court briefing in the present case, respondent urged the California Supreme

15  Court to apply the <u>Fretwell</u> standard to its analysis of prejudice under <u>Strickland</u>:  "To establish

16  prejudice, petitioner must show not only that the outcome would have been different but that the

17  'new' outcome would be more accurate than the one achieved at trial."  (Inf. Resp. to Pet., <u>In re

18  Frye</u>, No. S062455, at 9.[10])  Petitioner cites several California Supreme Court cases, decided both

19  before and shortly after the California Supreme Court decided petitioner's ineffective assistance

20  of counsel claims in 1998, in which that court applied the <u>Fretwell</u> standard to ineffective

21  assistance of counsel claims.  <u>See</u> <u>People v. Earp</u>, 20 Cal. 4th 826, 870 (1999) (citing <u>Fretwell</u> for

22  prejudice standard:  challenged conduct must have "some effect ... on the reliability of the trial

23  process"); <u>In re Avena</u>, 12 Cal. 4th 694, 722 & n. 5 (1996) (describing lack of clarity about use of

24  <u>Fretwell</u> standard; court found no prejudice under either <u>Strickland</u> or <u>Fretwell</u> prejudice

25  standards); <u>In re Harris</u>, 5 Cal. 4th 813, 833 (1993) ("[T]his second prong of the <u>Strickland</u> test is

26  not solely one of outcome determination.  Instead, the question is 'whether counsel's deficient

27  _____

28  [10]  The state court record, including the briefs submitted in the state appeal and the state habeas
proceedings, was lodged herein on April 27, 2001.  (<u>See</u> ECF No. 38.)

1   performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'")

2   (quoting <u>Fretwell</u>, 506 U.S. at 372); <u>In re Clark</u>, 5 Cal. 4th 750, 766 (1993) (To succeed on an

3   ineffective assistance of counsel claim, a petitioner must show that the attorney's "incompetence

4   ... resulted in a fundamentally unfair proceeding or an unreliable verdict.").[11]

5           Petitioner also points to cases in which the California Supreme Court simply cited

6   <u>Fretwell</u>.  This court does not find those cases particularly relevant evidence that the California

7   Supreme Court relied upon <u>Fretwell</u> in the present case.  In <u>People v. Coddington</u>, 23 Cal. 4th

8   529, 651-52 (2000), the court describes the two prongs of the test for ineffective assistance of

9   counsel using only the language from <u>Strickland</u> and citing to both <u>Fretwell</u> and <u>Strickland</u>.[12]

10  When finding a lack of prejudice, the court described it only in terms of the <u>Strickland</u> standard.

11  23 Cal. 4th at 653 ("it is not reasonably probable that a different verdict would have been

12  reached" absent counsel's errors).  The use of solely the <u>Strickland</u> standard is not surprising.

13  The California Supreme Court rendered its decision in <u>Coddington</u> after the United States

14  Supreme Court issued its opinion in <u>Williams</u>. [13]  In <u>People v. Cain</u>, 10 Cal. 4th 1, 42 n.17 (1995),

15  the court mentions <u>Fretwell</u> in a footnote.  While the court describes <u>Fretwell</u> as altering the

16  <u>Strickland</u> standard, it does so in the context of examining the defendant's unusual argument that

17  his attorney should have "refrain[ed] from frankness and honesty in his or her dealings with the

18  court." 10 Cal. 4th at 42 n.17.  As respondent in the present case correctly points out, the

19  California Supreme Court in <u>Cain</u> looked to <u>Fretwell</u> for its limited, and appropriate, use in the

20  ─────────────────────

21  [11]  While not mentioning <u>Fretwell</u>, the California Supreme Court in <u>In re Cudjo</u>, 20 Cal. 4th 673,
    687 (1999) also added a requirement that a petitioner also show "that as a result of counsel's

22  failures the trial was unreliable or fundamentally unfair."

23  [12]  Petitioner's description of <u>Coddington</u> as citing both cases for the prejudice standard is not
    correct.  (ECF No. 629 at 41.)  Rather, the cases are cited after a full recitation of the <u>Strickland</u>

24  standards for both reasonableness and prejudice.

25  [13]  The opinion in <u>Coddington</u> was issued on July 3, 2000.  The United States Supreme Court

26  decided <u>Williams</u> on April 18, 2000.  Other cases cited by both parties also post-date <u>Williams</u>
    and this court therefore finds they have little relevance to the question of whether or not the

27  California Supreme Court in the present, pre-<u>Williams</u> case relied upon <u>Fretwell</u>.  <u>See In re Crew</u>,
    52 Cal. 4th 126 (2011) (cited by respondent at ECF No. 616 at 27); <u>In re Cox</u>, 30 Cal. 4th 974,

28  1016 (2003) (cited by petitioner at ECF No. 629 at 41).

1    situation where strict adherence to the <u>Strickland</u> standard would provide the defendant a

2    windfall.

3         Respondent asserts that the California Supreme Court twice declined to adopt the <u>Fretwell</u>

4    standard.[14]  That is not entirely correct.  In <u>Avena</u>, the California Supreme Court explained that it

5    was "unclear" whether the United States Supreme Court intended <u>Fretwell</u> to "alter or

6    supersede[]" <u>Strickland</u>'s prejudice standard or whether the Court in <u>Fretwell</u> intended only to put

7    a "gloss" on the <u>Strickland</u> test for the unique factual situation in <u>Fretwell</u>.  12 Cal. 4th at 722 &

8    n. 5.  Because it was uncertain, the California Supreme Court examined prejudice under both

9    formulations of the test separately.  <u>Id.</u> at 722 n. 5, 726 ("petitioner has not demonstrated [his

10   attorney's] inaction prejudiced him under either of the tests laid down in <u>Strickland</u> and

11   <u>Fretwell</u>").

12        With respect to the other case cited by respondent, <u>In re Neely</u>, 6 Cal. 4th 901 (1993),

13   respondent is correct that the majority opinion relied solely on the <u>Strickland</u> prejudice standard.

14   The court held "there is a reasonable probability that, had the tape recording been suppressed, the

15   outcome with regard to the guilt phase of the trial would have been more favorable to petitioner."

16   6 Cal. 4th at 920.  While the majority in <u>Neely</u> does not mention <u>Fretwell</u>, it is discussed in the

17   concurring opinion.  <u>Id.</u> at 924 (Arabian, J., concurring).  In his concurrence, Justice Arabian

18   examines whether courts should also consider whether "our confidence in the outcome is

19   undermined" by the attorney's error.  <u>Id.</u>  He concludes that any significant change to the

20   <u>Strickland</u> prejudice standard must come first from the United States Supreme Court.  <u>Id.</u>

21   Recognizing the Court's decision in <u>Fretwell</u>, Justice Arabian notes, however, that the Court had

22   not yet taken the step of altering the <u>Strickland</u> standard.  <u>Id.</u>

23        This court's own research reveals a number of California Supreme Court cases decided

24   after the date of <u>Fretwell</u> and before the United States Supreme Court found the wide use of

25   _____

26   [14]  It should be noted that respondent's attempt to apply standards from <u>Woodford v. Visciotti</u>,
     537 U.S. 19 (2002) here is not well taken.  (ECF No. 616 at 28-29.)  In <u>Visciotti</u>, the state court

27   issued a reasoned opinion.  The Supreme Court took issue with the Ninth Circuit Court of
     Appeals' construction of that state court opinion.  In the present case, there is no state court

28   opinion to construe.

1    *Fretwell* unreasonable in *Williams* in which the state court looked at solely *Strickland* as the

2    standard for determining prejudice.  The following is only a small sample of the California

3    Supreme Court's cases with appropriate citation to *Strickland*:  *People v. Hester*, 22 Cal. 4th 290,

4    297 (2000); *People v. Williams*, 21 Cal. 4th 335, 349 (1999) (Brown, J., dissenting); *People v.*

5    *Smithey*, 20 Cal. 4th 936, 986-87, 1012 (1999); *People v. Welch*, 20 Cal. 4th 701, 743 (1999);

6    *People v. Hart*, 20 Cal. 4th 546, 624, 632, 634 (1999); *In re Gay*, 19 Cal. 4th 771, 827 (1998);

7    *People v. Ochoa*, 19 Cal. 4th 353, 445-46 (1998); *People v. Majors*, 18 Cal. 4th 385, 403 (1998);

8    *People v. Musselwhite*, 17 Cal. 4th 1216, 1260 (1998).  Included in this list is the California

9    Supreme Court's decision on petitioner's appeal.  In its reasoned decision, the court relied upon

10   the appropriate *Strickland* prejudice standard.  *People v. Frye*, 18 Cal. 4th 894, 952-53, 979

11   (1998).

12         When determining whether a state court's decision was contrary to or an unreasonable

13   application of federal law, this court must "presum[e] that state courts know and follow the law."

14   *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Of course, petitioner may rebut this presumption,

15   but he has not done so.  Petitioner demonstrates that on three occasions during the relevant time

16   period, the California Supreme Court appeared to rely on an inappropriate standard for

17   determining prejudice.  In addition, petitioner shows that, in the present case, respondent urged

18   the California Supreme Court to adopt this inappropriate standard.  However, in many more cases

19   decided during that time period, the California Supreme Court cited and/or applied the correct

20   prejudice standard.  The state court decision is entitled to the benefit of any doubt.  *Visciotti*, 537

21   U.S. at 24.  Petitioner's showing is insufficient to convince this court that the California Supreme

22   Court likely applied an incorrect prejudice standard to petitioner's claims.

23              c.   Failure to Consider Cumulative Effect of Errors

24         Finally, petitioner argues that the California Supreme Court also failed to consider the

25   effect of counsel's errors cumulatively.  He relies primarily on just one statement in just one case

26   that indicated the California Supreme Court had, in that case, divided one of the petitioner's

27   claims into subparts and then applied timeliness standards to each subpart, rather than to the claim

28   as a whole.  *In re Robbins*, 18 Cal. 4th 770, 820-21 (1998) (Kennard, J., dissenting).  Petitioner

1   mentions that the California Supreme Court has engaged in this practice in other cases, and

2   provides a link to the California Supreme Court docket in In re Majors, No. S117112.  (ECF No.

3   629 at 42 n. 11.)  However, petitioner provides no explanation of how the California Supreme

4   Court order in that case differed from the petition and how that difference resulted in the

5   "dilution" of petitioner's claims.[15]  In sum, petitioner provides insufficient reason to believe the

6   California Supreme Court engages in a "practice of diluting a petitioner's prejudice evidence

7   across distinct court-created subclaims."  (ECF No. 612 at 112:10-11.)

8            3.   Ineffective Assistance of Counsel for Failure to Investigate and Present a Mental
                  Health Defense at the Guilt Phase – Claim 2
9

10          The primary focus of petitioner's Sixth Amendment claims is that his trial attorney

11  Richard Hawk convinced petitioner he would win at the guilt phase and prevented co-counsel

12  Judd Iversen and Madeline McDowell from pursuing a mental health defense at the guilt phase or

13  mental health-based mitigation at the penalty phase.  For the reasons set out below, this court

14  finds petitioner has failed to establish that the California Supreme Court's denial of his guilt

15  phase ineffective assistance of counsel claims was contrary to law or unreasonable.

16              a.   Background and Evidentiary Proffer before the State Court

17                   i.   Deficient Performance

18                        (a)  Appointment of Counsel

19          In August 1985, the trial court appointed Larry Dixon to represent petitioner.  (2 ART

20  13.[16])  According to petitioner, Dixon was a sole practitioner who had never participated in a

21  murder case before, and knew no colleagues with death penalty experience with whom he could

---

22  [15]  In his reply brief, petitioner states that he is "prepared to present evidence" from other cases
23  that show the state court "routinely subdivides claims and adjudicates them as artificial
     subclaims."  (ECF No. 629 at 42:13-16.)  Petitioner has already had the opportunity to make this
24  showing in this briefing; he did not do so.

25  [16]  The following abbreviations are used herein for references to the state court record:  "RT" -
     Record of Transcript; "ART" – Augmented Record of Transcript; "2 ART" – Second Augmented
26  Record of Transcript; "CT" – Clerk's Transcript; "ACT" – Augmented Clerk's Transcript; "1
     ACT" – First Augmented Clerk's Transcript.  See also n. 7, supra.  This court identifies page
27  numbers by the bate-stamped numbers in the upper right corner of each page of the transcripts.

28

1   consult.  Dixon repeatedly told petitioner and the trial court that he was not competent to handle

2   the case.  He wanted to be relieved, but the court refused.[17]  Dixon requested the assistance of

3   second counsel, but the court would not appoint anyone.  (Decl. of L. Dixon in Supp. of Mot. to

4   Withdraw, 1 ACT 317-319.)

5        On August 5, 1985, attorney Dixon told the court he wanted to consult a psychiatrist

6   because he was concerned that Mr. Frye was not capable of assisting in his own defense.  (2 ART

7   17.)  Dixon retained psychiatrist James Peal, M.D., to treat petitioner and to determine, according

8   to Dr. Peal, "what the problems were, as I saw them, and give any suggestions that I might have."

9   (RT 7634:14-18.)  Dr. Peal felt petitioner "needed a great deal of support and help just to cope

10  with his situation and to maintain himself, because he went through some very stressful situations

11  to him ...." (RT 7635:24 – 7636:3.)  Dr. Peal found that part of petitioner's stress was due to his

12  legal problems surrounding attorney Dixon's attempts to be relieved of the case and the

13  appointment of new attorneys.  (RT 7642:2-19.)  Dr. Peal found petitioner to be depressed,

14  agitated, fearful, and suspicious during that time.  (RT 7642:20-25.)

15       On March 10, 1986, Dixon filed a motion to withdraw as petitioner's counsel.[18]  (1 ACT

16  313.)  Dixon argued the motion on March 21, 1986.  (1 ACT 326.)  On May 5, 1986, the trial

17  court provisionally granted the motion subject to the "prior appointment of substitute counsel."

18  (1 ACT 371.)  On May 16, 1986, Dixon informed the court that attorney Richard Hawk had

19  conferred with petitioner and was one of four attorneys interested in taking the case.  (See ART

20  185.)  In his declaration, petitioner states that Hawk began visiting him during the time Dixon

21  was looking for substitute counsel.  (1 SH, Ex. 1, ¶ 6.[19])  According to attorney Dixon's notes, at

22  _____

    [17]  Petitioner cites "Tr. Hr'g on Ex Parte App. Add'l Counsel (11/21/85)" for these allegations.
23  Petitioner does not identify where in the state court record the transcript or other memorialization
    of this hearing can be found.  The court has been unable to find it through its own search.
24  Accordingly, this court will not rely upon these allegations for purposes of these findings and
    recommendations.  Even if this court did rely on these allegations, it would not change the
25  recommendations made herein.

26  [18]  Petitioner identifies this motion as a second motion to withdraw.  However, petitioner does not
27  identify for the court the location of any prior motions.

28  [19]  The court refers to petitioner's state pleadings using the following abbreviations.  "1 SH" –

1    an ex parte hearing on May 23, 1986, the trial court expressed concern about appointing Hawk as

2    substitute counsel because of the Juan Corona trial and because the judge did not wish to "turn

3    this case into a media circus." (1 SH, Ex. 3.)

4         In 1978, a California appellate court found Hawk provided constitutionally deficient

5    representation to Juan Corona. People v. Corona, 80 Cal. App. 3d 684, 727 (1978). The Corona

6    court found Hawk failed to act appropriately in response to the strengths of the prosecution's case

7    because he "failed to raise the obvious ... defenses .... Still worse, trial counsel failed to present

8    any meaningful defense at all." Id. at 702. The court found Hawk was burdened by financial

9    conflicts. Hawk had acquired literary and dramatic rights to his client's story, including an

10   account of the trial. Id. at 703. The court found that Hawk's financial interests would benefit

11   from a prolonged, sensational trial, and provided a disincentive to raise incompetence or insanity

12   because those issues could have shortened the trial. Id. at 720. Hawk had "assumed a position

13   virtually adverse to his client and, totally unsupported by strategic or tactical considerations, took

14   deliberate steps to thwart the development of viable defenses available to the accused." Id. at 721

15   (emphasis in original).

16        Hawk's conduct during the Corona trial also resulted in his conviction on multiple counts

17   of contempt. Hawk v. Superior Court, 42 Cal. App. 3d 108 (1974).

18        The Corona case was not the sum total of Hawk's professional, legal problems. On March

19   13, 1986, the State Bar Court found that Hawk, when securing a deed of trust in lieu of a fee from

20   a criminal defendant, failed to disclose fully the terms of the security arrangement. (1 SH, Ex. 5.)

21   On April 16, 1987, the State Bar Court's Review Department adopted in part the Bar Court's

22   findings and recommendations and recommended to the California Supreme Court that Hawk be

23   suspended for four years, with three and a half years' suspension stayed pending probation. (Id.)

24   The California Supreme Court later determined that Hawk's appeal from the Review

25   Department's recommendation was based in part on the "patently false" assertion that he was

26

27   1997 State Habeas Proceeding; "2 SH" – 2001 State Habeas Proceeding; "AOB" – Petitioner's
     opening brief on appeal; "RB" – State's brief on appeal; "ARB" – Petitioner's reply brief on

28   appeal.

1    denied a continuance of his bar court hearing although he had made no earlier requests.  Hawk v.

2    State Bar, 45 Cal. 3d 589, 595 (1988).  The court found that Hawk "misled his clients about the

3    time they had in which to meet the obligation secured by the deeds of trust, and he changed the

4    terms of the first agreement after [the client] had already executed it."  Id. at 602.

5         This was the third time Hawk was disciplined by the State Bar, a fact the California

6    Supreme Court said weighed "heavily against him" in the bar proceedings.  Hawk, 45 Cal. 3d at

7    601.  In 1975 Hawk was reproved for gross negligence in management of a client trust account.

8    Id. at 593.  In 1978 Hawk was suspended from the practice of law for two months because he had

9    been convicted of failing to file tax returns.  Id.

10        In May 1980, the time relevant to the 1986 Bar proceedings, Hawk shared office space in

11   San Francisco with attorney Judd Iversen. (1 SH, Ex. 5 (Sept. 1985 Decl. of J. Iversen).)  Hawk

12   assigned to Iversen the deed of trust that was at the center of the State Bar's action against Hawk.

13   (Id.)  That State Bar action was pending in October 1986, when Hawk was considered for

14   appointment to represent petitioner in the present case.  (1 SH, Ex. 5.[20])  In September 1986 when

15   Iversen was appointed to Mr. Frye's case (ART 214), and in October 1986 when Iversen moved

16   for Hawk's appointment as co-counsel (ART 220 et seq.[21]), Iversen was aware of the bar

17   proceedings.  Iversen was involved in the proceedings because he demanded payment of the note.

18   (1 SH, Ex. 5 (Letter from Judd Iversen to Mr. and Mrs. James Mederos dated Oct. 20, 1980)).  On

19   September 2, 1985, Iversen executed a declaration as part of the bar proceedings.  (Id.)  In

20   addition, Iversen was aware the court had refused to appoint Hawk.  (1 SH, Ex. 26 at 2.)

21   ////

22

23   [20]  The State Bar records contained in this exhibit show that a Notice to Show Cause from the Bar
     Court Investigation Department was issued to Hawk in April 1984.  As described in the text, the
24   State Bar Court's decision was rendered in March 1986; the Review Department's decision in
     April 1987; and the California Supreme Court's decision in June 1988.  In the present case,
25   attorney Dixon informed the court in May 1986 that Hawk was one of the attorneys interested in
     representing petitioner and that Hawk had visited petitioner.
26

27   [21]  The photocopy of the transcript of this hearing is quite poor.  The court is unable to read some
     of the text and many of the page numbers.
28

1    Petitioner points out that Hawk appeared to be in bad financial condition at this time.  As

2    discussed above, he faced suspension from the practice of law.[22]  In addition, the trial record in

3    the present case shows Hawk had at least one very large debt.  Payment records show Hawk's

4    fees in this case were garnished and assigned to an individual in Pittsburg, California.  (See CT

5    2501.)   Petitioner argues this is further evidence that Hawk pursued appointment to this case.

6    In addition, petitioner attempts to show Hawk tried to work his way into petitioner's good

7    graces.  First, in a declaration, petitioner states that Hawk told him "that he thought that the State

8    didn't have any evidence of my guilt." (1 SH, Ex. 1, ¶ 7.)  Petitioner states Hawk left money on

9    his jail commissary account and told petitioner he had to insist that Hawk be appointed to

10   represent him.  (Id. ¶ 8.)  Attorney Iversen declared that he believed Hawk had left money in

11   petitioner's account prior to his appointment.  (1 SH, Ex. 26 at 2.)

12   Iversen recalled that Hawk repeatedly told petitioner he would get him acquitted.  (1 SH,

13   Ex. 26 at 2.)  "Mr. Hawk also told Jerry that he had a fishing pole in his office for Jerry and when

14   the not guilty verdict came down, they would go fishing together."  (Id.)  When he requested the

15   appointment of Hawk as his co-counsel, Iversen stated that Hawk spoke with petitioner "on a

16   regular basis" and had spent "in the neighborhood of 100-plus hours in this case on behalf of Mr.

17   Frye." (ART 228.)  According to petitioner's state post-conviction attorney, David Lane, attorney

18   McDowell told him that she believed Hawk "convinced Jerry Frye that he would win his case ...

19   for the sole purpose of motivating Jerry to demand that Hawk be appointed on this case." (1 SH,

20   Ex. 25 at 5.[23])

21   _____

     [22]  Petitioner also points to the California Supreme Court's statement that given Hawk's prior
22   disciplinary actions, disbarment was also a possibility.  (1 SH, Ex. 5 (Cal. Sup. Ct. op. at 17).)

23   [23]  Exhibit 25 before the California Supreme Court is Mr. Lane's declaration containing his
     recollection of what attorney McDowell told him.  He states in that declaration that he prepared a
24   declaration for Ms. McDowell's signature, but she told him she was "not 'comfortable' signing
     it." (1 SH, Ex. 25 at 2.)  Further, in an October 29, 1996 letter to Lane, McDowell stated that she
25   had "attempted to write down specifics of those years and I have found that I am not comfortable
     with the accuracy of my memories of those times." (1 SH, Ex. 27.)  Given McDowell's concern
26   about the accuracy of her memory, and the absence of any sworn declaration in the state court
     record from her, this court finds that the California Supreme Court could have reasonably chosen
27   not to rely upon statements attributed to Ms. McDowell in Exhibit 25 and many of the statements
     made in her letter to Lane, Exhibit 27, in determining whether petitioner's claims established a
28

1    The trial record shows that Hawk initially contacted attorney Dixon when, while working

2    in nearby Stockton, he heard there was a need for new counsel in this case.  (ART 189.)  By the

3    time his name was first mentioned in court, on May 16, 1986, Hawk had already "conferred with

4    the defendant." (ART 185.)  In response to the judge's concerns about Hawk, Dixon tried to

5    assure the court Hawk would not "play games" or "make a circus" of the case.  (ART 191.)

6    Dixon repeatedly mentions the "rapport" Hawk developed with petitioner.  (ART 191-93.)

7    Iversen summed up Hawk's relationship with petitioner in the following way:

8    Richard Hawk made a susceptible, psychologically malleable and
     brain-damaged Jerry Frye feel that Hawk was the only person who
9    could save his life. Hawk had completely convinced Jerry that
     Hawk was going to walk him out the door after a jury trial. Jerry
10   expressed his certainty that Hawk could deliver on his promises to
     walk him. Jerry trusted Hawk.
11

12   (1 SH, Ex. 26 at 3.[24])

13                    (b)  Investigations into Petitioner's Mental Health

14   Attorney Iversen states that the direct consequence of Hawk's actions was that "Jerry

15   refused to consider pleas involving insanity defenses or defenses involving a lack of or reduced

16   culpability based upon his mental condition and/or alcohol and drug intoxication."  (1 SH, Ex. 26

17   at 3.)  According to state habeas counsel Lane, attorney McDowell agreed.  (1 SH, Ex. 25 at 4.)

18   However, counsel did investigate petitioner's mental health problems.  Prior to the guilt phase,

19   petitioner was examined by psychiatrist Dr. Peal, psychologist Dr. Wagner, neuropsychologist

20   Dr. McGuire, and, it appears, psychiatrist Dr. Anderson.

21   ////

22   

23   prima facie case.  That is not to say that a petitioner must have sworn evidentiary support to
     establish a prima facie ground for relief.  Rather, in this case, the grounds for discounting these
24   exhibits are based on McDowell's refusal to sign a declaration and concern about her memory.
     Herein, this court considers some statements attributed to McDowell in Exhibit 25 or mentioned
25   in her letter, Exhibit 27, but the undersigned does not find any of those statements would have
     made a difference, one way or the other, in this court's final recommendations.

26   [24] Petitioner suggests that before he was appointed, Hawk knew about petitioner's brain damage
27   through his relationship with Dr. Peal.  Petitioner has no support for that suggestion and this court
     does not consider it.  However, the court does note that attorney Iversen referred to petitioner's
28   "mental deficiencies" as "apparent."  (1 SH, Ex. 26 at 2.)

                                        42

(i)     Dr. Peal

As already noted, the first inquiries into petitioner's mental condition were made by attorney Dixon. Dixon retained psychiatrist Dr. Peal, who started seeing petitioner in August 1985. (RT 7634:14 - 7635:7.[25]) Dr. Peal saw petitioner over the next several years. (RT 7635:10-11.) He estimated at trial that he had visited petitioner 21 times for a total of 50-60 hours. (RT 7635:16-17.) Dr. Peal testified that Dixon retained him for two reasons. First, to help Dixon determine "what was wrong with petitioner" and what "needed to be done ... to take care of whatever is wrong with him." (RT 7737:13-16.) Second, to determine "whether or not there was any basis for a psychiatric defense, any basis for 1368 [competency] proceeding." (RT 7737:17-21.)

Dr. Peal testified that he reviewed petitioner's records from Fayette Hospital in Connersville, Indiana; Indiana University hospital records; Florida Department of Corrections records; records from Shands Hospital in Florida; and medical records from the Amador County Jail. (RT 7639:13-19.) In addition, Dr. Peal had a history from petitioner's mother. (RT 7754:4-5.) Petitioner provided the California Supreme Court with copies of some of these medical records.[26] The Fayette Memorial Hospital Records, contained in exhibits 6, 8, 9, and 10 to petitioner's first state habeas petition, show several admissions for petitioner.[27] First, he was admitted in April 1962, when he was 6 years old, after he was hit by a car. The hospital records state that he had abrasions and was admitted for observation. He had several X-rays that revealed no evidence of fractures. Petitioner's next admission to that hospital was after an auto accident in May 1971, when he was 15 years old. Petitioner had a fractured knee cap and fractured "nasal and frontal bones." According to Dr. Peal, in addition to multiple fractures of bones in his face,

---

[25]  Because petitioner did not provide the California Supreme Court with a report by Dr. Peal, the court looks to Dr. Peal's testimony for information about what investigations were conducted into petitioner's mental health and what Dr. Peal's opinions were.

[26]  Petitioner indicates that the medical records were obtained by Dixon through requests by him or his investigators or through pre-trial discovery. (ECF No. 612 at 61:13-16.)

[27]  Many of the records in exhibits 6, 8, 9, and 10 appear to be duplicates.

43

1   the accident also caused a fracture at the base of petitioner's skull. (RT 7654:17-19.) The

2   hospital records appear to show that petitioner had surgery for his head injuries. In January 1972,

3   when he was 16 years old, petitioner was diagnosed with meningitis and was sent to the Indiana

4   University Medical Center. The final record from Fayette Memorial is dated December 1975.

5   Petitioner was then 20 years old. While many of the copies provided to the court are not legible,

6   it is apparent that petitioner was admitted at that time and diagnosed with meningitis. The

7   hospital's summary states that petitioner had three prior episodes of meningitis.

8          The records from the University of Florida's Shands Hospital were provided to the

9   California Supreme Court in Exhibit 11 to the first state habeas petition. Those records show that

10  in 1978, when he was 22 years old, petitioner was admitted for "persistent and progressive" "CSF

11  rhinorrhea." CSF rhinorrhea is identified in the records as the leakage of cerebral spinal fluid

12  through the nostrils. The hospital's records state that petitioner had developed this problem after

13  the surgical repair of his facial fractures following his 1971 auto accident. The records also state

14  that petitioner had had five episodes of meningitis following the 1971 surgery. The hospital

15  performed surgery in June 1978 and repaired the "fistula site" by closing the holes in petitioner's

16  dura, the sac that encloses the brain. The notes also state that petitioner's neurological exam

17  following the surgery was unchanged from his initial exam, "that is the only significant defect

18  which was found was bilateral amosmia." This condition is referred to as "bilateral anosmia" in a

19  note to the file from the neurologist. According to The Merck Manual, "anosmia" is "complete

20  loss of smell." The Merck Manual of Diagnosis & Therapy 466 (19th ed. 2011).

21         Exhibit 12 to the first state petition contains notes from Indiana University Hospital.

22  Although many of the records in this exhibit are, at best, barely legible, it appears that they

23  involve petitioner's approximately two-week stay at the hospital in 1972 for meningitis. It does

24  not appear that petitioner provided the state court with the remaining medical records relied upon

25  by Dr. Peal.

26         Dr. Peal also reviewed the police reports and interviews from Belle Fourche and

27  Deadwood, South Dakota. (RT 7640:12-18.) The interviews were available to Dr. Peal as

28  transcripts, a video of petitioner's interview by officers in Belle Fourche, videos of two

44

1   interviews of Jennifer Warsing, and an audio tape of petitioner's interview at the Deadwood Jail.

2   (RT 7640:12 – 7641:14.)

3        Dr. Peal testified that when he first met with petitioner in 1985, he suspected petitioner

4   had a neurological disorder or some kind of brain injury.  (RT 7750:12-15.)   Dr. Peal also

5   testified he recommended that Dixon and later Hawk have petitioner receive a neurological

6   examination.  (RT 7753:8-19.)  However, he also testified that he did not believe testing was

7   indicated due to the obviousness of petitioner's brain damage.  (RT 7775:25 – 7776:6; 7665:5-6.)

8   Dr. Peal testified that both petitioner and his mother reported that petitioner suffered "altered

9   states of consciousness, irritability, and memory problems."  (RT 7761:20-25.)  He also

10  determined petitioner suffered from blackouts and had brain impairments in the areas of

11  cognition, emotional control, behavior, and personality change.  (RT 7675:1-25; 7676:12-13.)

12  Dr. Peal felt that these changes were the result of petitioner's traumatic brain damage to his

13  frontal lobe.  (See RT 7774:22 – 7775:20.)  He testified that petitioner's mother described him as

14  a "happy-go-lucky person" before the auto accident and a "somewhat moody" person afterwards.

15  (RT 7677:4-7.)  However, Dr. Peal acknowledged that in the ten years since petitioner had had

16  the surgery to repair the holes in his dura, he had not been hospitalized for any other problems,

17  including any other mental health problems.  (RT 7762:11-24.)  Dr. Peal rejected the suggestions

18  that petitioner has anti-social personality disorder and that he was faking his memory problems.

19  (RT 7792:5-22.)  Dr. Peal also confirmed that petitioner was not insane, "pathological," or

20  psychotic.  (RT 7669:13-15.)

21       Dr. Peal testified that petitioner experienced significant stress and was depressed while

22  awaiting trial for a number of reasons.  (RT 7641:19 – 7642:3; 7649:23 – 7650:3.)  First,

23  petitioner was "agitated, fearful, and suspicious" due to the problems with attorney Dixon's

24  attempts to have second counsel appointed or be relieved of the case.  (RT 7642:4-25.)  Second,

25  petitioner felt he was being celled with people who were trying to get a confession from him.

26  (RT 7643:1-13.)  Third, petitioner felt some of his cellmates were mentally ill and at least one

27  was extremely so.  (RT 7643:16 – 7644:1.)  Fourth, petitioner was isolated from his family in

28  Indiana and felt he had no one to help him.  (RT 7644:5-8.)   Petitioner felt it was very difficult to

1    maintain control of his behavior while in jail, but he tried hard to do so.  (RT 7644:12-24.)  He

2    also had concerns about his health and about a recurrence of meningitis.  (RT 7645:6 – 7646:4.)

3        On redirect, Dr. Peal was asked whether the brain damage petitioner suffered "could

4    impair his ability to form intent?"  (RT 7858:25 – 7859:1.)  Dr. Peal responded:

5            The impairment from the brain damage is in the area of
     cognition, which is knowing, which is thinking, which is being able
6        to plan and carry out the plans.

7            The second part that's affected is his emotional control, and
     considering his brain, the impairments from his brain damage, they
8        affect these two areas, and these two areas are the areas that would
     be critical in his ability to form intent.  So he would be impaired in
9        the ability to form intent.

10   (RT 7859:2-9.)  Dr. Peal also opined about petitioner's ability to deliberate:

11           I think the same impairments in function that govern the
     previous impairment would be present in his impairment to
12       deliberate.  To deliberate, he has to be able to think and to plan, to
     perceive correctly the environment that he's in, and then to plan and
13       carry out whatever it is that he wants to carry out.

14           And he also has to have the ability to control whatever
     emotions that this situation arouses, to the point that the emotional
15       – the lack of emotional control doesn't impair his ability to think
     and plan.  And I think that he would be impaired in this area, also.
16

17   (RT 7860:1-11.)  Dr. Peal added that the same reasons impaired petitioner's ability to make

18   judgments because making judgments requires the ability "to size up the situation and then act

19   accordingly and appropriately."  (RT 7860:15-17.)  Dr. Peal also testified that petitioner's

20   accident, and its consequences which included injuries to friends in the car, along with repeated

21   severe headaches that had to be relieved by spinal taps and the repeated incidences of meningitis,

22   caused petitioner to suffer depression.  (RT 7867:3-4, 19-20.)  Dr. Peal testified that petitioner

23   sought help at mental health clinics, but left when clinic workers did not believe he had suffered,

24   and survived, five episodes of meningitis.  (RT 7867:23 – 7868:6.)

25       Also indicative of the pre-trial work undertaken by Dr. Peal is a letter he prepared

26   regarding petitioner's competence.  In a June 17, 1988 letter to the trial judge, Dr. Peal opined

27   that petitioner was incompetent to proceed with the penalty phase because he could not "accept

28   the reality that the guilt phase of the trial is over."  (1 SH, Ex. 13 at 2.)  Part of that determination

1   rested on petitioner's "marked memory problems," "very disturbed and depressed" state, lack of

2   "emotional control," and impaired judgment.  (Id.)  Dr. Peal concluded that petitioner was not

3   competent

4           because of impairments in judgment and memory precipitated by a
            severe automobile accident and head injury in 1971, the residuals
5           and sequelae of 5 episodes of meningitis . . ., the residuals of brain
            surgery . . ., and his utilization of alcohol in the presence of a head
6           injury.   These factors have all resulted in impulsive acts, poor
            judgment and poor emotional control and memory impairment.
7

8   (Id. at 5-6.)

9                              (ii)      Dr. Wagner

10          Sometime in early spring 1986, at Dr. Peal's request, Dixon retained psychologist Linda

11  Wagner, Ph.D.  (See 1 SH, Ex. 20 at 1.)  Dr. Wagner prepared a draft report almost two years

12  after she evaluated petitioner in May 1986.  (Id.)  According to her report, Dr. Wagner was hired

13  to evaluate petitioner's "present neuropsychological status subsequent to a long history of brain

14  trauma." (Id.)  It is not clear from the record before the state court just what communications, if

15  any, Dr. Wagner had with either attorney Dixon or with petitioner's subsequent counsel Hawk,

16  Iversen, and McDowell.  Petitioner states that Hawk and Iversen did not meet with Dr. Wagner

17  until March 29, 1988, just two days before the defense started its guilt phase case.  (ECF No. 612

18  at 9-10.)  Yet, petitioner cites only the report of forensic psychologist Dr. Mark Cunningham,

19  who was hired by state post-conviction counsel David Lane, for this statement.  (1 SH, Ex. 21 at

20  2.)  Dr. Cunningham prepared an evaluation of the mitigation case that was presented at the

21  penalty phase, as well as an analysis of the mitigation case that could have been, but was not,

22  presented at the penalty phase.  (Id.)  It appears that investigators working for Mr. Lane or Dr.

23  Cunningham spoke with Dr. Wagner.  (Id. at 5.)  Dr. Wagner described for them "providing a

24  report of her neuropsychological evaluation dated 3-22-88 to defense counsel" and a "two hour

25  conference with defense attorneys Hawke [sic] and Iverson [sic] on 3-29-88."  (Id.)

26          These statements do not necessarily support petitioner's characterization of that March 29,

27  1988 meeting as the first one between Dr. Wagner and petitioner's trial counsel.  There is a record

28  of at least one communication between Dr. Wagner and the defense before or during the guilt

                                               47

1    phase: Dr. Peal testified that he discussed Dr. Wagner's findings with her.  (RT 7751:13.)  In

2    addition, Dr. Wagner states that, in addition to the Shands Hospital and Indiana University

3    Hospital medical records, she also relied upon an interview she conducted with petitioner's

4    mother on December 16, 1987, well after the new attorneys were appointed and six days after the

5    start of jury selection.  (Id. at 6; CT 3385.)

6          Dr. Wagner found petitioner "demonstrated a deficit in memory functions," had a

7    personality characterized as "anti-social," and had symptoms that "could be suggestive of a

8    neurological disorder as well as symptoms which may be functional in origin."  (1 SH, Ex. 20 at

9    11-12.)  She also found petitioner in "chronic stress/distress" and suffering from "depression,

10   anxiety, and nervousness."  (Id.)  With respect to executive functions, petitioner demonstrated

11   "some deficits in sustained attention/concentration, mental tracking and mental control."  (Id. at

12   11.)

13                         (iii)     Dr. McGuire

14         Sometime in October 1987 defense counsel had petitioner examined by neurologist Dr.

15   Stephen McGuire.  (RT 7276:14-18.)  Dr. McGuire's contemporaneous notes indicate Mr. Frye

16   was "referred by his attorney for evaluation of possible encephalopathy secondary to previous

17   head trauma and meningitis."  (1 SH, Ex. 16 at 2.)  In his testimony, Dr. McGuire defined

18   encephalopathy as "altered function of the brain."  (RT 7324:1-2.)  Dr. McGuire testified that he

19   was asked to evaluate petitioner's "neurological function" as of the time of the evaluation.  (RT

20   7346:24-25; 7350:5-8)   In addition, he testified that he was asked to look at petitioner's

21   neurological function specifically with respect to memory.  (RT 7352:9-15.)

22   Dr. McGuire examined petitioner and ordered an MRI and EEG.  (1 SH, Ex. 16; RT 7276:14-20,

23   7277:6-7.)  Sometime after the results of the EEG were reported, Dr. McGuire met for

24   "approximately one hour ... with the attorneys representing Mr. Frye." (1 SH, Ex. 15.)  A copy of

25   Dr. McGuire's undated "clinical note" memorializing this meeting was submitted to the

26   ////

27   ////

28   ////

48

1    California Supreme Court as Exhibit 15.  It bears the handwritten note "Recvd 12/30/87" in the

2    upper right corner.[28]  (Id.)

3         In his clinical note of the meeting with counsel, Dr. McGuire memorialized two

4    substantive topics that were discussed.  (1 SH, Ex. 15.)  The first, and more detailed, issue

5    concerned "potential explanations for Mr. Frye's loss of memory."  (Id.)  Dr. McGuire identified

6    four such explanations.  "One is a partial, complex seizure disorder, including potentially complex

7    status epilepticus."  However, given the lack of evidence of seizure activity in Mr. Frye before or

8    after "that event," Dr. McGuire characterized the likelihood that petitioner suffers a seizure

9    disorder as "extremely remote."  (Id.; RT 7317:1-4.)  Dr. McGuire's second possible explanation

10   was a "drug or alcohol induced amnestic episode."  (1 SH, Ex. 15.)  Someone reported to Dr.

11   McGuire that Mr. Frye "had consumed some 12-16 beers and smoked at least two joints of

12   marijuana during the time in question.  This, especially with his pre-existing encephalopathy,

13   could account for his amnestic period."  (Id.)  The third possibility Dr. McGuire considered was

14   "a functional or emotionally traumatic induced episode ... similar to a fugue type state.  A fourth

15   possibility is that Mr. Frye is deliberately electing not to remember."  (Id.)  Dr. McGuire

16   concluded that it was "impossible at this time to distinguish between these events."  (Id.)

17        The second topic discussed in Dr. McGuire's note was petitioner's general diagnosis and

18   its effects.  The diagnosis was "chronic encephalopathy" with "EEG showing frontal lobe injury."

19   (1 SH, Ex. 15.)  From this diagnosis "one could postulate certain frontal lobe symptoms such as

20   apathy, personality changes, intolerance of stress, and memory loss.  However, in general, this

21   would not lead to directed violence.  Excessive violence would be more in concert with a

22

23   [28]   In an attempt to show petitioner's counsel's lack of preparation, petitioner points out that the
24   date written on this note, presumably the date the note was received by trial counsel, was twenty
     days after the start of jury selection.  (ECF No. 612 at 63:20-21.)  However, the date the note was
25   received by counsel shows only that the meeting with Dr. McGuire occurred sometime before
     then.  The EEG was administered on October 26, 1987.  (1 SH, Ex. 16.)  Exhibit 16 also contains
26   what appears to be a report on the EEG.  However, the court's copy is so poor that a date cannot
     be made out.  Based on the evidence the court has before it, there is certainly a possibility counsel
27   met with Dr. McGuire before trial began.  Further, while jury selection began on December 10,
     1987, defense counsel did not give an opening statement until almost three months later, on
28   March 2, 1988.  (CT 3385; RT 5380.)

1    personality disorder." (Id.) As petitioner points out, these responses indicate trial counsel did not

2    ask McGuire whether Mr. Frye's brain damage would impair his ability to form a plan to kill

3    someone.

4            Dr. McGuire's testimony further clarifies his pre-trial findings. First, Dr. McGuire

5    reported that the results of petitioner's EEG were abnormal. (RT 7290:21-25.) They indicated

6    that the left frontal and left temporal region of petitioner's brain "were not functioning

7    appropriately." (RT 7291:1-4.) Dr. McGuire explained that those areas of the brain "are highly

8    involved in cognitive function," which includes the "ability to process memory," a person's

9    "sense of initiative or self-drive," the "ability to maintain normal social behavior," and

10   "intolerance of stresses." (RT 7292:17 – 7293:4; 7294:16-20.) Petitioner's diagnosis was "static

11   encephalopathy." (RT 7294:2-3.) Dr. McGuire also testified that this type of brain injury would

12   not make a person more likely to commit a planned violent act. (RT 7295:1-8.) On cross-

13   examination, he clarified that he was not suggesting that petitioner was incapable of planning a

14   violent act. (RT 7335:18-23.) Brief episodes of amnesia are possible with this sort of brain

15   injury. (RT 7296:9-12.) Those episodes would be exacerbated by the use of drugs and/or

16   alcohol. (RT 7296:15 – 7297:6.) Most of Dr. McGuire's testimony was about these blackout

17   periods and the brain-damaged person's reliance upon others to fill in the blanks in his or her

18   memory. (RT 7299-7301.) However, on cross-examination, Dr. McGuire qualified his testimony

19   somewhat. He said petitioner's chronic encephalopathy was "mild" and that his testing showed

20   petitioner had "relatively mild" memory deficits. (RT 7347:2, 13-15.)

21           On re-direct, Dr. McGuire agreed that petitioner's brain dysfunction may cause problems

22   processing information, with judgment, and with the ability to reflect. (RT 7350:13 – 7351:6.)

23   He would also be more vulnerable to stress. (RT 7351:15-23.) Dr. McGuire opined that

24   petitioner may have difficulty testifying because testifying in court is a "fairly stressful activity."

25   (RT 7353:5-7.) A person with petitioner's brain dysfunction may have memory loss or block

26   memories when confronted with that sort of stress. (RT 7353:7-23.)

27   ////

28   ////

1                              (iv)      Dr. Anderson

2          Attorney McDowell recalled that petitioner was also evaluated by psychiatrist Dr. Doug

3   Anderson.  (1 SH, Ex. 27 at 2.[29])  McDowell stated that, based on her time records, the first

4   contact she made with Dr. Anderson occurred on December 14, 1987, when she telephoned "him

5   to set up an appointment to see Frye."  (Id.)  According to McDowell, after Dr. Anderson

6   interviewed Mr. Frye, he "recommended putting on a mental defense."  (Id.)

7                              ii.      Prejudice

8                              (a)   Mental Health Evidence

9          Much of the evidence developed by trial counsel is discussed above.  To summarize,

10  petitioner reported to Dr. McGuire his history of head trauma, "persistent problems with

11  photophobia and phonophobia leading to decreased tolerance of stress and increased irritability"

12  that inferred with his work, and numerous blackouts which were "[g]enerally ... associated with

13  alcohol ingestion."  (1 SH, Ex. 16 at 2.)  Dr. McGuire noted that petitioner was "very clear[]" that

14  "the black-out occurs before any violent episodes have occurred."  (Id.)  On the basis of the initial

15  examination and history, Dr. McGuire tentatively diagnosed

16                    episodes of transient alteration of consciousness. This appears to be
17                    secondary to substance abuse, however with his history of
                    meningitis as well as head trauma, a seizure disorder must be
18                    excluded.  In addition, structural abnormalities secondary to his
                    injuries must be evaluated.  Thus I have requested a MRI scan and
19                    EEG. In addition, I will be reviewing his previous extensive
                    medical records.

20  (Id. at 4.)

21         The MRI revealed abnormalities in Mr. Frye's frontal sinuses and ventricles. (1 SH, Ex.

22  16 at 6.[30])

23

24  [29] As stated above in note 20, this court finds the California Supreme Court could have discounted
    much of Exhibits 25 and 27, which contain statements attributed to or made in an unsworn format
25  by attorney McDowell.  However, because McDowell states in her letter that her memory about
    Dr. Anderson is confirmed by an examination of her time sheets, the court finds the statements
26  made in this paragraph more reliable.

27  [30] As noted above, pages 6 and 7 of Exhibit 16 appear to contain the MRI and perhaps some EEG
28  results.  However, the copies provided to the court are illegible.

                                              51

1    On October 26, 1987, A.J. Gabor, M.D., performed and analyzed the EEG. He reported

2    > an abnormal EEG characterized by the presence of focal, left
3    > anterior temporal epileptiform discharges and by the presence of
     > bilateral focal frontopolar epileptiform discharges. These findings
     > would be consistent with the presence of focal left anterior temporal
4    > abnormality which is epileptogenic and in addition would suggest a
     > possibility of bilateral frontopolar abnormalities which are
5    > epileptogenic.

6    (1 SH, Ex. 16 at 8.)

7         In addition to the mental health evidence petitioner's trial attorneys did develop before

8    trial, petitioner presented to the California Supreme Court, and presents here, significant

9    additional evidence of his mental health problems.

10        The record before the California Supreme Court included Exhibit 21, the curriculum

11   vitae and report of Mark D. Cunningham, Ph.D., a forensic psychologist.  (1 SH, Ex. 21.)  Dr.

12   Cunningham was asked to determine "what mitigation and related sentencing testimony

13   could have been presented at [Mr. Frye's] sentencing phase trial in August 1988."  (1 SH, Ex. 21

14   at 2.)  While Dr. Cunningham's report is titled "Capital Sentencing Mitigation Evaluation,"

15   petitioner's state habeas counsel cited to the report in his argument that trial counsel was

16   ineffective for failing to present a mental defense at the guilt phase.  (1 SH Pet. at 34-35.)

17        Dr. Cunningham had substantially more information than was provided to, or obtained by,

18   the doctors engaged prior to trial.  Dr. Cunningham interviewed petitioner and his mother, Hazel

19   Frye, and reviewed available evidence of petitioner's history including educational, medical,

20   corrections and other records.  (1 SH, Ex. 21 at 1-2.)  Dr. Cunningham also reviewed petitioner's

21   interrogation by police, the testimony of mental health experts from the trial, including the

22   competency trial, and the testimony of Jennifer Warsing and Ron Wilson.  (Id.)  His review of

23   mental health records included the draft report of neuropsychologist Linda Wagner, Ph.D., as well

24   as the psychologist and psychiatrist who testified at the competency trial.  (Id. at 1, 5.)  Dr.

25   Cunningham relied upon interviews of people from petitioner's past which were conducted by a

26   mitigation specialist who was apparently retained by post-conviction counsel.  (Id. at 1.)

27        Dr. Cunningham reviewed petitioner's educational records and records from his past

28   incarceration. (1 SH, Ex. 21 at 1.)  According to Dr. Cunningham, the educational records were

1   important to a mental health diagnosis because they showed that petitioner was more vulnerable

2   than the average person to suffering adverse psychiatric effects from his traumatic brain injury.

3   (Id. at 13-14.)  The records suggest Mr. Frye "was learning disabled," which is an additional risk

4   factor.  (Id.)

5          Dr. Cunningham identifies additional risk factors that explain petitioner's difficult

6   childhood and adolescence.  "Jerry's first head injury of note occurred at age 7 when he was hit

7   by an automobile and knocked unconscious."  (Id. at 14.)  "It is also notable that there is a history

8   of psychiatric disturbance in Jerry's extended family which may have predisposed him to

9   psychiatric disorder as well."  (Id.)  Petitioner's "paternal grandmother reportedly suffered a

10  'nervous breakdown' and died in a mental institution."  (Id.)

11         The psychological literature cited by Dr. Cunningham identifies other circumstances

12  present in petitioner's life as risk factors for developing psychiatric problems after a traumatic

13  brain injury.  Dr. Cunningham notes that petitioner suffered his injury when "Jerry's parents were

14  experiencing marital separation."  (Id.)  Specifically, petitioner's mother had an affair and left the

15  family home and his father "was depressed and drinking alcoholically."  (Id. at 14, 15.)  In

16  addition, petitioner's childhood friend Frank Sturgell reported that after petitioner's mother left,

17  petitioner's problems with the law began.  (Id. at 15.)  Dr. Cunningham also notes petitioner's

18  childhood head injuries and petitioner's extensive use of alcohol prior to and at the time of the

19  accident.  (Id. at 7.)

20         Dr. Cunningham looks to petitioner's disfigurement in the accident as contributing to his

21  later mental health problems.  The facial fractures petitioner suffered in the car accident

22  "markedly changed his facial features."  (Id. at 3-4.)  He describes how the disfigurement would

23  have adversely affected petitioner's adolescent development.  (Id. at 13.)

24         Dr. Cunningham explains Dr. Wagner's testing results.  He states that Dr. Wagner

25  "identified multiple pieces of data that formed a consistent pattern indicative of brain

26  dysfunction."  (Id. at 5.)  Her testing showed deficits in petitioner's executive functions, such as

27  sustained attention, concentration, mental tracking, and mental control.  (Id.)  According to Dr.

28  ////

Cunningham, "[d]eficits in executive functions are commonly associated with frontal lobe damage." (Id. at 6.)

Dr. Cunningham also considered the effects of petitioner's intoxication and disordered thinking at the time of the shootings. (Id. at 36-39.) Relying on Jennifer Warsing's account of what transpired that day, Dr. Cunningham concludes,

> the offense was impulsive, disorganized, and largely made up on the fly, entirely consistent with intoxication, frontal lobe brain damage, and Jerry's history of eruptive unprovoked violence when intoxicated.

(Id. at 39.)

Dr. Cunningham identifies other evidence that was available to trial counsel, but not presented, including "multiple visual exhibits to assist [jurors'] understanding" and "relevant psychological research which could have substantiated the mitigation and offense nexus." (Id. at 6.)

Through Dr. Cunningham, petitioner provided the state court with an overview of the "extensive psychological and medical literature available in August 1988 which could have been obtained by defense counsel had this effort been made." (Id. at 6.) Dr. Cunningham begins by describing the physical nature of the brain in order to "make ... understandable the mechanical forces and stresses of brain damage." (Id. at 6-9.) Dr. Cunningham focuses on frontal lobe functions relevant to culpability including the "formulation of intentions and programs of behavior," "maturity, decision making, planning, attention, delay of gratification." (Id. at 10.) He notes the literature available at the time of trial found the area of the brain damaged in petitioner's case "is responsible for long range planning, decision making, evaluation, impulse control, and maturity. Damage to the pre-frontal area will impact on these higher order psychological functions." (Id. at 11.) Dr. Cunningham then relies upon published studies to explain and graphically illustrate how petitioner experienced two traumatic brain injuries. (Id.) He describes how the impacts on petitioner's skull caused bruising in his brain. (Id.) He focused specifically on the literature examining the forces at play in a rapid deceleration motor vehicle accident such as Mr. Frye's. (Id. at 12.) Dr. Cunningham explains,

54

1
2
3

>  Begali described that the continuation of brain movement and rotation within the skull following initial impact puts strain on delicate nerve fibers and blood vessels and results in shearing. As brain surfaces are pushed against the inner surface of the skull with sudden deceleration, the brain sustains bruising.

4   (Id. (internal citations omitted).)  Dr. Cunningham relied upon published studies to explain that

5   the areas most often injured in this way in motor vehicle accidents are the frontal and temporal

6   lobes.  (Id.)  As discussed above, both Dr. McGuire, relying on the EEG, and Dr. Wagner, relying

7   on neuropsychological testing, found dysfunction in petitioner's frontal and temporal lobes.

8       Again relying on published research, Dr. Cunningham explains that the available literature

9   found the types of injury petitioner suffered "are identified as accounting for specific, localized

10  behavior alterations."  (Id. at 11.)  Specifically, he explains that "[l]esions to the undersides of the

11  frontal and temporal lobes may have negative consequences on behavior, affect, emotions,

12  memory, and attention."  (Id. at 12 (internal citation omitted).)  Appendix A to Dr. Cunningham's

13  report contains a long list of articles documenting personality changes as the result of traumatic

14  brain injury.  Dr. Cunningham notes that many of the listed changes are similar to those people

15  observed in petitioner after his accident and meningitis.  (Id. at 15-23.)  Dr. Cunningham also

16  describes case studies of young men who, after traumatic injury to their frontal lobes, faced

17  problems similar to those suffered by petitioner.  (Id. at 16-17.)

18      Dr. Cunningham discusses studies that showed frontal lobe damage

19
20
21

>  may disrupt the ability of the person to correctly perceive and interpret feelings in himself and others.  The patient may suffer an inability to cognitively 'deal with' arousal producing stimuli. There is often poor tolerance for frustration, greater dependence on others, insensitivity to others, and a generally more demanding attitude.

22  (Id. at 17.)   Dr. Cunningham notes that medical literature predating the trial by decades had

23  identified "emotional lability" in patients who had suffered brain trauma.  (Id. at 23.)  As Dr.

24  Cunningham explains at length, the events in petitioner's life following his brain injuries and

25  meningitis fit within the categories of outcomes described in the literature:  (1)  "Anxiety and

26  catastrophic reaction"; (2)  "Denial of illness or anosognosia";  (3) "Paranoia and psychomotor

27  agitation";  (4)  "Depression, social withdrawal, amotivational states."  (Id. at 17-19.)  Dr.

28  Cunningham observed that paranoid thinking is present and explainable in people with frontal and

left temporal lobe damage, and was observed in petitioner shortly before the Brandts were killed. (Id. at 18-19.)  The evidence of paranoia was reported by psychiatrist Patricia White, M.D., and psychologist Grant Hutchinson, Ph.D.  (Id. at 19.)  The former was the trial court's expert, the latter worked for the prosecution.

Lastly, Dr. Cunningham refers to several studies supporting the conclusion that brain damage such as petitioner's is "permanent and irreversible regardless of rehabilitative therapy." (Id. at 12.)  Dr. Cunningham explains that psychiatric disturbance is significantly more common in cases of damage to both hemispheres and the frontal lobe, such as petitioner's.  (Id.)

Dr. Cunningham found several aspects of petitioner's background consistent with higher risk of adverse psychological effects from traumatic brain injury.  First, he notes petitioner suffered facial disfigurement and "was subsequently more self conscious" and experienced a fundamental change in his relationship with peers.  (Id. at 13.)  Dr. Cunningham describes the many ways in which injury can affect an adolescent brain:

> Poor impulse control, aggression, disinhibition, and other emotional behavioral complications associated with traumatic brain injury may make old friendships difficult to sustain.    Adolescent developmental strivings toward individuation and independence may be compromised or reversed. . . . [A]dditional challenges to family adjust [sic.] may be associated with the self centered behavior, apathy, impulsivity, irritability, and loss of initiative of the traumatically brain injured adolescent.

(Id. at 14-15 (internal references omitted).)

Dr. Cunningham describes how petitioner's history fits within the observed histories of other patients with similar brain injuries:

> Review of Jerry's history reflects significant deficits in goal directed behavior and plan follow through. Jerry dropped out of high school following his brain injury.   His geographic, employment, and relationship pattern has been unstable. His participation in the instant offense would have reflected a failure to follow through on the much more promising and lower risk marijuana growing joint ventures which he had had in progress at the time of the instant offense. Even his spontaneously identifying himself to the police when arrested for domestic violence in July

////

////

1985 reflected an inability to follow through on a plan that was underway to create a new identity and thereby avoid arrest.

(Id. at 19.)

The medical literature identified by Dr. Cunningham shows that some sufferers of traumatic brain injury "may attempt to dull their pain with alcohol and drugs."  (Id. at 15 (internal references omitted).)  Dr. Cunningham notes that "Jerry's alcohol and substance abuse had begun prior to the traumatic brain injury, but markedly increased in quantity and pervasiveness following the injury."  (Id.)

Dr. Cunningham observes that the medical literature reports that "patients suffering frontal lobe injury as often displaying normal scores on standard intelligence tests but displaying personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in their having difficulty holding employment."  (Id. at 20.)  Dr. Wagner identified some of the same deficits in petitioner on the basis of neuropsychological testing.  She reported, "some deficits in sustained attention/ concentration, mental tracking, and mental control," and found "his ability to sequence and shift cognitive sets was impaired." (1 SH, Ex. 20 at 11.)  Dr. Cunningham notes the same difficulty found in "frontal patients:"  "chang[ing] from one solution of a problem or one form of response to a different one."  (1 SH, Ex. 21 at 20.)

Dr. Cunningham also explains that studies of frontal lobe patients exhibited increased libido and disregard for their partners.  (Id. at 21-22.)

(b)  Social History Mitigation

In his briefing, petitioner next sets out the social history mitigation developed during state habeas.  While this information is primarily relevant to the prejudice analysis of petitioner's claims of ineffective assistance of counsel at the penalty phase, discussed below, it is included here because some of it would have been helpful to counsel regarding the guilt phase to provide to mental health experts and to better understand petitioner.  Again, petitioner relies primarily on the report prepared by Dr. Cunningham.

////

57

Dr. Cunningham starts his story of petitioner's life by relating petitioner's discovery of his

mother's affair with the father of one of petitioner's friends.

> Jerry's father, Preston Frye, had hired a carpenter, Bob Burch, to help repair the house. Bob Burch was the father of one of Jerry's male friends. Additionally Bob and Jerry's mother, Hazel, often went to church together.  One day, when Jerry assumed that both parents would be gone from the house, he stayed or returned home from school to go rabbit hunting, only to hear two cars drive up to the house. Jerry hid in the attic, and watched through holes in the dining room ceiling as his mother and Bob began "making out." His mother saw Jerry's school books on the couch, and instantly panicked and began searching for Jerry. After they found him, Bob took him to school and tried to bribe Jerry not to say anything. Jerry described that his mother subsequently related to him in a more detached and irritated fashion.

(1 SH, Ex. 21 at 30-31.)  Petitioner said of this event, "I lost all my faith in anything that day."

(Id. at 31.)

Several months later, petitioner's younger brother and a friend found a case of beer

petitioner had hidden in the woods.  (Id.)  After they drank the beer and became sick, petitioner's

mother, Bob Burch, and petitioner's father became angry and attempted to beat petitioner.  (Id.)

Petitioner attempted to fight back.  (Id.)  The next day, when he came home from school,

petitioner discovered that his mother had taken a check he had earned picking tobacco and "left

with Jerry's younger three siblings for California where she remained for approximately six

months."  (Id.)  Petitioner felt guilty over his role in the separation and described his father's heart

as "broken" by it.  (Id.)

Petitioner was left alone with his father who was already "an episodic binge drinker" and

who had encouraged petitioner to get drunk for the first time when petitioner was only about nine

years old.  (Id. at 32.)  After petitioner's mother left, petitioner's father started drinking more

regularly.  (Id.)  "Our house on the weekends looked like a bar," petitioner said.  (Id.)  Adults and

teens congregated there on weekends and "drank heavily."  (Id.)  Petitioner and his father also

smoked marijuana together during this time.  (Id.)  These activities continued for about six

months until petitioner's accident.  (Id.)  The accident occurred when petitioner was driving two

friends home after a party at his house.  (Id.)  Petitioner was drunk.  (Id.)  His friend Frank

1    Sturgell was seriously injured and spent a month in the hospital.  (Id. at 32-33.)  The other friend,

2    Eddie Burch, lost his two front teeth.  (Id.)  Petitioner described feeling a lot of guilt about the

3    injuries his friends suffered.  (Id. at 33.)

4         After the accident, petitioner's mother and siblings returned home.  (Id.)  They found a

5    "'dump truck full' of beer cans behind the house."  (Id.)  However, petitioner's sister reported that

6    his father stopped binge drinking after their return.  (Id.)

7         Dr. Cunningham concludes petitioner experienced "developmental derailment" and

8    identified this as a mitigating circumstance that could have been presented at trial.  (Id. at 29-30.)

9    He describes the forces that "interacted to result in derailing Jerry from a normal, well socialized

10   sequence of development."  (Id. at 29.)  First were the effects of the car accident on his cognitive

11   functioning, his personality, and his socialization, including the knee injury that excluded him

12   from sports, the facial deformation that alienated him from peers, and the recurrent bouts with

13   meningitis.  (Id. at 29.)  Second, petitioner's alcohol consumption increased after the accident and

14   particularly after he dropped out of school.  (Id.)  Dr. Cunningham looks next at "a loss of a

15   protective sense of invulnerability and immortality."  (Id.)  He notes that the "disruption of this

16   sense of personal control, personal longterm optimism, and confidence in one's personal physical

17   security" often occurs in people who suffer serious injury or illness.  He adds that "[a]dolescence

18   is a particularly difficult time to have this sense of personal security disrupted" because it also is

19   the time when children must become more independent.  (Id. at 29-30.)  The final factors in

20   petitioner's developmental derailment discussed by Dr. Cunningham were petitioner's mother's

21   extramarital affair and subsequent abandonment of him and his father's "corruptive influence and

22   constructive abandonment."  (Id. at 30.)  Dr. Cunningham notes that at age 16, Jerry married a 21-

23   year-old woman, and that his history thereafter, including his relationship with Jennifer Warsing,

24   followed this pattern of relationships with older women and included domestic violence.  (Id.)

25        Dr. Cunningham also discusses at some length petitioner's alcohol and drug dependence.

26   (Id. at 33-39.)  He finds a number of factors influenced the development of petitioner's

27   dependence.  They included:  "[g]enetic vulnerability, family/community/peer influences,

28   child/adolescent onset, self medication in response to traumatic experience, reciprocal life impact

as alcohol and drug abuse further undermined opportunities and access to experiences which

would build confidence and more adaptive lifestyle, apathy of coping capacity, disinhibition of

aggressive impulses, and influencibility." (Id. at 33.)  Dr. Cunningham describes petitioner's

early exposure to and use of alcohol.  (Id.)  In addition, petitioner's sister reported that petitioner

experienced "multiple alcohol related blackouts during periods of intoxication even before [his]

automobile accident."  In fact, petitioner was drinking every weekend by the time he was 12 or

13.  (Id. at 33-34.)  The blackouts "increased in frequency following the accident."  (Id.)

Petitioner's sister described "episodes lasting 15 to 20 minutes when [petitioner] would be

conscious but unresponsive to external stimuli including being spoken directly to as if profoundly

internally preoccupied."  (Id. at 15.)  Dr. Cunningham also describes petitioner's abuse of

marijuana and methamphetamines.  (Id. at 34.)

As to genetic vulnerability, Dr. Cunningham notes that petitioner's father and two

maternal uncles were described as alcohol abusers, two other maternal uncles had multiple

convictions for drunk driving, and petitioner's sister reported that she also had drug dependency

problems.  (Id. at 35.)  In addition, many of the adults, as well as the peers, in petitioner's life

modeled alcohol abuse and encouraged his early consumption.  (Id. at 36.)  Dr. Cunningham

shows that petitioner's alcohol abuse increased markedly after extremely stressful events, such as

the discovery of his mother's affair and his accident, demonstrating that he used alcohol as a

coping mechanism.  (Id.)  Dr. Cunningham also discusses that "brain damage with its associated

judgment deficits and reduced coping capacity was a risk factor for alcohol and substance

dependence."  (Id.)

Many people reported that petitioner became "profoundly more aggressive" when he was

drinking.  (Id. at 36.)  Dr. Cunningham notes that Jennifer Warsing testified that petitioner beat

her when he was intoxicated.  (Id.)

b.  Discussion

In his opening brief, petitioner spends a great deal of time arguing that Iversen and Hawk

acted unreasonably in failing to investigate and present a mental health defense for the guilt

phase.  Petitioner makes a significant case that counsel acted unreasonably.  However, the

1   reasonableness of counsel's conduct is only half of the Strickland test.  Cf. Hurles v. Ryan, 752

2   F.3d 768, 787 (9th Cir. 2014) (court need not address both components of ineffective assistance

3   of counsel claim if the petitioner makes an insufficient showing as to one) (citing Strickland, 466

4   U.S. at 697).  Petitioner must also show a "reasonable probability" that counsel's errors affected

5   the outcome of the guilt phase.  Strickland, 466 U.S. at 694.  Moreover, he must make this

6   showing within the context of the deferential standard of review under 28 U.S.C. § 2254(d).  As

7   discussed above, this court may only find section 2254(d) satisfied if "no fair-minded jurist"

8   could have denied this claim.  Richter, 131 S. Ct. at 736.  Petitioner has failed to show that no

9   reasonable jurist could have found that he failed to make a prima facie showing of prejudice as a

10   result of counsel's failures at the guilt phase.

11        To establish a prima facie case of prejudice under Strickland, petitioner must make

12   allegations sufficient to show a reasonable probability that, had counsel presented a mental state

13   defense, the result of the guilt phase would have been different.  The jury found petitioner guilty

14   of first degree murder of both Brandts and guilty of first degree felony murder through verdicts of

15   guilt on the robbery and burglary charges.  (RT 9372-9377.)  Petitioner only suffered prejudice if

16   the mental state defense would have been successful to show that "because of his mental illness

17   or voluntary intoxication, [petitioner] did not in fact form the intent unlawfully to kill" or form

18   the intent to commit robbery or burglary.  See People v. Saille, 54 Cal. 3d 1103, 1117 (1991)

19   (emphasis in original), cited in  Sully v. Ayers, 725 F.3d 1057, 1070 (9th Cir. 2013), cert. denied,

20   134 S. Ct. 2697 (2014).

21        Petitioner has made no attempt to place the evidence he has collected regarding

22   petitioner's mental state within the legal context of the guilt phase determination.  Petitioner has

23   certainly shown he has mental health problems that were not fully explored at trial.  That does not

24   also mean he has alleged facts showing a reasonable probability that the jury's consideration of

25   those mental health problems would have changed its guilt phase determination.  Moreover, he

26   has not shown that no fair-minded jurist could have determined he had not established a prima

27   facie case of prejudice.

28   ////

61

1    There was significant evidence at trial that petitioner formed the intent for murder,

2    burglary, and robbery.  Garth Lavallee, whose house Ron Wilson and petitioner stopped at to get

3    some watering equipment on the afternoon of the crimes, testified that petitioner told him that the

4    Brandts should be "knocked in the head for their money."  (RT 5818:14-17.)  Ron Wilson

5    testified that petitioner told him twice that day that Mr. Brandt "should be more careful about

6    showing the bundle he has or somebody would hit him in the head and take it from him."  (RT

7    6001:5-17.)   However, when Wilson responded that anybody who did that would go to jail,

8    petitioner replied, "'Well, I wouldn't want to. I have already been to jail.  I don't want to go

9    back.'"  (RT 6001:20-24.)

10    Petitioner also indicated to Wilson that he was broke.  (RT 5996:6-7.)  Wilson saw the

11    shotgun at petitioner's campsite that night.  (RT 6003:7-12; 6110:22-26.)  After Wilson left

12    petitioner's campsite, petitioner told Jennifer Warsing that he was going to "take what he could"

13    and that he "was going to do something bad, really bad."  (RT 6271:25 – 6272:2.)  Warsing

14    testified that petitioner then told her he was going to kill the Brandts and that if she did not come

15    with him he would have to kill her too.  (RT 6272:15-21.)  Petitioner took the shotgun, grabbed

16    Warsing by the arm, and walked to the Brandts' cabin.  (RT 6273:11-22.)  Before he shot Mr.

17    Brandt, Warsing heard petitioner say, "Old man, you want to live?"  (RT 6279:4-5.)  After

18    petitioner shot both of the Brandts, he directed Warsing to help him take money and gold from

19    their house.  (RT 6290-6295.)  During their flight in the Brandts' car, petitioner disposed of the

20    murder weapon and hid the keys to the Brandts' car.  He and Warsing purchased a new car and

21    new clothes.  (RT 6300-6315.)

22    To succeed on his mental health defense at trial, the defense attorneys would have had to

23    discredit Wilson and Warsing's testimony.  That would have been particularly difficult because

24    petitioner needed both witnesses' testimony to show his mental state at the time of the crimes.

25    Petitioner relies on Wilson's statements about the amount petitioner drank the day and evening of

26    the crimes and many of Warsing's statements, including her description of petitioner's statement

27    that he saw the devil at their camp.  Petitioner does not show how trial counsel could have

28    induced the jury to selectively believe only parts of both Wilson's and Warsing's testimony.

1     This court recognizes that, previously, it found petitioner made a colorable showing of prejudice.

2     As other courts have recognized, the question under section 2254(d) is not whether this court

3     finds the petitioner has established a prima facie case.  Rather, the question is whether no

4     reasonable jurist could have found otherwise.  With respect to petitioner's argument that counsel

5     was ineffective for failing to investigate and present a mental health defense, he has failed to

6     satisfy that section 2254(d) standard.

7          4.   Other Instances of Ineffective Assistance of Counsel at the Guilt Phase – Claims 3
                and 7
8

9               a.   Opening Promises that Petitioner and Dr. Wagner would Testify[31]

10    Petitioner points out that attorney Iversen promised the jury that petitioner would testify

11    and tell his story.  Iversen also told jurors they would hear testimony from both neurologist Dr.

12    McGuire and psychologist Dr. Wagner about petitioner's memory problems.  Neither petitioner

13    nor Dr. Wagner testified at the guilt phase.

14                    i.   Background and Evidentiary Proffer

15    In his opening statement, attorney Iversen told the jury four times that petitioner would

16    testify.  At the beginning of his opening statement, he said that "when" petitioner took the witness

17    stand, he would tell the jury how sad he was about what happened to the Brandts.  (RT 5381:9-

18    12.)  After an extensive discussion of how the physical evidence contradicted Jennifer Warsing's

19    version of the events, Iversen said, "Jerry Frye wants to take the witness stand.  He wants to

20    testify.  He wants to tell you how he feels and what he remembers happening."  (RT 5406:1-3.)

21    Iversen then addressed the prosecutor's statements about petitioner's various stories to

22    police officers.  The prosecutor had described petitioner's first, videotaped statement to the Belle

23    Fourche police that he did not know whether he had killed the Brandts, but that Warsing had told

24    him he did.  (RT 5378:6-8.)  In a later statement, petitioner told police he had heard shots coming

25

26    [31]  Petitioner combines this issue with the various other allegations of ineffective assistance of
      counsel at the guilt phase.  However, because the court finds these allegations more serious, and
27    because there is a substantial body of law regarding this issue, the court considers it separately.
      In addition, the court considers it below as part of petitioner's overall argument that the defense
28    was unorganized and lacked a consistent strategy.

1    from the Brandts' cabin, he and Warsing had run down the hill, found the Brandts' bodies, and

2    fled in their car.  (RT 5378:9-18.)  Finally, the prosecutor recounted that during his trip from

3    North Dakota to California, petitioner told an officer that he had killed the Brandts.  (RT 5379:3-

4    7.)

5            Iversen explained that the jury would hear about petitioner's physical and mental

6    problems that resulted from an automobile accident.  (RT 5409:19-24.)  He stated that two mental

7    health experts would testify about the problems with petitioner's brain from the auto accident and

8    the repeated bouts of meningitis.  (RT 5409-5412.)  He identified neurologist Dr. Stephen

9    McGuire and psychologist "Dr. Linda Walker."  (RT 5411:16 – 5412:5.)  He told the jury the

10   experts' testimony was important for two reasons.  First, to help the jurors understand petitioner's

11   difficulties testifying:  "Jerry is going to testify. And when he testifies, the information that these

12   doctors will tell you is that he has difficulty processing words."  (RT 5412:11-15.)  He told jurors

13   the second reason the testimony was important was that "any damage to the neurons in the brain

14   makes you particularly susceptible or vulnerable to the effects of alcohol and/or drugs."  (RT

15   5413:12-15.)  He added that petitioner "has had a history of some blank spots or some blackouts.

16   There is some basis, just on the abnormal EEG, to consider that it might be a seizure pattern.

17   Certainly, it would be exacerbated or worsened if you drank."  (RT 5413:25 – 5414:4.)

18   However, Iversen went on to "make it clear" that "we are not saying he is crazy," or "that he has

19   diminished capacity."  (RT 5414:18-21.)  Rather, Iversen focused the expert testimony on

20   "memory loss."  (RT 5415:5-17.)

21          Shortly after the discussion of the experts' intended testimony, Iversen again said "He is

22   going to testify.  He is going to not only, obviously, tell his story, but be subject to cross-

23   examination with regard to that videotape.  So you will hear from him what was going on and

24   why he said what he said that night."  (RT 5418:6-10.)  This time Iversen was adding to his

25   promise that Mr. Frye would explain how, when he was speaking to South Dakota police in the

26   middle of the night while drunk, he was trying to piece together his memories.  (RT 5417:23 –

27   5418:5.)

28   ////

It is not clear whether at the time of his opening statement, which was delivered on March 2, 1988, Iversen had ever spoken to Dr. Wagner.  As discussed above, Dr. Wagner was hired while attorney Dixon was representing petitioner.  She examined petitioner in May 1986, several months before Iversen's appointment in September 1986.[32]  (1 SH, Ex. 20 at 1.)  According to the mitigation evaluation performed by psychologist Mark Cunningham at the behest of state habeas counsel, Dr. Wagner described preparing her report of the "neuropsychological evaluation" on March 22, 1988 and meeting with counsel Hawk and Iversen on March 29, 1988, two days before the beginning of the defense case.  (1 SH, Ex. 21 at 5.)  However, at the time of his opening statement in early March, Iversen was aware that Dr. Wagner "ran some tests" and that her findings corroborated the findings of Dr. McGuire regarding "this problem that [petitioner] has." (RT 5412:1-5.)

On April 21, 1988, Iversen requested an in camera hearing to discuss why he was not going to call petitioner as a witness.  (RT 8369-8370.)  Iversen described many hours of preparation he and Hawk had spent with petitioner, some of which also included Dr. Peal and some of which included a sociologist experienced in capital cases who worked with the National Jury Project.  (RT 8371.)  Iversen then explained that petitioner experienced what he referred to as "the popcorn phenomenon."  (RT 8372:1-3.)  He described petitioner's difficulty processing questions and his later, sudden provision of important information.  (RT 8372:4-11; 8372-8375.) Iversen told the judge that due to petitioner's

> physical and mental problems . . ., he really can't assist me in terms of preparing to testify, because he, one, can't bring things up from his memory to tell me about them, and secondly, we can't rely, if you ask the same question two days in a row, that you will get all the information.
>
> . . .

---

[32] Dr. Wagner found that petitioner had "demonstrated a deficit in memory functions."  (1 SH, Ex. 20 at 10.)  She described instances "when listening to a conversation where he misses information and becomes confused because there is to [sic] much information for him to process at once."  (Id.)  She also opined that petitioner had a "significantly impaired" ability "to learn and retain new information."  (Id.)  Dr. Wagner also identified problems with petitioner's executive functions.  She found "deficits in sustained attention/concentration, mental tracking, and mental control … [and] his ability to sequence and shift cognitive sets was impaired."  (Id. at 11.)

1

2

> [D]espite the many hours of preparation, I think that, because of this impairment that he has, it's virtually impossible for me to feel that he is prepared to testify or that he can properly testify.

3

4

> And I have researched the 1368 [competency] issue in terms of a client that is unable to assist you. It doesn't seem to fit into that area.

5   (RT 8375:19 – 8376:2, 8-15.)

6       Iversen also told the judge that Dr. Peal was concerned that the stress of testifying could

7   cause petitioner to have a stroke. (RT 8375:13-15.) However, Iversen informed the judge,

8   petitioner wanted to testify. (RT 8376:20-24.) Iversen stated that his opinion that petitioner

9   should not testify was not based on the usual tactical considerations in determining whether or not

10  a defendant should testify. (RT 8377:7-15.) He told the judge he was unsure about how to

11  proceed. (RT 8377:16-24.) The judge made clear that if petitioner wished to testify, he could do

12  so. (RT 8379:7-16.)

13      Also during this ex parte conference with the judge, Iversen told him that Dr. Wagner

14  would not testify. (RT 8381:13-16.) He told the judge the prosecutor had been seen observing a

15  trial in which there was cross-examination of a psychologist regarding the validity of

16  psychological testimony. (RT 8381:18-25.) He was aware the prosecutor had retained

17  "prominent psychologist" Dr. Grant Hutchinson, who had given "very effective testimony" about

18  the reliability of a number of tests. (RT 8382:1-4, 20-24.) Iversen said he had spent "the better

19  part of two days" with Dr. Wagner and was concerned that with her "very, very little forensic

20  experience" and her lack of knowledge about some of the testing, she would not do well under

21  cross-examination. (RT 8382:5-10.) Iversen told the court he had another psychologist "with a

22  great deal of forensic experience, Dr. Aaron Bohr" prepared to testify if necessary. (RT 8382:16-

23  19.)

24      In his closing argument, Iversen explained why he had not put on the testimony of

25  petitioner and Dr. Wagner. He first told the jury he felt "badly" about not doing so because he

26  wanted the jury to trust him. (RT 9076:23 – 9077:4.) He then explained that Dr. Wagner's

27  testimony was not necessary because "Dr. Peal testified extensively and testified that he had

28  discussed the results of Dr. Wagner's test with her and that they were consistent with his

66

1  opinion." (RT 9077:5-8.)  He added that had the prosecutor attempted to contradict either Dr.

2  Peal's or Dr. McGuire's testimony, he could have put Dr. Wagner on.  (RT 9077:14-16.)  With

3  respect to the failure to put petitioner on the stand, Iversen reminded the jury of Dr. McGuire's

4  testimony about petitioner's brain injury, told them that testifying is stressful, and concluded that

5  a person with an injured brain may have memory problems in a stressful situation.  (RT 9078:1-

6  10.)

7       The prosecutor responded to the failure to put Dr. Wagner on the stand.  First, she

8  discussed Dr. Peal's testimony at some length, including pointing out the facts that Dr. Peal

9  administered no tests for brain damage, was not qualified to do so, and was not familiar with, nor

10  did he inspect, the raw test data obtained by Dr. Wagner.  (RT 9245-9251.)  The prosecutor

11  added:

12       you were told you were going to hear from neuropsychologist
        Linda Wagner.  She did not show up at trial.  She did not testify.
13       Defense stated there was no reason for it.  But, despite that, you
        may reasonably infer, if that psychologist had some real helpful
14       information to the defense, you would have heard from her.

15  (RT 9248:16-21.)

16                    ii.   Legal Standards

17       Federal law is clear: counsel's failure to follow through on testimony promised in an

18  opening statement has a high probability of prejudicing the jury.  This is particularly true when

19  the testimony promised is the defendant's.

20       It does not appear that the Ninth Circuit has applied Strickland to a case in which defense

21  counsel promised certain testimony and then failed to deliver on that promise at trial.  See

22  Nguyen v. Cate, 2012 WL 850609, *8 (N.D. Cal. March 13, 2012).  The First Circuit addressed

23  defense counsel's unfulfilled promise that his client would testify in Ouber v. Guarino, 293 F.3d

24  19 (1st Cir. 2002).  The court in Ouber found defense counsel's actions unreasonable because,

25  after making the jury feel that the petitioner's testimony was the "centerpiece of the defense,"

26  counsel advised the petitioner not to testify.  293 F.3d at 27.  The court noted that such conduct

27  could not be accepted "as part and parcel of a reasoned strategy."  Id.  Further, recognizing that

28  "unexpected developments sometimes may warrant changes in previously announced trial

1    strategies," the court noted that Ouber's case had no such surprises.  Id. at 29-30.  The First

2    Circuit court found that the record did not support the state court's finding that the attorney's

3    conduct was a reasonable, strategic choice and concluded that the state court's finding was an

4    unreasonable application of Strickland.  Id. at 32.

5         In an earlier, pre-AEDPA case, when examining a broken promise of psychiatric

6    testimony, the First Circuit also stressed that "little is more damaging than to fail to produce

7    important evidence that had been promised in an opening."  Anderson v. Butler, 858 F.2d 16, 17

8    (1st Cir. 1988).  The court found that damage particularly bad in Anderson because the opening

9    was only the day before the defense case, the jurors had been asked on voir dire about their

10   acceptance of psychiatric testimony, the promise was "dramatic," and the promised testimony

11   "strikingly significant."  Id.  The court in Anderson rejected an argument that the expert's

12   testimony would not have been completely favorable to the defendant.  Id.  "[I]f it was ... wise

13   [not to call the experts to testify] because of the damaging collateral evidence, it was inexcusable

14   to have given the matter so little thought at the outset as to have made the opening promise."  Id.

15   at 18.  The First Circuit held that defendant Anderson's Sixth Amendment rights were violated by

16   the unfulfilled promise.  Id. at 19; see also Harris v. Reed, 894 F.2d 871, 878-79 (7th Cir. 1990)

17   (failure to put on testimony of promised eye witness ruled unreasonable and prejudicial).

18        District courts in this circuit have also considered the issue.  In United States v. Crawford,

19   680 F. Supp. 2d 1177 (E.D. Cal. 2009), a federal prisoner moved under 28 U.S.C. § 2255 to have

20   his judgment of conviction and sentence vacated, arguing that his trial lawyer was

21   unconstitutionally ineffective for, among other things, promising in his opening statement that the

22   jury would hear testimony that his client was framed and then failing to produce that evidence at

23   trial.  The court held counsel's failure to produce the promised witness may constitute ineffective

24   assistance of counsel depending upon "the nature of the promise(s) made during his opening

25   statement."  680 F. Supp. 2d at 1194-95, 1197.  To make the determination, the court considered

26   the following factors:  (1) whether the promise was "dramatic"; (2) whether the evidence omitted

27   would have been significant; (3) whether the promise was general or specific; (4) whether the

28   testimony was elicited through other means; and (5) whether the time lapse between the promise

68

1    in opening statement and submission of the case to the jury was relatively short or long.  Id. at

2    1195-1202.  The court determined that although counsel gave a "specific, and lengthy

3    description" of the witness's testimony, it was not unreasonable to fail to put that witness on the

4    stand.  The witness was "highly impeachable, disreputable, and incredible."  Id. at 1202.  By

5    describing the witness's testimony for the jury, but not putting him on the stand, the defense

6    attorney got the witness's statements before the jury without the risks involved in having him

7    testify.  Id.  The court held this decision allowed the defendant to, in effect, "'have his cake and

8    eat it too.'"  Id.

9       More recently, in Williams v. Woodford, Chief Judge Kozinski found that defense counsel

10   provided constitutionally deficient assistance when he promised jurors in opening statement they

11   would hear from two alibi witnesses as well as the defendant and thereafter failed to put any of

12   the witnesses on the stand at trial.  859 F. Supp. 2d 1154 (E.D. Cal. 2012).  The court compared

13   the conduct of counsel in that case to the deficient performances rendered in Anderson and

14   Ouber, among others, and found that "the failures in many of those cases were less serious than

15   the broken promises here; none was more serious."  Williams, 859 F. Supp. 2d at 1171.  The court

16   further found that defense counsel's broken promises in that case were "prejudicial not only

17   because of their harm but because of just how close a case this was."  Id. at 1172.  The court in

18   Williams acknowledged that each of the promised witnesses would have brought his or her own

19   weaknesses to the defense and that on that basis alone "[i]t would be a close call whether mere

20   failure to put these witnesses on the stand prejudiced [the defendant]."  Id. at 1173.  But "[w]hat

21   fatally undermined [the] defense were counsel's unfulfilled promises that these witnesses would

22   testify ….  Every indication is that this one came down to the wire.  Effective assistance of

23   counsel, rather than unfulfilled promises, might well have changed the outcome."  Id.; see also

24   Madrigal v. Yates, 662 F. Supp. 2d 1162 (C.D. Cal. 2009) (where prosecution's case was "weak,"

25   failure to present promised testimony was unreasonable).

26       Finally, last year in Nguyen, the court considered defense counsel's statement to the jury

27   that the defendant would testify and tell the jury "these things that I'm telling you."  2012 WL

28   856609, *7.  The defendant did not testify.  Counsel perceived the prosecution case as weak and

1    knew his client's testimony posed considerable risks.  Id. at *9.  The court accepted the state court

2    determination that counsel's conduct was not unreasonable.  Id.

3                                    iii.    Opinion of the State Court

4              Petitioner raised this claim on appeal and the California Supreme Court rejected it as

5    follows:

6                      On this record, we cannot conclude counsel rendered deficient
                       representation by advising defendant against taking the witness
7                      stand notwithstanding having told the jury in opening statement that
                       defendant would testify. In light of defendant's initial desire and
8                      willingness to testify, counsel's statement was an appropriate
                       exercise of his decisionmaking responsibilities at trial. (Cf. People
9                      v. Hines (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d
                       388] [counsel not ineffective for informing jury during opening
10                     statement defendant would testify, given defendant's indication to
                       counsel of willingness to do so].) As the trial progressed and
11                     counsel observed defendant's increasing inability to remember,
                       counsel's advice against testifying also fell within the realm of
12                     tactical considerations. Given defendant's decision to heed his
                       attorneys' advice and forego his right to testify, and in the absence
13                     of anything in the record evidencing the lack of a reasonable basis
                       for counsel's advice not to take the witness stand, we view the
14                     challenged acts as appropriate tactical decisions, subject to great
                       deference on appellate review. (Fields, supra, 51 Cal.3d at pp.
15                     1069-1.)

16

17   18 Cal. 4th at 983-84.  In his reply brief, petitioner argues generally that the California Supreme

18   Court appellate opinion should not be considered the final decision on his ineffective assistance

19   of counsel claims.  However, this court is unable to find any reference to this argument in

20   petitioner's state habeas petitions.  Therefore, it appears this aspect of petitioner's ineffective

21   assistance of counsel claim was only raised on appeal.  The California Supreme Court's appellate

22   decision is that court's final decision on the merits of this claim and therefore the one subject to

23   review under section 2254(d).

24                                    iv.    Discussion

25             The California Supreme Court held Iversen's decision was not unreasonable.  The state

26   court's decision is supported by the record.  The record shows that petitioner insisted upon

27   testifying.  Iversen obviously was aware of petitioner's problems with memory and understanding

28   ////

                                             70

1   questions.  Iversen told the jury about those problems in the opening statement.  Thus, Iversen

2   was confronted by an insistent client, who he knew would have trouble testifying.

3       Iversen was careful in his opening statement.  He did not describe petitioner's expected

4   testimony with any sort of specificity.  Rather, Iversen told jurors only that petitioner would tell

5   them how sad he was about what happened to the Brandts and "how he feels."  (RT 5381:9-12;

6   540-6:1-3.)  Iversen's references to petitioner's testimony about the crime were vague.

7   According to Iversen, petitioner would tell jurors "what he remembers happening."  (RT 5406:1-

8   3.)  Later Iversen stated that petitioner was going to "tell his story" and also be subject to cross-

9   examination regarding the video-taped statements he made to police in South Dakota.  (RT

10   5418:6-10.)  However, again Iversen was vague; with respect to the videotape, he told jurors only

11   that petitioner would tell them "what was going on and why he said what he said that night."  (Id.)

12   The only specificity Iversen provided the jury was that petitioner would explain he was drunk at

13   the time of the videotape and that "he was trying to piece together his memories."  (RT 5417:23 –

14   5418:5.)

15       Iversen made no attempt to tell the jury petitioner's "story."  Rather, Iversen spent his

16   time in the opening statement focusing on the problems with the physical evidence and showing

17   that Jennifer Warsing's testimony did not jibe with the physical evidence they did have.  (RT

18   5385-5409.)  The lack of specificity meant that the defense in the present case avoided the

19   situation in Anderson of failing to put on specific, promised, "powerful" evidence to support the

20   primary defense.  858 F.2d at 19.

21       It is also important that Iversen's promise was made in his opening statement on March 2,

22   before the beginning of the prosecution's case.  The defense case did not begin until April 21,

23   over a month and a half later.  This is not a situation like that in Anderson where defense counsel

24   made a promise in an opening statement given immediately before the beginning of the defense

25   case and then defense counsel rested the following day without calling the promised witness.  858

26   F.2d at 17.

27       Finally, Iversen had a reasonable explanation for his decision not to put on petitioner's

28   testimony.  He told the judge Dr. Peal was concerned that testifying could cause petitioner

71

1    extreme stress, possibly to the point of having a stroke.  And, Iversen provided the jury with a

2    reasonable explanation for petitioner's failure to testify.  He told the jury of Dr. McGuire's

3    testimony about petitioner's brain injury, that testifying is stressful, and that a person with an

4    injured brain may have memory problems in a stressful situation.  (RT 9078:1-10.)  In sum, while

5    Iversen's conduct was far from perfect and may indicate a lack of preparation, this court finds the

6    California Supreme Court's determination that Iversen acted reasonably is neither contrary to, nor

7    an unreasonable application of, Strickland and case law regarding counsel's failure to introduce

8    promised testimony.

9         Iversen's failure to put on the testimony of Dr. Wagner is somewhat different.  First, while

10   petitioner raised that issue on appeal, it does not appear that the California Supreme Court

11   addressed it directly.  (AOB at 66.)  This court presumes, however, that because the issue was

12   fairly raised, the state court rejected it on the merits.  See Johnson v. Williams, 133 S. Ct. 1088,

13   1094 (2013) (rebuttable presumption that claim raised in state court, but not explicitly addressed

14   by court in reasoned opinion, was rejected on the merits).  Getting to the merits of petitioner's

15   claim, it should first be noted that, unlike his description of petitioner's expected testimony,

16   Iversen did describe, albeit briefly, how Dr. Wagner would testify.  Iversen told the jury that Dr.

17   Wagner, along with Dr. McGuire, would explain why petitioner may have problems

18   understanding questions and remembering things.  (RT 5412:11-15; 5413:12-15.)   Nonetheless,

19   during the in camera proceeding, Iversen explained legitimate grounds for concern about cross-

20   examination of Wagner.  Further, and as Iversen told the jury, he put on the testimony of two

21   other experts.  Had the defense pursued a mental health defense, then the need for Wagner's

22   testimony would have been greater.  However, given the guilt-phase focus on attacking Jennifer

23   Warsing's credibility, this court finds the California Supreme Court would not have been

24   unreasonable in concluding that making or breaking the promise that Wagner would testify was

25   not contrary to Strickland or otherwise unreasonable.

26   ////

27   ////

28   ////

b.  Additional Allegations of Ineffective Assistance of Counsel

i.   Counsel's Conflicting Agendas

Petitioner makes much of counsel's conflict.  Because attorney Hawk is deceased, the court has only the declaration of attorney Iversen, state habeas counsel's declaration about what attorney McDowell told him, and McDowell's letter to Lane to support the argument they were unable to work well with Hawk.  Petitioner's primary argument here is the one discussed above, that Hawk developed a relationship with petitioner which foreclosed reasonable discussion of any guilt phase defense strategies besides outright acquittal.  In addition, petitioner argues that Hawk had no clear strategy.  Attorney Iversen described the situation like this:

> Prior to, and during both the guilt and penalty phases of the trial, I sat down with Mr. Hawk to discuss strategy with him. Hawk had his own agenda in this case.  He was often ill-prepared and abrasive. . . .  Hawk angered and frustrated the efforts of everyone involved in the process of representing Jerry Frye by failing to keep appointments with the investigator, failing to perform tasks assigned to him, and failing to follow previously-agreed upon strategies.

(1 SH, Ex. 26 at 3-4.)  Iversen said, "His lack of preparation, cooperation and failure to advise co-counsel of his intentions made planning a coherent strategy with Mr. Hawk futile."  (Id. at 4.) According to state habeas counsel Lane, attorney McDowell said,

> This case was absolutely frustrating because we could never agree on things as a team. Richard Hawk prevented the defense team from working cohesively together and thereby undermined the assistance Jerry received. There was no clear leadership and communication within the team was severely strained. . . . [Hawk's] agenda in this case . . . was completely unknown to me.

(1 SH, Ex. 25 at 5, 6.)  In her letter to Lane, McDowell confirmed that there were "numerous times that Hawk simply did not show up for appointments with [an investigator]."  (1 SH, Ex. 27 at 2.)

ii.   Attorneys took conflicting positions in front of the jury

Petitioner also points to various conflicts he claims would have confused or prejudiced jurors.  While the court understands that petitioner is attempting to show that the defense was in chaos and had no consistent strategy at the guilt phase, most of the conflicts pointed out are

1  simply not significant.  First, petitioner argues Hawk and Iversen had different goals, which

2  resulted in taking conflicting positions before the jury with respect to prosecution witness Jennifer

3  Warsing.  Petitioner points out that Iversen asked the jury to listen to Warsing's videotaped

4  statements to the police because "she talks about blackouts and she talks about telling Jerry Frye

5  things he did, and she said he has this disbelief like he didn't know he said that or done it."  (RT

6  5415:6-9.)  On the other hand, according to petitioner, Hawk attempted to discredit everything

7  Warsing said.  Given the fact that Warsing was, by far, the prosecution's most important witness,

8  any attorney would have attempted to discredit her before the jury.  Iversen's one, isolated

9  statement to the contrary, can hardly be said to have created a conflict in the eyes of the jury.

10  Petitioner also points out that, in his opening statement, Iversen took inconsistent

11  positions when he informed the jury about petitioner's mental problems, but followed that by

12  telling jurors, "We are not saying that he has a diminished capacity."  (RT 5414:19-20.)

13  Petitioner fails to mention that Iversen raised petitioner's mental health issues to give jurors some

14  understanding of petitioner's demeanor and memory issues during his videotaped statements to

15  police and his expected testimony.

16  Petitioner next argues that Hawk and Iversen approached the law enforcement witnesses

17  differently.  The defense case closed with testimony from criminalist John Thornton regarding the

18  crime scene.  According to petitioner, Thornton's testimony relied upon a crime scene diagram

19  prepared by Amador County Detective Mark Anderson.[33]  While Iversen attempted to show

20  Anderson's work was solid, Hawk attempted to impeach Anderson by insinuating he was having

21  a relationship with Warsing.  (Compare RT 5579-90, 5599-5606, 6964-48, 6981-86 with RT

22  7121-25.)  While this one example may demonstrate the lack of  consistency between Iversen and

23  Hawk with respect to the defense approach to the credibility of Detective Anderson, petitioner

24  does not demonstrate just how Hawk's attempt to label Anderson as Warsing's "boyfriend,"

25  would have prejudiced the jury's consideration of Thornton's testimony.

26  ////

27

28  _____
[33] Petitioner does not provide citations to the transcript to verify this statement.

74

1    Petitioner also shows that, while the guilt phase defense was that Jennifer Warsing was

2    lying, both Iversen and Hawk made some attempts to question experts about, and even argue, that

3    petitioner was not capable of committing a deliberate and premeditated murder.  Iversen

4    questioned Dr. McGuire on this point.  Dr. McGuire testified that a person with the sort of brain

5    injury suffered by petitioner might "be intolerant of stress, and thus would have non-directed

6    violence in response to his environment."  (RT 7295:12-14.)  This problem would be exacerbated

7    by the use of alcohol and/or drugs.  (RT 7296:15-17.)  Hawk briefly questioned Dr. Peal along the

8    same lines.  Dr. Peal testified that petitioner's brain damage would impair his ability to deliberate.

9    (RT 7860:1-11.)  Then, in his closing argument, Iversen stated, contrary to the statement made in

10   his opening that the defense was "not saying that he has a diminished capacity," that "[t]here is

11   evidence that supports a finding that Jerry Frye didn't have the appropriate mental state."  (RT

12   9083:16-17.)  What petitioner omits from his argument, however, is that Iversen also attempted to

13   tell the jury that he was not being inconsistent.  He first asserted that "our defense is [that] Jerry

14   Frye did not commit the act."  (RT 9083:10-12.)  He went on to state that if the jury was satisfied

15   beyond a reasonable doubt that petitioner did commit the act, then it should consider evidence

16   that he did not have the appropriate mental state.  (RT 9083:12-15.)  Iversen explained that he

17   brought up the issue because evidence was presented on it and the judge would give jurors an

18   instruction on it.  (RT 9083:16 – 9084:15.)  Iversen implied that the evidence came in because the

19   prosecutor "brought out evidence with regard to intoxication and asked some questions with

20   regard to certain of the experts."  (RT 9084:1-3.)  He told jurors they could consider testimony

21   from Drs. McGuire and Peal to find a doubt about whether petitioner harbored the specific intent

22   to commit the crimes.  (RT 9084:4-11.)  Iversen then further explained that jurors would need to

23   consider petitioner's brain damage and he reviewed the testimony of Dr. McGuire that

24   petitioner's brain injury would affect not only memory, but judgment.  (RT 9086:14 – 9093:7.)

25   He added that Jennifer's Warsing's videotaped statement supported the lack of specific intent.

26   She described petitioner's drunken state and his memory lapses.  (RT 9094:18 – 9095:17.)

27   Petitioner also uses examples of conflicts occurring after the guilt phase to show the

28   inconsistencies in the defense.  He makes much of Hawk's motion to stay the penalty phase

75

1    proceedings because he believed petitioner was incompetent.  Apparently, the motion took

2    Iversen and McDowell by surprise.  (1 SH, Ex. 26 at 4; Ex. 25 at 6.)  Petitioner also points to

3    penalty phase errors, which are discussed in greater detail below.

4           Petitioner has a somewhat better argument that the defense failed to object to the reading

5    of Warsing's immunity agreement and its provision to the jury.  This argument is contained in

6    petitioner's claim 7.  He argues that aspects of the immunity agreement bolstered Warsing's

7    credibility in conflict with counsel's strategy of attacking that credibility.  According to

8    petitioner, the following parts of that agreement were objectionable:  (a) the identity of petitioner

9    as the killer; (b) the statement that "information available to the District Attorney" prior to the

10   preliminary hearing "indicated" Warsing was an "unwilling participant" in the crimes; (c) the

11   agreement's statement that the "District Attorney believes Jennifer Warsing was an unwilling

12   participant."  (ECF No. 612-8 (text of immunity agreement).)

13          There was no apparent reason for counsel to permit the reading of Warsing's immunity

14   agreement.  Even if it was unreasonable for counsel to allow it, however, it would have been

15   reasonable for the California Supreme Court to conclude that it did not prejudice petitioner.

16   Jurors knew that the prosecutors' position was that Warsing was telling the truth and that the state

17   believed petitioner killed the Brandts.  The fact that the agreement made clear the prosecutor had

18   made that determination from "information" received before the preliminary hearing would not

19   have caused the jury necessarily to believe that that information was not also introduced at trial.

20   The jury had no reason to think the prosecutors' belief was based on anything but the evidence

21   presented at trial.  To the extent the prosecutors' statements were inappropriate, there is no

22   reasonable probability they affected the jury's guilt phase verdict.

23          This is also true when looked at as part of counsel's entire presentation at the guilt phase.

24   Most of petitioner's complaints about counsel's conduct involve their failure to investigate and

25   present a case that petitioner was unable to form the intent necessary for a first degree murder

26   conviction.  And those complaints rely, in important part, on the jury accepting as true many

27   aspects of Warsing's testimony, such as her descriptions about petitioner's behavior right before

28   the crimes.  Only a few arguments relate to the impeachment of Warsing.  Even if counsel should

76

1   have moved to exclude the objectionable portions of the immunity agreement, if Hawk had not

2   attempted in inappropriate ways to challenge Warsing's credibility, and if Iversen had not asked

3   the jury to believe Warsing's statements that petitioner had blackouts and that he sometimes had

4   no memory of things he had done, the California Supreme Court still could have reasonably

5   found that petitioner failed to make a prima facie showing that the absence of those errors would

6   have made a difference in the result.

7                    iii.   Hawk's offensive behavior

8          Petitioner points to numerous instances in the record of Hawk interrupting prosecutor

9   Graves, deriding her, speaking directly to her rather than to the court, and answering her

10  questions directed to witnesses.  (ECF No. 612 at 107-109.[34])  Petitioner also points out that the

11  trial judge admonished Hawk for this behavior a number of times.  Some of Hawk's attempts to

12  discredit Warsing were also offensive, particularly because he stressed issues which were not

13  directly related to her credibility.  Petitioner points to Hawk's questioning of Warsing regarding

14  why she "stuck around" after being beaten by petitioner, his graphic description of the sexual

15  molestation of her son by a Highway Patrol Officer, and his focus on Warsing's sexual

16  proclivities, including bestiality.  (E.g., RT 6555-6556; 7843-7844.)

17                    c.   Prejudice

18         While petitioner argues the unreasonableness of counsel's conduct, he devotes little effort

19  to showing how that behavior might have affected the guilt phase.  Prosecutors had a strong guilt

20  phase case supported by eye witness testimony.  While the defense managed to show some of

21  Warsing's memories were inexact, much of her testimony was corroborated by the physical

22  evidence.  For example, Warsing's testimony about the number of shots used to kill the victims

23

24  ───────────────────
    [34]  Some of the supposed instances of offensive conduct cited by petitioner are misleading.  For
25  example, petitioner says that Hawk "capped off his effort to offend everyone" by referring to the
    jurors' hometown as a "little Podunk area."  (ECF No. 612 at 109:7-8.)  Petitioner takes this
26  statement out of context.  Hawk was not rendering his personal opinion of the region.  Rather, he
    was trying to disparage the "big city" Department of Justice investigators by stating that "[t]hose
27  guys don't care.  They didn't care one way or the other.  They are up here in a podunk rural area
    and they wanted to go back to Sacramento City.  They didn't spend any more time in the woods
28  than they had to."  Frye, 18 Cal. 4th at 74.

1   was corroborated by testimony about the victims' injuries.  Her testimony about petitioner's

2   disposal of the murder weapon was corroborated by the testimony of officers that they located

3   that weapon based on Ms. Warsing's description.  In addition, as the California Supreme Court

4   pointed out,

5       Numerous items of physical evidence introduced at trial also
        corroborated Warsing's testimony. For example, a denim jacket
6       belonging to defendant was hanging on the back of one of the
        chairs in the Brandts' cabin when the victims' bodies were
7       discovered. The Brandts' automobile was recovered in
        Winnemucca.  One of the vials of gold taken from the Brandts'
8       cabin and sold to the proprietor of Silver Mountain Coins was
        introduced into evidence and Rolland Lungden identified defendant
9       as the person he saw come into the shop on two occasions in May
        or June of 1985 offering to sell some gold contained in such a
10      bottle.

11  18 Cal. 4th at 966.

12      Besides petitioner's statement to police that he and Warsing came upon the Brandts'

13  bodies and then fled, petitioner has not presented here any alternative explanation for what

14  happened to the Brandts.  Thus, petitioner's essential guilt phase ineffective assistance of counsel

15  argument appears to hinge on the claim that counsel should have chosen a mental health defense.

16  As discussed above, however, petitioner does not show how that defense would have convinced a

17  jury that petitioner did not intend to murder, rob, or burglarize the Brandts.  More importantly,

18  petitioner does not show how the state court's denial of these guilt phase ineffective assistance of

19  counsel claims was contrary to law or unreasonable.

20      5.  Ineffective Assistance of Counsel for Failure to Investigate and Present Mitigating
            Evidence at the Penalty Phase – Claims 28 and 29
21

22      The penalty phase defense presented at trial focused on petitioner's good qualities despite

23  some hardships in his upbringing, including his father's drinking and the effects petitioner's

24  mother noticed of the auto accident on his personality.  In addition, the defense presented

25  evidence to show petitioner had been a well-behaved prisoner.  Petitioner argues counsel was

26  ineffective for failing to investigate and present three categories of evidence:  (1) mental

27  health evidence; (2) evidence of traumatic events in petitioner's childhood; and (3) evidence of

28

78

1  the effects of petitioner's alcohol and drug dependencies.  Petitioner argues that each of these

2  issues supports one conclusion – counsel failed to adequately portray petitioner's mental state at

3  the time of the crime to show petitioner was less morally culpable than the "worst of the worst."

4          a.  Background and Evidentiary Proffer

5              i.   Deficient Performance

6          Petitioner presented little evidence to the California Supreme Court about what penalty

7  phase investigations took place.  In his declaration, Iversen stated that he was in charge of

8  "launching" the investigation.  (1 SH, Ex. 26 at 1.)  However, Iversen says nothing else about

9  preparation for the penalty phase investigations or the defense strategy.  In her letter to state

10 habeas counsel Lane, McDowell stated that no one on the defense team knew that petitioner's

11 mother had abandoned him shortly before the automobile accident until right before the penalty

12 phase began.  (1 SH, Ex. 27 at 3.)  She also indicated that Hawk and investigator Bricker took a

13 trip to Indiana to investigate, but "hated each other," which, she felt, resulted in a less than

14 adequate mitigation investigation.  (Id.; 1 SH, Ex. 25 at 9.)  Primarily, the state court and this

15 court must look to the penalty phase evidence presented to determine defense preparation for it.

16         Before the penalty phase began, petitioner asked the court to permit him to be absent from

17 the penalty proceedings.  (RT 9539-9540.)  Petitioner told the judge he could not stand being

18 there because he was so angry and he didn't want to "jeopardize anything that I might have with

19 the jury."  (RT 9540-9541.)  The court denied the request.  (RT 9542:2.)  Iversen asked for a

20 continuance to allow the defense time to deal with petitioner's anxiety, for which he had been

21 receiving medication for a short time.  (RT 9542-9543.)  This request was also denied.  (RT

22 9543:19.)

23         Another issue addressed prior to the start of the penalty phase was petitioner's request to

24 speak to the jurors in the form of an allocution, or unsworn testimony, rather than under oath and

25 subject to cross-examination.  (RT 9544:19-24.)  The judge had previously denied the request,

26 but, on reconsideration, granted it.  (RT 9545:5-10, 9546:10-15.)  Iversen asked for, and was

27 permitted, "a bit of time to prepare."  (RT 9546:23 – 9547:2.)  In his declaration, Iversen states

28 that the court denied the continuance and "[w]e did not prepare Jerry how to proper[ly] address

1    the jury." (1 SH, Ex. 26 at 4.[35])  However, when the court asked Iversen how much time he

2    needed and suggested 25 minutes, Iversen replied, "That would be fine."  (RT 9548:15-19.)

3          The prosecution presented in aggravation only the fact of petitioner's prior conviction for

4    sexual battery in Florida.  (RT 9619:16-17.)  When Iversen attempted to introduce testimony to

5    mitigate this prior offense, the court ruled the evidence inadmissible.  (RT 9631:20, 9633:20-24.)

6    The California Supreme Court recognized this ruling was error, but found it harmless.  18 Cal. 4th

7    at 1016-17.

8          Attorney Iversen conducted the penalty phase.  In his opening statement, Iversen briefly

9    mentioned three mitigating factors the defense would present: (1) whether defendant was under

10   the influence of extreme mental or emotional disturbance; (2) whether defendant was under the

11   substantial domination of another person; and (3) whether defendant's ability to conform his

12   conduct to the law was impaired by mental disease or intoxication.  (RT 9559-9560.)

13         After Iversen's opening statement, petitioner gave his allocution. Iversen led him through

14   it with questioning.  (RT 9562, et seq.)  Iversen's questions to petitioner made clear that petitioner

15   wanted to speak to the jury because he had problems with the guilt phase verdict, that petitioner

16   was afraid what he was going to say might make the jurors angry, and that petitioner did not want

17   the jurors to be angry at him.  Petitioner then gave a rambling statement of his disbelief at being

18   found guilty and derided the jury for taking so little time to arrive at a guilt phase verdict.  (RT

19   9563-9570.)

20         Thereafter, the defense presented a number of lay witnesses but no expert witnesses.

21   Most were family members who testified briefly that petitioner had some redeeming qualities (a

22   protective big brother, a good artist) and that they loved him.  Each asked the jury to spare his

23   life.  (RT 9571-9592 (petitioner's mother); RT 9593-9595 (petitioner's sister); RT 9596-9607

24   (petitioner's best friend; testified about the auto accident's effect on petitioner's life and about

25   petitioner and his father's drinking after petitioner's mother left them); RT 9608-9620

26

---

27   [35]  According to David Lane, attorney McDowell similarly recalled that the court denied the
     motion "for a brief continuance" and "we were unable to prepare Jerry to properly address the
28   jury."  (1 SH, Ex. 25 at 9.)

1    (petitioner's brother; testified about petitioner's son's need for a father); RT 9625-9637

2    (petitioner's uncle); RT 9638-9641 (petitioner's sister).)  In addition, the defense presented a

3    stipulation that jailers in Amador County and Florida (where petitioner served time on the sexual

4    assault conviction) would testify that petitioner did not present a problem when incarcerated. (RT

5    9622:18 – 9624:3.)  Finally, a jail chaplain from South Dakota testified that he spent three hours

6    with petitioner in the Deadwood jail and petitioner "accepted God that night" and is now a

7    changed man.  (RT 9642-9650.)

8            The prosecution put on no witnesses.  The prosecutor made a closing statement in which

9    she primarily described the aggravating nature of the crime.  (RT 9697-9720.)  In his closing,

10   Iversen summarized the testimony.  He described: (1) petitioner's difficulties after his mother and

11   younger siblings left him and his father; (2) how petitioner, then age 15, became his father's

12   drinking buddy; (3) petitioner's automobile accident at age 15 that left him with a severe head

13   injury and resulted in numerous bouts of meningitis; (4) petitioner's subsequent mental/memory

14   problems; (5) the difficulty petitioner must have faced from the disfiguring facial injuries suffered

15   in the auto accident; (6) petitioner's drug and alcohol problems; (7) petitioner's state of

16   intoxication at the time of the crimes; and (7) petitioner's dependency on Jennifer Warsing.

17   Iversen argued that petitioner's lack of remorse was due to his memory problems and that

18   petitioner was upset during the penalty phase in part because he had just been taken off anti-

19   anxiety medication.  (RT 9721-9766.)

20           With respect to petitioner's mental health, Iversen asked the jury to recall the testimony of

21   Drs. Peal and McGuire from the guilt phase.  (RT 9730.)  He briefly described Dr. Peal's

22   testimony about petitioner's personality being "passive-dependent" and that Dr. Peal did not think

23   someone with this personality could have committed the murders.  (RT 9741:10-18.)  He

24   discussed Dr. McGuire's diagnosis of "static encephalopathy" as a result of petitioner's head

25   injuries.  (RT 9743:13-23.)  He added that Dr. McGuire testified that alcohol would exacerbate

26   the effects of the injury.  (Id.)  In response to the prosecutor's focus on McGuire's

27   characterization of the brain injury as "mild," Iversen re-read Dr. McGuire's testimony which

28   referred to the injury as mild because it dealt only with one part of petitioner's brain.  (RT

81

1    9744:1-8.)  Iversen also stressed that both Peal and McGuire had testified that people with

2    petitioner's injuries tended to have memory deficits and to become dependent upon someone to

3    fill in the blanks.  (RT 9753:1-6.)  He also used that testimony to explain that petitioner was not

4    remorseful because he had relied upon Jennifer Warsing to fill in the blanks, but did not

5    remember committing the crime and could not believe he had done so.  (RT 9758.)

6         Petitioner argues that trial counsel were aware that petitioner had assisted law

7    enforcement officers in Indiana and that those officers were willing to testify on his behalf.

8    Petitioner presented to the state court declarations from Indiana law enforcement personnel who

9    stated that, had they been contacted, they would have come to California and testified that

10   petitioner was one of their best undercover operatives, making 100 to 150 cases for the police.  (1

11   SH, Exs. 23, 24.)

12                    ii.    Prejudice

13        The sort of evidence petitioner argues the defense could have found, and presented, is set

14   forth primarily in the report of Dr. Cunningham, which is discussed in detail above.

15                b.   Discussion

16        While the legal standards are set out above, it is worth repeating them here because those

17   relevant to counsel's conduct at the penalty phase differ somewhat from counsel's role in

18   preparing for the guilt phase.  With respect to counsel's role in presenting penalty phase

19   mitigating evidence, "[t]he duty to investigate is critically important."  Summerlin v. Schriro, 427

20   F.3d 623, 630 (9th Cir. 2005).  Counsel should attempt to discover "'all reasonably available

21   mitigating evidence and all evidence to rebut any aggravating evidence that may be introduced by

22   the prosecutor.'"  Wiggins v. Smith, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines

23   11.4.1(c), p. 93 (1989)) (emphasis in original).  Where "indications in the record suggest that

24   certain mitigating evidence may be available, those leads must be pursued."  Lambright v.

25   Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007).

26        The mitigating evidence counsel should consider includes "medical history, educational

27   history, employment and training history, family and social history, prior adult and juvenile

28   correctional experience, and religious and cultural influences."  Wiggins, 539 U.S. at 524 (citing

82

1 ABA Standards for Criminal Justice 4-4.1, commentary, p.4-55 (2d ed. 1982)).  Counsel has a

"'duty to investigate and present mitigating evidence of mental impairment' ... [,] [which]

includes examination of mental health records."  Summerlin, 427 F.3d at 630 (quoting Bean v.

Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, "counsel has an affirmative duty to

provide mental health experts with information needed to develop an accurate profile of the

defendant's mental health."  Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002).  This is a

distinctly different duty than counsel's obligations with respect to mental health experts at the

guilt phase.  Courts have held counsel had no duty to provide a guilt phase mental health expert

with background materials absent a specific request from the expert.  Compare Hendricks v.

Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995) (Requiring counsel to "second-guess their

experts ... would effectively eliminate the legitimate role experts play in guiding and narrowing

an attorney's investigation.") with Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999)

(attorney may render ineffective assistance at penalty phase for failing to investigate and

adequately prepare expert witness).

     "The defendant's history of drug and alcohol abuse should also be investigated."

Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford, 290 F.3d 1006, 1016-17 (9th Cir.

2002)).  In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation to

present and explain to the jury all available mitigating evidence."  Hamilton v. Ayers, 583 F.3d

1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)); Mayfield

v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001) (Counsel must "present and explain to the jury

the significance of all the available mitigating evidence.") (citing Williams v. Taylor, 529 U.S.

362 (2000)).

     It is clear from Iversen's penalty phase argument that a primary theme in mitigation was

petitioner's mental state.  Petitioner makes a substantial showing that counsel did not support that

theme with available evidence.  First, counsel failed to provide clear testimony regarding

petitioner's mental problems.  Instead, counsel relied upon the testimony of Drs. Peal and

McGuire which the jury had heard months previously and which counsel had argued at the guilt

phase was presented only for the purpose of explaining petitioner's memory gaps.  Both doctors'

83

1    testimony was inadequate to support the mental health argument Iversen attempted to make in his

2    closing argument and fell far short of the mental health argument counsel could have, and should

3    have, made.  Neither doctor examined, as a whole, petitioner's background, long-term substance

4    abuse, and substance abuse on the day of the murders, along with the effects of his head injury to

5    opine about petitioner's mental difficulties on the day of the murders.

6        Second, counsel failed to present evidence to put petitioner's mental problems in some

7    context.  Courts are clear: an important purpose of a penalty phase defense is helping a jury

8    understand how the defendant came to be sitting before them.  See Porter v. McCollum, 558 U.S

9    30, 41 (2009) (Mitigation should "humanize [the defendant] or allow [the jury] to accurately

10   gauge his moral culpability.")  The story Dr. Cunningham lays out is a multi-layered one.

11   Petitioner began abusing alcohol at a very young age with family encouragement; he was

12   abandoned by his mother; his father fell deep into his alcoholism and brought his son along with

13   him; petitioner's accident had numerous repercussions:  not only did he suffer a brain injury, but,

14   at a young age, he had to deal with the emotional traumas of injuring his friends and his facial

15   disfigurement; petitioner's multiple episodes of meningitis also took an emotional toll; finally,

16   and most importantly, petitioner has irreparable brain damage which affects his judgment,

17   memory, impulse control, aggression, and ability to cope with stress.  Dr. Cunningham supports

18   his analysis of the brain damage with scientific research, the reports of others about petitioner's

19   behavior, such as his blackouts, his substance abuse, and his paranoia, and with the results of

20   testing of petitioner himself.  Dr. Cunningham presents evidence of "the kind of troubled history

21   [the Supreme Court has] declared relevant to assessing a defendant's moral culpability."

22   Wiggins, 539 U.S. at 535.  The Court considers evidence of a defendant's "background and

23   character" highly relevant "because of the belief, long held by this society, that defendants who

24   commit criminal acts that are attributed to a disadvantaged background ... may be less culpable

25   than defendants who have no such excuse."  Penry v. Lynaugh, 492 U.S. 302, 319 (1989),

26   abrogated on other grounds in Atkins v. Virginia, 536 U.S. 304 (2002).

27        It is also worth noting that petitioner's allocution likely prejudiced him at the penalty

28   phase.  It is reasonable to suppose that Iversen's failure to control Hawk's relationship with

1    petitioner was one of the causes of petitioner's distress – he could not believe the jury found him

2    guilty.  It is also reasonable to assume that had petitioner been given a more realistic perspective

3    on the strength of the prosecutor's guilt phase case, his reaction to the verdict would have been

4    less extreme.

5            While the court agrees with much of petitioner's perspective on counsel's conduct at the

6    penalty phase, not every error charged is supported by the record.  For example, as respondent

7    points out, there is evidence that counsel knew about petitioner's cooperation with law

8    enforcement and made a reasoned decision not to present it.  Before the penalty phase began,

9    Iversen told the court that the defense and the prosecutor had agreed that petitioner's cooperation

10   with law enforcement would not be introduced at trial.  Iversen told the court "that's something

11   that is confidential and could have problems over [sic] the defendant, who at this point is looking

12   at the prospect, at the very best, of spending most of the rest of his life in prison." (RT 9386:24 –

13   9387:14.)  This makes clear that the defense made a decision, based on a fear that petitioner

14   would suffer serious repercussions in prison should other inmates know he had been an

15   informant, to keep the evidence of petitioner's cooperation with law enforcement out of the trial.

16   As respondent further points out, the evidence was also "two-edged."  Petitioner's actions were

17   not purely altruistic.  Both officers recollect that petitioner aided them to "work off" a burglary

18   charge.  (1 SH, Exs. 23 and 24.)  Thus, even assuming, for the sake of argument, that counsel

19   erred in failing to introduce that evidence at the penalty phase, the court would have to consider

20   both the good and bad impacts that evidence would have had on the jury.

21           In response to respondent's argument, petitioner charges that counsel's decision cannot be

22   considered in isolation.  This court agrees.  However, petitioner has provided no reason to think

23   that the decision counsel made to keep petitioner's informant activities out of trial was an

24   unreasonable one.  Moreover, when looking at the total prejudice from counsel's actions, the

25   court looks only to those actions that amounted to error, either alone or in combination with other

26   actions.  Looking at counsel's decision to keep petitioner's informant activity under wraps was

27   not, when considered alone or as part of counsel's whole strategy, unreasonable.

28   ////

85

1      That said, counsel's failure to present mitigating evidence of petitioner's mental health

2    problems, social history, and substance abuse, and counsel's failure to put on an expert to put that

3    evidence in some sort of understandable context for the jury cannot be "rationalized on any

4    tactical ground."  Stankewitz v. Wong, 698 F.3d 1163, 1172-73 (9th Cir. 2012).  Moreover, this

5    court finds it is reasonably likely it affected the verdict.  The prosecutor relied primarily on the

6    crimes at issue.  As the California Supreme Court pointed out, the defense should have been

7    permitted to put on testimony explaining the one prior offense for sexual assault.  Had they been

8    permitted to do so, and had petitioner's other violent behavior been considered in the context of

9    his brain injury and substance abuse, the jury may very well have considered petitioner in a

10    different light.

11      Of course, this court's analysis does not end there.  This court must consider whether any

12    fairminded jurist could have found petitioner failed to establish a prima facie case of ineffective

13    assistance of counsel at the penalty phase.  Respondent argues that Dr. Cunningham's findings

14    are "largely cumulative."  (ECF No. 616 at 37.)  This court disagrees.  The testimony of Drs. Peal

15    and McGuire did not give the jury the sense of how petitioner's brain damage and substance

16    abuse contributed to his behavior on the day of the crimes.  Dr. Cunningham's report does.  The

17    doctors' testimony also failed to consider and explain petitioner's childhood and the

18    psychological effects of his emotional and physical traumas.  Dr. Cunningham's report

19    accomplishes these goals as well.  The fact that counsel may have made a weak, brief closing

20    argument at the guilt phase that the doctors' testimony supported a mental state defense is a far

21    cry from the sort of multi-faceted mitigation case laid out by Dr. Cunningham.  Moreover, the

22    penalty phase determination is a very different one from the guilt phase determination.  Jurors

23    have a great deal of leeway in considering the mitigating and aggravating evidence presented and

24    in deciding how that evidence fits into the weighing process.  The mitigating evidence need only

25    convince one juror that a defendant's moral culpability requires a sentence of life, rather than

26    death.

27      The question here is not whether petitioner has proved a reasonable probability that the

28    result of the penalty phase would have been different.  Rather, the question is whether petitioner

1 has made a prima facie showing entitling him to further factfinding on this claim. This court

2 finds he has done so.

3       The Supreme Court has recognized that "a superficially reasonable mitigation theory

4 during the penalty phase" does not mean a defendant did not suffer prejudice from his counsel's

5 failure to present a substantial and more compelling mitigation case. See Sears v. Upton, 561

6 U.S. 945, 954-55 (2010) (internal citations omitted). The record before the California Supreme

7 Court does not show that counsel had a strategic reason to limit the mental health and social

8 history evidence at the penalty phase. To the contrary, counsel attempted to argue those points on

9 the basis of testimony presented at the guilt phase on a different issue and on the basis of very

10 brief and limited social history testimony. The record before the California Supreme Court also

11 shows that the prosecution relied almost exclusively on the crimes charged, which the defense

12 could have put in some context with expert testimony. After considering the evidence presented

13 in both phases of trial and the evidence proffered to the California Supreme Court in petitioner's

14 state habeas proceedings, this court recommends a finding that the California Supreme Court's

15 rejection of petitioner's claims of ineffective assistance of counsel at the penalty phase was either

16 an unreasonable application of Strickland or an unreasonable determination of the facts.

17       6.  Jailers' Interference with Right to Counsel – Claim 25

18       The basis of claim 25 is the decision made by jail personnel to take petitioner off anti-

19 anxiety medication just before the beginning of the penalty phase. In the petition, petitioner

20 argues that, as a result, he was rendered incompetent in violation of the Due Process Clause and

21 became unable to assist his attorneys in violation of his Sixth Amendment right to counsel.

22       a.  Background and Evidentiary Proffer

23       Just prior to the beginning of the penalty phase, the defense made several motions,

24 including: (1) a motion for an independent finding that petitioner was incompetent as of July 15,

25 1988, the date the competency phase jury found petitioner competent (CT 4400); and (2) a motion

26 to continue the penalty phase based on petitioner's present incompetence (CT 4423). The judge

27 made an independent finding that petitioner was competent as of the close of the competency

28 proceeding on July 15. (RT 9461.) With respect to petitioner's motion for a continuance, on

1    August 3, 1988, the judge considered declarations submitted by attorneys Philipsborn and

2    Iversen, testimony from an experienced capital attorney who had interviewed petitioner and his

3    counsel, and statements to the court by Philipsborn, Hawk, Iversen and McDowell.  All informed

4    the judge that petitioner's condition had deteriorated in the few weeks since the competency

5    hearing.  (CT 4408-4420; RT 9518-9529, 9532-9535.)

6            Defense counsel had also contacted Dr. White, who had been appointed by the court to

7    evaluate petitioner for the competency proceeding.  (1 SH, Ex. 18 at 1.)  Counsel asked Dr. White

8    to re-evaluate petitioner due to a concern about petitioner's ability to cooperate with his attorneys.

9    (Id.)  Dr. White interviewed petitioner on July 24, 1988.  (Id.)  In her report, which was provided

10   to the trial judge and to the California Supreme Court, Dr. White expressed concern about

11   petitioner's extreme, escalating anxiety and level of "emotional disturbance."  (Id. at 2-3.)  She

12   felt that petitioner had "deteriorated further in his mental functioning than when I originally

13   evaluated him on June 9, 1988.  He seems less able to understand the nature of the proceedings

14   pending against him and less able to assist counsel in a rational manner in the conduct of his

15   defense."  (Id. at 3.)   On July 27, 1988, she spoke with Dr. McLanahan, the jail physician.  (Id. at

16   3.)  "As a result of our conversation, Dr. McLanahan decided to place Mr. Frye on Ativan 2

17   mgms at bedtime for the next 3-4 days and follow him closely as to his response to the

18   medication."  (Id.)  Mr. Philipsborn noted that petitioner had been "medicated for a while after

19   Dr. White prepared her report" and indicated petitioner had been more cooperative while on the

20   medication.  (RT 9521.)

21           The judge found that petitioner was competent and denied the motion for a continuance.

22   (RT 9535-9537.)  The judge explained:

23              I can certainly understand Mr. Frye being under pressure,
            tense, having difficulty sleeping, things of that nature.  I think
24          anyone that finds himself in this situation and after the jury's
            verdict of guilt is certainly not up to par, in fact, is depressed,
25          anxious and very anxious as to what is going to happen in the
            future.
26
                The question is whether or not he is competent at this point
27          to be examined carefully.

28          . . .

88

1
2
3

       And I think that, when the verdict came in of guilt, I think that he is rightly, in his mind, angry, upset and concerned.  And that's why he can't shift gears.  It is because he feels that he made a mistake [by not testifying]; that it really was something that he should have done and that he regrets it as a very serious mistake.

4
5

       I know counsel is sincere in giving their advice, analyzing this situation.  But I think Mr. Frye can shift gears any time he wishes to, if he wishes to go on with the case.

6
7
8

       He is attempting to delay the case, in my judgment, trying to delay the case so that the jury will be eliminated in this case and there will be a different jury to hear it.  I think that he may wish to testify, as you have indicated, to blame the jury, blame anyone else, including the Court.  But I think he can change if he wants.

9
10

       I think it's his lack of cooperation; not inability, but his desire to not go forward because he is mad and he is very angry.  And I can understand that.

11
12
13

       But I have concluded that does not amount to incompetency.  I find that he is competent.  Dr. White made the most recent examination.  And I have read her report carefully and, although he is under pressure, there is no question about it that he, in my mind, is competent.

14
15
16

       So I find there is not substantial evidence of incompetency and, therefore, the motion is denied.  The defendant is competent to proceed to trial.

17  (RT 9535:14 – 9537:16.)

18      After the noon recess on August 3, Iversen informed the court that petitioner wished to be

19  absent during the penalty phase.  Iversen explained petitioner's state of distress and told the

20  judge: "The night before last was the last time that he got the medication, because Dr.

21  McLanahan knew the trial was starting and thought he shouldn't have medication during trial."

22  (RT 9539:20-23.)  After the judge denied petitioner's request to be absent, Iversen asked the

23  judge for a continuance to allow petitioner to deal with his "medical condition."

24      I am concerned about the shift in medication.

25
26

       I am at the horns of a dilemma.  I agree it's very important, except in an extreme situation, to have the defendant present.

27

       On the other hand, I do believe Mr. Frye is going to have some outbursts this afternoon.  I believe that is going to prejudice him in front of this jury.  We are in this very, very difficult spot.

28

. . .

Judge, we had a motion to continue, which was filed with the Court. It was based on two grounds that dovetailed each other. One was 1368; and the other one was the facts underlying the expression of doubt of the 1368.

The Court has ruled Mr. Frye is competent.

I am Mr. Frye's lawyer. I am unprepared to proceed. I am not prepared to proceed because Mr. Frye has a medical condition. It is detailed in the report of Dr. White, which the Court has been presented with, which deals with his anxiety and emotional distress at this time based upon that condition, based upon her recommendation of medicating him for a period of time. And that recommendation was made last week; and he was medicated for a short period of time.

I believe that his medical condition which has caused me to be unprepared is grounds for a continuance. And I would ask the court at this point to grant us a continuance to allow Jerry's medical condition . . . to be treated so that, hopefully, he will arrive at a place where he can assist us in preparing.

(RT 9542:5 – 9543:12.)

In a declaration presented to the California Supreme Court, petitioner says he was given some sort of "tranquilizer" around the time he was first incarcerated. (1 SH, Ex. 31, ¶ 5.) He felt it helped him "remain somewhat calm" and "focus on my case." (Id. ¶¶ 5-6.) According to petitioner, that medication was withdrawn the night prior to the beginning of the penalty phase. (Id. ¶ 7.) Petitioner described himself as a "nervous wreck" as a result and could not concentrate on the penalty phase proceedings. (Id. ¶¶ 8-9.) As described below, petitioner has since withdrawn his assertion that he was medicated throughout trial.[36]

////

---

[36] Petitioner also relies upon state habeas counsel Lane's statement that McDowell told him petitioner was taking "some sort of medication which kept him calm throughout the guilt phase of the trial...." (1 SH, Ex. 25 at 8.) As described above in note 20, McDowell refused to sign the declaration prepared by Lane because she did not feel "comfortable" signing it. It would have been reasonable for the California Supreme Court to refuse to rely on this statement in support of claim 25 and this court will not do so either. It is worth pointing out that it does not appear McDowell made this statement in the declaration submitted in federal court. While this fact is not relevant to this court's consideration of claim 25 at this juncture, the court questions the reliance that petitioner places upon Mr. Lane's memory of an unsworn statement that has not been included in McDowell's sworn statement.

90

1    While the defense did not specifically request a second competency proceeding, the trial

2    judge found petitioner was competent to proceed with the penalty phase and denied a request for

3    a continuance.  (RT 9537, 9543.)

4            b.   Discussion

5    While respondent again refers to the California Supreme Court's opinion on appeal, this

6    issue was raised in petitioner's state habeas proceeding, which was denied summarily.  Therefore,

7    this court must determine whether there was any "reasonable basis for the state court to deny

8    relief."  Richter, 131 S. Ct. at 784.

9    The parties' briefs on this claim lack clarity on a number of issues.  First, this court finds

10   there is no factual issue about the extent of petitioner's medication.  Even if there is an issue, it is

11   not material to petitioner's claims.  As respondent points out, petitioner conceded that some of the

12   facts he has relied upon are, in petitioner's words, "incorrect."  This problem was first raised in

13   respondent's opposition to petitioner's motion for an evidentiary hearing.  Respondent argued that

14   the record refuted petitioner's claim that his jailers discontinued medication he had been taking

15   throughout trial.  (ECF No. 187 at 32.)  Respondent then laid out all the record evidence showing

16   that petitioner was medicated for the first time, at Dr. White's insistence, shortly before the

17   beginning of the penalty phase and was only prescribed that medication for three or four days.  In

18   his reply, petitioner admitted that he had been in error:  "The State has correctly identified errors

19   in the factual allegations supporting Claims 25, 34, and 35.  We acknowledge that the pleadings

20   have not correctly described the sequence of events in some respects, and we apologize to the

21   Court and the Attorney General for these errors which we regret."  (ECF No. 194 at 57:17-19.)

22   Petitioner then went on to explain that his claim was based on the 3-4 day course of medication

23   prescribed to petitioner shortly before the penalty phase and the fact that it was discontinued

24   immediately before the penalty phase.  (Id. at 57-58.)

25   In his current briefing, petitioner attempts to backtrack.  He again mentions petitioner's

26   state court declaration stating that he took some sort of tranquilizer throughout his trial, arguing

27   creatively that his prior statement was simply for purposes of the motion for an evidentiary

28   hearing; petitioner fails to mention that he clearly stated previously that this factual recitation was

1  in error.  (ECF No. 629 at 73-75 & n.22.)  It is worth pointing out that whether petitioner was

2  medicated briefly or for a more extended period of time is not material to this claim.  Petitioner's

3  claim is based on the argument that he was more able to assist counsel while taking the

4  medication and that its discontinuation right before the penalty phase rendered him incompetent

5  and unable to assist counsel.

6        The second area of confusion in the briefing is that it is unclear to the court just what

7  petitioner is arguing as the legal basis for his claim.  In his state court petition, petitioner argued

8  that the discontinuation of his medication "reduced his ability to assist in his own defense."  (1

9  SH Pet. at 91.)  He relied on Riggins v. Nevada, 504 U.S. 127, 133-38 (1992), in which the

10  Supreme Court held that compelled medication of a defendant with anti-psychotic drugs, absent a

11  showing of necessity "to accomplish an essential state policy," violated his due process right to a

12  "full and fair trial."  Defendant Riggins began taking the anti-psychotic drug shortly after his

13  arrest.  504 U.S. at 129.  Prior to trial, a competency hearing was held.  Riggins was examined by

14  three psychiatrists while he was taking the drug.  Id. at 129-30.  Two of the three found Riggins

15  competent and the judge agreed.  Id. at 130.  Thereafter, the defense moved for an order

16  suspending the administration of the drugs until the end of Riggins' trial, in part because Riggins

17  intended to put on an insanity defense.  Id.  The trial judge denied the motion.  Id. at 131.  The

18  Supreme Court held that a criminal defendant has a due process right not to be forcibly medicated

19  absent a showing by the state that medication was necessary for the defendant's safety or for the

20  safety of others, that the trial could not be accomplished by any less intrusive means, or some

21  other reason serving an essential state policy.  Id. 135, 138.  The Court did not frame its holding

22  in terms of the defendant's competence.  Rather, it considered that "forcible injection of

23  medication into a nonconsenting persons' body ... represents a substantial interference with that

24  person's liberty" under the Fourteenth Amendment.  Id. at 133-34.

25        In the federal petition, petitioner relies again on Riggins.  Largely, he focuses on

26  comments made by Justice Kennedy in his concurrence about the potential prejudice that may

27  ////

28  ////

92

1    result from the forced administration of medication.  (ECF No. 612 at 130.)  However, he also

2    argues that discontinuation of the medication rendered him incompetent.[37]

3         Petitioner has failed to show the California Supreme Court's denial was contrary to law or

4    unreasonable.  First, petitioner has not shown clearly established Federal law, as decided by the

5    Supreme Court, that a criminal defendant has a constitutional right to be medicated.  Petitioner

6    has not shown that the Riggins analysis, and the Court's focus on a defendant's liberty, applies to

7    the situation here.  Accordingly, with respect to the argument under Riggins, petitioner has not

8    satisfied section 2254(d).

9         With respect to petitioner's argument that discontinuation of the medication rendered him

10   incompetent, that argument requires a prima facie showing that petitioner was, in fact,

11   incompetent on the first day of the penalty phase.  Under clearly established Federal law, a

12   criminal defendant is only competent to stand trial if he "'has sufficient present ability to consult

13   with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as

14   factual understanding of the proceedings against him.'"  Cooper v. Oklahoma, 517 U.S. 348, 354

15   (1996) (quoting Dusky v. United States, 362 U.S. 402 (1960)).  Based on the evidence before the

16   California Supreme Court, it would not have been unreasonable for that court to have found that

17   petitioner did not make that showing.  The trial judge presided over the competency proceeding,

18   made an independent finding that petitioner was competent on July 15, 1988, heard from

19   numerous witnesses on August 3, 1988 that petitioner could no longer cooperate with counsel,

20   observed petitioner during this time, and concluded that petitioner was competent on August 3.

21   The California Supreme Court held that the trial judge's final finding of competency on August 3

22   was not error.  18 Cal. 4th at 1005.

23        In his state habeas proceeding, petitioner presented the following extra-record evidence

24   that could be deemed supportive of this claim:  (1) the reports of Drs. McGuire, Wagner and

25   Cunningham discussed above, (2) petitioner's declaration that he took a tranquilizer throughout

26   trial, that it was suddenly stopped before the penalty phase, and that he "could not concentrate

27   ────────────────────

28   [37] In the petition, petitioner also argues this claim under the Sixth Amendment.  However, he cites no Sixth Amendment authority which would support his arguments here.

93

1  upon the proceedings," was "unable to focus [his] attention on the penalty phase," and "felt

2  disoriented" (1 SH, Ex. 31); and (3) reports from a District Attorney investigator that jail

3  personnel told him during June 1988 that petitioner was initially very distressed by the guilty

4  verdict but that by mid-June, he had appeared to be acting normally (1 SH, Ex. 35).  Even if the

5  California Supreme Court examined all of this evidence in the light most favorable to petitioner,

6  the court could still reasonably have determined that petitioner had not made a sufficient showing

7  that he was in fact incompetent at the penalty phase.  The doctors' reports did not directly address

8  petitioner's competence on August 3, 1988.  Petitioner's declaration showed he was upset and

9  lacked focus, but that is a far cry from a showing that he lacked an ability to reasonably assist

10  counsel.  Finally, the most reasonable conclusion from the District Attorney's investigator's notes

11  was that, as of mid-June, petitioner had improved.  This court finds the California Supreme

12  Court's rejection of this claim was neither contrary to law nor unreasonable.

13           7.   California Capital Sentencing Scheme Fails to Narrow – Claim 37

14           Petitioner was tried and sentenced in 1988 for crimes committed in 1985.  In California, a

15  defendant was eligible for the death penalty or for a sentence of life in prison without the

16  possibility of parole, if a jury convicted him of first degree murder and found at least one special

17  circumstance.[38]  Cal. Penal Code §§ 190.1, 190.2, 190.4.  If a prosecutor decided to seek the death

18  penalty, a second trial was held to determine whether a death-eligible defendant should be

19  sentenced to death or life without the possibility of parole.  Id. § 190.4(a).  At the time of

20  petitioner's trial, California had 26 special circumstances.  Id. § 190.2.[39]  Petitioner argues that

21  the special circumstances are so numerous and so broad that at least one can be found in almost

22  any first degree murder case.  Therefore, his argument continues, California's special

23  _____

24  [38] Petitioner's jury found five special circumstances: that petitioner committed multiple murders and that he committed each murder while engaged in the commission of a robbery and of a

25  burglary.  (RT 9372-9377.)

26  [39] In 1985, Cal. Penal Code § 190.2(a) listed 19 special circumstances, one of which (felony-murder) had 9 enumerated sub-parts.  The "heinous, atrocious, or cruel" special circumstance,

27  subsection (a)(14), was struck down by the California Supreme Court in People v. Superior Court (Engert), 31 Cal. 3d 797 (1982), and was not included in the discussion of the special

28  circumstances by petitioner or his expert. (See Decl. of Steven F. Shatz (1 SH, Ex. 29) at 3 n.2.)

94

1    circumstances fail to narrow the class of murderers eligible for the death penalty as required by

2    the Eighth Amendment.  The California Supreme Court rejected this claim summarily on state

3    habeas.[40]  For the reasons set out below, this court finds petitioner has failed to show the

4    California Supreme Court was unreasonable.  Claim 37 should be denied.

5                                    a.  Legal Standards

6              The Eighth Amendment's narrowing requirement is the product of a series of Supreme

7    Court cases starting with Furman v. Georgia, 408 U.S. 238 (1972).  Furman was a per curiam

8    opinion in which the Court held the Georgia and Texas capital sentencing statutes violated the

9    Eighth and Fourteenth Amendments.  However, there was little clear agreement on the underlying

10   reasons for that decision.  Five justices wrote concurring opinions.  The opinions of Justices

11   Stewart and White are considered some basis for a "majority" holding.  See 408 U.S. at 401

12   (Burger, J., dissenting) (While it is "not entirely clear" what the holding is, the Stewart and White

13   opinions are the "two pivotal concurring opinions.")  They focused on the fact that the states'

14   capital sentencing statutes made every murderer eligible for the death penalty, but provided no

15   guidance to help juries decide when to impose it.  As a result, "the death penalty is exacted with

16   great infrequency even for the most atrocious crimes and ... there is no meaningful basis for

17   distinguishing the few cases in which it is imposed from the many cases in which it is not."  408

18   U.S. at 313 (White, J., concurring).  Justice Stewart similarly focused on the apparent

19   arbitrariness of imposition of the death penalty:

20                         These death sentences are cruel and unusual in the same way that
                           being struck by lightning is cruel and unusual. For, of all the people
21                         convicted of rapes and murders in 1967 and 1968, many just as
                           reprehensible as these, the petitioners are among a capriciously
22                         selected random handful upon whom the sentence of death has in
                           fact been imposed.  My concurring Brothers have demonstrated
23                         that, if any basis can be discerned for the selection of these few to
                           be sentenced to die, it is the constitutionally impermissible basis of
24                         race. But racial discrimination has not been proved, and I put it to
                           one side.  I simply conclude that the Eighth and Fourteenth

25   _____

26   [40] Petitioner raised this claim in both his state appeal and his first state habeas petition.  The
     arguments were essentially the same.  However, in his state habeas petitioner made a significantly
27   different factual showing.  Accordingly, this court finds the California Supreme Court's rejection
     of petitioner's habeas claim to be the most recent decision of that court on this issue and is the
28   claim that should be analyzed herein.

                                            95

> Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

408 U.S. at 309-10 (footnotes and citations omitted).

In <u>Gregg v. Georgia</u>, 428 U.S. 153, 188 (1976), the Court further explained that in <u>Furman</u> it held that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.). In his concurring opinion Justice White described how a death penalty statute should work:

> As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries even given discretion not to impose the death penalty will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device.

<u>Id.</u> at 222-23. The Court in <u>Gregg</u> upheld Georgia's revised death penalty statute which, at a separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to be true before it imposed a death sentence. <u>Id.</u> at 198-05.

In <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983), the Court examined Georgia's aggravating circumstances and held that each must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Each aggravating circumstance must "provide a principled basis for distinguishing" the petitioner's case "from the many other murder cases in which the death penalty was not imposed under the statute." <u>Id.</u> at 878 n.16. The Court applied the narrowing principles of <u>Zant</u> to sentencing statutes in <u>Lowenfield v. Phelps</u>,

////

96

1
2
3
4
5

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

6   484 U.S. 231, 244 (1988) (internal citations omitted).

7         To summarize, the goal of the Eighth Amendment narrowing requirement is limiting the

8   possibility of arbitrary and capricious imposition of the death penalty. States may accomplish this

9   by enacting objective legislative standards to limit the pool of those eligible for the death penalty

10   in a way that reasonably justifies imposition of a more severe sentence on them. The sentencer

11   may then exercise discretion to determine who will be selected to receive that sentence.[41] If the

12   death eligible pool is so large that it includes persons with vastly different levels of culpability,

13   then the discretionary decisionmaking at the selection stage is not sufficiently limited. Without

14   sufficient, objective limits, the system risks arbitrary and capricious application of the death

15   penalty upon those who are not necessarily the most deserving of the greatest punishment.

16         b.  Evidentiary Proffer

17         In federal court, petitioner relies little on evidentiary support. Rather, he focuses on legal

18   arguments that respondent raised in state court and shows why, if the California Supreme Court

19   relied upon those arguments, its denial was contrary to law or unreasonable.[42] However, in state

20   court, petitioner's primary support for his argument about the expansiveness of the special

21
22
23
24

[41] The final selection process necessarily involves greater discretion because it requires "particularized consideration of relevant aspects of the character and record of each convicted defendant" and consideration of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Woodson v. North Carolina, 428 U.S. 280, 303 (1976); Lockett v. Ohio, 438 U.S. 586, 604 (1978).

25
26
27
28

[42] For example, petitioner makes an extended argument regarding respondent's reliance in state court upon Pulley v. Harris, 465 U.S. 37, 53 (1984). (ECF No. 612 at 144-146.) Petitioner concludes this argument by stating: "The California Supreme Court's misinterpretation and misapplication of Harris renders its decision in Mr. Frye's case 'objectively unreasonable.'" (Id. at 146:14-15.) Given the California Supreme Court's silent rejection of his claim, and the fact the court did not mention Harris in its rejection of the claim on appeal, this court finds no reason to assume the California Supreme Court relied upon Harris when it rejected petitioner's claim.

1   circumstances was the declaration of law professor Steven Shatz.  (1 SH, Ex. 29.)  Professor

2   Shatz describes a study he conducted to determine whether California's special circumstances in

3   fact narrow the class of death-eligible murderers.  Professor Shatz examined published opinions

4   from the California Supreme Court and California Courts of Appeal and unpublished opinions

5   from the California Court of Appeal for the First Appellate District in first and second degree

6   murder cases from 1988-1992.  (Id. at 4-6.)  Based on his review of the courts' opinions,

7   Professor Shatz determined that special circumstances were present in most cases.  He concluded

8   that only 12% of those who were potentially death-eligible according to the statute were actually

9   being sentenced to death.  (Id. at 16.)  Comparing that number to the 15-20% figure mentioned in

10  Furman, petitioner concluded in his state habeas petition that "the risk of arbitrariness in

11  California's death penalty scheme is even greater than the risk found unconstitutional in Furman,

12  and the scheme is likewise unconstitutional."  (1 SH Pet. at 91.)

13              c.      Discussion

14          Petitioner argues that because a very low percentage of those who are eligible for the

15  death penalty are sentenced to death, California's death penalty scheme fails to "genuinely

16  narrow the class of persons eligible for the death penalty."  Primarily, he focuses on the number

17  and breadth of California's special circumstances, which create the class of those eligible for the

18  death penalty.  The California Supreme Court has explained that the special circumstances were

19  enacted to perform the "constitutionally required 'narrowing' function."  People v. Bacigalupo, 6

20  Cal. 4th 457, 467-68 (1993).

21          Petitioner's argument is largely focused on the assumption that this court must divine the

22  actual basis for the California Supreme Court's summary denial of his claim.  (ECF No. 612 at

23  144-149.)  However, the Supreme Court does not require that sort of guesswork.  The Court

24  described a federal court's job when considering a summary denial under section 2254(d) as

25  reviewing the state court record to "determine what arguments or theories ... could have supported

26  [] the state court's decision; and then [asking] whether it is possible fairminded jurists could

27  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

28  [the Supreme] Court."  Richter, 131 S. Ct. at 786.  It described the petitioner's burden as

1   demonstrating that "there was no reasonable basis for the state court to deny relief." Id. at 784.

2   Accordingly, this court looks to petitioner's claim and considers whether there is any reasonable

3   basis for its rejection.

4       This task is difficult because petitioner sets out little real argument in support of his claim.

5   Petitioner does appear to be distancing himself from his reliance in state court on the 15-20%

6   ratio discussed in Furman.  He states that "the test for constitutionally adequate narrowing is not a

7   rigid, numerical one."  (ECF No. 612 at 143:23-24.)  In fact, Justice Burger cited the 15-20%

8   ratio to counter the petitioners' "unwarranted hyperbole" that the rate of imposition of the death

9   penalty was "freakishly rare."  408 U.S. at 386 n.11.  This court will not consider the 15-20%

10  figure as some sort of benchmark below which the rate of imposition of the death penalty could

11  be said to be so infrequent that it violates the Eighth Amendment narrowing requirement.  That

12  determination is supported by a decision of the First Circuit Court of Appeals.  In United States v.

13  Sampson, 486 F.3d 13, 23 (1st Cir. 2007), that court considered a narrowing challenge to the

14  Federal Death Penalty Act.  Defendant Sampson argued that the federal death penalty is so

15  infrequently sought, and even less frequently carried out, that its imposition is arbitrary under

16  Furman.  In rejecting this argument, the Court of Appeals clarified the nature of the Supreme

17  Court's arbitrariness concern:

18          In the thirty-four years since Furman was decided, the Court has
            made clear that its decision was not based on the frequency with
19          which the death penalty was sought or imposed.  Rather, the
            primary emphasis of the Court's death penalty jurisprudence has
20          been the requirement that the discretion exercised by juries be
            guided so as to limit the potential for arbitrariness.
21

22  486 F.3d at 23.

23      To the extent petitioner is making an argument based on a 15-20% ratio, he has not shown

24  the California Supreme Court's rejection of his claim was contrary to clearly established federal

25  law.

26      As this court recognized previously, the Court of Appeals for the Ninth Circuit has

27  rejected a claim that California's statutory scheme, on its face, fails to narrow.  See Karis v.

28  Calderon, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002); (Jul. 27, 2004 Order in the present case

1  (ECF No. 169)); see also Berryman v. Ayers, 2007 WL 1991049, ** 183-185 (E.D. Cal. Jul. 10,

2  2007).  Petitioner has not shown clearly established Federal law, as decided by the Supreme

3  Court, compels a different result based either on the face of the statute or on the evidence

4  proffered.  See Hawkins v. Wong, 2013 WL 3422701, *3 (E.D. Cal. Jul. 8, 2013) (no clearly

5  established federal law that only those death penalty schemes in which a large percentage of

6  death-eligible inmates receive the death penalty adequately narrow the death-eligible class);

7  Carter v. Chappell, 2013 WL 1120657, ** 198-201 (S.D. Cal. Mar. 18, 2013).  Because petitioner

8  has not satisfied the requirements of 28 U.S.C. § 2254(d) for claim 37, it should be denied.  In

9  addition, petitioner's pending motion for an evidentiary hearing or an expansion of the record on

10  claim 37 should be denied.

11         8.   Juror Misconduct – Claim 42

12         In claim 42, petitioner alleges several instances of juror misconduct.  The court granted an

13  evidentiary hearing on his allegation that Juror Fairfield had inappropriate communications and

14  considered extrinsic evidence prior to the penalty phase.  In 2008, the court heard evidence on

15  this claim and the parties briefed its merits.  (ECF Nos. 421, 437, 446.)  The question now is

16  whether petitioner can satisfy section 2254(d) for claim 42 so that this court may consider that

17  new evidence.  Because, as set out below, this court finds petitioner has satisfied section 2254(d),

18  this court considers the new evidence and recommends denial on the merits of petitioner's claim.

19         Petitioner raised this claim in his second state habeas petition.  (2 SH Pet. at  6-14.)  That

20  petition was denied summarily by the California Supreme Court.

21         a.   Background and Evidentiary Proffer[43]

22         Petitioner presented the state court with the April 18, 2000 declaration of Juror Fairfield

23  _____

24  [43]  At the beginning of his discussion of the background of this claim, petitioner describes defense
   investigators' discovery that when the jury recessed from its penalty phase deliberations on

25  Friday August 5, 1988, it was divided 11 to 1 in favor of the death penalty.  Jurors told the
   investigators that one juror told the holdout to consult her minister or husband about what to do.

26  When the jurors reconvened on Monday morning, they arrived at a verdict almost immediately.
   (ECF No. 612 at 150:15-21.)  What petitioner leaves out of this discussion is the fact that Juror

27  Doncaster stated in her declaration submitted to the state court that she was the holdout juror.  (2
   SH Pet., Ex. 102.)  Thus, petitioner's discussion of the fact of a holdout juror has little relevance

28  to his claim regarding Juror Fairfield.

1    regarding a communication she had with her minister:

2           Between the guilt and penalty phases, I talked with a
        clergyman because of the difficult decision I had just made in
3       finding Mr. Frye guilty and another difficult decision remaining
        about whether Mr. Frye should be sentenced to death. The
4       clergyman reconfirmed my own beliefs about the propriety of what
        I was doing.
5

6    (2 SH, Ex. 100, ¶ 3.)  In the next paragraph of her declaration, Juror Fairfield states that she voted

7    to impose the death penalty "because I felt the law as explained to the jury meant that we were

8    required under the circumstances to sentence him to death."  (Id. ¶ 4.)

9           Respondent also provided the state court with a declaration from Juror Fairfield.  (2 SH,

10   Ex. C to Inf. Resp.)  In this July 6, 2000 declaration, and contrary to her prior statement, Juror

11   Fairfield expressed a lack of certainty about the timing of the discussion with her minister – "I did

12   speak to my minister around the time of the trial, but I do not remember whether I did so before

13   or after my vote for the death penalty."  (Id. ¶ 3.)  She then explained the content of that

14   discussion:

15          I did not discuss the details of Mr. Frye's trial with my minister. I
        asked him what the Bible had to say about the death penalty.
16      My minister gave me a 1 ½ pages written response that basically
        said the people voted and enacted laws to determine what crimes
17      are and what the penalties should be.

18   (Id. ¶¶ 5,6.)

19                        b.   Legal Standards

20          The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial

21   by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Due

22   process requires that the defendant be tried by "a jury capable and willing to decide the case

23   solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982); Bayramoglu v.

24   Estelle, 806 F.2d 880, 887 (9th Cir.1986) ("Jurors have a duty to consider only the evidence

25   which is presented to them in open court.").  A defendant is denied the right to an impartial jury if

26   even one juror is biased or prejudiced.  Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.),

27   amended, 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en

28   banc).  The introduction of prejudicial extraneous influences into the jury room constitutes

1    misconduct which may result in the reversal of a conviction.  <u>Parker v. Gladden</u>, 385 U.S. 363,

2    364–65 (1966).

3             However, not every incident of juror misconduct requires a new trial.  <u>United States v.</u>

4    <u>Klee</u>, 494 F.2d 394, 396 (9th Cir.1974).  Rather, "[t]he test is whether or not the misconduct has

5    prejudiced the defendant to the extent that he has not received a fair trial."  <u>Id.</u>  On collateral

6    review, juror misconduct claims  "are generally subject to a 'harmless error' analysis, namely,

7    whether the error had 'substantial and injurious' effect or influence in determining the jury's

8    verdict."  <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1491 (9th Cir. 1997) (citing <u>Brecht v. Abrahamson</u>,

9    507 U.S. 619, 638 (1993)), <u>overruled on other grounds by</u> <u>Gonzalez v. Arizona</u>, 677 F.3d 383 (9th

10   Cir. 2012); <u>see also</u> <u>Brown v. Ornoski</u>, 503 F.3d 1006, 1018 (9th Cir. 2007); <u>Fields v. Brown</u>, 503

11   F.3d 755, 781 & n. 19 (9th Cir. 2007) (noting that <u>Brecht</u> provides the standard of review for

12   harmless error in cases involving unconstitutional juror misconduct); <u>Jeffries v. Blodgett</u>, 5 F.3d

13   1180, 1190 (9th Cir.1993) (a habeas petitioner must show that the alleged error "'had substantial

14   and injurious effect or influence in determining the jury's verdict.'")  While the <u>Brecht</u> standard

15   typically applies, over a century ago the United States Supreme Court held that, in some

16   instances, courts should presume prejudice, shifting the burden of proof to the state.

17            In 1892, the Supreme Court held that "private communications, possibly prejudicial,

18   between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden

19   and invalidate the verdict, at least unless their harmlessness is made to appear."  <u>Mattox v. United</u>

20   <u>States</u>, 146 U.S. 140, 150 (1892).  In <u>Mattox</u>, a murder case, the bailiff told jurors during their

21   deliberations that the defendant had admitted committing two prior murders.  The Court held this

22   communication was presumptively prejudicial.  <u>Id.</u> at 152-53.  Half a century later, the Court

23   further explained, that the presumption of prejudice is "not conclusive, but the burden rests

24   heavily upon the Government to establish, after notice to and hearing of the defendant, that such

25   contact with the juror was harmless to the defendant."  <u>Remmer v. United States</u>, 347 U.S. 227,

26   229 (1954).  The Court in <u>Remmer</u> stated broadly that "any private communication, contact, or

27   tampering directly or indirectly, with a juror during a trial about the matter pending before the

28   jury is, for obvious reasons, deemed presumptively prejudicial."  <u>Id.</u> at 229.  The issue was,

1    however, a fairly straightforward instance of jury tampering – an unknown person told a juror that

2    "he could profit by bringing in a verdict favorable to the petitioner."  Id. at 228.

3         Subsequent Supreme Court cases have done little to flesh out the standards, largely

4    because the Court examined juror communications and/or contact of a more obviously prejudicial

5    nature than the conduct this court considers in the present case.  In Turner v. Lousiana, 379 U.S.

6    466, 472-73 (1965), the Court considered the prejudicial effect of the fact that two sheriff's

7    deputies who were key witnesses for the prosecution were also responsible for supervising the

8    jurors during trial.  The Court felt the deputies' "continuous and intimate association" with the

9    jury was inherently extremely prejudicial, even though the deputies had not discussed the case

10   with the jurors.  The Court did not mention Mattox or Remmer.  A year later, the Court

11   considered a bailiff's statements to jurors that the petitioner was a "wicked fellow" who was

12   "guilty," and that "if there is anything wrong (in finding petitioner guilty) the Supreme Court will

13   correct it."  Parker v. Gladden, 385 U.S. 363, 363-64 (1966).  As it had in Turner, the Court made

14   no mention of Mattox or Remmer.  Rather, the Court held that the bailiff's conduct "'involves

15   such a probability that prejudice will result that it is deemed inherently lacking in due process.'"

16   Id. at 365.

17        Just when a court in this circuit should apply the Mattox/Remmer presumption is not

18   entirely clear.  In some cases, the Ninth Circuit Court of Appeals cited the Remmer rule without

19   much, if any, discussion.  See United States v. Stinson, 647 F.3d 1196, 1216 (9th Cir. 2011)

20   (states general rule that courts apply the presumption of prejudice to any "possibly prejudicial"

21   "unauthorized contact;" court finds non-party's statement that "they're not guilty," which was

22   overheard by jurors, to be presumptively prejudicial, but harmless);  United States v. Armstrong,

23   654 F.2d 1328, 1332 (9th Cir. 1981) (presumption applies when there are "outside influences

24   upon the jury;" court decides not to decide whether presumption applies to intra-jury conflict

25   involving communications outside the courtroom).  In other cases, the Ninth Circuit has indicated

26   the Remmer presumption is more limited.  For example, in United States v. Dutkel, 192 F.3d 893

27   (9th Cir. 1999), the court considered a case of intentional jury tampering.  The court first

28   distinguished jury tampering cases from other cases of jury misconduct.  Relying upon the

1  "categorical" terms set out in Remmer, the Court stated:

> Because jury tampering cuts to the heart of the Sixth Amendment's
> promise of a fair trial, we treat jury tampering cases very differently
> from other cases of jury misconduct. Once tampering is established,
> we presume prejudice and put a heavy burden on the government to
> rebut the presumption.

192 F.3d at 894.  The court in Dutkel, distinguished "more prosaic" kinds of jury misconduct,

such as an elevator encounter between a juror and victims or a juror's contact with friends who

encouraged her to convict the defendant.  Id. at 895 (collecting cases).  Prejudice was not

presumed in those cases because they did not involve an "inherently greater risk to the integrity of

the verdict."  Id.  It can be presumed, the court went on, that jurors would disregard these

ordinary ex parte contacts.  Id.

The Court of Appeals considered the issue of presumed prejudice more thoroughly in

Caliendo v. Warden, 365 F.3d 691 (9th Cir. 2004).  The facts there involved a conversation

between a police detective, who testified that defendant Caliendo confessed, and jurors during a

recess in deliberations.  The court in Caliendo defined the "bright-line rule" of Mattox as the

following:  "Any unauthorized communication between a juror and a witness or interested party

is presumptively prejudicial, but the government may overcome the presumption by making a

strong contrary showing."  365 F.3d at 696.  However, the court in Caliendo further indicated that

the presumption may not apply even where the third party is "interested."   According to that

court, only communications that "raise[] a risk of influencing the verdict" require a presumption

of prejudice.  365 F.3d at 697.  The court explained that this test is a "low threshold."  Id.  Factors

to be considered include whether the communication concerned the case, the length and nature of

the contact, the identity and role at trial of the parties involved, and evidence of actual impact on

the juror.  Id.[44]

---

[44] There is also an issue, not addressed in Caliendo, regarding the application of the
Mattox/Remmer presumption in a federal habeas corpus case.  The Court of Appeals in Caliendo
shifted the burden of proving prejudice to the state.  However, several circuits have held the
presumption inapplicable on collateral review.  See Barnes v. Joyner, 751 F.3d 229, 252-53 (4th
Cir. 2014) (in a fact situation similar to the one in the present case – juror misconduct for
speaking with a minister – court finds petitioner can only succeed by meeting Brecht standard of
actual prejudice); Vigil v. Zavaras, 298 F.3d 935, 940 n. 6 (10th Cir. 2002) (Remmer presumption

1    Petitioner cites <u>United States v. Rutherford</u>, 371 F.3d 634, 642 (9th Cir. 2004) for his

2    argument that <u>Dutkel</u> is not limited to intentional jury tampering.  It is true that the Court of

3    Appeals in <u>Rutherford</u> explained that "even indirect coercive contacts that could affect the peace

4    of mind of the jurors give rise to the <u>Remmer</u> presumption."  It should be noted that in

5    <u>Rutherford</u>, the ex parte contacts were made by "government agents intimately associated with

6    the prosecution," in other words, interested parties as defined in <u>Caliendo</u>.

7    Two years later, in <u>United States v. Rosenthal</u>, 454 F.3d 943 (9th Cir. 2006), the Ninth

8    Circuit appeared to retreat from the application of the <u>Remmer</u> presumption described in <u>Caliendo</u>

9    and <u>Dutkel</u>.  In <u>Rosenthal</u>, the court noted that ex parte contacts cases typically require a showing

10   of actual prejudice because the contact generally does not pertain to "any fact in controversy or

11   any law applicable to the case."  454 F.3d at 949.  A juror's consideration of extraneous

12   information, on the other hand, generally requires the "party opposing a new trial to demonstrate

13   the absence of prejudice."  <u>Id.</u>  A juror in Mr. Rosenthal's case called an attorney friend during

14   deliberations to ask whether the jury had to follow the judge's instructions.  The attorney friend

15   told the juror that she must follow the law and that she could get into trouble if she tried to do

16   something outside the jury instructions.  <u>Id.</u> at 950.  The court held that this situation should be

17   analyzed as one of "extraneous information" rather than "ex parte communication."  <u>Id.</u>  The

18   court further determined that the information that jurors could be in trouble for failing to follow

19   the instructions, was a "coercive influence" on the jury's independence and entitled the defendant

20   to a presumption of prejudice.  <u>Id.</u>

21   When reviewing a claim of jury misconduct, Federal Rule of Evidence 606(b) limits

22   consideration of juror testimony.  As discussed in <u>Sassounian v. Roe</u>, 230 F.3d 1097 (9th Cir.

23   2000), juror testimony may be considered to demonstrate that extraneous evidence or information

24   was introduced during the jury's deliberation, but not, for instance to show the subjective impact

25   of that extraneous information:

26

---

27   "has no application in habeas corpus cases."); <u>Oliver v. Quarterman</u>, 541 F.3d 329, 341 (5th Cir.
     2008) (court applies <u>Brecht</u> standard to claim that, had it been on appeal, would have been subject

28   to <u>Remmer</u> presumption).

1
2
3
4
5

> A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not.... Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence.

6   230 F.3d at 1108–09; see also Jeffries, 5 F.3d at 1190.

7          Evidence concerning the mental processes by which a juror arrived at his/her verdict is

8   inadmissible to test the validity of that verdict.  See Tanner v. United States, 483 U.S. 107, 117,

9   127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury

10  deliberations from intrusive inquiry.").  This rule is intended to protect the jury's deliberative

11  process by preventing challenges to a verdict based on arguments, statements, discussions, mental

12  and emotional reactions, votes, or methods used in reaching a verdict.  Fed. R. Evid. 606

13  Advisory Committee's Notes; In re U.S. Financial Securities Litigation, 609 F.2d 411, 430 n. 68

14  (9th Cir. 1979).

15                    c.    Application of Section 2254(d)

16         The California Supreme Court's summary denial of petitioner's claim meant that the court

17  "assume[d] the allegations in the petition to be true" and determined petitioner failed to state a

18  prima facie case of juror misconduct.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1402 n.12

19  (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing People v. Duvall, 9 Cal. 4th 464, 474

20  (1995)).  Petitioner's factual proffer shows that Juror Fairfield contacted her minister prior to the

21  end of the penalty phase because she was concerned about her role as a juror.  The minister

22  "reconfirmed" her beliefs about the "propriety" of what she was doing.  Juror Fairfield also stated

23  that she asked the minister "what the Bible had to say about the death penalty."  He gave her a

24  written response that "basically said the people voted and enacted laws to determine what crimes

25  are and what the penalties should be."

26         There is no question that Juror Fairfield went to see her minister because of concerns

27  about petitioner's trial and her role in it.  Her declarations do not, however, provide much clarity

28  about just what she and her minister may have discussed and just what his written response to her

1   involved.  From the evidence proffered, there is no way to know whether the content of that

2   conversation and written material could have affected a reasonable juror's consideration of

3   evidence during the penalty phase, her weighing of the aggravating and mitigating factors, or her

4   understanding of her role in the process.  While the court may not consider the actual effect the

5   conversation and written material had on Juror Fairfield's deliberations, federal law is clear that

6   the objective impact of the information Juror Fairfield learned must be considered.  A court can

7   only do that if it knows what information she learned.  As petitioner points out, it is also

8   important to consider that Juror Fairfield sought out information from her minister, someone

9   whose opinion and guidance she presumably respected.  Due to the nature of this relationship, it

10  is reasonable to conclude the possibility of prejudice may be greater – Juror Fairfield sought help

11  because of the difficult decision she had to make.

12          The California Supreme Court simply did not have the factual information necessary to

13  resolve this claim.  Petitioner presented that court with sufficient information to show likely juror

14  misconduct because Juror Fairfield sought advice about her "difficult decision" in this case and to

15  show a reasonable likelihood of prejudice from the fact Juror Fairfield felt that she needed advice

16  and from the fact that she discussed the death penalty with her minister.  Under the United States

17  Supreme Court case law set out above, and as described in this court's Findings and

18  Recommendations granting petitioner's request for an evidentiary hearing on this claim, this court

19  finds petitioner has made out a prima facie case for relief.  This court can think of no reasonable

20  basis for the California Supreme Court to have denied petitioner the opportunity to present

21  evidence to prove this claim.  To have done so, the California Supreme Court would have had to

22  make factual findings adverse to petitioner that were not apparent from the record before that

23  court.  See Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual

24  findings without an opportunity for the petitioner to present evidence, the fact-finding process is

25  deficient and the state court opinion is not entitled to deference.).

26          Respondent argues petitioner has "identified no established precedent establishing a per se

27  rule of prejudice resulting from a juror's bringing Biblical principles to bear on the decision of

28  whether a criminal defendant's life should be spared."  (ECF No. 616 at 50:5-6.)  Respondent's

107

1   argument assumes Juror Fairfield's communications with her minister involved only Biblical

2   principles, which is not necessarily clear from her state court declarations.  Further, this court

3   need not determine the information Juror Fairfield had was "per se" prejudicial in order to find

4   petitioner has made out a prima facie case for relief.

5       Respondent next questions whether the information is "extrinsic."  Again, without

6   knowing just what those communications involved, it is not possible to say whether what Juror

7   Fairfield was told was the type of general knowledge that might not be considered prejudicial,

8   Fields v. Brown, 503 F.3d 755, 780 (9th Cir. 2007) (en banc), or whether it was information that a

9   reasonable juror would have found impactful upon his or her penalty phase decisionmaking.[45]

10  Respondent also focuses on the fact that there is no allegation Juror Fairfield shared the

11  information with anyone else on the jury.  That is not the test.  Petitioner was entitled to have

12  each juror make the penalty determination based only on the evidence presented.  The death

13  penalty verdict required a unanimous jury.  Even misconduct on the part of one juror could affect

14  that verdict.  See Fields v. Woodford, 309 F.3d at 1103; Dyer, 151 F.3d at 973.

15      This court finds petitioner has met the requirements of 28 U.S.C. § 2254(d) for the

16  allegations of Juror Fairfield's misconduct in claim 42.  Accordingly, this court will consider the

17  evidence presented at the 2008 evidentiary hearing in resolving this aspect of claim 42.

18          d.   Merits of Juror Fairfield Allegations in Claim 42

19      During the August 2008 evidentiary hearing on this claim, petitioner presented the

20  testimony of three people.  First, petitioner's expert on religion and the death penalty, Professor

21  Richard Garnett, testified during the August 19, 2008 portion of the evidentiary hearing.  (ECF

22  No. 351 at 14-67.)  Second, Juror Fairfield testified by deposition on August 20, 2008.  The

23  transcript of that deposition is attached to petitioner's opening brief on the merits of claim 42.

24  (ECF No. 421-1.)  Finally, Department of Justice Special Agent John Radu testified at the August

25

26  [45]  Respondent argues that "the record does not show that Mrs. Fairfield's passages persuaded her
    to do anything during penalty deliberations other than to be mindful of the laws enacted to define
27  crimes and determine penalties."  (ECF No. 616 at 50:22-24.)  This court may not consider how
    the passages subjectively affected Juror Fairfield.  As explained in the text, the question is an
28  objective one.

1   21, 2008 portion of the hearing.  (ECF No. 352.)  The evidence was presented in an attempt to

2   show what Juror Fairfield learned from her minister.  The evidence can be organized into four

3   categories:  (1) what Juror Fairfield told or asked her minister; (2) when she talked with him; (3)

4   what the minister orally told Juror Fairfield; and (4) what was contained in the note the minister

5   prepared and gave to Juror Fairfield.

6                        i.   What Juror Fairfield asked her Minister

7       Juror Fairfield testified that she asked her minister "one time about the case," but that "we

8   did not discuss it."  (ECF No. 421-1 at 16:25 – 17:1.)  Rather, she "asked him what the Bible has

9   to say about the death penalty."  (Id. at 17:9-12.)  This testimony mirrors what she stated in her

10  July 2000 declaration.  (2 SH Inf. Resp., Ex. C at 1.)  In her April 2000 declaration, Juror

11  Fairfield described her reasons for talking with her minister as being due to the "difficult decision

12  I had just made in finding Mr. Frye guilty and another difficult decision remaining about whether

13  Mr. Frye should be sentenced to death."  (2 SH Pet., Ex. 100.)  She testified that she did not ask

14  the minister what he personally thought about the death penalty.  (ECF No. 421-1 at 33:2-4.)  Nor

15  did she ask him what the Southern Baptist organization had to say about the death penalty.  (Id. at

16  34:2-5.)

17      Agent Radu testified that Juror Fairfield told him in their June 2000 interview that she

18  talked with her minister because "she was concerned about what the Bible said about sentencing

19  someone to death.  And she wanted her minister's response about that."  (8/21/08 EH RT (ECF

20  No. 352) at 136:17-22.[46])

21                        ii.   When Juror Fairfield Spoke to her Minister

22      In her April 2000 declaration, Juror Fairfield stated that the conversation with her minister

23  occurred between the guilt and penalty phases.  (2 SH Pet., Ex. 100.)  However, in her July 2000

24  declaration, she stated that she did not remember whether she spoke with him before or after her

25  vote for the death penalty.  (2 SH Inf. Resp., Ex. C at 1.)  During her evidentiary hearing

26

27  ───────────────
    [46] The evidentiary hearing on claims 42 and 44 was held on August 19 and 21, 2008.  The
    transcripts of that hearing have been filed herein at ECF Nos. 351 and 352.  Those transcripts are
28  referred to herein as "8/19/08 EH RT" and "8/21/08 EH RT."

1   deposition, Juror Fairfield testified that the penalty phase "had to be after" the time she received

2   the written response from her minister.  (ECF No. 421-1 at 30:14-17; 37:12-18.)

3       Agent Radu testified that Juror Fairfield told him she had spoken to her minister "during

4   the trial."  (8/21/08 EH RT (ECF No. 352) at 136:17-18.)

5                     iii.   What the Minister told Juror Fairfield

6       Juror Fairfield testified that after she asked him about references to the death penalty in

7   the Bible, her minister told her "he would look it up, look up in the Bible and see what he could

8   find and then give it to me."  (ECF No. 421-1 at 17:17-24.)

9                     iv.   What the Minister's Note Contained

10      Juror Fairfield testified that the minister's note was typewritten and about a page and half

11  long.  (Id. at 19:13-20.)  She recalled that the note contained Bible verses, but could not recall

12  which ones.  (Id. at 20:21-24.)  She remembered that some of the verses "came from the Old

13  Testament, maybe a lot of them.  I don't really recall."  (Id. at 21:20-22.)  She did not remember

14  whether any verses came from the New Testament.  (Id. at 21:23-25.)

15      Juror Fairfield testified that she did not recall whether the Biblical verses mentioned the

16  death penalty specifically.[47]  (Id. at 28:14-16.)  Petitioner's statement that "[a]t a minimum, ...

17  Juror Fairfield received a selection of Bible verses that demanded a death sentence for murderers"

18  is absolutely unsupported.  (ECF No. 421 at 22:5-7.)

19      Juror Fairfield testified that she did not recall having an impression of the verses as a

20  whole.  She recalled only that she "felt like [she was] still going to have to make up [her] own

21  mind."[48]  (Id. at 22:11-14; 32:20-25.)  After being shown her July 2000 declaration, Juror

---

22  [47] Petitioner asserts that Fairfield testified that the minister "placed the death penalty in a Biblical
23  context for her."  (ECF No. 421 at 6:1-2.)  She did not.  Rather, when asked that question,
    Fairfield responded:  "It would have to be in a biblical context if it came from the Bible.  I guess I
24  don't understand what you're saying again."  (ECF No. 421-1 at 28:17-21.)

25  [48]  Petitioner states that Juror Fairfield testified that her recollection was that "the minister did not
26  confirm her own beliefs."  (ECF No. 421 at 4:17-18.)  Petitioner cites page 11 of the transcript of
    Fairfield's testimony in support of this statement.  Juror Fairfield did not make this statement.
27  Rather, when asked about the statement in her April 2000 declaration that the "clergyman
    reconfirmed my own beliefs about the propriety of what I was doing," Juror Fairfield testified:
28  "This is not quite the way I remember it, that the clergyman reconfirmed my own beliefs about

Fairfield stated that she must have made accurate statements in that declaration because she signed it.  (Id. at 23:2-5.)  In her July 2000 declaration, Juror Fairfield had stated that the minister's note "basically said the people voted and enacted laws to determine what crimes are and what the penalties should be." (2 SH Inf. Resp., Ex. C at 1.)  It is worth noting here that petitioner argues Federal Rule of Evidence 606(b) precludes this court's consideration of Juror Fairfield's statements about the "subjective effects of extraneous information." (ECF No. 446 at 5:17-18.)  It is true that this court may not consider Juror Fairfield's statements about the effect of the minister's note on her deliberations at the penalty phase.  See Jeffries, 5 F.3d at 1191 (use objective test to determine impact of extraneous evidence on jury).  But, the limitation of Rule 606(b) involves the determination of prejudice.  This court considers Juror Fairfield's statements regarding the note from her minister only to determine what that note may have contained.  The court does not consider her statements as direct evidence that the note did, or did not, affect her consideration of the penalty phase evidence or her deliberations.

When she was interviewed by Agent Radu, Juror Fairfield told him the minister's note included handwriting.  (8/21/08 EH, Ex. 40 at 2.[49])  However, Juror Fairfield testified that she did not recall handwriting on the note.[50]  (ECF No. 421-1 at 26:16-20.)   Neither of Juror Fairfield's declarations submitted to the state court mentioned any handwriting.  (2 SH Pet., Ex. 100; Inf. Resp., Ex. C.)  She also testified that the minister "didn't give me his personal opinion." (ECF No. 431-1 at 29:7-9.)  Nor did he give her a policy statement from the Southern Baptist national organization.  (Id. at 34:7-10.)

////

---

the --." (ECF No. 421-1 at 11:12-21.)  Petitioner's counsel then interrupted Fairfield and she did not complete the statement.

[49] Portions of Agent Radu's investigative report were admitted into evidence during the evidentiary hearing.  (See 8/21/08 EH RT at 142-145.)

[50] Juror Fairfield testified that she had no reason to think Agent Radu's notes did not accurately reflect her conversation with him.  (ECF No. 421-1 at 29:10 – 30:2.)  However, she repeated that she simply did not recall "that much about it."  (Id.)

1  Agent Radu testified that Juror Fairfield told him the written response from her minister

2  consisted of quotations from the Bible and some handwritten notations from the minister "further

3  describing" the Biblical passages.  (8/21/08 EH RT (ECF No. 352) at 137:3-14.)  He further

4  testified that Fairfield described the content of the document as stating that "the Bible had

5  described laws people had passed and the punishments that should be handed down for people

6  who broke those laws."  (Id. at 137:17-19.)  Radu also testified that Fairfield told him the minister

7  said "that if he was in a situation where someone had broke [sic] the law and they were – needed

8  to be given the death penalty, that he would do so."  (Id. at 137:23 – 138:2.)  On cross-

9  examination, Radu clarified that Fairfield told him it was her opinion, not something the minister

10  said, that he would have voted for the death penalty.  (Id. at 139:25 – 140:3.)  In his investigative

11  notes, Radu described Juror Fairfield's statement as follows:  "Fairfield said, in her opinion, the

12  minister would have given an individual the death penalty if the individual was found guilty and

13  the death penalty statutes applied."[51]  (8/21/08 EH, Ex. 40 at 2.)

14  Professor Garnett's testimony about what the minister's note likely contained is based on

15  his interpretation of Juror Fairfield's statements that she "consulted with her minister and asked

16  what the Bible said about the death penalty" and that she "received from her minister some

17  written materials which included scripture verses and some commentary so on" which the juror

18  summarized "as being in the vein of the people vote and enact laws and decide what crimes and

19  punishments should be."  (8/19/08 EH RT (ECF No. 351) at 23:22 – 24:8.)  Professor Garnett

20  then testified to what he thought were the minister's "likely" responses.  (Id. at 29:22-23.)  The

21  first passage Professor Garnett found "is ubiquitously cited in support of the proposition that

22  human authority is legitimate, that it's ordained by God, and that religious believers, like all

23  citizens, should submit to these authorities."  (Id. at 30:10-17.)  The passage then goes on to refer

24

---

25  [51] Petitioner tries very hard to interpret Radu's testimony to mean that Fairfield told him her minister said he would have voted for the death penalty.  However, as petitioner repeatedly stresses regarding Juror Fairfield's testimony and memory, what Radu recorded in 2000 shortly after he interviewed Fairfield is much more likely to be a reliable reflection of what she told him than his memory eight years later during his testimony in this court.  Further, neither Juror Fairfield nor Radu testified that the minister "favored the death penalty for those convicted of murder."  (ECF No. 446 at 6:8.)

26

27

28

1    to "civil rulers as being God's ministers and bearing the sword." (Id. at 30:18-20.)  Therefore,

2    according to Professor Garnett, it is frequently used in death penalty debates.  (Id. at 30:20-21.)

3        Professor Garnett went on to identify numerous passages from the Bible that he testified

4    are frequently used in response to questions like that posed by Juror Fairfield and would support

5    her description of what the minister told her.  (Id. at 24-47; EH Ex. 36.)

6                                    v.   Discussion

7        The first question for the court is whether Juror Fairfield's request to her minister

8    amounted to misconduct.  It undoubtedly did.  Jurors were instructed not to speak with anyone

9    about the trial.  Juror Fairfield violated that instruction.  The second, and more important,

10   question is whether Juror Fairfield's contact with and communication from the minister

11   prejudiced petitioner.  Before addressing this question, the court must determine who bears the

12   burden of proving prejudice.

13       Previously, the court held that petitioner bore the burden of showing actual prejudice.

14   (ECF No. 214 at 47.)  This court reiterates that holding.  Assuming the Remmer presumption has

15   viability in this habeas proceeding, petitioner has not shown it should be applied here.  The

16   presumption has been applied in situations in which the third party is interested in the outcome of

17   the proceedings and the information provided risked influencing the verdict.  Because Juror

18   Fairfield's minister does not meet the "interested party" standard set out in Caliendo,[52] this court

19   finds the presumption of prejudice should not be applied under this standard.  Prejudice has also

20   been presumed based on the content of the information provided to the juror.  In the present case,

21   there is insufficient evidence that the information provided to Juror Fairfield might be prejudicial

22   to petitioner.  The court recognizes that this is a difficult issue without clear guidelines.  Juror

23   Fairfield sought out her minister, in violation of the court's instructions, because she had some

24   sort of concerns about her role as a juror at the penalty phase.  Nonetheless, based on the

25   

26   [52] Petitioner does argue that this court should not assume the minister was disinterested.  The fact
     that the minister was aware that Fairfield was on a jury and aware of the subject matter of the trial
27   does not mean he was an "interested" party as defined in Caliendo.  Examples of interested
     parties given by the Court of Appeals include witnesses, potential witnesses, relatives of the
28   defendant, and the prosecutor.  365 F.3d at 696

1    development of the law in this circuit, that, alone, is not enough to trigger the presumption of

2    prejudice.  Accordingly, petitioner bears the burden of proving he was actually prejudiced by

3    Juror Fairfield's conduct.  Dutkel, 192 F.3d at 896 (citing with approval United States v.

4    Williams-Davis, 90 F.3d 490 (D.C. Cir. 1996) (exhortations from juror's husband to "nail"

5    defendant not subject to Remmer presumption)); see also United States v. Bradshaw, 281 F.3d

6    278, 288-89 (1st Cir. 2002).

7        The evidence showed that Juror Fairfield spoke to her minister between the guilt and

8    penalty phases of trial.  She was concerned about the decision she would be asked to make at the

9    penalty phase and asked him what the Bible has to say about the death penalty.  In response, her

10   minister gave her a limited number of Bible verses, possibly with some written commentary, that

11   basically told Fairfield that following the state's law was approved in the Bible.  While Professor

12   Garnett's testimony is interesting, he did not convince the court that it was anything more than

13   possible that the passages he identified were those supplied by Juror Fairfield's minister.  No

14   evidence was presented to give the court any sense that this minister in particular might choose

15   the passages suggested by Professor Garnett.

16        Juror Fairfield's testimony about the import of the minister's writing is the best evidence

17   of what that writing contained.  Because the most logical interpretation of Juror Fairfield's

18   statement is that the writing directed her to follow the law, and it can hardly be said that this

19   message was objectively prejudicial to petitioner, this court finds Juror Fairfield's contact with

20   her minister and consideration of any extraneous evidence did not have a substantial and injurious

21   effect or influence in determining the jury's verdict.  Cf. Fields, 503 F.3d at 781 & n. 19 (use

22   Brecht harmless error standard on federal habeas review of juror misconduct claim).  Claim 42

23   should be denied.

24        9.  Shackling – Claim 44

25        The final claim for which petitioner was granted an evidentiary hearing alleges that jurors

26   saw petitioner shackled.  In 2008, the court heard evidence on this claim and the parties briefed its

27   merits.  (ECF Nos. 421, 437, 446.)  Like claim 42, this court finds petitioner has satisfied section

28   ////

114

1    2254(d) for claim 44.  Therefore, as the court did in the prior section, the merits of claim 44 are

2    also addressed below.

3          Petitioner raised this claim in his second state habeas petition.  (2 SH Pet. at 16-18.)  That

4    petition was denied summarily by the California Supreme Court.

5                          a.   Background and Evidentiary Proffer

6          Prior to the commencement of trial, the judge ruled that petitioner not be shackled "any

7    time he's in the courtroom."  (RT 454:3-4; CT 2375.)  The judge also discussed with sheriff's

8    officers and petitioner's trial counsel limiting petitioner's restraints when he was being

9    transported to court to minimize the chance jurors might see petitioner restrained. (RT 454-457.)

10   Petitioner presented the declarations of two jurors who state they saw petitioner shackled.  Juror

11   Silvey's declaration includes a handwritten paragraph with, what appears to be, her initials.  This

12   paragraph states:

13               I recall seeing Mr. Frye in shackles:  feet, wrists & waist.  I
             recall the defense asking the court to remove them so the jury
14           would not form an opinion.  The shackles gave him the flavor of
             danger.
15

16   (2 SH, Ex. 101, ¶ 9.)

17         Juror Canale stated:

18               During the trial, I saw Mr. Frye in shackles – hands and feet
             – but I do not remember how many times this occurred or whether
19           this occurred inside the courtroom or in the hallway.

20   (2 SH, Ex. 3 to Inf. Reply, ¶ 3.)

21         Respondent's investigator also interviewed Juror Silvey.  Respondent provided the state

22   court with a second declaration from Juror Silvey stating:

23               I saw Mr. Frye shackled in the courtroom during jury
             selection.  I believe the entire jury saw him.  Mr. Hawk, one of
24           Frye's trial attorneys, asked the court to remove the shackles.
             Hawk seemed to make a production of his request.  He said it was
25           unfair to have Mr. Frye remain in shackles because it make [sic]
             him appear more dangerous than he really is.  The judge granted the
26           request and told the jury not to have preconceived ideas about Mr.
             Frye's guilt or innocence.
27

28               At the beginning of jury selection, I saw Mr. Frye sitting
             shackled on a bench near the entrance to the courtroom.  Mr. Frye

                                        115

should not have been there.  I believe the viewing was staged to make Mr. Frye appear more human to the jury.

(2 SH, Inf. Resp., Ex. E, ¶¶ 7,8.)

b.  Legal Standards

The "Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  Deck v. Missouri, 544 U.S. 622, 629 (2005).  To establish a claim of unconstitutional shackling, a petitioner must show that he was physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests.  Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002).  Where a defendant was seen shackled in the courtroom for a significant period of time, courts have found the shackling "inherently prejudicial," and, once it is established that it occurred without adequate justification, the burden shifts to the state to prove the error was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967).[53]  Deck, 544 U.S. at 635; Estelle v. Williams, 425 U.S. 501, 504-06 (1976); Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986).  However, if the defendant was seen shackled outside the courtroom or was seen shackled in the courtroom only briefly, prejudice has not been presumed and the petitioner must prove he was actually prejudiced.  Ghent, 279 F.3d at 1133; Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999); United States v. Olano, 62 F.3d 1180, 1190 (9th Cir. 1995) (jurors brief exposure to defendant in shackles as he entered courtroom requires a showing of actual

---

[53]  Respondent objects to use of the Chapman standard.  He argues simply that because this is a habeas proceeding, this court must consider whether the state court could reasonably have concluded that petitioner failed to show the shackling had a substantial and injurious effect on the verdict, the Brecht harmless error standard.  (ECF No. 616 at 51.)  This court must look to the clearly established Federal law regarding shackling.  That law, set out above, requires use of the Chapman harmless error standard for shackling during trial.  The Brecht harmless error standard is used by federal, not state, courts to consider the effect of a constitutional error.  The Supreme Court adopted this harmless error standard in large part due to concerns of comity and the state's interest in finality of its convictions.  Brecht v. Abrahamson, 507 U.S. 619, 634-35 (1993).  Respondent cites no authority for his assertion that this court should consider Brecht the harmless error standard the California Supreme Court was required to use under "clearly established Federal law."

116

1    prejudice); <u>United States v. Halliburton</u>, 870 F.2d 557, 561-62 (9th Cir. 1989) (jurors' brief view

2    of defendant handcuffed outside courtroom requires showing of actual prejudice); <u>Wilson v.</u>

3    <u>McCarthy</u>, 770 F.2d 1482, 1486 (9th Cir. 1985) (defendant required to make an "affirmative

4    showing of prejudice" from jurors brief exposure to shackles as defendant was leaving the

5    witness stand); <u>United States v. Figueroa-Espinoza</u>, 454 F.2d 590, 591 (9th Cir. 1972) (fact some

6    jurors may have seen defendants in handcuffs when they reentered the courtroom after a recess

7    "was not so inherently prejudicial as to require a mistrial").  Prejudice is not inherent in shackling

8    outside the courtroom because "'[i]t is a normal and regular as well as a highly desirable and

9    necessary practice to handcuff prisoners when they are being taken from one place to another, and

10   the jury is aware of this.'"  <u>Halliburton</u>, 870 F.2d at 561 (quoting <u>United States v. Leach</u>, 429

11   F.2d 956, 962 (8th Cir. 1970)).

12          The Court of Appeals has held that considerations in determining the prejudicial effect of

13   a shackling error include "the appearance and visibility of the restraining device, the nature of the

14   crime with which the defendant was charged and the strength of the state's evidence against the

15   defendant." <u>Larson</u>, 515 F.3d at 1064 (citing <u>Dyas v. Poole</u>, 317 F.3d 934, 937 (9th Cir. 2003)).

16   In addition, the Court of Appeals has considered that more elaborate physical restraints would

17   likely heighten the appearance of the defendant's dangerousness.  <u>Id.</u> (citing <u>Spain v. Rushen</u>, 883

18   F.2d 712, 722 (9th Cir. 1989)).  "Similarly, if the defendant is charged with a violent crime, then

19   the risk of prejudice increases, because shackling 'essentially brand[s] [him] as having a violent

20   nature.'"  <u>Id.</u> (quoting <u>Rhoden</u>, 172 F.3d at 637).

21          This court recognizes that all of these considerations have been set out by the Courts of

22   Appeals.  As such, they do not necessarily reflect "clearly established Federal law as decided by

23   the Supreme Court."  The Court of Appeals recognized this AEDPA limitation on the use of <u>Dyas</u>

24   and other circuit case law.  <u>Walker v. Martel</u>, 709 F.3d 925, 941 (9th Cir. ), <u>cert. denied</u>, 134 S.

25   Ct. 514 (2013).  However, the considerations mentioned by the Court of Appeals in <u>Larson</u> and

26   <u>Dyas</u> are just that, considerations.  They are logical facts to consider when determining whether

27   or not a defendant suffered prejudice from being inappropriately shackled at trial.  This court

28   looks to those listed considerations, among others, when examining the reasonableness of a

117

1    California Supreme Court determination that any constitutional shackling error was harmless.

2                        c.   Application of Section 2254(d)

3        This court finds there is little question that petitioner stated a prima facie shackling claim.

4    He presented the declarations of two witnesses who saw petitioner shackled during trial.  To the

5    extent respondent argues that the record shows otherwise, that is a factual and credibility issue

6    that involves consideration of the merits of petitioner's claim.  If the state court made those sort

7    of factual determinations adverse to petitioner without holding a hearing, then the state court

8    made an "unreasonable determination of the facts" under section 2254(d)(2).  See Hurles v. Ryan,

9    752 F.3d 768, 790-91 (9th Cir. 2014).  In addition, both parties agree the trial court did not order

10   the shackling and, in fact, seemed determined to keep any necessary restraints to a minimum and

11   out of the jury's presence.  The only issue, then, upon which the California Supreme Court could

12   reasonably have denied petitioner's claim is harmless error.

13       This court finds that the state court could not reasonably have determined petitioner's

14   shackling was not harmless.  Without developing the facts underlying petitioner's claim, there is

15   no way to know how many jurors saw petitioner shackled, where they saw him, how long they

16   saw him, or just what sort of shackles he was wearing at the time.  The harmless error analysis

17   necessarily rests upon numerous factual determinations.  The California Supreme Court lacked

18   the evidence it would have needed to determine whether or not the error was harmless.

19   Accordingly, this court finds the state court determination amounted to either an unreasonable

20   application of the law or an unreasonable determination of the facts.  The evidence presented

21   during the 2008 evidentiary hearing may therefore be considered when examining the merits of

22   petitioner's claim.

23                        d.   Merits of Claim 44

24       The evidence produced at the evidentiary hearing from Jurors Silvey and Canale was

25   largely the same as their declarations.  Juror Silvey testified that she saw petitioner's hands

26   shackled to his waist.  (8/19/08 EH RT (ECF No. 351) at 79:18-19.)  She recalled that she saw

27   petitioner sitting on a bench outside the courtroom almost every morning of trial before the jury

28   started deliberating at the guilt phase.  (Id. at 83:14-15; 84:5-8, 12-14.)  She recalled seeing him

                                            118

1  shackled outside the courtroom more than once, but was unsure how many times.  (Id. at 84:12 –

2  85:2.[54])  She also saw him shackled once inside the courtroom.  (Id. at 96:16-19.)  Juror Silvey

3  recalled attorney Hawk asking the court to remove the shackles.  (Id. at 83:19 – 84:2.)  The other

4  jurors were also present when that happened.  (Id.)  However, as respondent points out, and

5  petitioner does not contest, there is no indication in the record of the transcript that Hawk made

6  this statement.  Juror Silvey did not remember seeing petitioner shackled inside the courtroom

7  again.  (Id. at 99:4-7.)  Juror Silvey felt the shackles gave petitioner "just a touch of danger."  (Id.

8  at 85:7-8.)  She also recalled other jurors mentioning the shackles at some point prior to

9  deliberations.  (Id. at 101:13 – 102:9.)

10  Juror Canale also testified.  She recalled seeing petitioner shackled at the wrists and feet

11  outside the courthouse in a parking area.  (Id. at 69:16 – 70:19.)  She also recalled petitioner was

12  wearing an orange jumpsuit at the time.  (Id. at 70:8-10.)  She did not recall if she saw him

13  shackled more than once.  (Id. at 71:6-10.)  Juror Canale did not recall seeing petitioner shackled

14  in the hallway or inside the courtroom.  (Id. at 70:25 – 71:5.)

15  Trial prosecutor Jo Graves testified for respondent.  She did not recall ever seeing

16  petitioner shackled in the presence of the jury.  (8/21/08 EH RT (ECF No. 352) at 167-68, 172:8-

17  17.)  Prosecutor Graves testified that she was in the courtroom at all times the jury was present.

18  (Id. at 172:2-7.)

19  For the sake of this analysis, this court finds that jurors saw petitioner shackled once

20  inside the courtroom at the beginning of trial and at least once in the hallway outside the

21  courtroom.  In addition, the court finds that at least one juror saw petitioner shackled and in a

22  prison jumpsuit outside the courthouse.  When he was seen inside the courthouse, petitioner's

23  hands were shackled and connected to a belly chain.[55]  When he was seen outside the courthouse,

24  _____

25  [54]  In his reply brief, petitioner states that jurors "were forced to walk by [petitioner] almost every
day as he sat shackled before them."  (ECF No. 446 at 20:11-12.)  That statement is not supported
26  by the evidence.  Juror Silvey's testimony was only that she saw petitioner sitting outside the
courtroom more than once.

27  [55]  Petitioner states that Juror Silvey saw petitioner's feet shackled as well.  (ECF No. 421 at 23.)
28  He cites the evidentiary hearing transcript for that statement.  However, at the evidentiary

1    petitioner's feet were shackled as well.  Thus, petitioner has established unconstitutional

2    shackling.  The question is whether that shackling was harmless because it did not have a

3    "substantial and injurious effect or influence" on the jury's verdicts.  See Brecht, 507 U.S. at 638.

4           Shackling has been found to be prejudicial error where the defendant was shackled at the

5    feet during her entire trial, was charged with a violent crime, and the evidence against her was not

6    overwhelming, Dyas, 317 F.3d at 937; where the defendant was painfully shackled for an entire

7    seventeen-month trial, Spain, 883 F.2d 712; where the defendant was shackled during the entire

8    course of his trial, the case involved a violent crime, and the evidence was disputed, Rhoden, 172

9    F.3d 633; where the defendant was shackled during the entire penalty phase after not being

10   shackled at the guilt phase, Elledge v. Dugger, 823 F.2d 1439, 1451-52 (11th Cir.), withdrawn in

11   part on other grounds, 833 F.2d 250 (11th Cir. 1987).  Unconstitutional shackling was found

12   harmless, on the other hand, where there was overwhelming evidence of guilt.  Wilson v. United

13   States, 344 F.2d 166 (D.C. Cir. 1964).

14          With respect to the guilt phase, the in-court shackling occurred very early in the trial.  It is

15   unlikely jurors would have considered this one in-court occurrence to indicate petitioner's

16   dangerousness when he was not shackled for the remainder of the proceeding.  This case is not

17   unlike the situation in Larson v. Palmateer, 515 F.3d 1057 (9th Cir. 2008).  There, the trial judge

18   ordered the pro se defendant to wear a leg brace for two of the six days of his trial.  515 F.3d at

19   1064.  The Court of Appeals was "troubled" by the trial court's failure to make a finding of

20   necessity for the brace on the record.  Id.  However, the court felt that the fact the defendant was

21   allowed to move around the courtroom unencumbered for four of the six days of his trial

22   "mitigated the prejudicial impact of the trial court's decision to use the leg brace."  Id.  The Court

23   held the limited shackling was harmless under Brecht.  Id. at 1064-65.  Petitioner's in-court

24   shackling in the present case was far less intrusive than that found harmless in Larson.

25   ////

26   _____

27   hearing, Juror Silvey did not recall seeing petitioner's feet shackled.  (8/19/08 EH RT at 79:20-
     22.)  In her declaration submitted to the state court, Juror Silvey had said she had also seen
     petitioner's feet shackled.  (2 SH, Ex. 101, ¶ 9.)  Whether the shackling included petitioner's feet

28   or not, the court's analysis of this claim is the same.

1    The shackling occurring outside the courtroom could not have come as any surprise to the

2    jury.  Petitioner was charged with two capital murders.  Objectively, shackling during transport of

3    someone on trial for such violent and egregious crimes would have seemed reasonable and

4    ordinary.  The court recognizes that both Juror Silvey and Canale recalled the shackling, which

5    indicates it had some impact upon them.  See Rhoden, 172 F.3d at 637 (court considers fact juror

6    remembered the shackles six years after trial and recalled other jurors commenting on them).

7    However, as discussed above, the guilt phase evidence against petitioner was substantial.  This

8    court finds that any effect of shackling on the guilt phase verdict would have been insubstantial.

9    The same is true for the penalty phase.[56]  The court recognizes that the considerations at

10   the penalty phase are different.  The penalty phase determination is more amorphous and guided

11   by less precise factors than is the guilt phase determination.  Jurors may consider the defendant's

12   character and mercy.  That said, as discussed above regarding petitioner's claim of ineffective

13   assistance of counsel at the penalty phase, the penalty phase defense had serious flaws.  While the

14   nature of the penalty phase itself made it perhaps a closer case than the guilt phase decision, the

15   mitigating evidence was insubstantial.  Moreover, the only in-court shackling shown occurred

16   many months before the jurors deliberated at the penalty phase.  Any out-of-court shackling

17   would not have affected the verdict substantially.  This court finds shackling would have had

18   little, if any, effect on juror's consideration of the penalty phase evidence.  Any error was

19   harmless with respect to the penalty phase as well.  Claim 44 should be denied.

20   V.  Conclusion

21   Based on the foregoing findings, and good cause appearing, IT IS HEREBY

22   RECOMMENDED that:

23       1.   Petitioner's claims 2, 3, 25, and 37 be denied because the California Supreme Court's

24            rejection of those claims was not contrary to law or unreasonable as defined in 28

25            U.S.C. § 2254(d).

26   ////

27   _____

28   [56]  Petitioner also argues the shackling would have affected petitioner's mental health and ability
to participate in his trial.  However, he presents no evidence to support those conclusions.

2. The allegations in petitioner's claims 4, 5, and 7 that were the subject of the evidentiary hearing ordered previously be denied because the California Supreme Court's rejection of those claims was not contrary to law or unreasonable as defined in 28 U.S.C. § 2254(d).

3. The evidentiary hearing proceedings on petitioner's claims 28 and 29 resume because the California Supreme Court's denial of those claims was contrary to law or unreasonable as defined by 28 U.S.C. § 2254(d).

4. The allegations in petitioner's claim 42 that Juror Fairfield committed misconduct by communicating with her minister be denied on the merits.

5. Petitioner's claim 44 be denied on the merits.

6. Petitioner's November 5, 2010 Motion to Expand the Record and for an Evidentiary Hearing on Claim 37 (ECF No. 549) be denied.

The December 4, 2013 findings and recommendations are vacated.

These amended findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  The objections made to the December 4, 2013 findings and recommendations will be considered objections to these amended findings and recommendations.  Within thirty days after being served with these amended findings and recommendations, any party may file supplemental objections to the portions of these amended findings and recommendations that differ from the December 3, 2013 findings and recommendations.  Those amended portions can be found in the following sections: (1) I.  Legal Standards – changes made to n. 5 at p. 13; (2) II.A. Supremacy Clause – changes at pp. 17-21; (3) II.B. Article III – changes at pp. 21-22; (4) IV.A. Sixth Amendment Claims – addition of n. 8 at p. 27; (5) IV.A.2.a.  Inappropriate Pleading Standard – changes at pp. 32-37; (6) IV.A.3.a.i.(a) Appointment of Counsel – changes to n. 19 at p. 42; (7) IV.A.3.b. Discussion – changes at pp. 65-66; (8) IV.A.8.b. Legal Standards – changes at pp. 107-112; (9) IV.A.8.d.(v) Discussion – changes at pp. 119-120.   Objections shall be filed with the court and a copy served on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Amended Findings and Recommendations."  The parties are advised that failure to file objections within the

1  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

2  F.2d 1153 (9th Cir. 1991).

3  Dated:  January 21, 2015

4  _____
   CAROLYN K. DELANEY

5  UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10  Frye 2254d.fr

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28